Nos. 23-13085 & 23-13095

United States Court of Appeals

*for the*

Eleventh Circuit

IN RE: GEORGIA SENATE BILL 202

_____

On Appeal from the United States District Court

for the Northern District of Georgia

No. 1:21-mi-55555 (Broulee, J.)

**BRIEF OF CENTER FOR ELECTION CONFIDENCE, INC.
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANTS AND
INTERVENOR-DEFENDANTS-APPELLANTS**

Stephen P. Fuller
**Fuller Sloan**
6455 East Johns Crossing
Suite 400
Johns Creek, GA 30097
Phone (770) 622-4700
Direct (770) 622-4708
*Counsel for* Amicus Curiae

**Nos. 23-13085 & 23-13095**
*In re: Georgia Senate Bill 202*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. Proc. 26.1 and 29 and 11th Cir. Local R. 26.1-1, Counsel for Amicus Curiae Center for Election Confidence, Inc. (CEC) certifies that, in addition to those persons identified by Plaintiff-Appellees, Defendant-Appellants, and Intervenor-Defendant-Appellants, the following persons may have an interest in the outcome of this appeal:

1.  Center for Election Confidence, Inc. (Amicus Curiae)

2.  Stephen P. Fuller (Counsel for Amicus Curiae)

Amicus further certifies that it is a non-profit, 501(c)(4) organization. It is not a publicly held corporation, has no parent companies or subsidiaries, and it neither owns, nor is owned by, any of the parties in this case.


*/s/ Stephen P. Fuller*
Stephen P. Fuller
*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Table of Contents ................................................................................................. i

Table of Authorities............................................................................................. ii

Statement of Issues...............................................................................................1

Interest of Amicus Curiae ....................................................................................2

Summary of the Argument ...................................................................................4

Argument...............................................................................................................7

      A.     The Plain Text of the Materiality Provision Limits Application to Voter Qualifications and Registration ................................................8

      B.     The District Court Did Not Have the Benefit of More Recent Circuit Court Opinions .......................................................................14

      C.     All States in the 11th Circuit Have Requirements Similar to Georgia's Birthdate Requirement.......................................................16

Conclusion ..........................................................................................................21

Certificate of Compliance ...................................................................................23

Certificate of Service ..........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ball v. Chapman*,
289 A.3d 1 (Pa. 2023) ...................................................................................2

*\*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021).............................................................................3, 6, 20

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001).....................................................................................13

*\*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008).................................................................................6, 19

*Dep't of Homeland Sec. v. MacLean*,
574 U.S. 383 (2015).....................................................................................12

*Disability Rights Florida v. Secretary, State of Florida*,
No. 23-13727 (11th Cir. 2023) ......................................................................3

*In re Georgia Senate Bill 202*,
2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ....................................5, 10, 15, 21

*Lanier v. U.S. Atty Gen.*,
631 F.3d 1363 (11th Cir. 2011) ....................................................................11

*Migliori v. Cohen*,
36 F.4th 153 (3d Cir.), *judgment vacated sub nom* Ritter v.
Migliori, 143 S. Ct. 297 (2022) ......................................................................2

*\*Penn. State Conf. of NAACP Branches v. Schmidt*,
97 F.4th 120 (3rd Cir. 2024)................................... 5, 8, 9, 10, 11, 14, 15, 16, 19

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ......................................................................9

*Stanovsek v. Holder*,
768 F.3d 515 (6th Cir. 2014) .......................................................................13

*Vote.org v. Byrd*,
___ F.Supp.3d ___, 2023 WL 7169095 (N.D. Fla. 2023) ....................................5

*Vote.org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) .......................................................5, 9, 16

\*Vote.org v. Georgia State Election Bd.*,
661 F. Supp. 3d 1329 (N.D. Ga. 2023) ...............................................18

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ...........................................................................13

## Statutes

52 U.S.C. § 10101 .................................................. 1, 4, 7, 11, 12, 13, 14

Ala. Code § 17-11-4 .............................................................................17

Ala. Code § 17-11-7 .............................................................................17

Ala. Code § 17-11-9 .............................................................................17

Ala. Code § 17-11-10 ...........................................................................17

Fla. Stat. § 101.62 ...............................................................................17

Fla. Stat. § 101.65 ..........................................................................17, 18

Fla. Stat. § 101.6103 ...........................................................................18

Ga. Code Ann. § 21-2-381 ...................................................................18

Ga. Code Ann. § 21-2-384 ...................................................................19

Ga. Code Ann. § 21-2-385 ...............................................................9, 19

## Other Authorities

Frank H. Easterbrook, *The Role of Original Intent in Statutory
Construction*, 11 Harv. J.L. & Pub. Pol. 59 (1988) ...........................10

H.R. Rep. No. 88-914 (Nov. 20, 1963), *reprinted in* 1964
U.S.C.C.A.N. 2391 ..............................................................................10

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..............................................................11, 12, 13

## STATEMENT OF ISSUES

1. Whether the district court erred when it facially enjoined part of a Georgia election law, citing the First Amendment, that prohibits conduct rather than expression.

2. Whether the district court erred when it enjoined, as violating the Materiality Provision of the Civil Rights Act, enforcement of Georgia's law requiring absentee voters to include their birthdate on the outer, return envelope of an absentee ballot. *See* 52 U.S.C. § 10101(a)(2)(B).

This amicus brief seeks to educate the Court solely on the second issue.

## INTEREST OF AMICUS CURIAE[1]

Center for Election Confidence, Inc. (CEC) is a non-profit organization that promotes ethics, integrity, and professionalism in the electoral process. CEC works to ensure that all eligible citizens can vote freely within an election system of reasonable procedures that promote election integrity, prevent vote dilution and disenfranchisement, and instill public confidence in election systems and outcomes. To accomplish these objectives, CEC conducts, funds, and publishes research and analysis regarding the effectiveness of current and proposed election methods. CEC is a resource for lawyers, journalists, policymakers, courts, and others interested in the electoral process. CEC also periodically engages in public-interest litigation to uphold the rule of law and election integrity and files *amicus* briefs in cases where its background, expertise, and national perspective may illuminate the issues under consideration.

With respect to the intersection of election integrity laws and the Materiality Clause of the Civil Rights Act, CEC (when previously named Lawyers Democracy Fund) submitted an amicus brief to the U.S. Supreme Court in *Ritter v. Migliori*, advocating for vacatur of the Third Circuit's unprecedented opinion in *Migliori v.*

---

[1] Center for Election Confidence sought consent to file this amicus brief but at time of filing, has received a reply – in the affirmative – only from Intervenor-Defendant-Appellants.

2

*Cohen*, 36 F.4th 153 (3d Cir.), *judgment vacated sub nom Ritter v. Migliori*, 143 S. Ct. 297 (2022). CEC also submitted an amicus brief to the Supreme Court of Pennsylvania in *Ball v. Chapman*, 289 A.3d 1 (Pa. 2023), advocating that the state high court respect the policy judgments of the state's General Assembly and enforce the signature and date requirement for absentee ballots. Both courts ruled in favor of the positions advocated by CEC. Relevant for this Court, CEC also filed an amicus brief in *Disability Rights Florida v. Secretary, State of Florida*, currently pending a hearing by the merits panel. *See* Doc. No. 77 in Case No. 23-13727.

As CEC argued in the U.S. Supreme Court, the position advocated by the Plaintiffs-Appellants would effectively replace the well-established *Anderson-Burdick* test with an unprecedented and erroneous legal theory so broad in its import that it would invalidate an array of quotidian ballot-casting rules and open a Pandora's Box of novel legal challenges to reasonable election administration methods around the country. It also would countermand the Supreme Court's ruling in *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021). For these reasons, CEC's interest in preserving sound jurisprudence and reasonable regulation of election administration is directly implicated.

## SUMMARY OF THE ARGUMENT

Election administration laws can be divided into several distinct categories, including:

(a) The pre-election phase: laws regulating voter qualifications, voter registration, and voter rolls;

(b) The election phase: laws regulating ballots and vote casting; and

(c) The post-election phase: laws regulating vote tabulation and reporting.

Congress intended for the Materiality Clause of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"), to apply to the first category, voter qualifications and registration, to preempt certain, specific practices states employed to discriminate against prospective voters. Congress never intended for the Materiality Provision to apply to other categories of election administration laws, especially those related to vote casting and ballots.

Efforts, such as the District Court's decision, to expand the Materiality Provision into the vote-casting process ignore Congressional limitations and endanger *all* state laws enacted to safeguard the integrity of the ballot box and instill public confidence in election procedures and results. The Materiality Provision has not been applied to those phases of election administration in the sixty years since its enactment. Yet, Appellees'/Cross-Appellants' legal theory, as adopted by the District Court, would likely invalidate an array of essential and/or desirable state

rules designed to protect the integrity of the vote-casting, tabulation, and reporting processes, leaving large gaps in election administration.

Moreover, by applying the Materiality Provision to a broad range of vote-casting rules, the District Court's decision effectively renders *voter qualification* the sole acceptable state interest in regulating ballots and thereby prohibits virtually any regulation of how a qualified voter *casts a ballot*. *In re Georgia Senate Bill 202*, 2023 WL 5334582, \*9-10 (N.D. Ga. Aug. 18, 2023) (returning an absentee ballot and completing the outer envelope are both acts "requisite to, or essential to, completion of the act of voting"). That theory would leave states no legitimate room to impose any mundane regulations on balloting such as marking ballots with pens or pencils (not crayons); utilizing a standard envelope to mail ballots; signifying on absentee envelopes that a voting ballot is enclosed; and requiring, or barring improper markings on, a secrecy envelope. These and other rules are immaterial to determining a voter's qualifications to register but indispensable to sound election administration.

The District Court did not have the benefit of several well-reasoned opinions affirming states' authority to enact laws governing the vote-casting process and rejecting application of the Materiality Provision to those processes. *See Penn. State Conf. of NAACP Branches v. Schmidt*, 97 F.4th 120 (3rd Cir. 2024); *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023); *Vote.org v. Byrd*, ___ F. Supp. 3d ___, 2023

WL 7169095 (N.D. Fla. 2023). The Third Circuit's *Schmidt* decision distinguishes between voter registration and qualifications, on the one hand, and the vote-casting process on the other. The Fifth Circuit's and Northern District of Florida's decisions find a wet signature requirement for voter registration forms to be material, and thus outside the purview of the Materiality Provision.

The Supreme Court, too, has clarified that courts must afford state legislatures broad deference when evaluating whether certain practices violate federal statutory or constitutional standards. Indeed, the Supreme Court recognizes that states have a "strong and entirely legitimate" interest in ensuring the integrity of an election and building public confidence "in the fairness of elections and the perceived legitimacy of the announced outcome." *Brnovich*, 594 U.S. at 672. *See also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008). Those legitimate state interests are subverted under the District Court's application of the Materiality Provision which focuses solely upon voter registration.

Center for Election Confidence urges this Court to reject Appellees' and Cross-Appellants' attempts to expand the reach of the Materiality Provision beyond its intended application to voter qualification and registration and overturn the District Court's decision.

<u>**ARGUMENT**</u>

The Materiality Provision clearly applies to the processes by which states determine voter eligibility and the qualifications to register to vote, not to rules governing the process by which ballots are cast or counted. The Provision reads, in pertinent part:

> No person acting under color of law shall…(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining **whether such individual is qualified under State law to vote** in such election.

52 U.S.C. § 10101(a)(2)(B) (emphasis added).

When evaluating claims that a state's election administration practices violate the Materiality Provision, courts must first determine where the practices fit within the electoral process. If the practices do not determine voter qualifications or registration, the Provision does not apply. Efforts to expand the application of the Materiality Provision to include state laws regulating the casting of ballots threaten all state laws governing how citizens must return ballots if those laws are not "material" to the individual's qualification to vote. Such a position is illogical and countermands the Supreme Court's *Crawford* and *Brnovich* decisions, both of which sustained state election laws regulating vote-casting (without reference to the Materiality Provision).

State laws enacted to enhance public confidence and enhance integrity in elections can be harmoniously interpreted with the Materiality Provision (and other existing federal standards, such as the National Voter Registration Act). Courts that recognize the text, history, and purpose of the Provision understand Congress enacted it to prevent very specific practices and discrimination states used to prevent individuals from registering to vote. The Provision does not apply to any other category of election law, such as those regulating the casting or return of ballots, and ballot tabulation and reporting. When courts place the Materiality Provision within the proper category of election laws, they can harmonize federal and state standards along with Supreme Court jurisprudence.

### A.    The Plain Text of the Materiality Provision Limits Application to Voter Qualifications and Registration

The Materiality Provision applies only to "any application, registration, or other act requisite to voting" and only if an "error or omission is not material in determining whether such individual is qualified under State law to vote in such election." Phrases or words like "material," "error or omission," and "in determining" are significant in the Provision. As identified by the Third Circuit, those words and phrases "drive[] the interpretation of the rest of the statute.…But the text does not say the error must be immaterial 'to' whether an individual is qualified to vote. It uses the words 'in determining' and that choice must mean something." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 131.

8

Generally, the Provision targets "the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms," and it therefore "forbids a person acting under color of law to disqualify a potential voter because of his or her failure to provide unnecessary information on a voting application." *Schwier v. Cox*, 340 F.3d 1284, 1294, 1296-97 (11th Cir. 2003).

Congress wanted to eliminate specific types of practices state and local registrars used to reject applicants, such as "failing to calculate their age to the day, misspelling Louisiana, underlining Mr. when it should have been circled, or the Catch-22 of identifying their skin color as Negro instead of brown, or brown instead of Negro." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 126 (cleaned up) (citing the Report of the U.S. Commission on Civil Rights 1963). Other registrars required applicants to "analyze long sections of the Constitution" in addition to rejecting registrations for "simple misspellings." *Callanen*, 89 F.4th at 487 (citing H.R. Rep. No. 88-914). Because of the differing standards, or variances in how individual registrars applied state standards, Congress wanted both to protect minorities' right to vote and for state and local election officials to

> (1) apply standards, practices, and procedures equally among individuals seeking to register to vote; (2) disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote; (3) administer literacy tests in writing.

9

H.R. Rep. No. 88-914 (Nov. 20, 1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2491.[2]

      Appellees and Cross-Appellants want courts to apply the Materiality Provision beyond voter registration to include the birthdate requirements for absentee ballots. *In re Georgia Senate Bill 202*, 2023 WL 5334582, at *10; Ga. Code Ann. § 21-2-385(a). The logical end of such a theory would be that the Materiality Provision preempts a whole host of state "ballot-casting rules" even where they are not "related to a voter's qualifications to vote." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 134-35.[3] Citing to Pennsylvania law, the Third Circuit questioned whether laws requiring secrecy envelopes improperly marked to be set aside, voters to use the "same pen or pencil" when completing their ballots, voters to complete the outer envelope, or laws barring overvoting would stand. *Id.* at 134. The court observed that the Appellees'/Cross-Appellants' legal theories would ensure that the Materiality Provision "would preempt many [ ] ballot-casting rules

---

[2] The history behind the Materiality Provision cannot supplant a court's textual analysis, but it can help explain why Congress used certain terms. Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 Harv. J.L. & Pub. Pol. 59 (1988). Here, the history and text align to render a logical and compelling statutory interpretation.

[3] *See also id.* at 129, where the Third Circuit recites the major holdings of the underlying decision, especially the determination that dating and signature requirements were not "material to the act of voting" because neither the signature nor the date were used to "determin[e] a voter's qualification under Pennsylvania law."

because none are related to a voter's qualifications." *Id.* at 134-35. Because of this overbreadth, the Third Circuit concluded that the Materiality Provision "applies to determinations that affect a voter's eligibility to cast a ballot" and "its application necessarily is limited to 'records or papers' used in that process." *Id.* at 132.

Several canons of statutory construction guide court interpretations of the Materiality Provision. Expanding the analysis to examine § 10101 as a whole,[4] Congress understood the distinction between voting qualifications and vote casting. Congress used similar phrases in (2)(A) to the Materiality Provision, prohibiting states from applying "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision" when officials are "determining whether any individual *is qualified* under State law or laws to vote in any election." 52 U.S.C. § 10101(a)(2)(A) (emphasis added). Subsection (2)(C) bars literacy tests as qualifications for voting in any election, unless the jurisdiction adheres to certain procedures. *Id.* § 10101(a)(2)(C). In subsection (b), Congress barred anyone from "interfering with the right … to vote or to vote as he may choose" through intimidation, threats, coercion, or attempts to do so for federal

---

[4] *See Lanier v. U.S. Att'y Gen.*, 631 F.3d 1363, 1365-66 (11th Cir. 2011) and Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167-69 (Ch. 24, Whole-Text Canon) (2012).

elected officials. *Id.* § 10101(b). Between subsections (a)(2) and (b), then, Congress distinguished between determining whether someone is qualified to vote and casting votes.

Finally, subsection (e) confirms that Congress understood how these distinct voting-related events progress because subsection (e) defines the term "vote" to include both "registration or *other action* required by State law *prerequisite* to voting" as well as "casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." *Id.* § 10101(e) (emphasis added). That is, Congress knew how to distinguish between registration and voting. *See, e.g.*, *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015).[5]

Appellees'/Cross-Appellants' position disregards the statutory language and renders the "any …. other act requisite to voting" language superfluous.[6] Indeed, Congress had no reason to employ the list "application, registration, or other act requisite to voting" if it intended the Materiality Provision to reach all voting-related papers, especially since subsection (e) already defined the term "vote" to include "all

---

[5] In a dispute about whistleblower protections and the inclusion of the term "'law' in close connection with the phrase 'law, rule, or regulation' provides the necessary 'clear showing' that 'law' does not include regulations." 574 U.S. at 393-94. Such semantics demonstrated that "Congress knew how to distinguish between regulations that had the force and effect of law and those that did not." *Id*. at 394.

[6] *See* Scalia & Garner, *Reading Law* 174-79 (Ch. 26, Surplusage Canon).

action necessary to make a vote effective including, but not limited to, registration….” 52 U.S.C. § 10101(e); *see also id*. § 10101(a)(2)(B) (adopting subsection (e)’s definition). If Congress intended the theory pressed by Appellees/Cross-Appellants, that “result could quite easily have been obtained by saying something much simpler,” *Stanovsek v. Holder*, 768 F.3d 515, 517 (6th Cir. 2014), such as that the right to vote may not be denied “because of an error or omission on any record or paper relating to voting.” 52 U.S.C. § 10101(a)(2)(B). If that is what Congress intended, it is curious that it used a “decidedly awkward way of expressing [that] intent” with a cumbersome three-part list. *Will v. Mich. Dep’t of State Police*, 491 U.S. 58, 64 (1989).

Focusing on the text of (a)(2), “where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.” *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001).[7] The specific words in the text prohibit state and local officials from denying the right to vote “because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting” and clarifies that the error or omission must not be material when determining if the prospective voter “is qualified under

---

[7] Justice Kennedy explaining the application of *ejusdem generis* to statutory construction. *See also* Scalia & Garner, *Reading Law* 199-213.

State law to vote." 52 U.S.C. § 10101(a)(2)(B). Specific words, like "application" and "registration" necessarily limit the types of "errors or omissions" to the "records or papers" which are the subject of the statute. "Those specific words limit the scope of the relevant paperwork in a way that coheres with the statute's voter qualification focus." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 132.

### B.    The District Court Did Not Have the Benefit of More Recent Circuit Court Opinions

The District Court issued its decision on August 18, 2023. Nearly four months later, the Fifth Circuit released its decision in *Vote.org v. Callanen*, and over seven months later, the Third Circuit released its opinion in *Penn. State Conf. of NAACP Branches*. Both Circuits reached the opposite conclusion reached by the District Court in this case.

The Fifth Circuit found that Texas' law requiring wet signatures on voter registration forms was material and, thus, consistent with the Materiality Provision. The Third Circuit upheld Pennsylvania's requirements that outer envelopes enclosing absentee ballots be signed and dated. The Third Circuit concluded that the Materiality Provision does not apply to balloting. Because the Circuits released these opinions after the Northern District of Georgia, the court did not have the benefit of the appellate courts' analysis of the Materiality Provision.

The District Court in this case heavily relied on the district court's underlying decision in *Penn. State Conf. of NAACP Branches.* The District Court, for example,

14

used the Western Pennsylvania District's reasoning to reject Appellants' position that the plain language applied only to voter qualifications and to support its conclusion that returning an absentee ballot and completing the outer envelope are both acts "requisite to voting." *In re Georgia Senate Bill 202*, 2023 WL 5334582, at *9-10.

The Third Circuit's decision reversed these holdings. After discussing why Congress enacted the Materiality Provision, the court noted that states "have separate bodies of rules for separate stages of the voting process." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 129-30. The two specific stages referenced by the court includes "voter qualification, [which] deals with *who* votes" while the other stage "deals with *how* ballots are cast by those previously authorized to vote." *Id*. at 130 (emphases original). Reading the whole context of the statute, the Third Circuit concluded that the "Materiality Provision targets laws that restrict who may vote. It does not preempt state requirements on how qualified voters may cast a valid ballot." *Id.* at 131. Because the text does not preempt state requirements on how qualified voters may cast ballots, the Third Circuit cabined the Materiality Provision to the "process of determining a voter's *eligibility* to cast a ballot." *Id*. at 135 (emphasis original).

The Fifth Circuit rejected a challenge to a Texas law requiring prospective voters to physically sign their *registration form*—called a "wet signature." Texas used the wet signature requirement to ensure that voters understood state eligibility

15

requirements, such as "age, citizenship, residency, capacity, and criminal history." *Callanen*, 89 F.4th at 487. The Legislature wanted the applicant both to certify that he met the qualifications and understood the consequences for fraudulently registering. *Id*. at 488-89. The Materiality Provision clearly applied to this registration requirement. Because Texas justified the wet signature requirement as advancing voter integrity, the Fifth Circuit found it was "legitimate ... and ... a material requirement." *Id.* at 489. Public confidence and election integrity are legitimate state goals, signatures are material to achieving those goals, and, thus, consistent with the Materiality Provision.

### C.    All States in the 11th Circuit Have Requirements Similar to Georgia's Birthdate Requirement

Equally concerning is what would happen to other state confidence-building and election integrity laws in states across the 11th Circuit if the District Court's analysis is upheld. Alabama, Florida, and Georgia all have laws regulating the act of voting that, like those challenged in the instant litigation, have little-to-no relevance—i.e. materiality—to determining the voter's *qualifications* to vote.[8] If the District Court's opinion stands, each of these laws would automatically be suspect.

Alabama, for example, requires prospective absentee voters to list their name, residence address, or "such other information necessary to verify that the applicant

---

[8] *See, e.g.*, *Penn. State Conf. of NAACP Branches*, 97 F.4th at 129.

is a registered voter" when applying for an absentee ballot. Ala. Code § 17-11-4. Similarly, when returning the absentee ballot, the state requires voters to include the affidavit on the outer envelope, state their place of residence, state their reason for voting absentee, sign the ballot, include the signatures of two witnesses or the signature of a notary public, and state – like Georgia – the *voter's date of birth*. *Id.* § 17-11-7; *see also id.* § 17-11-9 (reiterating the requirement that the voter have his signature on the outer envelope witnessed by two individuals or notarized).[9]

A voter requesting a vote-by-mail or absentee ballot in Florida may do so in person, in writing, by telephone, or through the supervisor of election's website. If requesting the ballot in person, through the telephone, or through the website, the voter must provide either his state-issued identification number (driver's license or ID card) or the last four digits of his social security number. If requesting the ballot in writing, he must provide his identification number and sign the request. Fla. Stat. § 101.62.

When returning an absentee ballot, Florida law requires voters to sign their name on the outer return envelope to allow officials to match the signatures with those in the voter files. Fla. Stat. § 101.65. The same law limits voters to marking

---

[9] Ala. Code § 17-11-10(c)(2) prohibits election officials from opening an outer envelope or counting the ballot if it is unsigned, unmarked, or lacking the witness or notary signature.

17

"only the number of candidates or issue choices for a race as indicated on the ballot" and requires voters to "completely fill out the Voter's Certificate on the back of the mailing envelope." *Id*. The Voter's Certificate requires the voter to print his name, swear (or affirm) that he is qualified and has not voted more than once, and then to sign and list his residence address. Fla. Stat. § 101.6103. While material to identifying the voter who is casting the absentee ballot, these requirements are not material to determining that voter's qualification to register because the voter already has been registered to vote.

Voters in Georgia who wish to cast absentee ballots must first apply to the relevant officials using forms made available by the Secretary of State. The forms require voters to provide their "date of birth, address as registered, address where the elector wishes the ballot to be mailed, and the number of his or her Georgia driver's license or identification card." Ga. Code Ann. § 21-2-381. That same provision requires voters to sign the absentee ballot application form "with a pen and ink." *Id*.[10] In addition to requiring absentee voters to list their birthdates, Georgia requires each voter to sign an oath, affirm his eligibility to participate in the relevant

---

[10] In an unrelated case, plaintiffs have challenged the "pen and ink" signature requirement for absentee ballot application forms alleging that it also violates the Materiality Provision. *Vote.org v. Georgia State Election Bd.*, 661 F. Supp. 3d 1329 (N.D. Ga. 2023) (finding that plaintiffs have standing and denying defendants' motion to dismiss).

election and include his identification number (driver's license, state issued identification, or social security number). Ga. Code Ann. § 21-2-385.[11]

Voters requesting an absentee ballot are properly registered. That is to say, the relevant election official has already determined the voter satisfies the state's eligibility requirements and enrolled him on the list of voters. When voters fail to follow the rules for requesting or casting an absentee ballot, those individuals "are not denied the right to vote." *Penn. State Conf. of NAACP Branches*, 97 F.4th at 135. Instead, when an individual fails to follow a state's rules for requested or casting an absentee ballot, "th[at] voter has failed to follow a rule … that renders his ballot defective under state law." *Id*.

States have a strong, legitimate interest in protecting "the integrity and reliability of the electoral process." *Crawford*, 553 U.S. at 190, *citing Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 788 n.9 (1966). In *Crawford*, the Supreme Court sustained Indiana's requirement that voters show state-issued identification prior to casting a ballot. Yet, showing identification at the time an individual attempts to vote is immaterial to determining whether that individual is qualified.

Similarly, in *Brnovich*, the Supreme Court sustained two restrictions on voters. The first required voters choosing to cast ballots in-person to do so in their

---

[11] Ga. Code Ann. § 21-2-385, in part, is the subject of this appeal. Ga. Code Ann. § 21-2-384(b)-(c) includes the text of the oath absentee voters must sign.

own precincts. The second restricted individuals who collect absentee or mail-in ballots to immediate family members or caregivers, election officials, and postal workers. When sustaining the latter restriction, the Court recognized the broad authority states have to combat fraud and enhance public confidence in elections. In doing so, it rejected the Ninth Circuit's position that allegations of fraud "were tenuous in large part because there was no evidence that fraud in connection with early ballots had occurred in Arizona." *Brnovich*, 594 U.S. at 685-86. States may also legislate to prevent pressure and intimidation, and even enact legislation to prevent problems from occurring. *Id*. at 686 (Arizona was likely aware of problems in other states and the "Legislature was not obligated to wait for something similar to happen closer to home.")

Like the birthdate requirement in the instant case, the measures enacted by Indiana and Arizona applied only to voters who were already registered. That is to say, the relevant election officials determined the voters satisfied eligibility requirements and enrolled them. The measures affirmed by the Supreme Court, then, were not "material" for determining whether an individual is qualified to vote – showing identification at a polling location or to request an absentee ballot only

proves the person doing so is, in fact, who he claims to be; his name should already appear on the rolls – nor was the limitation on who may return a ballot.[12]

Because the Supreme Court has upheld state laws protecting the integrity of the voting process, the Materiality Provision cannot preempt them. The danger in the Provision's expansive reading, as interpreted by the District Court, is that nearly every state law governing how voters can request, mark, or return absentee ballots or vote in-person ballots will be subsumed within the Provision's requirements. This is not the end that Congress envisioned and certainly not consistent with the Supreme Court's decisions in *Crawford* and *Brnovich*.

<u>CONCLUSION</u>

The Materiality Clause's text limits its application to the voter registration process. Congress enacted it to prevent states from demanding information irrelevant to determining a voter's qualifications under state law, such as the voter's age to the month and day, misspelling a state's name, or circling options when they should have been underlined. Congress did not intend for the Provision to apply to laws

---

[12] The Materiality Provision arguably may not apply to showing an identification to vote in-person, as such an act relates neither to a "paper or record," though it gives a voter access to a paper in the form of a ballot in the polling place. But the Arizona law limits who may return a ballot, which under the opinion of the District Court, would be considered a "paper or record … requisite to voting" since it found a right within the provision for voters to have "one's ballot 'counted and included in the appropriate totals of votes" which includes "all action necessary to make a vote effective." *In re Georgia Senate Bill 202*, 2023 WL 5334582, at *9.

governing the vote-casting process and Supreme Court decisions reflect states' authority to protect the integrity of the electoral process.

For these reasons, the Court should reverse the decision of the District Court.

Dated:  July 8, 2024

Respectfully submitted,

*/s/* Stephen P. Fuller
Stephen P. Fuller
**Fuller Sloan**
6455 East Johns Crossing
Suite 400
Johns Creek, GA 30097
Phone (770) 622-4700
Direct (770) 622-4708
*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because the brief contains 4,830 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:   July 8, 2024                                     */s/ Stephen P. Fuller*

23

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 8, 2024, the Brief of *Amicus Curiae* Center for Election Confidence, Inc. was filed electronically through the appellate CM/ECF system with the Clerk of the Court, which will automatically send e-mail notification of such filing to all attorneys of record.

Dated:  July 8, 2024                                    */s/ Stephen P. Fuller*

24