No. 23-13095; No. 23-13085

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## IN RE: GEORGIA SENATE BILL 202

_____

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:21-mi-55555 (Hon. J.P. Boulee)

_____

## BRIEF OF PLAINTIFFS-APPELLEES
### SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, DELTA SIGMA THETA SORORITY, INC., GEORGIA ADAPT, GEORGIA ADVOCACY OFFICE, GEORGIA MUSLIM VOTER PROJECT, LATINO COMMUNITY FUND OF GEORGIA, THE ARC OF THE UNITED STATES, WOMEN WATCH AFRIKA

_____

Leah C. Aden
Alaizah Koorji
John S. Cusick
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Anuja Thatte
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street, NW
Washington, DC 20005
(202) 682-1300

Cory Isaacson
Caitlin May
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
(678) 981-5295

Davin M. Rosborough
Sophia Lin Lakin
Jonathan Topaz
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7836

Bradley E. Heard
Pichaya Poy Winichakul
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30031
(404) 521-6700

Debo P. Adegbile
WILMER CUTLER PICKERING HALE AND
DORR LLP
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Additional Counsel Listed on Inside Cover*

George P. Varghese
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Tania Faranasso
Laura E. Powell
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, Georgia Muslim Voter Project, Women Watch Afrika, Latino Community Fund of Georgia, and The Arc of the United States certify all counsel, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1. Abbott, Robert, *Defendant*

2. Abudu, Nancy, *Former Attorney for Plaintiffs-Appellees*

3. Adegbile, Debo, *Attorney for Plaintiffs-Appellees*

4. Aden, Leah, *Attorney for Plaintiffs-Appellees*

5. Advancement Project, *Attorneys for Plaintiffs-Appellees*

6. Ameri, Mana, *Attorney for Plaintiffs-Appellees*

7. American Civil Liberties Union Foundation of Georgia, Inc., *Attorneys for Plaintiffs-Appellees*

8. American Civil Liberties Union Foundation, Inc., *Attorneys for Plaintiffs-Appellees*

9. Andrews, Wanda, *Defendant*

10. Aquino, Nora, *Plaintiff-Appellee*

11. Asian Americans Advancing Justice-Asian Law Caucus, *Attorneys for Plaintiffs-Appellees*

12. Asian Americans Advancing Justice-Atlanta, *Plaintiff-Appellee*

13. Augusta Georgia Law Department, *Attorneys for Defendant*

14. Ausburn, Deborah, *Attorney for Defendants-Appellants*

15. Awuku, George, *Defendant*

16. Banks, Marques, *Attorney for Plaintiffs-Appellees*

17. Banter, James, *Attorney for Defendant*

18. Barkdull, Annika Boone, *Attorney for Defendants-Appellants*

19. Barnes, Sherry, *Defendant*

20. Barron, Richard, *Defendant*

21. Bartolomucci, Christopher, *Attorney for Defendants-Appellants*

22. Beausoleil, William, *Attorney for Plaintiffs-Appellees*

23. Beck Owen & Murray, *Attorneys for Defendant*

24. Begakis, Steven, *Attorney for Intervenors-Appellants*

25. Belichick, Joseph, *Attorney for Plaintiffs-Appellees*

26. Bell, Jordan, *Attorney for Defendant*

27. Bennette, Matletha, *Attorney for Plaintiffs-Appellees*

28. Bibb County Board of Elections, *Defendant*

29. Bibb County Board of Registrars, *Defendant*

iv

30. Black Voters Matter Fund, *Plaintiff-Appellee*

31. Blender, Matthew, *Defendant*

32. Bloodworth, Kristin, *Former Attorney for Defendant*

33. Boulee, Honorable Jean-Paul ("J.P."), *United States District Court Judge*

34. Bowman, Brad, *Attorney for Defendant*

35. Boyle, Donald, *Attorney for Defendants-Appellants*

36. Broder, Karl, *Attorney for Defendant*

37. Brooks, Jessica, *Defendant*

38. Brooks, Sofia, *Attorney for Plaintiffs-Appellees*

39. Brown, Marcia, *Defendant*

40. Bruning, Stephen, *Defendant*

41. Bruning, Steven, *Defendant*

42. Bryan, Bennett, *Attorney for Defendant*

43. Burwell, Kaye, *Attorney for Defendant*

44. Campbell-Harris, Dayton, *Attorney for Plaintiffs-Appellees*

45. Carr, Christopher M., Attorney General of the State of Georgia, *Attorney for Defendants-Appellants*

46. Carver, William, *Attorney for Intervenors-Appellants*

47. Cathey, Thomas, *Former Attorney for Defendant*

48. Chalmers, Adams, Backer & Kaufman, LLC, *Attorneys for Defendant*

49. Chatham County Attorney, *Attorneys for Defendant*

50. Chatham County Board of Elections, *Defendant*

51. Chatham County Board of Registrars, *Defendant*

52. Clarke County Board of Election and Voter Registration, *Defendant*

53. Clayton County Board of Elections and Registration, *Defendant*

54. Cobb County Board of Elections and Registration, *Defendant*

55. Cochran, Ken, *Defendant*

56. Columbia County Board of Elections, *Defendant*

57. Columbia County Board of Registrars, *Defendant*

58. Common Cause, *Plaintiff-Appellee*

59. Consovoy McCarthy PLLC, *Attorney for Intervenors-Appellants*

60. Cramer, Raisa, *Former Attorney for Plaintiffs-Appellees*

61. Crawford, Teresa, *Defendant*

62. Crowell & Moring, LLP, *Attorneys for Plaintiffs-Appellees*

63. Cushman, Ann, *Defendant*

64. Cusick, John, *Attorney for Plaintiffs-Appellees*

65. Dasgupta, Riddhi, *Attorney for Defendants-Appellants*

66. Dave, Charles, *Defendant*

67. Davenport, Jennifer, *Attorney for Defendant*

68. Davis Wright Tremaine LLP, *Attorneys for Plaintiffs-Appellees*

69. Davis, Britton, *Former Attorney for Plaintiffs-Appellees*

70. Day, Stephen, *Defendant*

71. DeKalb County Board of Registrations and Elections, *Defendant*

72. DeKalb County Law Department, *Attorneys for Defendant*

73. Delta Sigma Theta Sorority, Inc., *Plaintiff-Appellee*

74. Denmark, Emilie, *Attorney for Defendant*

75. Dentons US LLP, *Attorney for Intervenors-Appellants*

76. Deshazior, Zurich, *Defendant*

77. DeThomas, Courtney, *Attorney for Plaintiffs-Appellees*

78. Dianis, Judith, *Attorney for Plaintiffs-Appellees*

79. Dickey, Gilbert, *Attorney for Intervenors-Appellants*

80. Dicks, Terence, *Defendant*

81. Dimmick, Brian, *Attorney for Plaintiffs-Appellees*

82. DiStefano, Don, *Defendant*

83. Doss, Travis, *Defendant*

84. Dozier, Shauna, *Defendant*

85. Drennon, Baxter, *Attorney for Intervenors-Appellants*

86. Duffey, William, Jr., *Defendant-Appellant*;

87. Duffie, Wanda, *Defendant*

88. Durbin, Jauan, *Plaintiff-Appellee*

89. Durso, Katherine, *Defendant*

90. Edwards, Gregory, District Attorney for Dougherty County, *Defendant*

91. Elias Law Group LLP, *Attorneys for Plaintiffs-Appellees*

92. Ellington, Thomas, *Defendant*

93. Enjeti-Sydow, Anjali, *Plaintiff-Appellee*

94. Evans, James, *Attorney for Defendant*

95. Evans, Rachel, *Attorney for Plaintiffs-Appellees*

96. Evans-Daniel, Karen, *Defendant*

97. Eveler, Janine, *Defendant*

98. Exousia Lighthouse International C.M., Inc, *Former Plaintiff*

99. Faith In Action Network, *Former Plaintiff*

100. Falk, Donald, *Attorney for Defendants-Appellants*

101. Fambrough, Willa, *Defendant*

102. Faransso, Tania, *Attorney for Plaintiffs-Appellees*

103. Farrell, Gregory, *Attorney for Plaintiffs-Appellees*

104. Feldsherov, Ilya, *Former Attorney for Plaintiffs-Appellees*

105. Fenwick & West, LLP, *Attorneys for Plaintiffs-Appellees*

106. Field, Brian, *Attorney for Defendants-Appellants*

107. First Congregational Church, United Church of Christ Incorporated, *Plaintiff-Appellee*

108.     Fogelson, Matthew, *Attorney for Plaintiffs-Appellees*

109.     Forsyth County Board of Voter Registrations and Elections, *Defendant*

110.     Fortier, Lucas, *Former Attorney for Plaintiffs-Appellees*

111.     Foster, Mikayla, *Attorney for Plaintiffs-Appellees*

112.     Freeman Mathis & Gary, LLP, *Attorneys for Defendant*

113.     Fulton County Attorney's Office, *Attorneys for Defendant*

114.     Fulton County Registration and Elections Board, *Defendant*

115.     Galeo Latino Community Development Fund, Inc., *Plaintiff-Appellee*

116.     Gammage, Keith, *Defendant*

117.     Garabudu, Rahul, *former Attorney for Plaintiffs-Appellees*

118.     Gartland, Pat, *Defendant*

119.     Gay, Nancy, *Defendant*

120.     Geiger, Debra, *Defendant*

121.     Georgia Adapt, *Plaintiff-Appellee*

122.     Georgia Advocacy Office, *Plaintiff-Appellee*

123.     Georgia Coalition for the People's Agenda, Inc., *Plaintiff-Appellee*

124.     Georgia Department of Law, *Attorneys for Defendants-Appellants*

125.     Georgia Latino Alliance for Human Rights, Inc., *Plaintiff-Appellee*

126.     Georgia Muslim Voter Project, *Plaintiff-Appellee*

127.     Georgia Republican Party, Inc., *Intervenor-Appellant*

128.    Georgia State Conference of the NAACP, *Plaintiff-Appellee*

129.    Georgia State Election Board, *Defendant*

130.    Ghazal, Sara, *Defendant*

131.    Gibbs, Fannie, *Plaintiff-Appellee*

132.    Gillon, Thomas, *Defendant*

133.    Givens, Diane, *Defendant*

134.    Gossett, David, *Attorney for Plaintiffs-Appellees*

135.    Greater Works Ministries Network, Inc., *Former Plaintiff*

136.    Green, Tyler, *Attorney for Intervenors-Appellants*

137.    Greenberg Traurig, LLP, *Attorneys for Defendant*

138.    Groves, Angela, *Attorney for Plaintiffs-Appellees*

139.    Gwinnett County Board of Registrations and Elections, *Defendant*

140.    Gwinnett County Department of Law, *Attorneys for Defendant*

141.    Hall Booth Smith, P.C., *Attorney for Intervenors-Appellants*

142.    Hall County Board of Elections and Registration, *Defendant*

143.    Hall County Government, *Attorneys for Defendant*

144.    Hall, Dorothy, *Defendant*

145.    Hall, John, *Attorney for Intervenors-Appellants*

146.    Hamilton, Brittni, *Attorney for Plaintiffs-Appellees*

147.    Hancock, Jack, *Attorney for Defendant*

148.    Hart, Ralph, *Attorney for Defendant*

149.    Hart, Twyla, *Defendant*

150.    Hasselberg, Emily, *Attorney for Plaintiffs-Appellees*

151.    Hayes, Vilia, *Attorney for Plaintiffs-Appellees*

152.    Haynie, Litchfield & White, PC, *Attorneys for Defendant*

153.    Hazard, Joel, *Defendant*

154.    Heard, Bradley, *Attorney for Plaintiffs-Appellees*

155.    Heimes, Marianne, *Defendant*

156.    Henseler, James, *Attorney for Plaintiffs-Appellees*

157.    Herren, Thomas, *Attorney for Plaintiffs-Appellees*

158.    Hiatt, Alexandra, *Attorney for Plaintiffs-Appellees*

159.    Ho, Dale, *Former Attorney for Plaintiffs-Appellees*

160.    Hodge, Malinda, *Defendant*

161.    Houk, Julie, *Attorney for Plaintiffs-Appellees*

162.    Hoyos, Luis, *Attorney for Plaintiffs-Appellees*

163.    Hughes Hubbard & Reed, LLP, *Attorneys for Plaintiffs-Appellees*

164.    Hughes, Aileen, *Attorney for Plaintiffs-Appellees*

165.    Hull Barrett, PC, *Attorneys for Defendant*

166.    Ingram, Randy, *Defendant*

167.    Isaacson, Cory, *Attorney for Plaintiffs-Appellees*

xi

168.    Jacoutot, Bryan, *Attorney for Defendants-Appellants*

169.    Jaffe, Erik, *Attorney for Defendants-Appellants*

170.    Jahangiri, Mahroh, *Former Attorney for Plaintiffs-Appellees*

171.    Jaikumar, Arjun, *Former Attorney for Plaintiffs-Appellees*

172.    James-Bates-Brannan-Groover-LLP, *Attorneys for Defendant*

173.    Jarrard & Davis, LLP, *Attorneys for Defendant*

174.    Jasrasaria, Jyoti, *Former Attorney for Plaintiffs-Appellees*

175.    Jaugstetter, Patrick, *Attorney for Defendant*

176.    Jedreski, Matthew, *Attorney for Plaintiffs-Appellees*

177.    Jester, Alfred, *Defendant*

178.    Jester, Nancy, *Defendant*

179.    Jhaveri, Sejal, *Attorney for Plaintiffs-Appellees*

180.    Johnson, Aaron, *Defendant*

181.    Johnson, Ben, *Defendant*

182.    Johnson, Darlene, *Defendant*

183.    Johnson, Melinda, *Attorney for Plaintiffs-Appellees*

184.    Johnston, Janice, *Defendant*

185.    Joiner, Amelia, *Attorney for Defendant*

186.    Kanu, Nkechi, *Attorney for Plaintiffs-Appellees*

187.    Kaplan, Mike, *Defendant*

188.    Kastorf Law, LLC, *Attorneys for Plaintiffs-Appellees*

189.    Kastorf, Kurt, *Attorney for Plaintiffs-Appellees*

190.    Kaufman, Alex, *Attorney for Intervenors-Appellants*

191.    Keker Van Nest & Peters LLP, *Attorneys for Plaintiffs-Appellees*

192.    Kemp, Brian, Governor of the State of Georgia, *Defendant-Appellant*

193.    Kennedy, David, *Defendant*

194.    Kennedy, Kate, *Attorney for Plaintiffs-Appellees*

195.    Keogh, William, *Attorney for Defendant*

196.    Khan, Sabrina, *Attorney for Plaintiffs-Appellees*

197.    Kim, Danielle, *Attorney for Plaintiffs-Appellees*

198.    Kingsolver, Justin, *Attorney for Plaintiffs-Appellees*

199.    Klein, Spencer, *Attorney for Plaintiffs-Appellees*

200.    Knapp, Halsey, *Attorney for Plaintiffs-Appellees*

201.    Koorji, Alaizah, *Attorney for Plaintiffs-Appellees*

202.    Krevolin & Horst, LLC, *Attorneys for Plaintiffs-Appellees*

203.    Kucharz, Kevin, *Attorney for Defendant*

204.    Lakin, Sophia, *Attorney for Plaintiffs-Appellees*

205.    Lam, Leo, *Attorney for Plaintiffs-Appellees*

206.    Lang, Antan, *Defendant*

207.    LaRoss, Diane, *Attorney for Defendants-Appellants*

208.    Latino Community Fund of Georgia, *Plaintiff-Appellee*

209.    Lauridsen, Adam, *Attorney for Plaintiffs-Appellees*

210.    Law Office of Gerald R Weber, LLC, *Attorneys for Plaintiffs-Appellees*

211.    Lawyers' Committee for Civil Rights Under Law, *Attorneys for Plaintiffs- Appellees*

212.    League of Women Voters of Georgia, Inc., *Plaintiff-Appellee*

213.    Leung, Kimberly, *Attorney for Plaintiffs-Appellees*

214.    Lewis, Anthony, *Defendant*

215.    Lewis, Joyce, *Attorney for Plaintiffs-Appellees*

216.    Lin, Stephanie, *Attorney for Plaintiffs-Appellees*

217.    Lindsey, Edward, *Defendant*

218.    Lower Muskogee Creek Tribe, *Plaintiff-Appellee*

219.    Lowman, David, *Attorney for Defendant*

220.    Ludwig, Jordan, *Attorney for Plaintiffs-Appellees*

221.    Luth, Barbara, *Defendant*

222.    Ma, Eileen, *Attorney for Plaintiffs-Appellees*

223.    Mack, Rachel, *Attorney for Defendant*

224.    Mahoney, Thomas, *Defendant*

225.    Manifold, Zach, *Defendant*

226.    Martin, Grace Simms, *Attorney for Defendant*

227.    Mashburn, Matthew, *Defendant-Appellant*

228.    May, Caitlin, *Attorney for Plaintiffs-Appellees*

229.    McAdams, Issac, *Defendant*

230.    McCandless, Spencer, *Former Attorney for Plaintiffs-Appellees*

231.    McCarthy, Thomas, *Attorney for Intervenors-Appellants*

232.    McClain, Roy, *Defendant*

233.    McCord, Catherine, *Attorney for Plaintiffs-Appellees*

234.    McFalls, Tim, *Defendant*

235.    McFarland, Ernest, *Attorney for Plaintiffs-Appellees*

236.    McGowan, Charlene, *Former Attorney for Defendants-Appellants*

237.    Mcrae, Colin, *Defendant*

238.    Melcher, Molly, *Attorney for Plaintiffs-Appellees*

239.    Metropolitan Atlanta Baptist Ministers Union, Inc., *Plaintiff-Appellee*

240.    Mijente, Inc., *Former Plaintiff*

241.    Miller, Nicholas, *Attorney for Defendants-Appellants*

242.    Milord, Sandy, *Attorney for Defendant*

243.    Minnis, Terry, *Attorney for Plaintiffs-Appellees*

244.    Mizner, Susan, *Attorney for Plaintiffs-Appellees*

245.    Mocine-McQueen, Marcos, *Attorney for Plaintiffs-Appellees*

246.    Momo, Shelley, *Attorney for Defendant*

247.        Morrison, Tina, *Attorney for Plaintiffs-Appellees*

248.        Mosbacher, Jennifer, *Defendant*

249.        Motter, Susan, *Defendant*

250.        Murchie, Laura, *Attorney for Plaintiffs-Appellees*

251.        Murray, Karen, *Defendant*

252.        NAACP Legal Defense and Education Fund, Inc., *Attorneys for Plaintiffs- Appellees*

253.        National Association for the Advancement of Colored People, Inc., *Parent Corporation of Georgia State Conference of the NAACP*

254.        National Republican Congressional Committee, *Intervenor-Appellant*

255.        National Republican Senatorial Committee, *Intervenor-Appellant*

256.        Natt, Joel, *Defendant*

257.        Nemeth, Miriam, *Former Attorney for Plaintiffs-Appellees*

258.        Nercessian, Armen, *Attorney for Plaintiffs-Appellees*

259.        New Birth Missionary Baptist Church, Inc., *Plaintiff*

260.        Newland, James, *Defendant*

261.        Nguyen, Candice, *Attorney for Plaintiffs-Appellees*

262.        Nguyen, Phi, *Former Attorney for Plaintiffs-Appellees*

263.        Nkwonta, Uzoma, *Attorney for Plaintiffs-Appellees*

264.        Noa, Jack, *Defendant*

265.    Noland Law Firm, LLC, *Attorneys for Defendant*

266.    Noland, William, *Attorney for Defendant*

267.    Norris, Cameron, *Attorney for Intervenors-Appellants*

268.    Norse, William, *Defendant*

269.    Nwachukwu, Jennifer, *Attorney for Plaintiffs-Appellees*

270.    O'Brien, James, *Defendant*

271.    O'Connor, Eileen, *Attorney for Plaintiffs-Appellees*

272.    O'Lenick, Alice, *Defendant*

273.    Olm, Rylee, *Attorney for Plaintiffs-Appellees*

274.    Oxford, Neil, *Attorney for Plaintiffs-Appellees*

275.    Paik, Steven, *Plaintiff-Appellee*

276.    Pant, Shontee, *Attorney for Plaintiffs-Appellees*

277.    Paradise, Loree, *Former Attorney for Defendants-Appellants*

278.    Parker, Warrington, *Attorney for Plaintiffs-Appellees*

279.    Pelletier, Susan, *Former Attorney for Plaintiffs-Appellees*

280.    Petrany, Stephen, *Attorney for Defendants-Appellants*

281.    Porter, Megan, *Former Attorney for Plaintiffs-Appellees*

282.    Powell, Laura E., *Attorney for Plaintiffs-Appellees*

283.    Prince, Joshua, *Former Attorney for Defendants-Appellants*

284.    Pulgram, Laurence, *Attorney for Plaintiffs-Appellees*

285.     Pullar, Patricia, *Defendant*

286.     Qadir, Hunaid, *Defendant*

287.     Radzikinas, Carla, *Defendant*

288.     Raffensperger, Brad, Secretary of State of Georgia, *Defendant-Appellant*

289.     Raffle, Rocky, *Defendant*

290.     Ramahi, Zainab, *Attorney for Plaintiffs-Appellees*

291.     Rich, James, *Attorney for Plaintiffs-Appellees*

292.     Richardson, Jasmyn, *Attorney for Plaintiffs-Appellees*

293.     Richmond County Board of Elections, *Defendant*

294.     Ringer, Cheryl, *Former Attorney for Defendant*

295.     Rise, Inc., *Plaintiff-Appellee*

296.     Rodriguez, Anthony, *Defendant*

297.     Rosborough, Davin, *Attorney for Plaintiffs-Appellees*

298.     Rosenberg, Ezra, *Attorney for Plaintiffs-Appellees*

299.     Rosenberg, Steven, *Former Attorney for Defendant*

300.     Rusciano, Megan, *Attorney for Plaintiffs-Appellees*

301.     Russ, John, *Attorney for Plaintiffs-Appellees*

302.     Ruth, Kathleen, *Defendant*

303.     Ryan, Elizabeth, *Attorney for Plaintiffs-Appellees*

304.    Sabzevari, Arash, *Attorney for Defendant*

305.    Sachdeva, Niharika, *Attorney for Plaintiffs-Appellees*

306.    Samuel Dewitt Proctor Conference, Inc., *Former Plaintiff*

307.    Sankofa United Church of Christ Limited, *Former Plaintiff*

308.    Schaerr | Jaffe LLP, *Attorneys for Defendants-Appellants*

309.    Schaerr, Gene, *Attorney for Defendants-Appellants*

310.    Scott, William, *Former Attorney for Defendant*

311.    Seals, Veronica, *Defendant*

312.    Segarra, Esperanza, *Former Attorney for Plaintiffs-Appellees*

313.    Sells, Bryan, *Attorney for Plaintiffs-Appellees*

314.    Shah, Niyati, *Attorney for Plaintiffs-Appellees*

315.    Sheats, Gala, *Defendant*

316.    Shelly, Jacob, *Attorney for Plaintiffs-Appellees*

317.    Shirley, Adam, *Defendant*

318.    Sieff, Adam, *Attorney for Plaintiffs-Appellees*

319.    Silas, Tori, *Defendant*

320.    Sixth District of the African Methodist Episcopal Church, *Plaintiff-Appellee*

321.    Smith, Casey, *Attorney for Plaintiffs-Appellees*

322.    Smith, Dele, *Defendant*

323.    Smith, Mandi, *Defendant*

324.    Solh, Chahira, *Attorney for Plaintiffs-Appellees*

325.    Solomon, Elbert, *Plaintiff-Appellee*

326.    Sosebee, Charlotte, *Defendant*

327.    Southern Poverty Law Center, *Attorneys for Plaintiffs-Appellees*

328.    Sowell, Gregory, *Attorney for Defendant*

329.    Sparks, Adam, *Attorney for Plaintiffs-Appellees*

330.    Squiers, Cristina, *Attorney for Defendants-Appellants*

331.    Stewart Melvin & Frost, LLP, *Attorneys for Defendant*

332.    Strawbridge, Patrick, *Attorney for Intervenors-Appellants*

333.    Sumner, Stuart, *Attorney for Intervenors-Appellants*

334.    Sung, Connie, *Attorney for Plaintiffs-Appellees*

335.    Swift, Karli, *Defendant*

336.    Szilagyi, Heather, *Attorney for Plaintiffs-Appellees*

337.    Tatum, Tobias, *Attorney for Defendants-Appellants*

338.    Taylor English Duma LLP, *Attorneys for Defendants-Appellants*

339.    Taylor, Wandy, *Defendant*

340.    Thatte, Anuja, *Attorney for Plaintiffs-Appellees*

341.    The ACLU Foundation Disability Rights Program, *Attorneys for Plaintiffs- Appellees*

342.    The Arc of the United States, *Plaintiff-Appellee*

343.    The Concerned Black Clergy of Metropolitan Atlanta, Inc., *Plaintiff-Appellee*

344.    The Georgia State Election Board, *Defendant*

345.    The Justice Initiative, Inc., *Plaintiff-Appellee*

346.    The Law Office of Bryan L. Sells, LLC, *Attorneys for Plaintiffs-Appellees*

347.    The New Georgia Project, *Plaintiff-Appellee*

348.    The Republican National Committee, *Intervenor-Appellant*

349.    The State of Georgia, *Defendant-Appellant*

350.    The United States of America, *Plaintiff-Appellee*

351.    The Urban League of Greater Atlanta, Inc., *Former Plaintiff-Appellee*

352.    Thomas, Ethan, *Attorney for Plaintiffs-Appellees*

353.    Thompson, Grace, *Attorney for Plaintiffs-Appellees*

354.    Till, Ann, *Defendant*

355.    Topaz, Jonathan, *Attorney for Plaintiffs-Appellees*

356.    Trent, Edward, *Attorney for Defendants-Appellants*

357.    Tucker, William, *Attorney for Plaintiffs-Appellees*

358.    Tyson, Bryan, *Attorney for Defendants-Appellants*

359.    Uddullah, Angelina, *Plaintiff-Appellee*

360.     Unger, Jess, *Attorney for Plaintiffs-Appellees*

361.     United States Department of Justice, *Attorneys for Plaintiffs-Appellees*

362.     Van Stephens, Michael, *Attorney for Defendant*

363.     Vander Els, Irene, *Former Attorney for Defendant*

364.     Varghese, George, *Attorney for Plaintiffs-Appellees*

365.     Varner, Johnny, *Defendant*

366.     Vasquez, Jorge, *Former Attorney for Plaintiffs-Appellees*

367.     Vaughan, Elizabeth, *Former Attorney for Defendants-Appellants*

368.     Waite, Tristen, *Attorney for Defendant*

369.     Wakschlag, Shira, *Attorney for Plaintiffs-Appellees*

370.     Wang, Emily, *Attorney for Plaintiffs-Appellees*

371.     Wardenski, Joseph, *Former Attorney for Plaintiffs-Appellees*

372.     Ward-Packard, Samuel, *Attorney for Plaintiffs-Appellees*

373.     Webb, Brian K., *Attorney for Defendants-Appellants*

374.     Weber, Gerald, *Attorney for Plaintiffs-Appellees*

375.     Weigel, Daniel, *Attorney for Defendants-Appellants*

376.     Wesley, Carol, *Defendant*

377.     White, Daniel, *Attorney for Defendant*

378.     White, William, *Attorney for Intervenors-Appellants*

379.     Wiggins, Larry, *Defendant*

380.    Wilberforce, Nana, *Attorney for Plaintiffs-Appellees*

381.    Wilborn, Eric, *Attorney for Defendant*

382.    Willard, Russell D., *Attorney for Defendants-Appellants*

383.    Williams, Gilda, *Former Attorney for Plaintiffs-Appellees*

384.    Williams, Tuwanda, *Former Attorney for Defendant*

385.    Wilmer Cutler Pickering Hale and Dorr LLP, *Attorneys for Plaintiffs-Appellees*

386.    Wilson, Jacob, *Attorney for Defendant*

387.    Wilson, Melanie, *Attorney for Defendant*

388.    Wingate, Mark, *Defendant*

389.    Winichakul, Pichaya, *Attorney for Plaintiffs-Appellees*

390.    Women Watch Afrika, *Plaintiff-Appellee*

391.    Woodfin, Conor, *Attorney for Intervenors-Appellants*

392.    Woolard, Cathy, *Defendant*

393.    Wurtz, Lori, *Defendant*

394.    Yoon, Meredyth, *Attorney for Plaintiffs-Appellees*

395.    Young, Sean, *Former Attorney for Plaintiffs-Appellees*

396.    Zatz, Clifford, *Attorney for Plaintiffs-Appellees*

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, Plaintiffs-Appellees state that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: August 30, 2024

Respectfully Submitted,

Leah C. Aden
John S. Cusick
Alaizah Koorji
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Anuja Thatte
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.
700 14th Street, NW
Washington, DC 20005
(202) 682-1300

Bradley E. Heard
Pichaya Poy Winichakul
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30031
(404) 521-6700

Tania Faranasso
Laura E. Powell
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000

/s/ *Davin M. Rosborough*
Davin M. Rosborough
Sophia Lin Lakin
Jonathan Topaz
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7836

Cory Isaacson
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
(678) 981-5295

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

George P. Varghese
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

xxiv

*Attorneys for Plaintiffs-Appellees Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, Georgia Muslim Voter Project, Latino Community Fund of Georgia, The Arc of the United States, and Women Watch Afrika*

## STATEMENT REGARDING ORAL ARGUMENT

Because the district court correctly applied binding case law and made careful findings based on an extensive factual record, affirmance is possible without oral argument. Given the important constitutional issues at stake, however, Plaintiffs request oral argument to ensure they can answer any questions helpful to the Court's analysis.

# TABLE OF CONTENTS

STATEMENT REGARDING ADOPTION OF BRIEFS
    OF OTHER PARTIES............................................................................1

STATEMENT OF THE ISSUE.................................................................2

INTRODUCTION ....................................................................................3

STATEMENT OF THE CASE..................................................................6

    A. Georgia's Persistent Problem with Long Waiting Times to Vote,
    Especially in Precincts Serving Predominantly Black Voters and
    Other Voters of Color...................................................................6

    B. Through Line Relief, Plaintiffs Provide Messages of Solidarity and
    Support to Georgians Waiting in Long Lines to Vote. .............................9

        1. Activities Using Food to Send Messages of Support and
        Encouragement in Civil Rights Struggles Leading to Line
        Relief. ...........................................................................9

        2. Plaintiffs' Messages of Solidarity Sent When Engaging in
        Line Relief Efforts...........................................................10

        3. Lack of Complaints from Election Officials Regarding Line
        Relief in the Roving Supplemental Zone.....................................12

    C. Georgia's Criminal Bans on Electioneering and Line Relief..................13

    D. The Criminal Line Relief Ban Forces Plaintiffs to Cease Their Line
    Relief Activities................................................................16

    E. Procedural History................................................................16

STANDARD OF REVIEW ..................................................................20

SUMMARY OF ARGUMENT .............................................................21

ARGUMENT .......................................................................................26

I.  The District Court Did Not Abuse Its Discretion in Finding Plaintiffs Are Likely to Succeed on the Merits. ...........................................................26

   A. The District Court Did Not Clearly Err in Finding that Plaintiffs' Line Relief Conveyed Messages of Solidarity in Exercising Civic Rights Amidst Obstacles, which Voters Reasonably Perceived. .............26

      1. The court correctly found that line relief is expressive based on extensive evidence that reasonable observers would, and did in fact, understand it to convey a message given the context. .........................................................................................27

      2. Defendants fail to show clear error in the district court's finding of expressive conduct. ........................................................31

   B. The Roving Supplemental Zone Line Relief Ban is a Content-Based Restriction as It Targets Expressive Conduct because of Concerns about the Messages' Effect on Its Recipients. .........................36

      1. The Roving Supplemental Zone Ban is a content-based regulation because it was justified based on the expected effect of its message on voters, albeit erroneously. .......................36

      2. The district court did not abuse its discretion in finding that line relief occurs in a public forum, which Defendants conceded below. ..............................................................................41

   C. The Roving Supplemental Zone Ban's Limitless Application Outside the 150-foot Buffer Zone Fails Any Level of Scrutiny. .............43

      1. The Ban significantly impinges on Plaintiffs' expression by functionally banning their line relief activities outright. ..............44

      2. The Ban's limitless application and chilling sweep are not narrowly tailored to advance the State's interests.........................46

   D. Because Many Applications of the Roving Supplemental Zone Line Relief Ban Are Unconstitutional, the District Xourt Awarded the Correct Scope of Relief. ....................................................................50

II. The District Court Properly Weighed the Equitable Factors. .....................52

A. Defendants Fail to Rebut Plaintiffs' Showing of Irreparable Harm. .......52

B. The Balance of Equities and Public Interest Favor Plaintiffs. .................53

CONCLUSION ......................................................................................................55

# TABLE OF AUTHORITIES

## Cases

*Allied Veterans of the World, Inc.: Affiliate 67 v. Seminole County*,
    468 F. App'x 922 (11th Cir. 2012) .......................................20

*Americans for Prosperity Foundation v. Bonta*,
    594 U.S. 595 (2021) ...............................................................50

*Anderson v. Spear*,
    356 F.3d 651 (6th Cir. 2004) ......................................... 45, 51

*BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*,
    425 F.3d 964 (11th Cir. 2005) .............................................20

*\*Boos v. Barry*,
    485 U.S. 312 (1988).......................................... 22, 36, 37

*Brooklyn Branch of NAACP v. Kosinski*,
    No. 21 CIV. 7667 (KPF), 2024 WL 2846687
    (S.D.N.Y. May 30, 2024)......................................... 31, 39, 43

*Bucklew v. Precythe*,
    587 U.S. 119 (2019)...............................................................51

*\*Burns v. Town of Palm Beach*,
    999 F.3d 1317 (11th Cir. 2021) ................................... 26, 33

*Burson v. Freeman*,
    504 U.S. 191 (1992)................................ 17, 18, 23, 41, 43, 45, 46

*Citizens for Police Accountability Political Committee v. Browning*,
    572 F.3d 1213 (11th Cir. 2009) ....................... 23, 42, 43, 48

*Clark v. Community for Creative Non-Violence*,
    468 U.S. 288 (1984)........................................... 23, 40, 43

*Club Madonna Inc. v. City of Miami Beach*,
    42 F.4th 1231 (11th Cir. 2022) .............................................52

*Democratic Executive Committee of Florida v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ................................................... 25, 53

*Elrod v. Burns*,
    427 U.S. 347 (1976).................................................................. 25, 52

*Federal Election Commission v. Cruz*,
    596 U.S. 289 (2022).....................................................................4, 47

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) .................................................................. 38, 50

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    11 F.4th 1266 (11th Cir. 2021) ..........................................................40

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018) ................................. 28–30, 32, 34, 35

*Frank v. Lee*,
    84 F.4th 1119 (10th Cir. 2023) ..........................................................45

*Gonzalez v. Governor of Georgia*,
    978 F.3d 1266 (11th Cir. 2020) ............................................. 25, 27, 53

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004) ....................................... 5, 21, 26, 33

*Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995)..................................................... 5, 21, 26, 27, 32

*Islam v. Secretary, Department of Homeland Security*,
    997 F.3d 1333 (11th Cir. 2021) .........................................................48

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022)........................................................................49

*Leake v. Drinkard*,
    14 F.4th 1242 (11th Cir. 2021) .........................................................33

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023) ....................................................... 38, 39

xxxi

*LSSi Data Corp. v. Comcast Phone, LLC*,
696 F.3d 1114 (11th Cir. 2012) ..........................................................20

*McCullen v. Coakley*,
573 U.S. 464 (2014).................................................................... 41, 44

*Minnesota Voters Alliance v. Mansky*,
585 U.S. 1 (2018)..............................................................................42

*\*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024)...................................................... 5, 24, 32, 50

*NetChoice, LLC v. Attorney General, Florida*,
34 F.4th 1196 (11th Cir. 2022) ..........................................................32

*New Georgia Project v. Raffensperger*,
976 F.3d 1278 (11th Cir. 2020) ..........................................................54

*Northeast Ohio Coalition for the Homeless v. Husted*,
837 F.3d 612 (6th Cir. 2016) ..............................................................46

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ............................................................54

*Perry Education Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)..................................................................... 36, 43

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) ....................................................... 39, 40

*Purcell v. Gonzalez*,
549 U.S. 1 (2006)..............................................................................18

*\*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)...........................................................................36

*Russell v. Lundergan-Grimes*,
784 F.3d 1037 (6th Cir. 2015) ............................................................45

*Sapuppo v. Allstate Floridian Insurance Co.*,
739 F.3d 678 (11th Cir. 2014) ............................................................48

Schenck v. Pro-Choice Network of West New York,
  519 U.S. 357 (1997).................................................................44

Schiavo ex rel. Schindler v. Schiavo,
  403 F.3d 1223 (11th Cir. 2005) ...........................................20

Schirmer v. Edwards,
  2 F.3d 117 (5th Cir. 1993) ....................................................46

Spence v. State of Washington,
  418 U.S. 405 (1974).................................................. 26, 29, 30

Texas v. Johnson,
  491 U.S. 397 (1989).......................................................... 26, 52

Tucker v. Mukamal,
  616 F. App'x 969 (11th Cir. 2015) ........................................41

United States v. Grace,
  461 U.S. 171 (1983).................................................................30

United States v. Salerno,
  481 U.S. 739 (1987).................................................................50

United States v. Virginia,
  518 U.S. 515 (1996).................................................................49

Ward v. Rock Against Racism,
  491 U.S. 781 (1989).......................................................... 6, 36, 38

## Statutes

18 U.S.C. § 597 ...........................................................................14

*O.C.G.A. § 21-2-414(a) ............................................. 3, 13, 14, 15, 27

O.C.G.A. § 21-2-566.....................................................................55

*O.C.G.A. § 21-2-570.................................................................. 3, 13, 14

xxxiii

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................................47

**Legislative Materials**

§ 19, H.B. 268, Act 250, 154th Leg., Reg. Sess. (Ga. 2017)...................... 14, 47, 55

§ 2(13), S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021)...................... 15, 39, 49

§ 22, H.B. 540, Act 32, 150th Leg., Reg. Sess. (Ga. 2010)....................................13

§ 33, S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021) ......................................14

§ 58, H.B. 244, Act 53, 148th Leg., Reg. Sess. (Ga. 2005)....................................13

S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021) .................................................14

## STATEMENT REGARDING ADOPTION OF BRIEFS
## OF OTHER PARTIES

Pursuant to Federal Rule of Appellate Procedure 28(i) and 11th Circuit Rule 28-1(f), Plaintiffs adopt by reference, in full, the brief of Plaintiffs/Appellees/Cross-Appellants Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; League of Women Voters of Georgia, Inc.; GALEO Latino Community Development Fund, Inc.; Common Cause; and the Lower Muskogee Creek Tribe (collectively, "GA NAACP Plaintiffs"). That brief answers Defendant-Intervenors' brief (DE 125 (23-13085), DE 106 (23-13095)), which was adopted in full by State Defendants (DE 124 (23-13085), DE 105 (23-13095)), and which addresses the District Court's preliminary injunction against County Defendants from rejecting absentee ballots based on any error or omission relating to the Birthdate Requirement on the envelope.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in finding that Georgia violated the First Amendment by making it a crime for non-partisan, pro-voter groups to come within 25 feet of any voter to offer water and food in an expression of support and solidarity ("line relief"), even when outside of the 150-foot "Buffer Zone" around the polling place building and no matter how many hundreds of feet away from the building voters are waiting.

## INTRODUCTION

In 2021, the Georgia legislature criminalized giving or offering to give food or drink to voters, not only within the 150-foot Buffer Zone surrounding the polling place, but also within 25 feet of any voter in line no matter how far away from the polling place building (the "Roving Supplemental Zone"). It did so despite existing bans on gift-giving to for purposes of "voting, or voting for a particular candidate," O.C.G.A. § 21-2-570, and bans—within 150-feet of the polling place building (the "Buffer Zone") or within 25 feet of any voter—on vote solicitation, "distribut[ing] or display[ing] any campaign material," or setting up tables or booths, O.C.G.A. § 21-2-414(a). Because the Roving Supplemental Zone Ban had both the intent and effect of stopping non-profit, pro-voter groups like Plaintiffs from engaging in expressive line-relief activities, Plaintiffs sought and obtained an injunction against the Ban as violative of the First Amendment.[1]

With the benefit of two years of discovery, testimony of at least two-dozen witnesses, numerous depositions, and a full-day hearing, the district court correctly found that Plaintiffs' line-relief activities constituted expressive conduct protected by the First Amendment and preliminarily enjoined the Roving Supplemental Zone Ban as not narrowly tailored. Far from committing the clear abuse of discretion

---

[1] The portion of the line relief ban covering the 150-foot Buffer Zone is not at issue in this appeal and remains in effect.

necessary for reversal, the court made careful findings and conclusions by applying binding precedent to an extensive factual record.

Based on this record, the court found that voters who received line relief from Plaintiffs and similar groups recognized the expressive and symbolic nature of that conduct—understanding that these groups intended to convey messages of support and perseverance while voters faced notoriously long lines in attempting to exercise their civic duty. The court also found that the Ban was enacted precisely because of concerns about the effects of this expression on voters, and thus was a content-based restriction that merited strict scrutiny. Because the Ban applies within 25 feet of any voter, regardless of how far from the polling place building the voters are waiting, the Court also found that it was not narrowly tailored and instead restricted an unacceptable swath of First Amendment-protected activity. The State's assertions that it must ban nonpartisan, non-electioneering line-relief activities at limitless distances from polling places to prevent "improper interference, political pressure, or intimidation" lacks any basis in fact or reason. Their "prophylaxis-upon-prophylaxis approach," *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 306 (2022) (citation omitted), unnecessarily burdens Plaintiffs' speech in light of existing prohibitions against electioneering and when any such concerns by election officials were focused on activities within the 150-foot Buffer Zone surrounding the polling place rather than outside of it.

4

Defendants cannot point to any legal errors committed by the court or any clearly erroneous factfinding. They claim Plaintiffs' line-relief activities must convey "a particular message" and a "common thread," criticizing them as a "grab bag of ideas." Br. 25–26. In doing so, they ignore the Supreme Court's reaffirmance that "[a] 'narrow, succinctly articulable message is not a condition of constitutional protection,'" *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2402 (2024) (quoting *Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)), and the principle that expressive conduct depends on listeners' understanding of "*some* sort of message," not necessarily "a *specific* message," *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

Moreover, they show no clear error in the court's factual finding that Plaintiffs' line relief activities are intended to "convey messages about community support, voter dignity and the importance of political participation," and that "voters perceive these messages from Plaintiffs' conduct." Order Granting Preliminary Injunction ("Order Granting PI"), Doc. 614 at 21. They further ignore the context-specific symbolism of Plaintiffs' activities, particularly food sharing's "specific historical and cultural significance in the context of civil rights activities." Order on First Motion for Preliminary Injunction ("First PI Order"), Doc. 241 at 32–33.

Defendants also argue the Ban is not content-based but merely regulates speech as a secondary effect. That argument disregards that "[t]he government's

purpose is the controlling consideration," *Ward v. Rock Against Racism*, 491 U.S.
781, 791 (1989), and that S.B. 202 explicitly justifies the legislation on grounds that
it protects voters from the potential effects of Plaintiffs' speech. Order Granting PI,
Doc. 614 at 22.

Regardless—whether using the modified strict scrutiny standard the district
court applied or intermediate scrutiny as Defendants urge—the Roving
Supplemental Zone Ban prohibits a greater swath of speech than is necessary to
satisfy any important governmental interest. Defendants assert that the Ban is
necessary to "protect[ ] voters from confusion and undue influence" and "preserv[e]
the integrity of [the] election process," Br. 44–45. But they do not explain *why*
prohibiting non-partisan line relief activities more than 150 feet from the polling
place reduces voter confusion or prevents undue influence, especially in light of
existing electioneering bans.

Under binding case law and the record on appeal, the district court's decision
stands firmly within its ample discretion.

### STATEMENT OF THE CASE

**A.  Georgia's Persistent Problem with Long Waiting Times to Vote,
Especially in Precincts Serving Predominantly Black Voters and
Other Voters of Color.**

"Georgia has historically had a very bad problem with line length." Doc. 535-
9 at 2. This testimony from Defendant and State Board of Elections Member

6

Matthew Mashburn is consistent with expert findings of Dr. Stephen Pettigrew, who analyzed voting wait times over nearly two decades: Georgia has a "consistent pattern" of "being among the worst states regardless of the ebb and flow from year to year of turnout patterns nationally." Doc. 574-35 at 127; *see also* Doc. 535-18 at 17. Not only does Georgia have "some of the longest lines in the country," but these lines "are more likely to afflict a black voter versus a white voter." Doc. 574-35 at 173.

In presidential elections since 2008, Georgia voters of color were much more likely than white voters to experience more than a 30-minute wait to vote, regardless of whether they voted early or on Election Day. Doc. 535-18 at 26. "In the 2020 election, non-white voters spent nearly 50% longer in line than white voters," *id.* at 9, and experienced *average* wait times "above that 30-minute threshold," Doc. 574-35 at 113. These disparities reflect the experience of Plaintiff organizations and their members, who usually see "the longest lines at polling places in Black and brown neighborhoods," Doc. 171-3 at 6; *see also* Doc. 171-13 at 3; Doc. 171-6 at 4.

Many members of Plaintiff Delta Sigma Theta Sorority (the "Deltas") and the communities they serve have "waited an hour or longer to cast their votes during early voting and on Election Day." Doc. 171-4 at 8. A Black voter in DeKalb County testified about waiting approximately four hours to vote in the 2020 November election. Doc. 171-18 at 3. In Henry County, a group of predominantly Black voters

waited almost eight hours, until 2:45 A.M., to vote during the June 2020 primary, Doc. 171-8 at 3, and another Black voter "waited for over 6 hours to vote" in the November 2020 general election, Doc. 171-6 at 3.

Voters faced these long lines in the June heat on sidewalks and roads lacking shade or "protection from the elements," Doc. 171-3 at 5–6, and, in the bitter cold of the January 2021 runoff election, when at least one elderly voter had hands so cold they were turning purple, Doc. 171-15 at 5. Many lines extended "more than 150 feet from the entrance to the polling location," on public sidewalks and streets. *Id.*; *see also* Doc. 171-6 at 3.

In the November 2022 election—after the passage of S.B. 202—Georgia had the second-longest wait times of any state during early voting, and the worst racial gap in wait times that it had experienced over the past several midterm cycles. Doc. 574-35 at 125–26, 133–34. In the 2022 general runoff election, Georgia's State Elections Director testified that "[t]here were areas that saw long lines." Doc. 535-15 at 3. In Gwinnett County, it was still "somewhat common" to have wait times over an hour, and such lines for the runoff "[d]efinitely" extended beyond 150 feet from the polls. Doc. 535-16 at 3. The same held true in Fulton County, Doc. 535-15 at 2, and in Cobb County, where some locations had waits of "up to two hours," Doc. 535-8 at 2. On the Friday before the runoff, 21 of 24 Fulton early voting locations and 11 of 16 in DeKalb had waits of at least an hour. Doc. 535-18 at 43.

**B.    Through Line Relief, Plaintiffs Provide Messages of Solidarity and Support to Georgians Waiting in Long Lines to Vote.**

*1.    Activities Using Food to Send Messages of Support and Encouragement in Civil Rights Struggles Leading to Line Relief.*

Plaintiffs are "nonprofit organizations whose work includes fostering participation in the democratic process." First PI Order, Doc. 241 at 6. They include religious organizations like the Sixth District of the African Methodist Episcopal Church ("AME"), civic organizations like the Deltas, national civil rights organizations like the Arc of the United States, and Georgia-based groups like Women Watch Afrika and the Georgia Muslim Voter Project.

Many Plaintiffs have longstanding records of participating in civil rights struggles. The Deltas participated in the 1913 Suffragist March to advocate for Black women's participation and leadership at that historic event. Doc. 171-4 at 5. During the Civil Rights Movement, Georgia AME churches served as organizational centers for Black leaders. Doc. 171-10 at 4.

As "part of a rich tradition of Black political activism," Plaintiffs and their members have long provided line relief like food and water to voters waiting in long lines to vote. Doc. 171-4 at 11; *see also* Doc. 171-10 at 5. Bishop Reginald Jackson of AME explained that providing food and water is part of a "Southern Black political tradition" in which food plays "an important role in resisting unjust laws and regimes that have sought to stymie Black political participation." Doc. 171-10

at 6. For AME, providing line relief also carries religious significance in "living up to the tenets of the Gospel": "'For I was hungry and you gave me something to eat, was thirsty and you gave me something to drink.' Matthew 25:35 (NIV)." *Id.* at 5.

Melody Bray, part of a pro-voting group that provided line relief prior to the Ban, testified that sharing food at the polling place reflects traditions in Southern Black communities including a "close connection" with "the work of civil rights activists in the past." Doc. 171-3 at 4. Both because of this tradition in the Black community, and the fact that Black voters remain disproportionately burdened by long wait times when exercising their right to vote, much of the line relief activity is provided by "[B]lack-led civic groups," Doc. 535-5 at 3, and takes place in "predominantly Black" communities, Docs. 171-5 at 5, 535-11 at 3.

### 2. *Plaintiffs' Messages of Solidarity Sent When Engaging in Line Relief Efforts.*

For Plaintiffs, providing line relief is rooted in a core "belief that voters have an important role to play in the political process and should be supported when they encounter long lines at polling stations." First PI Order, Doc. 241 at 9. Line relief symbolizes solidarity and support in the face of obstacles to exercise the fundamental right to vote like hours-long wait times. *See* Doc. 535-10 at 4 (line-relief "re-affirms the dignity of Black voters by showing a community is standing with them and supporting them"); Doc. 171-7 at 5 ("[O]ur line relief efforts say, 'Don't give up. This is your duty and we are proud of you.'"); Doc. 535-11 at 3 (line relief sends the

message that voters waiting in long lines have "dignity as voters, their voice matters, and that they should overcome barriers to political participation"); Doc. 535-14 at 2–3 ("The message is telling people that as a citizen, this is one of the most powerful weapons that you have.").

Similarly, Plaintiffs and others who provide line relief describe it as celebrating democratic engagement. *See* Doc. 535-12 at 3 (the message "is that exercising your right to vote doesn't have to feel burdensome and it can be an enjoyable experience."); Doc. 171-3 at 4 (line-relief activities try to "create a community around voting"); Doc. 171-14 at 4 (line relief "sends a message about participation in democracy.").

By providing line relief, Plaintiffs "convey a message that words alone cannot adequately convey." Doc. 535-10 at 4; *see also* Doc. 171-7 at 4–5; Doc. 171-14 at 4. Communicating that message necessarily requires coming within 25 feet of people waiting in the voting line. Doc. 535-13 at 2; *see also* Doc. 171-3 at 7 ("It is important to be able to approach voters closer to where they are standing in line."); Doc. 535-10 at 4. Election officials similarly report that line relief providers like Plaintiffs feel it is important not to leave items with poll workers, but rather "indicate that they wanted that contact [with voters], yes." Doc. 535-8 at 3–4.

Georgians who have received line relief while waiting in long lines to vote have understood that the activity was intended to convey a message. As one voter

testified, line relief was about receiving the message that their voices "had value in the democratic process." Doc. 171-18 at 4. For another voter, "[r]eceiving the water, in particular, was like receiving hope"—"somebody understood how important the cause was." Doc. 171-6 at 4. Another voter reported that line relief "sent the message that my vote matters, that I had dignity as a voter." Doc. 171-19 at 3.

Others also drew messages of solidarity from receiving line relief: "[i]t sent me the message that the people providing the food and water supported our efforts to stay in line." Doc. 171-8 at 3; *see also* Doc. 171-17 at 3 (voter received message that volunteers "understood what the voters in line were going through"); Doc. 171-20 at 4. Receiving line relief conveyed to one voter that her "voice mattered, and that [she has] an important role to play in the political process"; the message was so impactful that she herself started participating in line-relief activities as a volunteer. Doc. 171-13 at 5.

### 3. *Lack of Complaints from Election Officials Regarding Line Relief in the Roving Supplemental Zone.*

As officials responsible for administering elections, many county election officials reported no issues or concerns with line relief. Docs. 216-2 at 4, 171-5 at 5, 535-7 at 3. Former Fulton County Elections Director Dwight Brower "neither saw nor heard any evidence that volunteers who were providing water or food at a polling location attempted to influence individuals' votes" and believed existing electioneering laws were adequate to address such concerns. Doc. 171-5 at 5. So too

12

for Bartow County Board of Elections Member Dexter Benning, who testified that he had never "received any complaints or reports from voters regarding line relief" and was not "aware of any complaints or issues that the Bartow County Elections Office has received regarding line relief." Doc. 216-2 at 4. Douglas County Elections Director Milton Kidd similarly testified that he did not understand the need for any ban on line relief; rather, it "was very useful for Douglas County to be able to have external organizations" provide line relief. Doc. 535-7 at 3.

Other election administrators, including Defendants' witness and former Richmond County Elections Director Lynn Bailey, testified they had no concerns with line relief outside of the Buffer Zone. Doc. 535-5 at 3; *see also* Doc. 535-6 at 2–3 (Athens-Clarke Elections Director "wouldn't have a problem with [line relief occurring outside the 150-foot zone but within 25-feet of voters]").

### C.   Georgia's Criminal Bans on Electioneering and Line Relief.

Georgia has long banned vote buying, O.C.G.A. § 21-2-570, and electioneering around polling places, O.C.G.A. § 21-2-414. Georgia bans soliciting votes or providing campaign material within 150 feet of the polling place or 25-feet of any voter waiting in line. § 58, H.B. 244, Act 53, 148th Leg., Reg. Sess. (Ga. 2005); *see also* O.C.G.A. § 21-2-414(c).

In 2010, Georgia added a ban on soliciting petition signatures within the same areas. § 22, H.B. 540, Act 32, 150th Leg., Reg. Sess. (Ga. 2010); *see also* O.C.G.A.

13

§ 21-2-414 (a)(1), (a)(3). In 2017, Georgia banned tables or booths within the same areas, but amended the law to loosen restrictions on exit polling, permitting it 25 feet beyond polling place building exits. § 19, H.B. 268, Act 250, 154th Leg., Reg. Sess. (Ga. 2017).

Therefore, through the 2020 elections, Georgia law already restricted activities around polling places, including prohibiting giving "gifts for the purpose of . . . voting, or voting for a particular candidate." O.C.G.A. § 21-2-570; *see also* 18 U.S.C. § 597 (similar federal provision), and "solicit[ing] votes in any manner or by any means or method" or "distribut[ing] or display[ing] any campaign material," O.C.G.A. § 21-2-414(a).

In March 2021, after a contentious election marked by historic participation by voters of color and extensive disinformation campaigns about the voting process and results of the 2020 election, *see* Doc. 717 at 176, the Georgia Legislature passed S.B. 202, an omnibus law imposing numerous new restrictions on different aspects of the voting process, S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021). Relevant here, Section 33 of S.B. 202 amended O.C.G.A. § 21-2-414(a) to prohibit "giv[ing], offer[ing] to give, or participat[ing] in the giving of any money or gifts, ***including, but not limited to, food and drink***, to an elector." § 33, S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021) (emphasis added). Any person who violates these provisions faces criminal penalties. O.C.G.A. § 21-2-414(f). The law's criminal ban prohibits

14

providing food and drink both within the 150-foot Buffer Zone and in the Roving Supplemental Zone. O.C.G.A. § 21-2-414.

S.B. 202 claimed, without specifics, that "many groups approach[ed] electors while they waited in line" during the 2020 elections and justified the new ban as seeking to prevent "improper interference, political pressure, or intimidation" because of voter perception concerns. § 2(13), S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021). Subsequently, in discovery, State Defendants identified "voter intimidation at polling locations" as the sole claimed burden voters would face if the line relief ban was enjoined. Doc. 171-22 at 3–4.

Defendant Mashburn testified that the line relief ban was intended to create a bright-line rule because of an increasing number of "incursions into the hundred and fifty foot" zone, but he did not reference the Roving Supplemental Zone. Doc 535-4 at 3. Both Mr. Mashburn and former Georgia Secretary of State's Office General Counsel Ryan Germany provided justifications relying on the historical precedent of restrictions within "150 feet away from the polling place" and the 150-foot "bubble" rather than the Roving Supplemental Zone. Docs. 535-9 at 2–3, 535-3 at 7–8. Mr. Germany also testified that the Secretary's Office was "concerned about perceptions of political influence from organizations distributing food and water around polling places and that S.B. 202 responded to these concerns." Order Granting PI, Doc. 614 at 22 (citing Doc. 535-3 at 4 (Germany deposition)).

15

**D.    The Criminal Line Relief Ban Forces Plaintiffs to Cease Their Line Relief Activities.**

S.B. 202 forced Plaintiffs to cease their line-relief activities during the 2022 election cycle. *See* Docs. 535-10 at 4, 535-11 at 4, 535-12 at 4, 535-13 at 2. Plaintiffs ceased these activities "because of the criminal penalties S.B. 202 has imposed," Doc. 535-10 at 4, and the "risk [of] being arrested" Doc. 535-12 at 4.

Plaintiffs testified that if the Roving Supplemental Zone criminal ban was enjoined (as the court's order now has done), they "would resume line-relief activities" because even though "the presence of the 150-foot buffer zone would still restrict [their] efforts," they would be able to "interact[ ] with voters waiting on long lines past the 150-foot zone without the fear of criminal prosecution." Doc. 535-10 at 4–5; *see also* Docs. 535-11 at 4, 535-12 at 4, 535-13 at 2, 535-14 at 3.

**E.    Procedural History**

Four Plaintiffs groups brought lawsuits challenging S.B. 202's line-relief ban under the First Amendment. These claims and others were eventually consolidated for discovery. *See* Doc. 1.

On May 25, 2022, the above-captioned Plaintiffs (along with the GA NAACP Plaintiffs) sought a preliminary injunction against the Ban as to both the Buffer Zone and the Roving Supplemental Zone. Doc. 171. Another group of Plaintiffs filed joinder, Doc. 173, and on June 3, 2022, the fourth group of Plaintiffs filed their own preliminary injunction motion on similar grounds but against different Defendants,

16

Doc. 185.

Plaintiffs' motion included testimony from 19 individuals about their experience conducting and receiving line relief, Docs. 171-3, 171-4, 171-6–171-20, from several local election officials concerning their experience with groups providing line relief, Docs. 171-5, 216-2, 216-3, and expert testimony on wait times in Georgia, Docs. 171-21, 216-5.

On July 18, 2022, the district court held a full-day hearing on the motions, including argument and live testimony from five witnesses. *See* Doc. 227.

On August 18, 2022, the district court ruled on the preliminary injunction motions. First PI Order, Doc. 241. First, the court found that Plaintiffs' line-relief activities constitute expressive conduct protected by the First Amendment, crediting the "substantial evidence" that "Plaintiffs intend to convey a message that voting is important and that voters should remain in line to ensure their participation in the democratic process" and further that "voters infer 'some' message from Plaintiffs' efforts." *Id.* at 31. Second, it found that the Ban was a content-based restriction, because "prohibits a specific category of speech," *id.* at 38, and because it was motivated by the concern "that line warming activities could constitute or be perceived as improper electioneering, political pressure or intimidation," *id.* at 38–39. Third, the court applied "modified strict scrutiny analysis" under *Burson v. Freeman*, 504 U.S. 191 (1992), separately analyzing the Buffer Zone Ban and the

17

Roving Supplemental Zone Ban. *Id.* at 51–56.

The court found that the Buffer Zone Ban was constitutional under the *Burson* standard, but that the Roving Supplemental Zone Ban was not. *Id.* at 54–56. As to the latter, the court explained that "a restricted zone becomes unconstitutional at 'some measurable distance from the polls,'" *id.* at 55 (quoting *Burson*, 504 U.S. at 210), and that Defendants failed to meet their burden of showing that the "limitless Supplemental Zone" was reasonable, *id.* Therefore, the court found that Plaintiffs were substantially likely to succeed on their claim as to the Roving Supplemental Zone, Plaintiffs face irreparable harm from the Ban, and the public interest and equities weigh in their favor. *Id.* at 56–61. As the 2022 general election was "just a few months away," *id.* at 61, however, the court held that ordering relief would be improper under *Purcell v. Gonzalez,* 549 U.S. 1 (2006), and the Court denied the motion on that basis. Doc. 241 at 72–74.

Just after the close of fact discovery on April 24, 2023, Plaintiffs renewed their preliminary injunction motion for the 2024 elections and beyond for the Roving Supplemental Zone Ban. Doc. 535. In addition to the previous testimony and evidence, Plaintiffs provided new declarations, expert evidence, and testimony from Defendants and election officials. *See* Docs. 535-3–535-19.

On August 18, 2023, the district court granted a preliminary injunction against Defendants enforcing the Roving Supplemental Zone Ban. *See* Order Granting PI,

18

Doc. 614. It explained that, "[a]fter thorough review of the parties' arguments and the record in this case (which is now even more developed than what was before the court for the 2022 Order), this Court declines to depart from" its previous finding that Plaintiffs were likely to succeed on the merits of the claim that the Roving Supplemental Zone Ban violates the First Amendment. *Id.* at 20. The court found Defendants' arguments that Plaintiffs' activities are not expressive conduct "at odds with binding precedent" and inconsistent with the full record. *Id.* at 20. Instead, it held that the Ban was content-based, as it "was prompted by the notion that voters would perceive line relief as improper electioneering or political pressure," rejecting Defendants' arguments that the Ban's expressive harms were merely secondary effects. *Id.* at 22.

The court further held that the Ban was not narrowly tailored under *Burson*, because "it does not apply only in the immediate vicinity of the polling location and instead applies no matter the distance from the polls so long as a voter is present" and so has "no fixed boundary and thus no limit." Doc. 614 at 25. Plaintiffs had also established irreparable harm through a chilling of their speech and that the equities favored the injunction, there was no unreasonable delay in bringing the motion, nor any concerns under rejecting arguments about unreasonable delay and *Purcell*, the court found. *Id.* at 27–39. In preliminarily enjoining Defendants from enforcing the Roving Supplemental Zone Ban, the court found that "the issue of long lines is

19

sufficiently likely to continue" past 2022. *Id.* at 31.

State Defendants filed their notice of appeal on September 18, 2023. Intervenor-Defendants filed a separate appeal, docketed as Case No. 23-13085.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for a "clear abuse of discretion," meaning that appellate review "is very narrow." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005). This abuse-of-discretion standard encompasses each component of the preliminary-injunction factors, including whether Plaintiffs have shown "a substantial likelihood of success on the merits" of their claim. *LSSi Data Corp. v. Comcast Phone, LLC*, 696 F.3d 1114, 1120 (11th Cir. 2012). Reversal is appropriate "only if the district court applies an incorrect legal standard, or applies improper procedures, or relies on clearly erroneous factfinding, or if it reaches a conclusion that is clearly unreasonable or incorrect." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005) (citation omitted).

Abuse-of-discretion review "recognizes there is a range of choice within which" this Court "will not reverse the district court even if [it] might have reached a different decision." *Id.* "Weighing these considerations is the responsibility of the district court." *Allied Veterans of the World, Inc.: Affiliate 67 v. Seminole Cnty.*, 468 F. App'x 922, 923 (11th Cir. 2012) (citation omitted).

20

## SUMMARY OF ARGUMENT

The district court acted within its ample discretion—based on a robust factual record—when it preliminarily enjoined Georgia's Roving Supplemental Zone Ban. The court applied well-established law for evaluating whether a regulation infringes on expressive conduct based on content, and if so, whether that regulation survives strict or heightened scrutiny. Defendants identify no legal error in the district court's analysis. They also largely ignore the extensive record supporting line relief as expressive conduct, the Legislature's justification of the Ban based on their unfounded fears about the message line-relief activities would convey to potential voters, the Ban's unlimited and unreasonable geographic scope, and the irreparable harm to Plaintiffs and threat to the public interest of the Ban's continued operation. This Court should affirm.

**I.A.** Both the Supreme Court and this Court have held that conduct qualifies as sufficiently expressive to merit First Amendment protection when, viewed within its proper context, a reasonable audience "would interpret it as *some* sort of message." *Holloman*, 370 F.3d at 1270; *see also Hurley*, 515 U.S. at 569. The district court did not clearly err when it found that Plaintiffs' line-relief activities were inherently expressive within their context. The court had before it an extensive record and full fact discovery, which provided unrebutted evidence that Georgians who received line relief understood not only that the activity had symbolic and

21

communicative meaning, but also specifically that it "conveyed messages about community support, voter dignity and the importance of political participation," and that voters reasonably "perceive these messages from Plaintiffs' conduct." Order Granting PI, Doc. 614 at 21.

Defendants' arguments that Plaintiffs' line-relief activities do not constitute expressive conduct because they do not carry a particularized message, common thread, or symbolic content misrepresent binding case law which requires only that a reasonable observer understand that the conduct is communicating *some sort* of message. Defendants also ignore the facts showing that even were their standard governing, voters receiving line relief *do* understand a common theme from receiving line relief and that the provision of food and water to voters facing long lines to vote is imbued with historical and cultural symbolism.

**I.B.** Because the Legislature enacted the Roving Supplemental Zone Ban with the explicit purpose of regulating the effect of expressive activities on voters waiting in line, the Ban is a content-based restriction on speech. *See Boos v. Barry*, 485 U.S. 312, 320 (1988). Both the context of where the Ban applies and S.B. 202's justifications show that the law was not, as Defendants argue—trying to stop people from receiving food to eat in line. Instead, the Legislature justified the law based on purported and unjustified fears that listeners may perceive the expression as an attempt to influence voting rather than, as those who received line relief testified,

22

messages of solidarity in performing civic duties amidst obstacles. The Ban halts Plaintiffs' expressive activities in a public forum—the area surrounding a polling place including streets and sidewalks—and this Court has affirmed that the Supreme Court found as such in *Burson*. *See Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217–18 n.9 (11th Cir. 2009). Because the Ban is a content-based restriction in a public forum, strict scrutiny is appropriate.

**I.C.** The Roving Supplemental Zone Ban cannot survive strict scrutiny or even the intermediate scrutiny Defendants argue is warranted if Plaintiffs' conduct is expressive. Defendants have not proven that the Ban "is 'reasonable and does not significantly impinge on constitutionally protected rights,'" *Id.* at 1221 (quoting *Burson*, 504 U.S. at 209), nor that it is "narrowly drawn to further a substantial governmental interest" which "is unrelated to the suppression of free speech," *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984). Rather than representing a minor geographic limitation, the district court correctly found that the Ban "applies no matter the distance from the polls so long as a voter is present" with "no fixed boundary and thus no limit." Doc. 614 at 25.

Moreover, the Roving Supplemental Zone Ban advances no substantial governmental interest, particularly since it functionally only applies outside the 150-foot Buffer Zone, the area which was at the center of Defendants' justification for banning line relief. Defendants offer no rationale for why prohibiting non-

23

partisan line-relief activities so far from the polling place reduces voter confusion or prevents undue influence in light of existing electioneering bans. Defendants also cite the need for prophylactic measures to deter tabling and booths but ignore that Georgia law already makes illegal these feared tabling activities. Defendants also ignore another key distinction from *Burson* and *Citizens for Police Accountability*: line relief asks nothing of potential voters, and thus could not reasonably be seen as harassing or intimidating.

None of the Ban's stated purposes (or Defendants' post hoc rationales) suffice to deny Plaintiffs their chosen form of expressive conduct at limitless distances from the polling place.

**I.D.** The district court ordered an appropriate scope of relief by enjoining the Roving Supplemental Ban (outside of the Buffer Zone). The Supreme Court recently affirmed that under the First Amendment, facial challenges will succeed "if the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 144 S. Ct. at 2397. Here, in light of existing electioneering and tabling bans, the Roving Supplemental Zone Ban would limit primarily, if not exclusively, expressive line relief activities by groups like Plaintiffs. The record reflects no prior activities swept into this Ban that were not already illegal under Georgia law before the Ban's enactment.

24

**II.** The record reflects, and the district found, that Georgia voters have faced hour-plus lines that stretch farther than 150 feet from the polling place and that these long lines are likely to continue past 2022. Plaintiffs have shown, and Defendants do not dispute, that with this preliminary injunction in place, they will resume their line relief work outside of the 150-foot Buffer Zone in the 2024 elections and beyond. Without this injunction in place, Plaintiffs and other groups will be unable to conduct their expressive line-relief activities and thus face impairment to their First Amendment interests which, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).

The weight of the equities and the public interest also requires affirmance. Because Plaintiffs' constitutional rights hang in the balance, this interest outweighs any prospective harm to defendants from being unable to enforce an unconstitutional law. *See, e.g., Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1272 (11th Cir. 2020). Similarly, by protecting Plaintiffs' constitutional rights, the injunction serves the public interest. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

## ARGUMENT

I.    **The District Court Did Not Abuse Its Discretion in Finding Plaintiffs Are Likely to Succeed on the Merits.**

A.    **The District Court Did Not Clearly Err in Finding that Plaintiffs' Line Relief Conveyed Messages of Solidarity in Exercising Civic Rights Amidst Obstacles, which Voters Reasonably Perceived.**

Constitutional protection for freedom of speech "does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). The First Amendment protects "expressive conduct," which includes nonverbal acts "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence v. State of Wash.*, 418 U.S. 405, 409 (1974).

To evaluate whether conduct is sufficiently expressive to merit First Amendment protection, courts ask whether the audience would reasonably understand it to express some sort of message in the context in which it occurs. *See Hurley*, 515 U.S. 557; *Holloman*, 370 F.3d at 1270. Thus, courts "ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman*, 370 F.3d at 1270; *see also Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336–37 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1361 (2022) (same). For example, the Supreme Court held that a St. Patrick's Day parade was expressive despite the varied messages different groups conveyed and the audience received: "a private speaker does not forfeit

26

constitutional protection" because it fails "to isolate an exact message as the exclusive subject matter of the speech." *Hurley*, 515 U.S. at 569–70.

The district court properly applied this framework, and after evaluating ample, unrebutted evidence and testimony about Plaintiffs' activities, did not clearly err in finding that those activities "convey messages about community support, voter dignity and the importance of political participation," and that voters reasonably "perceive these messages from Plaintiffs' conduct." Order Granting PI, Doc. 614 at 21. These factual findings require great deference. *Gonzalez*, 978 F.3d at 1270.

### 1. The court correctly found that line relief is expressive based on extensive evidence that reasonable observers would, and did in fact, understand it to convey a message given the context.

Defendants do not contest that the Ban's prohibition on "*offer[ing]* to give . . . food and drink" within 25 feet of any voter prohibits pure speech, implicating the First Amendment. O.C.G.A. § 21-2-414(a) (emphasis added). Nor do they dispute that Plaintiffs express *some* sort of idea by giving voters food and drink in line. In fact, they call line relief a "grab-bag of ideas," conceding its expressive nature. Br. 26.

The record confirms the expressive nature of line relief. For Plaintiffs, the "act of line relief is special because it sends a message about participation in democracy." Doc. 171-14 at 4. Line relief celebrates the importance of voting through symbolism: establishing a "connection between food and voting" and trying to "create a

27

community around voting," Doc. 171-3 at 4, even when faced with obstacles like lines that stretch for blocks. As this Court itself has recognized, "[l]ike the flag, the significance of sharing meals with others dates back millennia." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*Food Not Bombs I*"), 901 F.3d 1235, 1243 (11th Cir. 2018). Using food-sharing as the expressive symbol, Plaintiffs' line relief conveys messages of support and solidarity to voters in carrying out their civic duty. *See*, *e.g.*, Doc. 535-10 at 4 (line-relief "re-affirms the dignity of Black voters by showing a community is standing with them and supporting them"); Doc. 171-7 at 5 ("our line relief efforts say, 'Don't give up. This is your duty and we are proud of you'"); Doc. 535-11 at 3.

As the district court found, "voters perceive these messages from Plaintiffs' conduct." Doc. 614 at 21. Voters understand—and the record demonstrates—that line relief is about more than a granola bar or bottle of water. The "common thread is that voters understand that line warming activities are intended to support and encourage voters who have chosen to exercise their right to vote." First PI Order, Doc. 241 at 31.

Defendants offer no substantive response to the testimony of voters who received line relief—voters who testified that it was not "just about the food and water—it was also the fact that I felt like my voice had value in the democratic process." Doc. 171-18 at 4; *see also* Doc. 171-6 at 4 ("[r]eceiving the water, in

particular, was like receiving hope"); Doc. 171-19 at 3 (line relief "sent the message that my vote matters, that I had dignity as a voter"); Doc. 171-8 at 3 ("[i]t sent me the message that the people providing the food and water supported our efforts to stay in line."). For one voter, the message she received from line relief that her "voice mattered, and that [she has] an important role to play in the political process" translated with such clarity and force that she later performed line relief herself to "make sure that others also realized the power of participating in democracy." Doc. 171-13 at 5.

Beyond voter testimony, other context-specific evidence supports the district court's finding that line relief bears sufficient indicia of expressiveness. *See Spence,* 418 U.S. at 410. As this Court explained in *Food Not Bombs I*, 901 F.3d at 1241, "the circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not." Context makes the difference between "the physical activity of walking from the expressive conduct associated with a picket line or a parade" and a sit-in to protest segregated facilites versus merely sitting down. *Id.*

Plaintiffs provide line relief within a highly specific historical, cultural, and political context that explains its symbolic meaning, particularly in predominantly Black communities. Line relief primarily arises out of "a rich tradition of Black political activism," Doc. 171-4 at 11; Doc. 171-10 at 4, where providing food and

water has long played "an important role in resisting unjust laws and regimes that have sought to stymie Black political participation." Doc. 171-10 at 6. Not surprisingly, many of the groups that provide line relief like Plaintiffs are "[B]lack-led civic groups," Doc. 535-5 at 3, who provide line relief in "predominantly Black" neighborhoods and communities. Doc. 171-5 at 5; Doc. 535-11 at 3. This context is critical. *See Spence,* 418 U.S. at 410; *Food Not Bombs I*, 901 F.3d at 1241.

Providing food at polling places has a long history in Southern Black communities, sharing a "close connection" with "the work of civil rights activists in the past." Doc. 171-3 at 4. As Bishop Jackson of AME testified, providing food and water "is part of a rich Southern Black political tradition" in which food plays "an important role in resisting unjust laws and regimes that have sought to stymie Black political participation." Doc. 171-10 at 6.

These facts provide ample support for the district court's conclusion that "the context of the activities in this case largely mirrors the context of the food-sharing events in" *Food Not Bombs I*. Doc. 241 at 32. As in *Food Not Bombs I*, the court found that "Plaintiffs' activities occur in a traditional public forum," *id.* at 32—on sidewalks and streets stretching out from polling places which "are historically associated with the free exercise of expressive activities." *United States v. Grace*, 461 U.S. 171, 177 (1983). Plaintiffs offer food and water to "all who wish to access" it "irrespective of the recipient's political persuasion," emphasizing both the

message that voting matters and all should participate. First PI Order, Doc. 241 at 32. Line relief occurs in places with long lines and wait times, and thus the "message relates to an issue of community concern (long lines at polling stations) that the legislature has acknowledged and is now attempting to address." *Id.* at 32–33. And as explained *supra*, "food has specific historical and cultural significance in the context of civil rights activities," *id.*, where recipients understand the messages of solidarity and perseverance conveyed.

The court was right that "context matters and supports Plaintiffs' argument that voters perceive Plaintiffs' activities as more than just the distribution of food and water." Doc. 241 at 33. For similar reasons, another federal court recognized that line-relief activities by groups such as the NAACP communicates a message to voters, and thus "it is expressive conduct that is protected by the First Amendment." *Brooklyn Branch of NAACP v. Kosinski*, No. 21 CIV. 7667 (KPF), 2024 WL 2846687, at *14 (S.D.N.Y. May 30, 2024). Based on the extensive factual record before it, the district court's finding of expressive conduct was not clear error.

**2.    *Defendants fail to show clear error in the district court's finding of expressive conduct.***

Defendants challenge the district court's careful factfinding based on a distortion of cherry-picked evidence and an erroneous view of the law this Court has already rejected. None of their arguments show an abuse of discretion.

31

First, Defendants assert that Plaintiffs cannot prove "an intent to convey a particularized message." Br. 25. Yet both the Supreme Court and this Court have rejected this as a requirement for finding expressive conduct. A "narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll. *Hurley*, 515 U.S. at 569 (internal citation omitted); *see also Food Not Bombs I*, 901 F.3d at 1240.

Second, Defendants argue that Plaintiffs' conduct must at least follow a "common thread." Br. 26. As explained *infra*, and as the district court found, Docs. 614 at 21, 241 at 31, Plaintiffs' messages *do* have a common thread. Regardless, Defendants get the standard wrong. This Court rejected this precise argument, i.e., that "in order to receive First Amendment protection a platform must curate and present speech in such a way that a 'common theme' emerges," as "flawed." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1219 (11th Cir. 2022), *vacated and remanded on other grounds sub nom. Moody*, 144 S. Ct. 2383. Crucially, the Supreme Court affirmed the principle from *Hurley* that "[a] 'narrow, succinctly articulable message is not a condition of constitutional protection,'" and noted that the "Eleventh Circuit [ ] saw the First Amendment issues much as we do." *Moody*, 144 S. Ct. at 2402, 2399 (quoting *Hurley*, 515 U.S. at 569). Similarly, in *Leake v.*

32

*Drinkard*, this Court held that display of the Confederate flag was expressive conduct even though people displaying the flag may be trying to convey *distinct and opposing messages* to different people. 14 F.4th 1242, 1252–53 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1443 (2022).

Third, Defendants argue that an observer must understand "at least a generic version of the intended message." Br. 26. Defendants conflate *Holloman*'s factual characterization of the gesture at issue there as "express[ing] a generalized message of disagreement or protest" with the baseline legal standard. 370 F.3d at 1270. As a legal matter, *Holloman* requires only that a "reasonable person" interpret the conduct "as *some* sort of message"—in other words, recognize the conduct as an attempt at expression irrespective of whether they understand the specific content of the message. *Id.*; *see also Burns*, 999 F.3d at 1336–37.

Even if Defendants were correct, the record demonstrates that "voters understand" the messages Plaintiffs convey with line relief "about community support, voter dignity and the importance of political participation," Order Granting PI, Doc. 614 at 21; *see also* Doc. 171-18 at 4 ("felt like my voice had value in the democratic process"); Doc. 171-19 at 3 (received message she "had dignity as a voter"); Doc. 171-13 at 5 (message that her "voice mattered, and that [she has] an important role to play in the political process"); Doc. 171-6 at 4; *supra* Section I.A.1.

33

Fourth, Defendants contend that expressive conduct "usually requires symbolism," but that line relief "does not inherently symbolize anything." Br. 26, 27. Defendants cite no authority for the necessity of symbolism or explain how conduct that conveys a message is not necessarily symbolic. More importantly, they ignore the tradition and context surrounding line relief that imbue the act with symbolism. Providing food and water "is part of a rich Southern Black political tradition" in which food plays "an important role in resisting unjust laws and regimes that have sought to stymie Black political participation." Doc. 171-10 at 6; *see also* Doc. 171-3 at 4 (line relief shares a "close connection" of that work with "the work of civil rights activists in the past."); Doc. 171-4 at 8; *supra* Section I.A.1. Sharing food and water to voters waiting in lines longer than 150 feet connects this tradition with a contemporary political struggle. Given this evidence, the district court did not clearly err in finding symbolism in line relief, where it occurred in the midst of "an issue of community concern (long lines at polling stations) that the legislature has acknowledged," and given food sharing's "specific historical and cultural significance in the context of civil rights activities." Doc. 241 at 32–33 (citing *Food Not Bombs I*, 901 F.3d at 1242–43).

Fifth, Defendants point to passing references by three individuals to contend that Plaintiffs are actually communicating through their speech rather than conduct. Br. 28. But as this Court explained in *Food Not Bombs I*, conduct does not lose "its

34

expressive nature just because it is also accompanied by other speech. . . . The critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct." 901 F.3d at 1243–44. The answer here is no. That some individuals may sometimes use actual speech does not detract from the ample evidence in support of the district court's finding that the conduct is expressive.

These isolated references only further demonstrate that line relief is expressive conduct and any other speech that followed was incidental and driven by the expressive act. For the individual who handed out nonpartisan voter guides while providing food and water, her conduct "let voters know that what they are doing is important, that it is important to exercise their legal rights." Doc. 171-15 at 4. To her, "[w]ords without action can mean nothing." *Id.* For the person who provided words of encouragement in addition to food, he was inspired to provide line relief himself because of the "messages of solidarity and encouragement" he had taken from receiving line relief himself while waiting in a long line. Doc. 185-4 at 3. And for the individual whose line relief sparked conversation, it was still the "simple offerings" of food and water that bore symbolic meaning and that spur a subsequent conversation about the message the line relief conveyed. Doc. 185-7 at 3.

The record supports that the district court was well within its discretion in finding that line relief constitutes protected expressive conduct.

**B.    The Roving Supplemental Zone Line Relief Ban is a Content-Based Restriction as It Targets Expressive Conduct because of Concerns about the Messages' Effect on Its Recipients.**

Content-based restrictions on speech are subject to strict scrutiny and are presumptively unconstitutional. *See*, *e.g.*, *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 55 (1983). The district court correctly found, and thus did not abuse its discretion in finding, that the Ban was both a content-based regulation and that line relief takes place in a traditional public forum.

> *1.    The Roving Supplemental Zone Ban is a content-based regulation because it was justified based on the expected effect of its message on voters, albeit erroneously.*

The Ban is content-based because the state's principal justification for the law is not a non-expressive concern about littering or physical obstruction, but an unjustified belief about how voters will perceive the message of the line relief. Laws can be content-based if they "cannot be 'justified without reference to the content of the regulated speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (alteration in original) (citation omitted); *see also Boos*, 485 U.S. at 320 (same). In this inquiry, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791.

36

The Roving Supplemental Zone Ban is content-based because it "targets the direct effect of Plaintiffs' speech on voters." Order Granting PI, Doc. 614 at 22. Indeed, "the very preamble of S.B. 202 justifies the legislation on the grounds that it protects voters from the potential effects of Plaintiffs' speech." *Id.* Mr. Germany also admitted that the Ban was driven by concerns about perceptions of political influence (regardless of partisan intent) by those providing line relief—i.e., the effect of the message on the audience. Doc. 535-3 at 4. Defendants were wrong about how recipients of line relief received this message, but that does not change the fact the Roving Supplemental Ban targets speech for its communicative effect rather than incidentally burdening speech while targeting secondary effects like litter or physical obstruction.

In *Boos*, the prohibition on signs within a certain distance of foreign embassies sought "to protect the dignity of foreign diplomatic personnel by shielding them from speech that is critical of their governments." 485 U.S. at 321. There, the Supreme Court rejected the government's attempt to sidestep the ban's target on the direct, emotive impact that speech has on its listeners as a "secondary effect." *Id.* So too here, where the Ban sought to protect voters from messages that the government believed they may perceive as electioneering (albeit incorrectly). If, for example, Defendants had justified the Ban because of a need to prevent litter on public streets, it would be content neutral and a different standard of review

would apply, much like the noise ordinance in *Ward*, 491 U.S. at 792. But legislating based on "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). Yet that is the very basis for the Ban's enactment here. Because the "government's purpose" controls, *see Ward*, 491 U.S. at 791, the district court did not abuse its discretion in finding the Ban was content-based.

Defendants cite *Lichtenstein v. Hargett*, 83 F.4th 575, 588 (6th Cir. 2023)—a case concerning whether distribution of absentee voting applications constituted expressive conduct—for the proposition that the "First Amendment's content-neutrality test asks whether a law treats different *messages* differently, not whether it treats different *conduct* differently." Br. 42. But this ignores the reason why the district court found the Ban content-based even if facially neutral: it targeted the potential effect on the listener, i.e., voters' perception of the messages of line relief. *Lichtenstein* is more instructive for a different point: the appropriateness of "heightened scrutiny" when a statute "target[s] speech by restricting the conduct that created the speech." 83 F.4th at 586. So too here. The law is "concerned about perceptions of political influence from organizations distributing food and water" and "S.B. 202 responded to these concerns." Order Granting PI, Doc. 614 at 22 (quoting Doc. 535-3 at 4). By contrast, Defendants ignore that another federal court agreed that New York's line-relief restrictions are content-based because they do

"not prohibit *all* communication with voters, but instead selectively carve[] out line warming." *Brooklyn Branch of NAACP*, 2024 WL 2846687, at *14.

Nor does Defendants' argument that "court's key mistake on this point was conflating the analysis for regulations of speech (written or verbal) with that for regulations of conduct," Br. 44, advance their point. Defendants' cite *Lichtenstein* for this distinction, but omit that the Sixth Circuit explained that a ban of expressive conduct may be content-based when the "violation 'depended'" not on the conduct-related risks of burning things but on the "communicative impact" of the action. *Lichtenstein*, 83 F.4th at 585 (citation omitted). Here, the Georgia Legislature's justification for the law was not based on people receiving food to eat in line but instead on the messages it thought people may perceive when receiving that food.

The ban on honking in *Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023), another out-of-circuit case that Defendants cite, is even more inapposite. Br. 42–43. As the Ninth Circuit emphasized, the California legislature "justified" that law with reference to "the safe operation of motor vehicles and noise reduction," and was not "motivated by disagreement with any particular expressive use of the vehicle horn." *Porter*, 68 F.4th at 443. Not so here, where the law itself makes clear that it is motivated by assumptions that voters may view potential messages as "interference, political pressure, or intimidation." § 2(13), S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021). Unlike the blanket ban on "*all* driver-initiated horn use

except when such use is 'reasonably necessary to [e]nsure safe operation' of the vehicle" there, *Porter*, 68 F.4th at 441, the Ban here criminalizes giving food only to people waiting to vote—not sharing food anywhere and at any time. That is precisely because that context renders the conduct communicative, and Defendants want to minimize certain types of messages.

For similar reasons, this case also differs from *Food Not Bombs*, where the Court applied intermediate scrutiny because the prohibition on food distribution in parks applied to many non-expressive activities, and the city had cited several non-content-related concerns like "trash build-up, noise, and food safety issues." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*Food Not Bombs II*"), 11 F.4th 1266, 1293 (11th Cir. 2021). No such neutral justifications based on secondary effects are present here. The Ban targets line relief at polling places by design, and because of content-related concerns.

Finally, Defendants cite *Clark*, in which the challenged law allowed protesters calling attention to the plight of unhoused communities to erect tent cities but not sleep in them. Br. 43 (citing 468 U.S. at 295–96). But unlike here, where the Ban was aimed at fears of the effects of Plaintiffs' expression on listeners, the *Clark* restriction on sleeping in tents was not applied because of fears of the message expressed but rather for reasons unrelated to speech. *See Clark*, 468 U.S. at 295.

>    **2.    The district court did not abuse its discretion in finding that line relief occurs in a public forum, which Defendants conceded below.**

On appeal, Defendants now contend that the district court abused its discretion in finding that the area covered by the Roving Supplemental Zone—more than 150-feet from the polling place building—was a traditional public forum. Br. 36–41. But Defendants explicitly abandon this argument below. *See*, *e.g.*, *Tucker v. Mukamal*, 616 F. App'x 969, 973 (11th Cir. 2015) (party waives argument by conceding it below). Even if they had not waived it, the argument also lacks merit in light of *Burson*, which recognized that an area even closer to the polling place building is a public forum. 504 U.S. at 196.

Additionally, below, in their response to the motion for preliminary injunction at issue, Defendants conceded that the space regulated by the Roving Supplemental Zone is a public forum. Referencing *Burson*, they argued that "if a state may regulate pure political speech—even after a voter has voted—around a polling place that is also a public forum, it may certainly restrict lesser forms of expression." Doc. 578 at 22. Defendants' concession below was correct. The *Burson* plurality held that the area outside a polling place, including "parks, streets and sidewalks," is a "quintessential public forum[]." 504 U.S. at 196; *see also McCullen v. Coakley*, 573 U.S. 464, 476–77 (2014) (discussing the "traditionally open character of public streets and sidewalks" and characterizing them as "traditional public fora"). This Court has recognized that the *Burson* plurality's

41

decision is binding in this respect. *See Citizens for Police Accountability*, 572 F.3d at 1217–18 n.9.

Now, on appeal, Defendants contend that the line relief Ban "applies only to a narrow selection of government property (usually the polling place and some part of a sidewalk)," Br. 36. But *Burson* recognized that sidewalks are a traditional public forum. Regardless, Defendants ignore that the Ban here concerns only activity *outside* of the 150-foot Buffer Zone. If the 100-foot Buffer Zone in *Burson* was a regulation of speech in a public forum because it encompassed sidewalks, streets, and other traditional public fora, surely similar areas even further (more than 150-feet) from the polling place are public fora as well.

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018), which Defendants cite, provides them no support. Br. 36–38. That case held that "the *interior* of the [polling place] building" was a nonpublic forum, and explicitly distinguished that from the *Burson* plurality's conclusion that "the public sidewalks and streets *surrounding* a polling place" are a traditional public forum. *Minn. Voters All.*, 585 U.S. at 12–13 (emphasis added).

The Court did not abuse its discretion by agreeing with Supreme Court and this Court's precedent in classifying the Supplemental Zone as a public forum.

**C.    The Roving Supplemental Zone Ban's Limitless Application Outside the 150-foot Buffer Zone Fails Any Level of Scrutiny.**

Because the Ban is a content-based restriction of expression in a public forum, traditional strict scrutiny applies. *See Perry Educ. Ass'n*, 460 U.S. at 55. Modified strict scrutiny under *Burson* applies "*only* when the First Amendment right *threatens to interfere with the act of voting itself.*" *Burson*, 504 U.S. at 209 n.11 (emphasis added). It "does not apply to all cases where there is a conflict between First Amendment rights and a State's election process" such as a regulation directed at attempts to "influence" voters. *Id.*; *see also Citizens for Police Accountability*, 572 F.3d at 1221.

Nonetheless, the district court did not abuse its discretion in finding that the Roving Supplemental Zone Ban does not survive *Burson* scrutiny either. Under *Burson*, Defendants bear the burden of proving that the law is narrowly tailored to advance a compelling government interest, meaning the "[s]tatute is 'reasonable and does not significantly impinge on constitutionally protected rights.'" *Citizens for Police Accountability*, 572 F.3d at 1221 (quoting *Burson*, 504 U.S. at 209). But the Roving Supplemental Zone Ban is not "*narrowly drawn* to further a substantial governmental interest" which "is unrelated to the suppression of free speech," *Clark*, 468 U.S. at 294 (emphasis added), and thus also fails the intermediate scrutiny standard that Defendants urge, *see* Br. 41; *see also Brooklyn Branch of NAACP*, 2024 WL 2846687, at *16 ("Because the Line Warming Ban is insufficiently tailored

43

to survive intermediate scrutiny under *O'Brien*, it certainly does not withstand strict scrutiny.").

> ### 1. The Ban significantly impinges on Plaintiffs' expression by functionally banning their line relief activities outright.

Defendants do not and cannot contest Plaintiffs' showing that the Roving Supplemental Zone Ban caused them to cease their expressive line relief activities. *See* Docs. 535-10 at 4, 535-11 at 4, 535-12 at 4, 535-13 at 2. Instead, they say that Plaintiffs may still offer food and drink if they stay 25-feet away from any voter in line outside of the 150-foot Buffer Zone, even as the line ebbs and flows. Br. 46. But providing line relief necessarily means "approaching voters within 25 feet of the voting line." Doc. 535-13 at 2; *see also* Docs. 171-3 at 4, 535-10 at 4. Of course, any voter who leaves the line and walks more than 25 feet away risks losing their place in the queue, or even being unable to vote at all if they leave after 7:00 p.m. *See* Doc. 578-4 at 9. Simply saying Plaintiffs may hover many feet back from any voter does not provide them the "close, personal" interactions "they view as essential" to the expression. *McCullen*, 573 U.S. at 487. Nor is such a restriction practical, given the difficulty of determining a 25-foot boundary that is constantly moving, unlike the set 150-foot Buffer Zone. *See* S*chenck v. Pro-Choice Network of W. N.Y.,* 519 U.S. 357, 377 (1997) (striking down floating buffer zone around abortion clinic for similar reasons).

44

Here, as the district court correctly found, the Roving Supplemental Zone Ban fails *Burson* scrutiny almost as a matter of definition (even if viewed in the context of electioneering bans, which Plaintiffs' challenge do not implicate): "it does not apply only in the immediate vicinity of the polling location and instead applies no matter the distance from the polls so long as a voter is present" and has "no fixed boundary and thus no limit." Doc. 614 at 25. Rather than serving as a "minor geographic limitation," the Roving "Supplemental Zone is neither restricted nor limited in its geographic application." *Id.* (quoting *Burson*, 504 U.S. at 210); *cf. Anderson v. Spear*, 356 F.3d 651, 661 (6th Cir. 2004) (holding 500-foot buffer zone against electioneering was of such a "geographic scope" that the distance "alone raises constitutional concerns"); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1053 (6th Cir. 2015) (striking down 300-foot no-electioneering buffer zone where the State "did not present any evidence—or even a non-evidentiary policy argument" that justified "a no-speech zone nine times larger than the one previously authorized by the Supreme Court"). Instead, it is "so expansive that it constitute[s] a total ban on" the speech and expressive conduct. *Frank v. Lee*, 84 F.4th 1119, 1145 (10th Cir. 2023) (quoting *Burson*, 504 U.S. at 210).

As the district court found, the Ban prohibits an unreasonable swath of speech and expression, functionally banning line relief activities altogether in the Roving Supplemental Zone, and thus violates the First Amendment.

45

### 2. The Ban's limitless application and chilling sweep are not narrowly tailored to advance the State's interests.

The sole interests that Defendants offer in service of the Roving Supplemental Zone Ban are "protecting voters from confusion and undue influence" and "preserving the integrity of [the] election process." Br. 44–45; *see also* Br. 21. But they offer no rationale—in the adoption of S.B. 202 or even in this litigation—for why prohibiting non-partisan line relief activities more than 150 feet from the polling place reduces voter confusion or prevents undue influence in light of existing electioneering bans, or what they even mean by a vague reference to "election integrity." *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 632 (6th Cir. 2016) ("some level of specificity is necessary to convert that abstraction into a definite interest for a court to weigh").

Defendants' reliance on *Burson* is misplaced. There, the state was able to support its 100-foot electioneering-restricted zone as advancing the State's interests in preventing voter fraud (and thus protecting election integrity) based on an extensive history in Tennessee of "political candidates [using] campaign workers to commit voter intimidation or electoral fraud." 504 U.S. at 207; *see also Schirmer v. Edwards*, 2 F.3d 117, 122 (5th Cir. 1993) (citing evidence in Louisiana that poll workers engaged in voter harassment and intimidation). Here, the State has not shown *any* history of *anyone* using line relief as a cover to commit voter fraud or

46

otherwise interfere with voters. And that hypothetical conduct would already be illegal under multiple provisions of Georgia law anyway.

Defendants claim that gift-giving around polling places has included "food trucks, food tables, and other activities," that create a circus-like atmosphere, making "prophylactic measures . . . essential." Br. 53. But even were this concern sufficient to stifle speech, Georgia law has forbidden tables and booths near the polling place since 2017. *See* § 19, H.B. 268, Act 250, 154th Leg., Reg. Sess. (Ga. 2017). Thus, any interest in prohibiting bribery or maintaining order around the polling place already exists via prohibitions on electioneering and tabling. The Roving Supplemental Zone Ban represents a "prophylaxis-upon-prophylaxis approach" that is a "significant indicator that the regulation may not be necessary for the interest it seeks to protect." *Fed. Election Comm'n*, 596 U.S. at 306.

Moreover, Defendants miss another key distinction from *Burson* and *Citizens for Police Accountability*: line relief does not involve solicitation. It asks nothing of potential voters, simply offering food or water without any conditions attached. *See* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining solicitation as the "act or an instance of requesting or seeking to obtain something."). The court relied on this distinction in upholding a ban on solicitation within a 100-foot buffer zone around a polling place, rejecting the plaintiffs' comparison to exit polling: "exit polling does not include advocating for the success of some political proposal or candidate,"

47

creating "fundamental differences between the two activities." *Citizens for Police Accountability*, 572 F.3d at 1219 n.11. Like exit polling, line relief does not involve advocating for candidate success or asking anything of the voter in return.

Elsewhere in their brief, Defendants reference voter "intimidation," *see* Br. 15, 20, 53, but do not explain how voters might reasonably feel intimidated by unconditional offers of food and water, and do not develop the argument further in their narrow tailoring section. The only concrete reference to intimidation is based on one double hearsay story—Mr. Germany recounting a woman who purportedly believed that *other* voters appeared frightened by the mere presence of individuals wearing Black Voters Matter shirts and providing line relief. *See* Br. 9 (citing Doc. 197-2 at 50). This speculative, far-removed evidence about a single incident laced with racial undertones lacks any reliability.

Defendants asserted one more interest below—that the Ban helps maintain peace and order at the polling place—but they abandon that assertion here, referring to it only in passing when quoting the district court's opinion. *See* Br. 15, 41; *Islam v. Sec'y, Dep't of Homeland Sec.*, 997 F.3d 1333, 1343 (11th Cir. 2021) (holding argument was "abandoned" when mentioned "only in passing, without developing any substantive arguments"); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Regardless, "[g]overnment 'justification[s]' for interfering with First Amendment rights 'must be genuine, not hypothesized or invented *post*

*hoc* in response to litigation." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Neither S.B. 202's text nor Defendants in their discovery responses referenced such an interest, *see* § 2(13), S.B. 202, Act 9, 156th Leg., Reg. Sess. (Ga. 2021); Doc. 171-22 at 3–4, and Defendants presented it for the first time in defending against Plaintiffs' first preliminary injunction motion.

Even if Defendants had presented rationales or evidence supporting the need for the Ban within the 150-foot Buffer Zone, nothing in the record supports the need for a Ban in the Roving Supplemental Zone at limitless distances beyond 150 feet. As explained *supra*, county election officials—who are consistently on the front lines at polling places—either saw little need for a ban at all, Docs. 216-2 at 4, 171-5 at 5, 535-7 at 3, or were satisfied limiting it to 150 feet, Docs. 535-5 at 3, 535-6 at 2–3. None of the approximately dozen counties sued even opposed this preliminary injunction or appealed the district court's grant of it.

The Roving Supplemental Zone Ban stifles Plaintiffs' speech and expressive conduct far more broadly than is reasonable and thus cannot survive strict, *Burson*, or intermediate scrutiny.

**D.    Because Many Applications of the Roving Supplemental Zone Line Relief Ban Are Unconstitutional, the District Court Awarded the Correct Scope of Relief.**

Laws that "sweep[] too broadly, penalizing a substantial amount of speech that is constitutionally protected" are "subject to facial review and invalidation" despite more stringent standards for facial invalidation in other contexts. *Forsyth Cnty.*, 505 U.S. at 129–30. Defendants rely on *United States v. Salerno*, 481 U.S. 739 (1987), Br. 32, yet the Supreme Court reaffirmed this year that a "different standard applies" when the challenge "is based on the First Amendment," *Moody*, 144 S. Ct. at 2397. Rather, in cases like this, facial relief is appropriate against a law when "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). In other words, a First Amendment facial challenge succeeds when "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* Here, a substantial number, if not almost all of the Roving Supplemental Zone Ban's applications are unconstitutional.

The Ban's purpose was specifically to stymie Plaintiffs' line relief efforts, supporting justifies facial relief. As Defendants spell out, the Legislature passed the law to address what it saw as "invasive activities of advocacy organizations" in providing food and drinks to voters in line. Br. 3. The restrictions of expressive conduct are the feature, not a bug, of the Ban. Defendants' attempts to characterize

much of this activity as pure "conduct" simply beg the question of their First Amendment argument, and do not pertain to the scope of relief.

Moreover, the only other situations they identify of providing food and drink that are not line relief relate to electioneering activities, *see* Br. 32, which Georgia law already banned and thus are not part of the scope of this analysis. The only other feasible scenario that implicates the Ban outside of line relief or electioneering is someone in line sharing food with someone else in line—but this is not a realistic target of enforcement for the law, and there is no record testimony as to how often, if ever, this occurs and whether any action is taken. Thus, based on the law's main purpose and the lack of examples of other non-expressive conduct that it sweeps in, Plaintiffs have demonstrated that the Ban has a "substantial number of unconstitutional applications" with little if any legitimate sweep. *See*, *e.g.*, *Anderson*, 356 F.3d at 657 ("Applying the *Burson* 'significant impingement' test, we conclude that the 500–foot buffer zone is facially overbroad.")

In any event, the facial versus as-applied distinction "affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (citation omitted); *see also Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). Therefore, if the Court decides

51

the Ban is only unconstitutional as applied, it can remand to order that relief rather than reversing. *See Johnson*, 491 U.S. at 403 n.3 ("Although Johnson has raised a facial challenge to Texas' flag desecration statute, we choose to resolve this case on the basis of his claim that the statute as applied to him violates the First Amendment.").

## II.    The District Court Properly Weighed the Equitable Factors.

### A.    Defendants Fail to Rebut Plaintiffs' Showing of Irreparable Harm.

The threat of impairment of First Amendment interests, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373–74. The district court found that the Ban "chilled the exercise" of Plaintiffs' "First Amendment rights" and "the lost opportunity for expression cannot be remedied after the fact." Doc. 614 at 28. Because the record supports a likelihood that at least some Georgians will continue to be forced to wait in lines stretching longer than 150-feet from the polling place building, and because the Roving Supplemental Zone Ban prevents Plaintiffs' from engaging in line relief for those voters, the district court correctly found that Plaintiffs face irreparable harm in the absence of an injunction.

Both the 2022 general election and runoff elections featured 150-foot-plus lines and multi-hour waiting times in numerous locations. Georgia's State Elections Director admitted "[t]here were areas that saw long lines" during the 2022 runoff,

Doc. 535-15 at 3, like in Gwinnett County, where it was "somewhat common" to have wait times over an hour, and lines "[d]efinitely" extending beyond 150 feet from the polls, Doc. 535-16 at 3. In Cobb County, some locations had waits of "up to two hours," Doc. 535-8 at 2, and on the Friday before the runoff, 21 of 24 Fulton County early voting locations and 11 of 16 in DeKalb County had waits of at least an hour, Doc. 535-18 at 43.

Based on the total evidence, the district court found "that the issue of long lines is sufficiently likely to continue" in future elections and that "Plaintiffs will suffer irreparable injury absent an injunction." Doc. 614 at 31. It did not abuse its discretion in so finding. The Ban did and will continue to irreparably harm Plaintiffs by preventing them from engaging in expressive conduct.

## B.    The Balance of Equities and Public Interest Favor Plaintiffs.

When constitutional rights hang in the balance, this interest outweighs any prospective harm to defendants from being unable to enforce the law. *See, e.g.,* *Gonzalez*, 978 F.3d at 1272. Rather, a preliminary injunction serves the public interest when constitutional rights are protected. *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1327.

Additionally, "neither the government nor the public has any legitimate interest in enforcing an unconstitutional [law]." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). Defendants cite *New Georgia Project v. Raffensperger*,

976 F.3d 1278, 1283 (11th Cir. 2020), Br. 52–53, for its statement that the State faces harm when a court bars it from conducting elections "pursuant to a statute enacted by the Legislature," but they omit the language that follows: "unless the statute is unconstitutional." *Id.* They also fail to note that the County Defendants, who play a major part in enforcing the Ban, did not oppose the instant preliminary injunction and did not pursue an appeal here.

The district court also was well within its discretion to reject Defendants' argument that Plaintiffs unduly delayed seeking a preliminary injunction against the Ban. As to the first preliminary injunction motion, which is not the subject of this appeal, the Court explained that "[t]he complaints in this case were filed soon after the passage of S.B. 202, and the timing of Plaintiffs' Motions is reasonable in the context of ongoing discovery and the procedural posture of this case." Doc. 241 at 73. As to the motion seeking relief for the 2024 elections and beyond, which resulted in the injunction presently before this Court, the district court explained that "[h]ad Plaintiffs filed their motions earlier," their "irreparable harm would not be shown for an election so far in advance." Doc. 614 at 33–34 & n.18. The district court's rejection of those arguments should be accorded great deference given its intimate knowledge of how the case has proceeded and its docket management decisions.

As to "the threat of election interference and voter intimidation," Br. 53, Defendants' own evidence belies their point. They speak to the explosion of "food

trucks, food tables, and other activities," Br. 53, but again, food tables and booths (which would include food trucks) were banned in 2017, § 19, H.B. 268, Act 250, 154th Leg., Reg. Sess. (Ga. 2017), and thus not a subject of the challenge. And in any event, a separate Georgia law already provides criminal penalties for anyone who "materially interrupts or improperly and materially interferes with the execution of a poll officer['s]…duties." O.C.G.A. § 21-2-566.

The district court was well within its discretion in finding that the equities weigh decidedly in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court affirm the district court's order granting a preliminary injunction.

Dated: August 30, 2024

Respectfully Submitted,

/s/ *Davin M. Rosborough*
Davin M. Rosborough
Sophia Lin Lakin
Jonathan Topaz
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7836

Leah C. Aden
John S. Cusick
Alaizah Koorji
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Cory Isaacson
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
(678) 981-5295

Anuja Thatte
NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.
700 14th Street, NW
Washington, DC 20005
(202) 682-1300

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

Bradley E. Heard
Pichaya Poy Winichakul
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30031
(404) 521-6700

George P. Varghese
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000

Tania Faranasso
Laura E. Powell
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000

*Attorneys for Plaintiffs-Appellees Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, Georgia Muslim Voter Project, Latino Community Fund of Georgia, The Arc of the United States, and Women Watch Afrika*

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FRAP 32, because, excluding the parts of the document exempted by FRAP 32(f), this document contains 12,923 words. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).


Dated: August 30, 2024                    Respectfully submitted,

                                          /s/ *Davin M. Rosborough*