Nos. 23-13085 and 23-13095

In the United States Court of Appeals
for the Eleventh Circuit

---

IN RE: GEORGIA SENATE BILL 202

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

Master Case No. 1:21-mi-55555-JPB

**PLAINTIFFS-APPELLEES GEORGIA STATE CONFERENCE OF THE NAACP, GEORGIA COALITION FOR THE PEOPLE'S AGENDA, INC., LEAGUE OF WOMEN VOTERS OF GEORGIA, INC., GALEO LATINO COMMUNITY DEVELOPMENT FUND, INC., COMMON CAUSE, AND THE LOWER MUSKOGEE CREEK TRIBE'S BRIEF IN OPPOSITION TO APPEAL AND IN SUPPORT OF CROSS-APPEAL**

FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
(415) 875-2300

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Ste 900
Washington, D.C. 20005
(202) 662-8600

THE LAW OFFICE OF BRYAN SELLS,
LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

LAW OFFICES OF GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

*Attorneys for Plaintiffs-Appellees
Georgia State Conference of the NAACP,
Georgia Coalition for the People's
Agenda, Inc., League of Women Voters of
Georgia, Inc., GALEO Latino
Community Development Fund, Inc.,
Common Cause, and the Lower
Muskogee Creek Tribe*

*Additional Counsel Information on Front
Pages*

*Attorneys for Plaintiffs-Appellees Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek Tribe:*

Laurence F. Pulgram
Armen Nercessian
FENWICK & WEST LLP
555 California Street
San Francisco, CA 94104
(415) 875-2300

Catherine McCord
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
(212) 430-2690

Ezra D. Rosenberg
Julie M. Houk
Jennifer Nwachukwu
Heather Szilagyi
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600

Bryan L. Sells
THE LAW OFFICE OF BRYAN SELLS, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

Gerald Weber
LAW OFFICES OF GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3, Plaintiffs-Appellees Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek Tribe certify that the following persons and entities have an interest in the outcome of this appeal:

1. Abbott, Robert, *Defendant*

2. Abudu, Nancy, *Former Attorney for Plaintiffs-Appellees*

3. Adegbile, Debo, *Attorney for Plaintiffs-Appellees*

4. Aden, Leah, *Attorney for Plaintiffs-Appellees*

5. Advancement Project, *Attorneys for Plaintiffs-Appellees*

6. Ameri, Mana, *Attorney for Plaintiffs-Appellees*

7. American Civil Liberties Union Foundation of Georgia, Inc., *Attorneys for Plaintiffs-Appellees*

8. American Civil Liberties Union Foundation, Inc., *Attorneys for Plaintiffs-Appellees*

9. Andrews, Wanda, *Defendant*

10. Aquino, Nora, *Plaintiff-Appellee*

11.  Asian Americans Advancing Justice-Asian Law Caucus, *Attorneys for Plaintiffs-Appellees*

12.  Asian Americans Advancing Justice-Atlanta, *Plaintiff-Appellee*

13.  Augusta Georgia Law Department, *Attorneys for Defendant*

14.  Ausburn, Deborah, *Attorney for Defendants-Appellants*

15.  Awuku, George, *Defendant*

16.  Banks, Marques, *Attorney for Plaintiffs-Appellees*

17.  Banter, James, *Attorney for Defendant*

18.  Barkdull, Annika Boone, *Attorney for Defendants-Appellants*

19.  Barnes, Sherry, *Defendant*

20.  Barron, Richard, *Defendant*

21.  Bartolomucci, Christopher, *Attorney for Defendants-Appellants*

22.  Beausoleil, William, *Attorney for Plaintiffs-Appellees*

23.  Beck Owen & Murray, *Attorneys for Defendant*

24.  Begakis, Steven, *Attorney for Intervenors-Appellants*

25.  Belichick, Joseph, *Attorney for Plaintiffs-Appellees*

26.  Bell, Jordan, *Attorney for Defendant*

27.  Bennette, Matletha, *Attorney for Plaintiffs-Appellees*

28.  Bibb County Board of Elections, *Defendant*

29.  Bibb County Board of Registrars, *Defendant*

30. Black Voters Matter Fund, *Plaintiff-Appellee*

31. Blender, Matthew, *Defendant*

32. Bloodworth, Kristin, *Former Attorney for Defendant*

33. Boulee, Honorable Jean-Paul ("J.P."), *United States District Court Judge*

34. Bowman, Brad, *Attorney for Defendant*

35. Boyle, Donald, *Attorney for Defendants-Appellants*

36. Broder, Karl, *Attorney for Defendant*

37. Brooks, Jessica, *Defendant*

38. Brooks, Sofia, *Attorney for Plaintiffs-Appellees*

39. Brown, Marcia, *Defendant*

40. Bruning, Stephen, *Defendant*

41. Bruning, Steven, *Defendant*

42. Bryan, Bennett, *Attorney for Defendant*

43. Burwell, Kaye, *Attorney for Defendant*

44. Campbell-Harris, Dayton, *Attorney for Plaintiffs-Appellees*

45. Carr, Christopher M., Attorney General of the State of Georgia, *Attorney for Defendants-Appellants*

46. Carver, William, *Attorney for Intervenors-Appellants*

47. Cathey, Thomas, *Former Attorney for Defendant*

48. Chalmers, Adams, Backer & Kaufman, LLC, *Attorneys for Defendant*

49. Chatham County Attorney, *Attorneys for Defendant*

50. Chatham County Board of Elections, *Defendant*

51. Chatham County Board of Registrars, *Defendant*

52. Clarke County Board of Election and Voter Registration, *Defendant*

53. Clayton County Board of Elections and Registration, *Defendant*

54. Cobb County Board of Elections and Registration, *Defendant*

55. Cochran, Ken, *Defendant*

56. Columbia County Board of Elections, *Defendant*

57. Columbia County Board of Registrars, *Defendant*

58. Common Cause, *Plaintiff-Appellee*

59. Consovoy McCarthy PLLC, *Attorney for Intervenors-Appellants*

60. Cramer, Raisa, *Former Attorney for Plaintiffs-Appellees*

61. Crawford, Teresa, *Defendant*

62. Crowell & Moring, LLP, *Attorneys for Plaintiffs-Appellees*

63. Cushman, Ann, *Defendant*

64. Cusick, John, *Attorney for Plaintiffs-Appellees*

65. Dasgupta, Riddhi, *Attorney for Defendants-Appellants*

66. Dave, Charles, *Defendant*

67. Davenport, Jennifer, *Attorney for Defendant*

68. Davis Wright Tremaine LLP, *Attorneys for Plaintiffs-Appellees*

69. Davis, Britton, *Former Attorney for Plaintiffs-Appellees*

70. Day, Stephen, *Defendant*

71. DeKalb County Board of Registrations and Elections, *Defendant*

72. DeKalb County Law Department, *Attorneys for Defendant*

73. Delta Sigma Theta Sorority, Inc., *Plaintiff-Appellee*

74. Denmark, Emilie, *Attorney for Defendant*

75. Dentons US LLP, *Attorney for Intervenors-Appellants*

76. Deshazior, Zurich, *Defendant*

77. DeThomas, Courtney, *Attorney for Plaintiffs-Appellees*

78. Dianis, Judith, *Attorney for Plaintiffs-Appellees*

79. Dickey, Gilbert, *Attorney for Intervenors-Appellants*

80. Dicks, Terence, *Defendant*

81. Dimmick, Brian, *Attorney for Plaintiffs-Appellees*

82. DiStefano, Don, *Defendant*

83. Doss, Travis, *Defendant*

84. Dozier, Shauna, *Defendant*

85. Drennon, Baxter, *Attorney for Intervenors-Appellants*

86. Duffey, William, Jr., *Defendant-Appellant*;

87. Duffie, Wanda, *Defendant*

88. Durbin, Jauan, *Plaintiff-Appellee*

89.  Durso, Katherine, *Defendant*

90.  Edwards, Gregory, District Attorney for Dougherty County, *Defendant*

91.  Elias Law Group LLP, *Attorneys for Plaintiffs-Appellees*

92.  Ellington, Thomas, *Defendant*

93.  Enjeti-Sydow, Anjali, *Plaintiff-Appellee*

94.  Evans, James, *Attorney for Defendant*

95.  Evans, Rachel, *Attorney for Plaintiffs-Appellees*

96.  Evans-Daniel, Karen, *Defendant*

97.  Eveler, Janine, *Defendant*

98.  Exousia Lighthouse International C.M., Inc, *Former Plaintiff*

99.  Faith In Action Network, *Former Plaintiff*

100.  Falk, Donald, *Attorney for Defendants-Appellants*

101.  Fambrough, Willa, *Defendant*

102.  Faransso, Tania, *Attorney for Plaintiffs-Appellees*

103.  Farrell, Gregory, *Attorney for Plaintiffs-Appellees*

104.  Feldsherov, Ilya, *Former Attorney for Plaintiffs-Appellees*

105.  Fenwick & West, LLP, *Attorneys for Plaintiffs-Appellees*

106.  Field, Brian, *Attorney for Defendants-Appellants*

107.  First Congregational Church, United Church of Christ Incorporated,

    *Plaintiff-Appellee*

108.  Fogelson, Matthew, *Attorney for Plaintiffs-Appellees*

109.  Forsyth County Board of Voter Registrations and Elections, *Defendant*

110.  Fortier, Lucas, *Former Attorney for Plaintiffs-Appellees*

111.  Foster, Mikayla, *Attorney for Plaintiffs-Appellees*

112.  Freeman Mathis & Gary, LLP, *Attorneys for Defendant*

113.  Fulton County Attorney's Office, *Attorneys for Defendant*

114.  Fulton County Registration and Elections Board, *Defendant*

115.  Galeo Latino Community Development Fund, Inc., *Plaintiff-Appellee*

116.  Gammage, Keith, *Defendant*

117.  Garabadu, Rahul, *Former Attorney for Plaintiffs-Appellees*

118.  Gartland, Pat, *Defendant*

119.  Gay, Nancy, *Defendant*

120.  Geiger, Debra, *Defendant*

121.  Georgia Adapt, *Plaintiff-Appellee*

122.  Georgia Advocacy Office, *Plaintiff-Appellee*

123.  Georgia Coalition for the People's Agenda, Inc., *Plaintiff-Appellee*

124.  Georgia Department of Law, *Attorneys for Defendants-Appellants*

125.  Georgia Latino Alliance for Human Rights, Inc., *Plaintiff-Appellee*

126.  Georgia Muslim Voter Project, *Plaintiff-Appellee*

127.  Georgia Republican Party, Inc., *Intervenor-Appellant*

128.  Georgia State Conference of the NAACP, *Plaintiff-Appellee*

129.  Georgia State Election Board, *Defendant*

130.  Ghazal, Sara, *Defendant*

131.  Gibbs, Fannie, *Plaintiff-Appellee*

132.  Gillon, Thomas, *Defendant*

133.  Givens, Diane, *Defendant*

134.  Gossett, David, *Attorney for Plaintiffs-Appellees*

135.  Greater Works Ministries Network, Inc., *Former Plaintiff*

136.  Green, Tyler, *Attorney for Intervenors-Appellants*

137.  Greenberg Traurig, LLP, *Attorneys for Defendant*

138.  Groves, Angela, *Attorney for Plaintiffs-Appellees*

139.  Gwinnett County Board of Registrations and Elections, *Defendant*

140.  Gwinnett County Department of Law, *Attorneys for Defendant*

141.  Hall Booth Smith, P.C., *Attorney for Intervenors-Appellants*

142.  Hall County Board of Elections and Registration, *Defendant*

143.  Hall County Government, *Attorneys for Defendant*

144.  Hall, Dorothy, *Defendant*

145.  Hall, John, *Attorney for Intervenors-Appellants*

146.  Hamilton, Brittni, *Attorney for Plaintiffs-Appellees*

147.  Hancock, Jack, *Attorney for Defendant*

148. Hart, Ralph, *Attorney for Defendant*

149. Hart, Twyla, *Defendant*

150. Hasselberg, Emily, *Attorney for Plaintiffs-Appellees*

151. Hayes, Vilia, *Attorney for Plaintiffs-Appellees*

152. Haynie, Litchfield & White, PC, *Attorneys for Defendant*

153. Hazard, Joel, *Defendant*

154. Heard, Bradley, *Attorney for Plaintiffs-Appellees*

155. Heimes, Marianne, *Defendant*

156. Henseler, James, *Attorney for Plaintiffs-Appellees*

157. Herren, Thomas, *Attorney for Plaintiffs-Appellees*

158. Hiatt, Alexandra, *Attorney for Plaintiffs-Appellees*

159. Ho, Dale, *Former Attorney for Plaintiffs-Appellees*

160. Hodge, Malinda, *Defendant*

161. Houk, Julie, *Attorney for Plaintiffs-Appellees*

162. Hoyos, Luis, *Attorney for Plaintiffs-Appellees*

163. Hughes Hubbard & Reed, *Attorneys for Plaintiffs-Appellees*

164. Hughes, Aileen, *Attorney for Plaintiffs-Appellees*

165. Hull Barrett, PC, *Attorneys for Defendant*

166. Ingram, Randy, *Defendant*

167. Isaacson, Cory, *Attorney for Plaintiffs-Appellees*

168. Jacoutot, Bryan, *Attorney for Defendants-Appellants*

169. Jaffe, Erik, *Attorney for Defendants-Appellants*

170. Jahangiri, Mahroh, *Former Attorney for Plaintiffs-Appellees*

171. Jaikumar, Arjun, *Former Attorney for Plaintiffs-Appellees*

172. James-Bates-Brannan-Groover-LLP, *Attorneys for Defendant*

173. Jarrard & Davis, LLP, *Attorneys for Defendant*

174. Jasrasaria, Jyoti, *Former Attorney for Plaintiffs-Appellees*

175. Jaugstetter, Patrick, *Attorney for Defendant*

176. Jedreski, Matthew, *Attorney for Plaintiffs-Appellees*

177. Jester, Alfred, *Defendant*

178. Jester, Nancy, *Defendant*

179. Jhaveri, Sejal, *Attorney for Plaintiffs-Appellees*

180. Johnson, Aaron, *Defendant*

181. Johnson, Ben, *Defendant*

182. Johnson, Darlene, *Defendant*

183. Johnson, Melinda, *Attorney for Plaintiffs-Appellees*

184. Johnston, Janice, *Defendant*

185. Joiner, Amelia, *Attorney for Defendant*

186. Kanu, Nkechi, *Attorney for Plaintiffs-Appellees*

187. Kaplan, Mike, *Defendant*

188. Kastorf Law, LLC, *Attorneys for Plaintiffs-Appellees*

189. Kastorf, Kurt, *Attorney for Plaintiffs-Appellees*

190. Kaufman, Alex, *Attorney for Intervenors-Appellants*

191. Keker Van Nest & Peters LLP, *Attorneys for Plaintiffs-Appellees*

192. Kemp, Brian, Governor of the State of Georgia, *Defendant-Appellant*

193. Kennedy, David, *Defendant*

194. Kennedy, Kate, *Attorney for Plaintiffs-Appellees*

195. Keogh, William, *Attorney for Defendant*

196. Khan, Sabrina, *Attorney for Plaintiffs-Appellees*

197. Kim, Danielle, *Attorney for Plaintiffs-Appellees*

198. Kingsolver, Justin, *Attorney for Plaintiffs-Appellees*

199. Klein, Spencer, *Attorney for Plaintiffs-Appellees*

200. Knapp, Halsey, *Attorney for Plaintiffs-Appellees*

201. Koorji, Alaizah, *Attorney for Plaintiffs-Appellees*

202. Krevolin & Horst, LLC, *Attorneys for Plaintiffs-Appellees*

203. Kucharz, Kevin, *Attorney for Defendant*

204. Lakin, Sophia, *Attorney for Plaintiffs-Appellees*

205. Lam, Leo, *Attorney for Plaintiffs-Appellees*

206. Lang, Antan, *Defendant*

207. LaRoss, Diane, *Attorney for Defendants-Appellants*

208. Latino Community Fund of Georgia, *Plaintiff-Appellee*

209. Lauridsen, Adam, *Attorney for Plaintiffs-Appellees*

210. Law Office of Gerald R Weber, LLC, *Attorneys for Plaintiffs-Appellees*

211. Lawyers' Committee for Civil Rights Under Law, *Attorneys for Plaintiffs-Appellees*

212. League of Women Voters of Georgia, Inc., *Plaintiff-Appellee*

213. Leung, Kimberly, *Attorney for Plaintiffs-Appellees*

214. Lewis, Anthony, *Defendant*

215. Lewis, Joyce, *Attorney for Plaintiffs-Appellees*

216. Lin, Stephanie, *Attorney for Plaintiffs-Appellees*

217. Lindsey, Edward, *Defendant*

218. Lower Muskogee Creek Tribe, *Plaintiff-Appellee*

219. Lowman, David, *Attorney for Defendant*

220. Ludwig, Jordan, *Attorney for Plaintiffs-Appellees*

221. Luth, Barbara, *Defendant*

222. Ma, Eileen, *Attorney for Plaintiffs-Appellees*

223. Mack, Rachel, *Attorney for Defendant*

224. Mahoney, Thomas, *Defendant*

225. Manifold, Zach, *Defendant*

226. Martin, Grace Simms, *Attorney for Defendant*

227.  Mashburn, Matthew, *Defendant-Appellant*

228.  May, Caitlin, *Attorney for Plaintiffs-Appellees*

229.  McAdams, Issac, *Defendant*

230.  McCandless, Spencer, *Former Attorney for Plaintiffs-Appellees*

231.  McCarthy, Thomas, *Attorney for Intervenors-Appellants*

232.  McClain, Roy, *Defendant*

233.  McCord, Catherine, *Attorney for Plaintiffs-Appellees*

234.  McFalls, Tim, *Defendant*

235.  McFarland, Ernest, *Attorney for Plaintiffs-Appellees*

236.  McGowan, Charlene, *Former Attorney for Defendants-Appellants*

237.  Mcrae, Colin, *Defendant*

238.  Melcher, Molly, *Attorney for Plaintiffs-Appellees*

239.  Metropolitan Atlanta Baptist Ministers Union, Inc., *Plaintiff-Appellee*

240.  Mijente, Inc., *Former Plaintiff*

241.  Miller, Nicholas, *Attorney for Defendants-Appellants*

242.  Milord, Sandy, *Attorney for Defendant*

243.  Minnis, Terry, *Attorney for Plaintiffs-Appellees*

244.  Mizner, Susan, *Attorney for Plaintiffs-Appellees*

245.  Mocine-McQueen, Marcos, *Attorney for Plaintiffs-Appellees*

246.  Momo, Shelley, *Attorney for Defendant*

247. Morrison, Tina, *Attorney for Plaintiffs-Appellees*

248. Mosbacher, Jennifer, *Defendant*

249. Motter, Susan, *Defendant*

250. Murchie, Laura, *Attorney for Plaintiffs-Appellees*

251. Murray, Karen, *Defendant*

252. NAACP Legal Defense and Education Fund, Inc., *Attorneys for Plaintiffs-Appellees*

253. National Association for the Advancement of Colored People, Inc., *Parent Corporation of Georgia State Conference of the NAACP*

254. National Republican Congressional Committee, *Intervenor-Appellant*

255. National Republican Senatorial Committee, *Intervenor-Appellant*

256. Natt, Joel, *Defendant*

257. Nemeth, Miriam, *Former Attorney for Plaintiffs-Appellees*

258. Nercessian, Armen, *Attorney for Plaintiffs-Appellees*

259. New Birth Missionary Baptist Church, Inc., *Plaintiff*

260. Newland, James, *Defendant*

261. Nguyen, Candice, *Attorney for Plaintiffs-Appellees*

262. Nguyen, Phi, *Former Attorney for Plaintiffs-Appellees*

263. Nkwonta, Uzoma, *Attorney for Plaintiffs-Appellees*

264. Noa, Jack, *Defendant*

C-14

265. Noland Law Firm, LLC, *Attorneys for Defendant*

266. Noland, William, *Attorney for Defendant*

267. Norris, Cameron, *Attorney for Intervenors-Appellants*

268. Norse, William, *Defendant*

269. Nwachukwu, Jennifer, *Attorney for Plaintiffs-Appellees*

270. O'Brien, James, *Defendant*

271. O'Connor, Eileen, *Attorney for Plaintiffs-Appellees*

272. O'Lenick, Alice, *Defendant*

273. Olm, Rylee, *Attorney for Plaintiffs-Appellees*

274. Oxford, Neil, *Attorney for Plaintiffs-Appellees*

275. Paik, Steven, *Plaintiff-Appellee*

276. Pant, Shontee, *Attorney for Plaintiffs-Appellees*

277. Paradise, Loree, *Former Attorney for Defendants-Appellants*

278. Parker, Warrington, *Attorney for Plaintiffs-Appellees*

279. Pelletier, Susan, *Former Attorney for Plaintiffs-Appellees*

280. Petrany, Stephen, *Attorney for Defendants-Appellants*

281. Porter, Megan, *Former Attorney for Plaintiffs-Appellees*

282. Powell, Laura E., *Attorney for Plaintiffs-Appellees*

283. Prince, Joshua, *Former Attorney for Defendants-Appellants*

284. Pulgram, Laurence, *Attorney for Plaintiffs-Appellees*

285. Pullar, Patricia, *Defendant*

286. Qadir, Hunaid, *Defendant*

287. Radzikinas, Carla, *Defendant*

288. Raffensperger, Brad, Secretary of State of Georgia, *Defendant-Appellant*

289. Raffle, Rocky, *Defendant*

290. Ramahi, Zainab, *Attorney for Plaintiffs-Appellees*

291. Rich, James, *Attorney for Plaintiffs-Appellees*

292. Richardson, Jasmyn, *Attorney for Plaintiffs-Appellees*

293. Richmond County Board of Elections, *Defendant*

294. Ringer, Cheryl, *Former Attorney for Defendant*

295. Rise, Inc., *Plaintiff-Appellee*

296. Rodriguez, Anthony, *Defendant*

297. Rosborough, Davin, *Attorney for Plaintiffs-Appellees*

298. Rosenberg, Ezra, *Attorney for Plaintiffs-Appellees*

299. Rosenberg, Steven, *Former Attorney for Defendant*

300. Rusciano, Megan, *Attorney for Plaintiffs-Appellees*

301. Russ, John, *Attorney for Plaintiffs-Appellees*

302. Ruth, Kathleen, *Defendant*

303. Ryan, Elizabeth, *Attorney for Plaintiffs-Appellees*

304. Sabzevari, Arash, *Attorney for Defendant*

305. Sachdeva, Niharika, *Attorney for Plaintiffs-Appellees*

306. Samuel Dewitt Proctor Conference, Inc., *Former Plaintiff*

307. Sankofa United Church of Christ Limited, *Former Plaintiff*

308. Schaerr | Jaffe LLP, *Attorneys for Defendants-Appellants*

309. Schaerr, Gene, *Attorney for Defendants-Appellants*

310. Scott, William, *Former Attorney for Defendant*

311. Seals, Veronica, *Defendant*

312. Segarra, Esperanza, *Former Attorney for Plaintiffs-Appellees*

313. Sells, Bryan, *Attorney for Plaintiffs-Appellees*

314. Shah, Niyati, *Attorney for Plaintiffs-Appellees*

315. Sheats, Gala, *Defendant*

316. Shelly, Jacob, *Attorney for Plaintiffs-Appellees*

317. Shirley, Adam, *Defendant*

318. Sieff, Adam, *Attorney for Plaintiffs-Appellees*

319. Silas, Tori, *Defendant*

320. Sixth District of the African Methodist Episcopal Church, *Plaintiff-Appellee*

321. Smith, Casey, *Attorney for Plaintiffs-Appellees*

322. Smith, Dele, *Defendant*

323. Smith, Mandi, *Defendant*

324. Solh, Chahira, *Attorney for Plaintiffs-Appellees*

325.    Solomon, Elbert, *Plaintiff-Appellee*

326.    Sosebee, Charlotte, *Defendant*

327.    Southern Poverty Law Center, *Attorneys for Plaintiffs-Appellees*

328.    Sowell, Gregory, *Attorney for Defendant*

329.    Sparks, Adam, *Attorney for Plaintiffs-Appellees*

330.    Squiers, Cristina, *Attorney for Defendants-Appellants*

331.    Stewart Melvin & Frost, LLP, *Attorneys for Defendant*

332.    Strawbridge, Patrick, *Attorney for Intervenors-Appellants*

333.    Sumner, Stuart, *Attorney for Intervenors-Appellants*

334.    Sung, Connie, *Attorney for Plaintiffs-Appellees*

335.    Swift, Karli, *Defendant*

336.    Szilagyi, Heather, *Attorney for Plaintiffs-Appellees*

337.    Tatum, Tobias, *Attorney for Defendants-Appellants*

338.    Taylor English Duma LLP, *Attorneys for Defendants-Appellants*

339.    Taylor, Wandy, *Defendant*

340.    Thatte, Anuja, *Attorney for Plaintiffs-Appellees*

341.    The ACLU Foundation Disability Rights Program, *Attorneys for Plaintiffs-Appellees*

342.    The Arc of the United States, *Plaintiff-Appellee*

343. The Concerned Black Clergy of Metropolitan Atlanta, Inc., *Plaintiff-Appellee*

344. The Georgia State Election Board, *Defendant*

345. The Justice Initiative, Inc., *Plaintiff-Appellee*

346. The Law Office of Bryan L. Sells, LLC, *Attorneys for Plaintiffs-Appellees*

347. The New Georgia Project, *Plaintiff-Appellee*

348. The Republican National Committee, *Intervenor-Appellant*

349. The State of Georgia, *Defendant-Appellant*

350. The United States of America, *Plaintiff-Appellee*

351. The Urban League of Greater Atlanta, Inc., *Former Plaintiff-Appellee*

352. Thomas, Ethan, *Attorney for Plaintiffs-Appellees*

353. Thompson, Grace, *Attorney for Plaintiffs-Appellees*

354. Till, Ann, *Defendant*

355. Topaz, Jonathan, *Attorney for Plaintiffs-Appellees*

356. Trent, Edward, *Attorney for Defendants-Appellants*

357. Tucker, William, *Attorney for Plaintiffs-Appellees*

358. Tyson, Bryan, *Attorney for Defendants-Appellants*

359. Uddullah, Angelina, *Plaintiff-Appellee*

360. Unger, Jess, *Attorney for Plaintiffs-Appellees*

361. United States Department of Justice, *Attorneys for Plaintiffs-Appellees*

362. Van Stephens, Michael, *Attorney for Defendant*

363. Vander Els, Irene, *Former Attorney for Defendant*

364. Varghese, George, *Attorney for Plaintiffs-Appellees*

365. Varner, Johnny, *Defendant*

366. Vasquez, Jorge, *Former Attorney for Plaintiffs-Appellees*

367. Vaughan, Elizabeth, *Former Attorney for Defendants-Appellants*

368. Waite, Tristen, *Attorney for Defendant*

369. Wakschlag, Shira, *Attorney for Plaintiffs-Appellees*

370. Wang, Emily, *Attorney for Plaintiffs-Appellees*

371. Wardenski, Joseph, *Former Attorney for Plaintiffs-Appellees*

372. Ward-Packard, Samuel, *Attorney for Plaintiffs-Appellees*

373. Webb, Brian K., *Attorney for Defendants-Appellants*

374. Weber, Gerald, *Attorney for Plaintiffs-Appellees*

375. Weigel, Daniel, *Former Attorney for Defendants-Appellants*

376. Wesley, Carol, *Defendant*

377. White, Daniel, *Attorney for Defendant*

378. White, William, *Attorney for Intervenors-Appellants*

379. Wiggins, Larry, *Defendant*

380. Wilberforce, Nana, *Attorney for Plaintiffs-Appellees*

381. Wilborn, Eric, *Attorney for Defendant*

382. Willard, Russell D., *Attorney for Defendants-Appellants*

383. Williams, Gilda, *Former Attorney for Plaintiffs-Appellees*

384. Williams, Tuwanda, *Former Attorney for Defendant*

385. Wilmer Cutler Pickering Hale and Dorr LLP, *Attorneys for Plaintiffs-Appellees*

386. Wilson, Jacob, *Attorney for Defendant*

387. Wilson, Melanie, *Attorney for Defendant*

388. Wingate, Mark, *Defendant*

389. Winichakul, Pichaya, *Attorney for Plaintiffs-Appellees*

390. Women Watch Afrika, *Plaintiff-Appellee*

391. Woodfin, Conor, *Attorney for Intervenors-Appellants*

392. Woolard, Cathy, *Defendant*

393. Wurtz, Lori, *Defendant*

394. Yoon, Meredyth, *Attorney for Plaintiffs-Appellees*

395. Young, Sean, *Former Attorney for Plaintiffs-Appellees*

396. Zatz, Clifford, *Attorney for Plaintiffs-Appellees*

Members of the above-named Plaintiff-Appellee groups and residents of the State of Georgia also have an interest in the outcome of this appeal.

Except Plaintiff-Appellee Georgia State Conference of the National Association for the Advancement of Colored People (whose parent corporation is

National Association for the Advancement of Colored People, Inc.), none of the above parties has a parent corporation, and no corporation owns 10% or more of any party's stock.  No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Per Eleventh Circuit Rule 26.1-2(c), Appellees certify that the certificate of interested persons contained in this motion is complete.

Dated: August 30, 2024

Respectfully Submitted

Laurence F. Pulgram
Armen Nercessian
FENWICK & WEST LLP
555 California Street
San Francisco, CA  94104
(415) 875-2300

Catherine McCord
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
(212) 430-2690

Vilia Hayes
Neil Oxford
Gregory Farrell
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

*Attorneys for Plaintiffs-Appellees
Georgia State Conference of the
NAACP, Georgia Coalition for the
People's Agenda, Inc., League of
Women Voters of Georgia, Inc.,*

Ezra D. Rosenberg
Julie M. Houk
Jennifer Nwachukwu
Heather Szilagyi
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600

Bryan L. Sells
THE LAW OFFICE OF
BRYAN SELLS, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212
Gerald Weber
LAW OFFICES OF
GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

C-22

*GALEO Latino Community
Development Fund, Inc., Common
Cause, and the Lower Muskogee Creek
Tribe*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a) and 11th Circuit Rule 28-1(c), Plaintiffs-Appellees and Cross-Appellants Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; League of Women Voters of Georgia, Inc.; GALEO Latino Community Development Fund, Inc.; Common Cause; and the Lower Muskogee Creek Tribe request oral argument on this matter. This appeal concerns important issues about enforcement of the Civil Rights Act and Georgia voters' access to the ballot, which are matters of paramount importance to Plaintiffs' members, Georgia voters, and the general public.  The Court's decisional process would be significantly aided by addressing these issues through oral argument.

## <u>TABLE OF CONTENTS</u>

P<small>AGE</small>

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................6

STATEMENT REGARDING ADOPTION OF  BRIEFS
OF OTHER PARTIES .......................................................................................7

STATEMENT OF THE ISSUES........................................................................8

STATEMENT OF THE CASE............................................................................8

    A.    S.B. 202 Resurrects A Disenfranchising Birthdate Requirement
        Previously Struck Down By Georgia Federal Courts. .........................8

    B.    The Birthdate Requirement Disenfranchises Eligible Georgia
        Voters. ...............................................................................................12

    C.    Plaintiffs Sue To Enjoin Unlawful Provisions Of S.B. 202. ...............15

    D.    The District Court Grants In Part, And Denies In Part, Plaintiffs'
        Motion For Preliminary Injunction. ...................................................18

SUMMARY OF ARGUMENT .........................................................................20

STANDARDS OF REVIEW .............................................................................22

ARGUMENT ....................................................................................................24

    I.    Appellants Have No Standing To Appeal The District
       Court's Grant Of A Preliminary Injunction As To
       The Birthdate Requirement. ...............................................................24

    II.    The District Court Correctly Enjoined County Defendants
       From Enforcing The Immaterial Birthdate Requirement...................25

# **TABLE OF CONTENTS**
**(continued)**

**PAGE**

A.   Plaintiffs Are Likely To Succeed On The Merits
Of The Birthdate Requirement Claim.......................................25

    1.   The District Court Properly Applied The
Materiality Provision To The Birthdate
Requirement..................................................27

    2.   Applying The Materiality Provision To Voting
Acts Beyond Registration Effectuates
Congressional Intent. ......................................33

    3.   Appellants Rely On An Outlier Case That
Contradicts The Overwhelming Weight
Of Authority..................................................35

    4.   Constitutional Avoidance Principles Do Not
Prevent Application Of The Clear Statutory Text.........43

    5.   Appellants Do Not And Cannot Dispute That
The Birthdate Requirement Is Immaterial.....................47

B.   There Was No Clear Error In Finding That Relief Was
Required Before The 2024 Elections To Avoid Irreparable
Harm From Denying The Lawful Right To Vote.....................48

C.   The District Court Did Not Abuse Its Discretion In
Weighing The Equities And Public Interest. ...........................51

III.   Plaintiffs Have Standing As To State Defendants, Which
The Court Should Enjoin To Ensure That Counties Do Not
Enforce The Birthdate Requirement.....................................53

A.   Plaintiffs' Injury Is Traceable To The "Form And Substance"
Of The Outer Envelope And Redressable By Order Enjoining
The Secretary Of State To Amend It .......................................56

## TABLE OF CONTENTS
### (continued)

PAGE

B.   Plaintiffs' Injuries Are Traceable To State Defendants'
     Enforcement Of S.B. 202 And Can Be Redressed Through
     An Order Requiring The Secretary To Direct Counties To
     Correct And Recertify Tallies Computed In Violation Of
     Federal Law................................................................59

C.   Plaintiffs' Injuries Are Traceable To The SEB And Can Be
     Redressed Through An Order Requiring It To Ensure
     Compliance. ................................................................61

CONCLUSION ........................................................................62

CERTIFICATE OF COMPLIANCE........................................64

CERTIFICATE OF SERVICE ................................................65

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) ...................................................................... 43

*Am.'s Health Ins. Plans v. Hudgens*,
   742 F.3d 1319 (11th Cir. 2014) .................................................. 23

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ........................................................................ 46

*AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
   494 F.3d 1356 (11th Cir. 2007) .......................................... 23, 53

*Babb v. Wilkie*,
   589 U.S. 399 (2020) .................................................................... 31

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*,
   515 U.S. 687 (1995) .................................................................... 29

*Baldwin v. Express Oil Change, LLC*,
   87 F.4th 1292 (11th Cir. 2023) ................................................. 48

*Ball v. Chapman*,
   289 A.3d 1 (Pa. 2023) ................................................................. 30

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
   425 F.3d 964 (11th Cir. 2005) ................................................... 23

*Benisek v. Lamone*,
   585 U.S. 155 (2018) (per curiam) ............................................. 51

*Black Voters Matter Fund v. Raffensperger*,
   478 F. Supp. 3d 1278 (N.D. Ga. 2020) ........................... 55, 57, 58

*Bostock v. Clayton Cnty*,
   590 U.S. 644 (2020) .................................................................... 45

*Brnovich v. Democratic National Committee*,
   594 U.S. 647 (2021) .................................................................... 44

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) .................................................................... 40

*CBS v. PrimeTime 24 Joint Venture*,
   245 F.3d 1217 (11th Cir. 2001) ................................................. 31

v

**TABLE OF AUTHORITIES**
**(continued)**

**PAGE(S)**

CASES

*Clover v. Total Sys. Servs., Inc.*,
176 F.3d 1346 (11th Cir. 1999) ....................................................31, 41

*Common Cause Georgia v. Kemp*,
347 F. Supp. 3d 1270 (N.D. Ga. 2018)............................................27, 36, 51, 60

*Common Cause v. Thomsen*,
574 F. Supp. 3d 634 (W.D. Wis. 2021) ..............................................36

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ........................................................54

*Democratic Party of Georgia, Inc. v. Crittenden*,
347 F. Supp. 3d 1324 (N.D. Ga. 2018)............................................11, 36, 59, 60

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ......................................................26, 46, 47

*Ford v. Tennessee Senate*,
No. 06-2031, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) .....................27, 35

*Friedman v. Snipes*,
345 F. Supp. 2d 1356 (S.D. Fla. 2004) ..............................................36, 37

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) ..........................................................55

*Gonzalez v. Governor of Ga.*,
978 F.3d 1266 (11th Cir. 2020) ........................................................48

*GRACE, Inc. v. City of Miami*,
No. 1:22-CV-24066-KMM, 674 F. Supp. 3d 1141 (S.D. Fla. 2023) ...............51

*Jacobson v. Florida Sec. State*,
957 F.3d 1236 (11th Cir. 2020) ..................................................*passim*

*Jennings v. Rodriguez*,
583 U.S. 281 (2018).........................................................................43

*KH Outdoor, L.L.C. v. Fulton Cnty., Ga.*,
587 F. App'x 608 (11th Cir. 2014) ....................................................56

*La Union del Pueblo Entero v. Abbott*,
705 F. Supp. 3d 725 (W.D. Tex. 2023) ..............................................35, 36, 47

## TABLE OF AUTHORITIES
### (continued)

PAGE(S)

CASES

*League of Women Voters of Ark. v. Thurston*,
    No. 5:20-cv-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023)...........36, 46

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) .................................................................52

*Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*,
    148 F.3d 1231 (11th Cir. 1998) .............................................................54

*Martin v. Crittenden*,
    347 F. Supp. 2d 1302 (N.D. Ga. 2018).........................................*passim*

*Migliori v. Cohen*,
    36 F.4th 153 (3d Cir. 2022) ..............................................................31, 37

*ModernaTx, Inc. v. Arbutus Biopharma Corp.*,
    18 F.4th 1352 (Fed. Cir. 2021) ..............................................................7

*New Georgia Project v. Raffensperger*,
    484 F. Supp. 3d 1265 (N.D. Ga. 2020)...............................................61

*Org. for Black Struggle v. Ashcroft*,
    493 F. Supp. 3d 790 (W.D. Mo. 2020) ...............................................36

*Pa. State Conf. of NAACP Branches v. Secretary Commonwealth of Pa.*,
    97 F.4th 120 (3d Cir. 2024) ...........................................................*passim*

*Pulsifer v. United States*,
    601 U.S. 124 (2024)........................................................................40, 41

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)............................................................................49, 50

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)..............................................................................39

*Resnick v. AvMed, Inc.*,
    693 F.3d 1317 (11th Cir. 2012) .............................................................54

*Richardson v. Alabama State Bd. of Educ.*,
    935 F.2d 1240 (11th Cir. 1991) ..............................................................46

*Rose v. Raffensperger*,
    511 F. Supp. 3d 1340 (N.D. Ga. 2021).........................54, 55, 57, 58

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

CASES

*Rose v. Sec'y, State of Georgia,*
  87 F.4th 469 (11th Cir. 2023) ...............................................................55

*Schwier v. Cox,*
  340 F.3d 1284 (11th Cir. 2003) ........................................25, 26, 27, 34

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966)...........................................................26, 33, 45

*Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over
  Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in
  Land Lot 1049,*
  910 F.3d 1130 (11th Cir. 2018) ........................................23, 48, 54

*United States ex. rel. Williams v. NEC Corp.,*
  931 F.2d 1493 (11th Cir. 1991) ...............................................31

*United States v. Dodge,*
  597 F.3d 1347 (11th Cir. 2010) ...............................................30

*United States v. Safehouse,*
  985 F.3d 225 (3d Cir. 2021) ...............................................40

*Villarreal v. R.J. Reynolds Tobacco Co.,*
  839 F.3d 958 (11th Cir. 2016) ...............................................43

*Vote.org v. Byrd,*
  No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30,
  2023) ...............................................................46

*Vote.org v. Georgia State Election Bd.,*
  661 F. Supp. 3d 1329 (N.D. Ga. 2023)........................27, 30, 36, 62

*Warger v. Shauers,*
  574 U.S. 40 (2014)...............................................................44

*Wesberry v. Sanders,*
  376 U.S. 1 (1964)...............................................................52

*Wheaton v. Peters,*
  33 U.S. 591 (1834)...............................................................32

*Wolff v. Cash 4 Titles,*
  351 F.3d 1348 (11th Cir. 2003) ...............................................7, 24

# TABLE OF AUTHORITIES
## (continued)

PAGE(S)

CASES

*Wreal, LLC, v. Amazon.com, Inc.,*
840 F.3d 1244 (11th Cir. 2016) ........................................................................49

*Yick Wo v. Hopkins,*
118 U.S. 356 (1886) ...............................................................................................22

STATUTES

28 U.S.C. § 1292(a)(1) ...............................................................................................7

28 U.S.C. § 1331 ..........................................................................................................6

42 U.S.C. § 1971 ....................................................................................................34, 36

Civil Rights Act of 1965, 52 U.S.C. § 10101 ...............................................*passim*

1965 Voting Rights Act ......................................................................................*passim*

H.B. 316 § 30, 2019 Ga. Laws 7, 25 ..................................................................11, 12

O.C.G.A. § 21-2-31(1) .........................................................................................61, 62

O.C.G.A. § 21-2-33.1(a) ..............................................................................................61

O.C.G.A. § 21-2-216(a)(3) ....................................................................................9, 10

O.C.G.A. § 21-2-381(a)(1)(C)(i) .................................................................................8

O.C.G.A. § 21-2-381(b)(1) .......................................................................................8, 9

O.C.G.A. § 21-2-381(b)(2) ......................................................................................9, 39

O.C.G.A. § 21-2-384(b) .........................................................................................56, 58

O.C.G.A. § 21-2-384(c)(1) (2017) ...........................................................................10

O.C.G.A. § 21-2-385(a) ................................................................................................9

O.C.G.A. § 21-2-386(a)(1) ..........................................................................9, 14, 15

O.C.G.A. § 21-2-390 .................................................................................................57

O.C.G.A. § 21-2-499(a) ........................................................................................59, 61

## TABLE OF AUTHORITIES
### (continued)

PAGE(S)

STATUTES

Pub. L. 89-110, § 15(a), 79 Stat. 437, 444 (1965) ...................................26

Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964).............................26

Pub. L. No. 89-110, 79 Stat. 437, 445 (1965)..........................................34

RULES

11th Cir. R. 28-1(f) ...................................................................................7

Fed. R. App. P. 28(i) .................................................................................7

Fed. R. Civ. P. 52(a)(6)............................................................................48

CONSTITUIONAL PROVISIONS

U.S. Const. amend. XV.........................................................................43, 44

U.S. Const. art. I, § 4, cl.1 .......................................................................46

OTHER AUTHORITIES

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*
  (2012)..................................................................................................39, 45

H.R. REP. NO. 88-914 (1963) ...............................................................34, 46

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ....................30

Op. Att'y Gen. No. 05-3, 2005 WL 897337 (Apr. 15, 2005)   ............................56

*Oxford Advanced Learner's Dictionary of Current English* (10th ed. 2020) .........30

Black's Law Dictionary (12th ed. 2024) ...................................................32

Report of the U.S. Comm'n on Civil Rights (1959).................................33

Report of the U.S. Comm'n on Civil Rights (1963).................................33

SAFE Commission Report (Jan. 10, 2019)...............................................11

## INTRODUCTION

Provisions of Georgia Senate Bill 202 ("S.B. 202") require rejection of absentee ballots when voters fail to print their birthdate accurately on the ballot's outer envelope (the "Birthdate Requirement"). The District Court preliminarily enjoined the 11 Georgia counties named in Plaintiffs' suits from enforcing the Birthdate Requirement, correctly holding that it is unlawful under the "Materiality Provision" of the Civil Rights Act of 1965, 52 U.S.C. § 10101(a)(2)(B). The counties do not appeal the injunction, but Georgia statewide officials ("State Defendants"), whom the District Court did *not* enjoin, and third-party Intervenors (together with State Defendants, "Appellants"), do. The Court should affirm the District Court's injunction as to the counties, rejecting Appellants' bid to revive the illegal, disenfranchising Birthdate Requirement. The Court should reverse the District Court's denial of an injunction against State Defendants, and so extend the protections of the Civil Rights Act to voters throughout Georgia.

The 2018 and 2020 elections saw a groundswell in voter participation among, and the unprecedented success of, minority groups and candidates. To counter that trend, the party in power in the Georgia Legislature enacted S.B. 202, which imposes a host of new voting restrictions. These include limitations on ballot drop boxes in heavily minority counties, restrictions on voters' ability to submit provisional ballots outside their normal precinct, prohibitions on various types of voter assistance, and

1

the Birthdate Requirement.  The Birthdate Requirement, and S.B. 202's limits on "Line Relief," are the restrictions at issue in this appeal.

At the District Court, two groups of plaintiffs—NAACP Plaintiffs[1] and AME Plaintiffs[2] (collectively, "Plaintiffs")— sued to challenge the Birthdate Requirement. Plaintiffs named as defendants certain County and State election officials and entities, including the Georgia Governor, Brian Kemp, and Secretary of State Brad Raffensperger.  After discovery showed that the Birthdate Requirement was disenfranchising Georgians, Plaintiffs sought a preliminary injunction preventing its enforcement.

The District Court granted the injunction against the counties, finding that the Birthdate Requirement likely violates the Materiality Provision, which prohibits government actors from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material

---

[1] NAACP Plaintiffs are Georgia State Conference of the NAACP; Georgia Coalition for the People's Agenda, Inc.; League of Women Voters of Georgia, Inc.; GALEO Latino Community Development Fund, Inc.; Common Cause; and the Lower Muskogee Creek Tribe.

[2]  AME Plaintiffs are Sixth District of the African Methodist Episcopal Church; Delta Sigma Theta Sorority; Georgia ADAPT; Georgia Advocacy Office; Georgia Muslim Voter Project; Latino Community Fund of Georgia; The Arc of the United States; and Women Watch Afrika.

in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

In Georgia, only voters whom the state has *already* deemed qualified to vote receive absentee ballots. Therefore, the Birthdate Requirement plays no role in determining a voter's qualifications, for purposes of the Materiality Provision or otherwise. Nor is printing one's birthdate on the outer envelope necessary for voter identification, as the envelope provides fields for a voter's driver's license number (or alternative identification). The Birthdate Requirement is nothing other than an unnecessary hoop through which already eligible voters must jump lest their ballots be rejected, and the uncontroverted record shows that it has already disenfranchised hundreds or thousands of Georgia voters. Consistent with the Materiality Provision's plain language and cases interpreting it, the District Court properly found that a voter's failure to satisfy the Birthdate Requirement is exactly the type of immaterial paperwork error that illegally impedes and impairs the right to vote.

The Court reviews the District Court's entry of a preliminary injunction for abuse of discretion. The District Court applied the plain meaning of the Civil Rights Act, and a body of well-established law, to conclude that Plaintiffs were likely to succeed on the merits of their challenge to the Birthdate Requirement and that there is no genuine dispute that denying eligible Georgians the right to vote constitutes

irreparable harm that cannot otherwise be remedied.  Appellants[3] do not contest that the Birthdate Requirement is immaterial.  Instead, they argue that the Materiality Provision regulates voter *registration* only, and not what they describe as "ballot-casting rules."  *See generally* Intervenors' Opening Brief (DE 125 (23-13085), DE 106 (23-13095)) ("IOB").  But as the District Court recognized, that argument ignores both the plain language and the intent of the statute.  The Civil Rights Act prohibits "deny[ing] the right of any individual to *vote*," 52 U.S.C. § 10101(a)(3)(A) (emphasis added), and it expressly defines "vote" to include "all action necessary to make a vote effective including … casting a ballot, and having such ballot counted," *id.* § 10101(e).  The District Court did not abuse its discretion in enjoining the counties, and the Court should affirm that decision.

But the Court should reverse the District Court's denial of an injunction against State Defendants, which is the subject of Plaintiffs' cross-appeal.  Without injunctions directed to *statewide* officials, and the statewide relief that would bring, many Georgia voters will be denied the protection of federal law.  The District Court found that Plaintiffs' injuries are not traceable to, or redressable by an injunction

---

[3]  State Defendants are Governor of Georgia Brian Kemp; Secretary of State Brad Raffensperger; the Georgia State Election Board; and individual members of the board in their official capacities.  Intervenors are Republican National Committee; National Republican Senatorial Committee; National Republican Congressional Committee; and Georgia Republican Party, Inc.

directed to, State Defendants, such that Plaintiffs lacked standing with respect to them.  (Having found no traceability, the District Court did not substantively consider redressability.)  That was error.

The Georgia Secretary of State promulgates absentee ballot rules and controls the "form and substance" of ballots, including the outer envelope.  The envelope currently requires voters to print their birthdate, in violation of the Materiality Provision.  Plaintiffs' injuries are therefore traceable to the Secretary and redressable by an order enjoining him to delete the birthdate field.  The Secretary can also be enjoined to order counties to correct and recertify election returns, which Georgia law requires him to do, when the counties have rejected absentee ballots for Birthdate Requirement non-compliance.  Georgia law also gives the Secretary and the State Election Board ("SEB") authority and duty to supervise county election officials and to correct counties' errors, such as the enforcement of unlawful voting requirements.  An injunction directing the Secretary and SEB to exercise the oversight that the law requires of them would also redress Plaintiffs' injuries.

The District Court's denial of an injunction against Appellants also raises a potentially dispositive issue of subject matter jurisdiction.  Because Appellants were not enjoined, they have no Article III standing to appeal the District Court's

Birthdate Requirement order.  County Defendants,[4] the only parties that the District Court *did* enjoin, did *not* appeal.  If the Court denies Plaintiffs' cross-appeal, therefore, Appellants will continue to lack standing with respect to the Birthdate Requirement, and the Court would lack subject matter jurisdiction over this appeal.

In sum, the Court should affirm the District Court's preliminary injunction against County Defendants order but reverse the District Court's denial of an injunction against State Defendants.  Alternatively, if the Court does not hold that State Defendants should be enjoined, it should dismiss the appeal for lack of Article III standing.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction under 28 U.S.C. § 1331.

The Court lacks jurisdiction over Appellants' appeal because the District Court's preliminary injunction order applies only to County Defendants, none of which appealed.  As discussed in the briefing on Plaintiffs' Motion to Dismiss and reply in Support of Motion to Dismiss (DE 70, 97 (23-13085)), and the Court's Jurisdictional Question (DE 98 (23-13085)), none of the Appellants (who are State Defendants and Intervenors) are bound or aggrieved by the District Court's order,

---

[4]  The County Defendants subject to the District Court's injunction are the Boards of Registrations and Elections from Fulton, DeKalb, Gwinnett, Cobb, Hall, Clayton, Richmond, Bibb, Chatham, Clarke, Columbia, and Forsyth counties, in addition to various members of those boards.

and thus they lack standing to appeal.[5]  *See Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1354 (11th Cir. 2003).

Plaintiffs timely filed a cross-appeal challenging the District Court's failure to extend the preliminary injunction order to the State Defendants.  The Court has appellate jurisdiction over that cross-appeal under 28 U.S.C. § 1292(a)(1).  *See, e.g.*, *ModernaTx, Inc. v. Arbutus Biopharma Corp.*, 18 F.4th 1352, 1362-63 (Fed. Cir. 2021) (jurisdiction existed for cross-appeal despite lack of jurisdiction over primary appeal).

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

Pursuant to Federal Rule of Appellate Procedure 28(i) and 11th Circuit Rule 28-1(f), NAACP Plaintiffs adopt by reference, in full, the brief of AME Plaintiffs.  That brief answers State Defendants' brief (DE 124 (23-13085), DE 105 (23-13095)), which was adopted in full by Intervenors (IOB at 29) and which addresses the District Court's preliminary injunction against enforcement of the Line Relief restrictions of S.B. 202.

---

[5]  Citations to the record are indicated with "DE" (Docket Entry), the number of the docket entry, and any page number generated by the relevant court's electronic filing system or, where appropriate, paragraph number or page-and-line number ranges, followed by the page number where the document is located in Plaintiffs' supplemental appendix ("SA") in brackets.  Unless otherwise noted, citations are to the consolidated case docket, Case No. 1:21-mi-55555.

## STATEMENT OF THE ISSUES

1.     Whether the District Court abused its discretion by enjoining County Defendants from rejecting absentee ballots based on any error or omission relating to the Birthdate Requirement.

2.     Whether Plaintiffs' injuries are traceable to and redressable by proposed injunctions against State Defendants, such that Plaintiffs have standing to seek statewide relief from State Defendants.

3.     Whether Appellants lack Article III standing to prosecute their appeal of the injunction against County Defendants because they are not aggrieved by the District Court's preliminary injunction order.

## STATEMENT OF THE CASE

### A.     S.B. 202 Resurrects A Disenfranchising Birthdate Requirement Previously Struck Down By Georgia Federal Courts.

Georgia law permits eligible voters to vote absentee.  To obtain an absentee ballot, voters must submit applications with their name, *date of birth*, registered address, address where they want the ballot mailed, a signed oath, and the number on their driver's license or identification card.  O.C.G.A. § 21-2-381(a)(1)(C)(i). Election officials compare this information, including date of birth, with information in the voter registration records to "verify the identity of the applicant."  O.C.G.A. § 21-2-381(b)(1).  If the application contains all the required information and matches the information in the voter file, the applicant is deemed "eligible to vote"

8

absentee. *Id.* The registrar then provides an absentee ballot to the voter. O.C.G.A. § 21-2-381(b)(2).

The absentee ballot comes with two envelopes. O.C.G.A. § 21-2-385(a). Ballots go into the inner envelope, and the inner envelope goes into a second, ballot-return envelope. *Id.* On the outer envelope, voters must sign an oath, provide their driver's license or identification card number (or the last four digits of their voter's social security number), and, in the field provided, handwrite their date of birth. *Id.* When absentee ballots are returned, election officials compare the information on the ballot-return envelope with information in the voter's registration records. O.C.G.A. § 21-2-386(a)(1)(B). Under S.B. 202's Birthdate Requirement, the official must reject the ballot if the birthdate printed on the outer envelope does not match the birthdate in the registration record. O.C.G.A. § 21-2-386(a)(1)(C); DE 548-4 at 211:13-23 [SA390].

Appellants admit that the birthdate on ballot-return envelopes "is not used to determine whether the individual is 'qualified' to vote under Georgia law." DE 548-5 at 4 [SA396]; *see* DE 548-4 at 211:13-213:16 [SA390-92]. Under Georgia law, only voters whom the state has already deemed qualified to vote will receive absentee ballots. Among other criteria, a person must be at least 18 years old by the time of the election to be qualified to vote. O.C.G.A. § 21-2-216(a)(3).

In addition, the District Court found that Appellants provided no evidence that the Birthdate Requirement was necessary for confirming absentee voters' identity or preventing fraud. DE 613 at 35. As Defendants and their representatives testified, election officials have no trouble confirming the identities of absentee voters without using birthdates. DE 582-05 at 202:20-203:23 [SA522-23] (Fulton County); DE 582-12 at 48:3-21 [SA538] (Gwinnett County); *see also* DE 582-13 at 113:3-24 [SA542] (driver's license number or state ID number is "probably the most common" way to verify voter identity). Indeed, State Defendants' expert Justin Grimmer, Ph.D., admitted that "the ID requirements will ensure that voters are who they say they are." DE 548-18 at 180:22-181:11 [SA511-12].

S.B. 202 was not the first instance of the Georgia Legislature imposing an immaterial birthdate requirement, and the District Court was not the first to overturn one. From 2007 to 2018, Georgia required absentee voters to handwrite their birthdates on ballot-return envelopes. *See, e.g.*, O.C.G.A. § 21-2-384(c)(1) (2017) (pre-S.B. 202 statute mandating year of birth on ballot-return envelopes). During the 2018 election cycle, two federal courts in the Northern District of Georgia held that the requirement violated the Materiality Provision. In *Martin v. Crittenden*, 347 F. Supp. 2d 1302, 1308-09, 1311 (N.D. Ga. 2018), the court held that "a voter's ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law," and

10

accordingly enjoined Gwinnett County from rejecting absentee ballots on that basis. A day later, in *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1341 (N.D. Ga. 2018), the court granted a state-wide preliminary injunction requiring that "absentee mail-in ballots rejected solely because of an omitted or erroneous birth date must be counted."

Two months later, in light of the *Crittenden* decisions, the Secure, Accessible & Fair Elections ("SAFE") Commission—which was established by then-Secretary of State, Appellant Brian Kemp—recommended that Georgia update its election laws to "make clear that slight variations in any information on the envelope not be a reason to reject an absentee ballot …."  SAFE Commission Report at 18 (Jan. 10, 2019), *available at* https://sos.ga.gov/sites/default/files/2022-03/safe_commission_report_final_1-10-18.pdf.    In    2019,    following    the    SAFE    Commission's recommendations, the Georgia Legislature enacted H.B. 316 to remove the birthyear requirement for absentee ballots (among other things).  H.B. 316 § 30, 2019 Ga. Laws 7, 25.

Appellants try to minimize this history, noting only that, "[b]efore the 2020 election, Georgia revised its absentee voting procedures to drop the requirement for information about a voter's birthdate."  IOB at 31.  Appellants also ignore the undisputed evidence that the 2019 change in the law prevented significant disenfranchisement of absentee voters: shortly before S.B. 202 was enacted, counsel

11

for the Secretary of State and SEB confirmed in open court that removing the birthyear requirement "resulted in a significant decrease in the percentage of absentee ballots that were rejected at the outset" in the 2020 General Election as compared to the one in 2018, as "[t]here were quite a number in 2018 that were rejected for that missing [birthyear] information."  DE 548-3 at 51:3-15 [SA378].

## B.    The Birthdate Requirement Disenfranchises Eligible Georgia Voters.

It was foreseeable that reinstituting the Birthdate Requirement would disenfranchise eligible voters, and not only based on historical experience with H.B. 316.  *See id*.  State Defendants' expert Lynn Bailey, former chair of elections in Richmond County, Georgia, who oversaw county elections for 28 years, confirmed that it is not uncommon for voters, particularly the elderly or first-time voters, to mistakenly write down the current year instead of their birthyear on the ballot envelope.  DE 595-5 at 188:1-189:6 [SA597-98].  Moreover, part of the State's rationale for removing the birthyear requirement in H.B. 316 was "due to identity theft concerns and the fact that voters felt uncomfortable putting their date of birth on the outside of the envelope."  DE 548-3 at 51:3-10 [SA378].

The record evidence of the actual impact of the Birthdate Requirement bears this out.  Many Defendant Counties did not provide metrics for how many absentee ballots were excluded due to the Birthdate Requirement, but the six that did revealed that County election officials had relied on the Birthdate Requirement to reject

hundreds of otherwise valid ballots during the 2022 general and run-off elections. The table below shows the minimum number of absentee ballots that those six counties *conceded* rejecting due to the Birthdate Requirement:

| County | Pre-S.B. 202 | | Post-S.B. 202 | |
|---|---|---|---|---|
| | Nov. 2020 | Jan. 2021 | Nov. 2022 | Dec. 2022 |
| Athens-Clarke | 0 | 0 | 17 | 3 |
| Chatham | 0 | 0 | 25 | 49 |
| Cobb | 0 | 0 | 0 | 180 |
| Fulton[6] | 0 | 0 | 16-283 | 1-279 |
| Hall | 0 | 0 | 3 | 1 |
| Richmond | 0 | 0 | 21 | 13 |

*See* DE 548-6 to 548-11 [SA397 to SA453] (County interrogatory responses). And in 2022, one of Plaintiffs' constituents, Terri Thrower, had her absentee ballot rejected based on the Birthdate Requirement. DE 595-15 at ¶¶ 6-7 [SA901]; DE 595-16 at ¶ 13 [SA906]. The Birthdate Requirement clearly denied absentee voters their right to cast a ballot and have it counted.

The evidence also showed that the reported ballot-rejection numbers do not tell the whole story. For example, Gwinnett County reported "0" absentee ballots rejected for lacking a birthdate, DE 582-11 at 3-4 [SA533-34], but deposition testimony from county representatives explained that this was because the county

---

[6]    Fulton County responded that, when counting ballot rejections, it combines rejections based on the Birthdate Requirement with rejections for other reasons (e.g., a missing identification number). That combined approach resulted in the ranges identified in the table above.

reporting did not "separate" exclusions based on the Birthdate Requirement, *see* DE 595-6 at 117:23-119:17 [SA603-05] (birthdate-based rejections were "all kind of lumped together" with ballot rejections on other bases). Thus, by reporting "0," the County suggested there had been no Birthdate Requirement ballot rejections, when in fact the County has not attempted to identify them and did not know how many rejections there were. And State Defendants indicated that Georgia law does not even *permit* counties to break out data about missing birthdates. *See* DE 595-14 at 4-7 [SA888-91] (no option for reporting rejection for missing birthdate); *see also, e.g.*, DE 582-09 at 2 [SA525] (Columbia County responses reporting "N/A," not "0," for each election's "[m]issing birthdate[s]"); DE 582-10 at 3 [SA528] (DeKalb County responses refusing to provide "information which the DeKalb Defendants do not track"). This mandated lack of reporting obscures the disenfranchising impact of the Birthdate Requirement.

But Georgia law *does* require counties to notify voters of ballot rejections and the reason for them and to retain the notices. O.C.G.A. §21-2-386(a)(1)(C). The notices are "the best data for the cure process as far as rejections" are concerned. DE 595-06 at 157:6-15 [SA606]. Notices from Gwinnett County revealed that, contrary to its "0" rejection claim, the County excluded at least 218 ballots based on missing or incorrect birthdates in the 2022 run-off election alone. DE 595-01 at ¶¶ 12-15 [SA560]; *see generally* DE 595-08 [SA610-829] (ballot rejection letters).

14

That constitutes at least *74% of all absentee rejections* in Gwinnett County during that one run-off.  DE 595-01 at ¶¶ 12-15, 18 [SA560-61].  Similarly, the record on summary judgment showed that, in the 2022 elections, Cobb County rejected 759 absentee ballots based on missing or incorrect birthdates.  DE 820-8 at ¶ 20; *see also id.* at ¶¶ 23, 25, 27, 30-32.

### C.    Plaintiffs Sue To Enjoin Unlawful Provisions Of S.B. 202.

There is a complicated procedural history leading to this appeal.

Plaintiffs are organizations that serve underrepresented communities in Georgia, including people of color and women, and, among other things, help those constituencies participate in elections and exercise their right to vote.  DE 548-12 at ¶¶ 2-3 [SA455-56]; DE 548-13 at ¶ 2 [SA461-62]; DE 548-14 at ¶¶ 2-3 [SA467-68]; DE 548-15 at ¶ 4 [SA475]; DE 548-16 at ¶ 2 [SA481-82]; *see also* DE 548-19 at ¶ 4 [SA515].  Plaintiffs' core missions include promoting voter registration, voter education, voter participation, and election protections.  *Id*.  The undisputed record established that Plaintiffs were forced to divert their limited resources to address the sweeping threats posed by S.B. 202.  As just one example, instead of pursuing other key priorities like housing discrimination, the Georgia NAACP had to organize an unprecedented 22-city, statewide campaign to educate voters about S.B. 202's new restrictions (including the Birthdate Requirement), so as to prevent voters from being disenfranchised.  DE 548-12 at ¶ 9 [SA458], DE 595-2 at 84:3-85:1 [SA575-76].

15

*See also* DE 548-13 at ¶ 7 [SA463], DE 548-14 at ¶ 7 [SA469-70], DE 548-15 at ¶ 8 [SA477-78], DE 548-16 at ¶¶ 6-10 [SA483-85], DE 548-19 at ¶¶ 6-8 [SA515-16] (discussing Plaintiffs' respective diversion of resources).

Shortly after S.B. 202's enactment, NAACP Plaintiffs sued Georgia State officials, including the Secretary of State, and members of the SEB on March 28, 2021.  DE 1 (1:21-cv-01259).  AME Plaintiffs, also parties to this appeal, sued Georgia state officials, including Governor Kemp, Secretary Raffensberger, and the SEB.  DE 1 (1:21-cv-01284).  Several other sets of plaintiffs also filed suits challenging provisions of S.B. 202.

Plaintiffs in these actions challenged various provisions of S.B. 202, including the Birthdate Requirement; restrictions on out-of-precinct provisional ballots, absentee voting, and ballot drop boxes in counties with significant minority populations; its imposition of new identification requirements and voter challenge procedures; various prohibitions on assisting voters, whether with ballot applications and absentee ballots, and so-called "Line Relief" restrictions limiting help to voters at polling places.  *See, e.g.*, DE 83 (1:21-cv-01284) at ¶¶ 246-328; DE 35 (1:21-cv-01259) at ¶¶ 133-168.

In June 2021, the Republican National Committee, National Republican Senatorial Committee, National Republican Congressional Committee, and the Georgia Republican Party, Inc. were joined as Intervenors in several of the pending

cases. *See, e.g.*, DE 40 (1:21-cv-01259). Intervenors moved to dismiss the amended complaints, in their entireties in both NAACP Plaintiffs' and AME Plaintiffs' respective cases. The District Court denied those motions on December 9, 2021. DE 64 (1:21-cv-01259); *see also* DE 110 (1:21-cv-01284).

On December 23, 2021, the District Court consolidated NAACP Plaintiffs' and AME Plaintiffs' cases with four other suits challenging S.B. 202, including one filed by the United States. DE 001 at 8 [SA008]. The consolidated plaintiffs worked diligently to obtain discovery with the aim of proceeding to trial before the 2024 elections. The parties jointly asked, and the District Court initially agreed, to set a summary judgment deadline of June 21, 2023, which would have permitted a trial to occur before the 2024 election. DE 400 at 1 [SA164].

But then, on March 17, 2023, over Plaintiffs' objection, the District Court extended the discovery deadline and vacated the summary judgment schedule. DE 496 at 3 [SA167]. Realizing that trial was unlikely to occur before the 2024 elections, and armed with discovery and experience of voter disenfranchisement from the 2022 election, Plaintiffs promptly moved to enjoin the Birthdate Requirement. The District Court granted the motion in August 2023, leading to this appeal. Briefing on eight separate summary judgment motions was not completed until May 14, 2024. *See generally* DE 853-860. All summary judgment motions are still pending before the District Court, with no trial date scheduled.

**D.     The District Court Grants In Part, And Denies In Part, Plaintiffs' Motion For Preliminary Injunction.**

On August 18, 2023, the District Court granted in part NAACP Plaintiffs' and AME Plaintiffs' joint motion for preliminary injunction with respect to the Birthdate Requirement.  DE 613.  As to standing, the District Court found that Plaintiffs had adequately established injury-in-fact on organizational and associational standing theories, *id.* at 7-14, and it also "easily conclude[d] that as to County Defendants, Plaintiffs have met their burden to show traceability and redressability" (required to pursue injunctive relief), because Georgia law tasks county officials with "processing and verification of absentee ballots," *id.* at 15-16.  No party has challenged either of those findings on appeal.

The District Court found that Plaintiffs' injury was not traceable to State Defendants, and so not redressable by an injunction directed to them.  *Id.* at 16-17.  Accordingly, the District Court ruled that Plaintiffs lacked standing to pursue injunctive relief against State Defendants.

As to the merits of Plaintiffs' request for a preliminary injunction, the District Court faithfully construed the Materiality Provision and concluded that the rejection of absentee ballots based on the Birthdate Requirement amounted to an illegal denial of the right to vote.  *Id.* at 25-26.  With respect to irreparable harm, the District Court found that the "continued diversion of resources" from Plaintiffs to combat S.B. 202 constituted ongoing irreparable harm, citing to ample record evidence.  *Id.* at 30-31.

18

The District Court found the risk that one of Plaintiffs' constituents had her absentee ballot rejected "[e]ven more concerning," because, after votes are counted, "there can be no do-over and no redress." *Id.* at 31-32. The District Court rejected Appellants' arguments that the Birthdate Requirement serves the public interest, noting that there are alternative ways to verify voter identity and that Appellants presented no evidence that the Birthdate Requirement prevents voter fraud. *Id.* at 35. Accordingly, the District Court enjoined County Defendants "from rejecting absentee ballots based on any error or omission relating to the Birthdate Requirement." *Id.* at 38.

On September 18, 2023, Appellants, but not County Defendants, appealed. DE 639; DE 643; DE 644. Plaintiffs timely noticed their cross-appeal on October 2, 2023. DE 666.

On October 13, 2023, Plaintiffs moved to dismiss the appeal as to the Birthdate Requirement because neither set of Appellants had standing. DE 70 at 1 (23-13085). Independently, the Court issued a Jurisdictional Question, dated October 11, 2023, asking the parties to address "whether the Intervenor-Defendants and State Defendants were aggrieved by the appealed orders." DE 76 at 1 (23-13085). After briefing, the Court ruled that the "motion to dismiss and the remaining standing issues are CARRIED WITH THE CASE" and that a "final determination" would be made by the merits panel. DE 111-2 at 2 (23-13085).

## SUMMARY OF ARGUMENT

With respect to the Birthdate Requirement, the District Court enjoined County Defendants only. County Defendants did not appeal. Only State Defendants and Intervenors appealed, but as the District Court did not enjoin or otherwise order relief against them, they were not aggrieved by the District Court's order, and, consequently, they lack standing to appeal. If the Court disagrees and finds that State Defendants do have standing, it should grant Plaintiffs' cross-appeal, as State Defendants control key aspects of the absentee-balloting process in a manner that contributes to voter disenfranchisement, and continuing harm to Plaintiffs, and they could contribute to redressing them; the Court should therefore reverse the District Court's decision with respect to State Defendants and remand with instructions to issue an injunction against the State Defendants as well. But, if this Court affirms that aspect of the District Court's ruling, then it must dismiss the entire appeal as it relates to the Birthdate Requirement because no party has standing to bring it. Only aggrieved parties have Article III standing to appeal.

If the Court reaches the merits of the District Court's injunction against County Defendants, it should affirm. The District Court did not abuse its discretion but carefully and properly applied the injunction standards. First, the District Court correctly held that Plaintiffs have shown a likelihood of success on the merits of their challenge to the Birthdate Requirement. The Materiality Provision prohibits

20

government officials from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). There is no dispute that the Birthdate Requirement is immaterial for determining an absentee voter's qualifications because qualification occurs before an absentee ballot is mailed to the voter. The District Court applied the plain text of the statute, which covers "any application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), and it defines "vote" as "all action necessary to make a vote effective," including "casting a ballot[] and having such ballot counted." *Id.* § 10101(e). The Birthdate Requirement is a paperwork technicality, immaterial to voter qualifications, which prevents eligible absentee voters from casting ballots and having the ballots counted, in violation of the Materiality Provision.

Second, the District Court correctly found that the Birthdate Requirement caused irreparable harm to Plaintiffs, given the "continued diversion of resources" from Plaintiffs' other activities and the undisputed evidence that legally valid votes were excluded. DE 613 at 30.

Third, the District Court properly weighed the equities and the public interest. The franchise is "a fundamental political right, because [it is] preservative of all

21

rights." *E.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Appellants could not overcome the public's significant interest in free, fair, and open elections, particularly because Appellants failed to show that the Birthdate Requirement was necessary to verify voter identity or that it somehow advanced election integrity.

Finally, the Court reviews *de novo* the District Court's ruling that Plaintiffs lack standing to pursue injunctive relief against State Defendants, and the Court should reverse that ruling. For standing, a party must show injury in fact and that the injury is traceable to and redressable by the defendant. Here, Plaintiffs' injuries are traceable to State Defendants because State Defendants are at least *one* cause of disenfranchisement created by the Birthdate Requirement. For example, the Secretary of State promulgates the ballot-return envelope that requires the birthdate. A harm is redressable if a favorable decision is merely "likely" to address the harm as a practical matter. Here, an injunction against State Defendants can redress the injury in at least three ways: (1) the Secretary of State can establish a compliant ballot-return envelope; (2) State election officials can fulfill their duty to correct erroneous vote counts by Counties before certifying election results; and (3) the SEB can instruct Counties not to reject absentee ballots for missing birthdates.

## STANDARDS OF REVIEW

The Court reviews the grant or denial of a preliminary injunction for abuse of discretion, reviewing any underlying factual findings for clear error and any legal

conclusions *de novo*. *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014); *see also Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1163 (11th Cir. 2018). Review of a district court's decision is "very narrow," and the Court must not reverse "unless there is a clear abuse of discretion." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (quoting *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984)).

A district court may grant a preliminary injunction if the movant shows that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Am.'s Health Ins. Plans*, 742 F.3d at 1329 (citations omitted).

With respect to Plaintiffs' cross-appeal challenge to the District Court's rejection of standing as to State Defendants, "[a]s with all jurisdictional issues, this Court reviews standing *de novo*." *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1360 (11th Cir. 2007).

# ARGUMENT

## I. APPELLANTS HAVE NO STANDING TO APPEAL THE DISTRICT COURT'S GRANT OF A PRELIMINARY INJUNCTION AS TO THE BIRTHDATE REQUIREMENT.

Under Article III, a party must establish "standing not only to bring claims, but also to appeal judgments." *Wolff*, 351 at 1353. To do so, the party must show that it is "aggrieved by the judgment." *Id* at 1354 (internal citations omitted). The District Court did not enjoin State Defendants. DE 613 at 16-17. They are therefore not aggrieved by the District Court's injunction order. And Intervenors (national and state Republican Party entities) are not even arguably bound by the order, nor has anyone argued otherwise. The injunction binds County Defendants only, none of which has appealed.

This creates a dilemma for Appellants. If they successfully oppose Plaintiffs' cross-appeal, then they remain unaffected—and unaggrieved—by the District Court's Birthdate Requirement injunction. Appellants would therefore lack Article III standing to appeal that injunction in any respect, including as it affects County Defendants. *Wolff*, 351 F.3d at 1353. As County Defendants themselves have not appealed, this Court would lack jurisdiction over the Birthdate Requirement appeal in its entirety—no party with standing would have appealed the injunction—and the District Court's injunction must remain in place.

24

## II.    THE DISTRICT COURT CORRECTLY ENJOINED COUNTY DEFENDANTS FROM ENFORCING THE IMMATERIAL BIRTHDATE REQUIREMENT.

If the Court finds that Appellants do have standing to appeal the Birthdate Requirement injunction, it should affirm that portion of the order enjoining County Defendants.[7]  Plaintiffs are likely to succeed on their claim that the Birthdate Requirement is prohibited by the Materiality Provision.  Its plain text applies to the entire voting process, including filling out the ballot return envelopes containing absentee ballots, an interpretation consistent with the historical context and Congress's purpose in passing the Civil Rights Act.  Indeed, the vast majority of courts to have addressed the provision's scope (barring one recent outlier addressed below) have so concluded.  The Court therefore should affirm the injunction, and so protect Georgia voters from illegal disenfranchisement based on the Birthdate Requirement.

### A.    Plaintiffs Are Likely To Succeed On The Merits Of The Birthdate Requirement Claim.

The Materiality Provision prohibits any state actor from:

> deny[ing] the right of any individual to vote in any election because of an error or omission on **any** record or paper relating to **any** application, registration, **or other act**

---

[7]  The Court has established that the Materiality Provision creates a "private right of action." *Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003).  Appellants do not challenge that rule.  *See generally* IOB.  State Defendants do not separately address the Materiality Provision and instead "adopt the Intervenor-Appellants' brief."  DE 124 (23-13085), DE 105 (23-13095) at 49 n.4.

> **requisite to voting**, if such error or omission is not
> material in determining whether such individual is
> qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B) (emphasis added). The Civil Rights Act broadly defines

"vote" as:

> **all action necessary to make a vote effective** including,
> but not limited to, registration or other action required by
> State law prerequisite to voting, **casting a ballot**, and
> **having such ballot counted and included in the
> appropriate totals of votes cast** ….

*Id.* § 10101(e) (emphases added). Congress made the definition of "vote" expressly

applicable to the Materiality Provision. *Id.* § 10101(a)(3)(A).

In 1964, Congress enacted the Materiality Provision as part of the Civil Rights

Act and extended it to state elections through the 1965 Voting Rights Act ("VRA").

*See* Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964); Pub. L. 89-110, § 15(a), 79

Stat. 437, 444 (1965). The Civil Rights Act reflects the need for "sterner and more

elaborate measures" to combat persistent, "ingenious" efforts to defeat prior voting

protections. *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966). One classic

disenfranchisement technique was to "disqualify an applicant who failed to list the

exact number of months and days in his age." *Schwier*, 340 F.3d at 1294 (cleaned

up); *accord Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir.

2008). By design, the Materiality Provision ensured that pernicious and immaterial

voting requirements did not prevent qualified voters from participating in the

franchise, with broad coverage and protections for "all action necessary to make a vote effective ...."  52 U.S.C. § 10101(e).

Since its enactment, courts in this Circuit and elsewhere have applied the Materiality Provision to address disenfranchisement techniques at various points in the voting process, from voter-registration forms, *Schwier*, 340 F.3d at 1294; paper forms at the polls, *Ford v. Tennessee Senate*, No. 06-2031, 2006 WL 8435145, at *7, 10-11 (W.D. Tenn. Feb. 1, 2006); absentee ballot applications, *Vote.org v. Georgia State Election Bd.*, 661 F. Supp. 3d 1329, 1340 (N.D. Ga. 2023); and envelopes enclosing mail-in or absentee ballots, *Martin*, 347 F. Supp. 3d at 1308-09 (requirement to handwrite birth year on return form).

### 1.    The District Court Properly Applied The Materiality Provision To The Birthdate Requirement.

By its plain text, the Materiality Provision forbids denying "the right of any individual to vote," i.e. to cast a ballot and have it counted, based on trivial paperwork errors that are immaterial in determining voter qualifications.  *See, e.g.*, *Schwier*, 340 F.3d at 1296-1297.  In endorsing this straightforward reading of the law, the District Court gave effect to all terms, abided by rules of grammar, and enforced a voter-protection provision that is narrow in focus (applying only to immaterial paperwork mistakes) but broadly applicable and robust enough to foil attempts to disenfranchise voters—exactly as Congress intended.

27

Appellants advance a sharply restrictive interpretation of the Materiality Provision, in which it would apply only to *voter-registration* forms but not to any conduct after registration, e.g., to *ballot-casting* paperwork. Adopting that construction would disregard the provision's plain text, the statute's express definition of "vote," and Congress's intent. As explained below, until a recent outlier decision from the Third Circuit, issued 2-1 over a vigorous dissent, the overwhelming weight of authority has rejected the narrow construction of the Civil Rights Act that Appellants propose.

The Materiality Provision consists of two clauses. The first clause sets forth the general prohibition on disenfranchisement based on paperwork errors and "on" which such errors might be made: "any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The second, subordinate clause, starting with "if," specifies the types of errors or omissions on the relevant paperwork that cannot serve as a basis for disenfranchisement. A paperwork error or omission cannot be the basis to deny a voter the right to vote: "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *Id.*

The first clause begins by setting out what the statute prohibits: denying an individual's right to vote. Congress defined the word "vote" in the statute as "all action necessary to make a vote effective including, but not limited to, registration

or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(a)(3)(A), (e). The Materiality Provision's prohibition, read together with the definition of "vote," therefore applies to errors or omissions on paperwork connected to "all action necessary to make a vote effective," including registration, casting a ballot, and having that vote counted. Any conventional or commonsense understanding of "vote" encompasses casting a ballot, but Congress nevertheless chose to explicitly define that term, and the Court must apply that definition. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 697 n.10 (1995) (holding that courts must defer to Congress's choice to "explicitly define" a term). Accordingly, the Materiality Provision on its face applies to all of the steps in the voting process that are listed in the statute: registration, casting a ballot, and having it counted.

The next part of the first clause establishes the scope of voting paperwork that the statute covers: "application" and "registration." The Birthdate Requirement does not apply to a voter's application or registration to vote. The questions, then, are what "other act requisite to voting" means, and whether it encompasses submitting a completed ballot in a return envelope.

Appellants argue that "other act requisite to voting" does not, in fact, cover acts *other* than "application" or "registration" but instead is "meant to sweep in other acts of the same kind." IOB at 41. But the word "other" does not mean one of the

same; it means "not the same: DIFFERENT." *Merriam-Webster's Collegiate Dictionary* 878-879 (11th ed. 2003); *accord Oxford Advanced Learner's Dictionary of Current English* 1097 (10th ed. 2020) (first definition: "used to refer to people or things that are additional or different to people or things that have been mentioned or are known about"). *See also United States v. Dodge*, 597 F.3d 1347, 1352 (11th Cir. 2010) ("other criminal offense" signifies intent "to expand the scope of offenses that meet the statutory criteria" including those "not specifically enumerated").

Given the ordinary meaning of "other," the phrase "other act requisite to voting" means that any statutorily defined voting action is within the ambit of the statute. "By using the word 'other,' Congress made clear that … the statute sweeps more broadly than" just "registering to vote and applying for an absentee ballot"; "an '*other* act requisite to voting' must be something else." *Ball v. Chapman*, 289 A.3d 1, 26 (Pa. 2023) (lead opinion).[8] Indeed, because the statute expressly defines

---

[8] Appellants criticize the District Court for citing the Pennsylvania Supreme Court's lead opinion in *Ball*, arguing that the court was divided evenly on the Materiality Provision. IOB at 52. But that does not detract from the persuasive force of *Ball*'s reasoning, and it certainly does not offer any basis to adopt, as Appellants urge, the conclusions of the *Ball dissent*, which garnered only two votes. *See* IOB at 41-42, 44. Nor does it change the fact that the District Court's order, like its prior decision in *Vote.org*, is more faithful to the statutory language of the Civil Rights Act. *See Vote.org*, 661 F. Supp. 3d at 1340 (holding that Materiality Provision applied to pen-and-ink requirement for absentee ballot applications because, "[b]ased on the plain language of the statute," an "absentee ballot application squarely constitutes a 'record or paper' relating to an 'application' for voting").

the vote to include "casting a ballot" and "having [it] counted," writing one's birthdate on the outer envelope of an absentee ballot submission is inescapably an "act requisite to voting."

Because the Materiality Provision already enumerates "registration," Appellants' argument that the first clause reaches only voter registration, not ballot-casting, would further render the phrase "or other act requisite to voting" meaningless. *See Migliori v. Cohen*, 36 F.4th 153, 162 n.56 (3d Cir.), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022) ("[T]he text of the provision … includes 'other act[s] requisite to voting' in a list alongside registration.  Thus, we cannot find that Congress intended to limit this statute to … registration.").  It is axiomatic that "[a]ny interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided."  *United States ex. rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir. 1991).

Appellants' construction also negates the statute's repeated use of the word "any," and its "expansive meaning."  *Babb v. Wilkie*, 589 U.S. 399, 405 n.2 (2020) (quoting *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008)); *CBS v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001).  "Any" is "not ambiguous … [a]ny means all."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999).  Interpreting the Materiality Provision to apply to "any" voting-related

paperwork beyond registration comports with the broad language Congress chose. Appellants' narrow construction, by contrast, would read "any" out of the statute.

Appellants argue that applying the Materiality Provision to ballot-casting paperwork reads "the word 'requisite' out of the statute." *See* IOB at 45 (quoting *Liebert v. Millis*, No. 23-cv-672-jdp, 2024 WL 2078216, at *13 (W.D. Wis. May 9, 2024)). But it is *Appellants'* proposed construction, not the District Court's, that distorts the meaning of "requisite to voting." "Requisite" means "[t]hat which cannot be dispensed with; a necessity either by rule or by the nature of things" or "necessary." REQUISITE, Black's Law Dictionary 1564 (12th ed. 2024). Appellants confuse that word with "prerequisite," or "[s]omething that is necessary *before* something else can take place or be done" (i.e., a condition precedent). PREREQUISITE, Black's Law Dictionary 1432 (12th ed. 2024) (emphasis added). Consistent with plain English, the law has long distinguished between "requisites" and "prerequisites." *See, e.g.*, *Wheaton v. Peters*, 33 U.S. 591, 653, (1834) (considering whether the Copyright Act of "1802 make the requisites of the act of 1790 pre-requisites"). And Congress, in enacting the Civil Rights Act, knew how to differentiate between all acts "***requisite*** to voting"—in other words, "all action necessary to make a vote effective"—and those in a narrower subset, which—like "registration"—are "***pre***requisite to voting," i.e., things you must do *before* you can vote. 52 U.S.C. § 10101(a)(2)(B), (e) (emphases added). As Congress chose to use

32

"requisite," and not "prerequisite," to describe the acts covered by the Materiality Provision, the statute must apply to "all action necessary to make a vote effective," not merely the initial registration.

> ### 2.    Applying The Materiality Provision To Voting Acts Beyond Registration Effectuates Congressional Intent.

Congress enacted the Materiality Provision to combat rampant disenfranchisement of Black voters. Congress was "disturbed" that citizens were denied the right to vote based on "their race, color, creed or national origin[]." U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights, at ix (1959). Despite early voter-protection legislation, Congressional investigators found that states employed "ingenious and sometimes violent methods" to continue denying the franchise on racial grounds. *Id.* at 30. In Georgia, these techniques involved "discrimination in registration" as well as in "polling facilities and ballot counting." U.S. Comm'n on Civil Rights, 1963 Report of the U.S. Comm'n on Civil Rights, at 17 (1963) ("1963 CCR Report"). Congress enacted the Civil Rights Act as a prophylactic law that would effectuate "sterner and more elaborate measures" to end disenfranchisement of Black voters. *Katzenbach*, 383 U.S. at 309. The first iteration of the Materiality Provision, which applied only to federal elections, quickly proved ineffectual, however, because states deployed "discriminatory devices not covered by the federal decrees." *Katzenbach*, 383 U.S. at 314. Congress responded by

passing the VRA, which extended the Materiality Provision to all U.S. elections, state and federal.  Pub. L. No. 89-110, 79 Stat. 437, 445 (1965).[9]

Thus, the legislative record is far from "bare" of evidence that Congress designed the Materiality Provision as an expansive and flexible measure to combat evolving disenfranchisement strategies throughout all phases of the voting process. *See* IOB at 49; *cf. Schwier*, 340 F.3d at 1294.  Congress's overarching purpose for the Materiality Provision was to "end wholesale voter discrimination *in many areas*."  H.R. REP. NO. 88-914, at 2448 (1963) ("1963 House Report") (emphasis added).  It was enacted to address discrimination in voter registration at the time, 1963 House Report at 2391-94, 2491, but limiting it to "registration ills" (IOB at 49)—without regard to other means of disenfranchisement—would make little sense.  1963 House Report at 2393 (explaining that the Civil Rights Act "would reduce discriminatory obstacles to the exercise of the right to vote," not just the right to register); *see also Pa. State Conf. of NAACP Branches v. Secretary Commonwealth of Pennsylvania ("PSC")*, 97 F.4th 120, 149-50 & n.19 (3d Cir. 2024) (Shwartz, C.J., dissenting) ("[I]t is illogical to conclude that Congress, who was seeking to ensure that Black Americans could vote, intended to enact legislation

---

[9]  The Materiality Provision was later editorially reclassified from 42 U.S.C. § 1971 to 52 U.S.C. § 10101.

that only allowed Black Americans to register to vote but gave no regard to whether those same individuals could actually have their votes counted once registered.").

Appellants argue that their circumscribed version of the statute *would* have meaning because a state would "still violate the provision if it rejected a *registration application* for an irrelevant misspelling." IOB at 46 (emphasis added). But that would leave states free to reject a registered voter's absentee *ballot*, and so deny the voter's right to vote, if the voter made the same irrelevant misspelling, e.g., "Octobre," on the outer envelope. Elected officials could "intentionally reject ballots cast by eligible voters for any reason whatsoever, so long as it does not disqualify the voter from attempting to vote in future elections." *La Union del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 765 (W.D. Tex. 2023). As the District Court put it, a "state could impose immaterial voting requirements yet escape liability each time by arguing that the very immateriality of the requirement takes it outside the statute's reach." DE 613 at 28. This is precisely the kind of voter disqualification Congress sought to foreclose.

### 3. Appellants Rely On An Outlier Case That Contradicts The Overwhelming Weight Of Authority.

As the District Court correctly noted, "[i]t has never been the law that the Materiality Provision only applies to that initial determination of whether a voter is qualified to vote." DE 613 at 28. And, indeed, the Materiality Provision has routinely been applied beyond voter registration paperwork. *See*, *e.g.*, *Ford*, 2006

WL 8435145, at *7, 10-11 (requirement to separately sign both application form and poll book).  That includes mistakes on forms related to absentee ballots.  *See, e.g.*, *La Union del Pueblo Entero*, 705 F. Supp. 3d at 760 (requirements for carrier envelope of mail ballot); *Vote.org*, 661 F. Supp. 3d at 1340-41 (pen-and-ink requirement for absentee ballot envelopes); *Martin*, 347 F. Supp. 3d at 1308-09 (addressing dates of births for absentee ballot envelopes); *Democratic Party of Ga.*, 347 F. Supp. 3d at 1340 (same).  Other courts have applied the Materiality Provision to non-registration voting activities but concluded that the challenged requirement was in fact material to voter qualification.  *See, e.g.*, *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-05174, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023) (signature requirement for absentee ballot application was material); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) (same for ID requirement); *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020) (same for information required for remote ballot request).  Virtually every court to address the issue has applied the Materiality Provision to non-registration paperwork without comment.[10]

---

[10] Appellants cite a single early decision, *Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004), which suggests that the Materiality Provision—then codified as 42 U.S.C. § 1971(a)(2)(B)—does not apply to requirements for ballots.  Appellants contend that *Friedman* reflects the settled understanding of the Civil Rights Act among courts in this Circuit.  IOB at 50.  Not so.  *Friedman* is completely out of step with how courts in this Circuit have construed the Materiality Provision, and it was decided at a time before "case law in this jurisdiction or in other jurisdictions set

Appellants lean heavily on a recent non-binding, 2-1 decision from a panel of the Third Circuit in *PSC*, but it cannot hold their weight. *See* IOB at 28, 37, 51. The majority opinion in *PSC* is a stark outlier, as it conflicts with virtually all prior rulings about the Materiality Provision, including the unanimous decision of a Third Circuit panel just two years before, which struck down a state policy of rejecting ballots in undated return envelopes. *See Migliori*, 36 F.4th at 164. The *Migliori* panel found no evidence in the Civil Rights Act's text that Congress intended to limit it to "registration." *Migliori*, 36 F.4th at 163 n.56. Appellants claim that *Migliori* was the first decision to apply "Plaintiff's novel interpretation of the statute." IOB at 37. It was not. *Migliori* simply explained what other courts implicitly accepted: the plain language of the Materiality Provision means what it says.[11]

*PSC* was clearly wrongly decided. Rather than start with the Civil Rights Act's plain text (where every proper statutory-interpretation exercise must begin), the *PSC* majority attempted a "holistic" interpretation of the statute. 97 F.4th at 132.

---

forth a test for determining a violation …." 345 F. Supp. 2d at 1371. As Plaintiffs explained above, courts in this Circuit and elsewhere have consistently found that the Materiality Provision applies to voting-related paperwork beyond registration.

[11] The U.S. Supreme Court declined to stay the Third Circuit's ruling in *Migliori*. *See Ritter*, 142 S. Ct. at 1824. The *PSC* majority drew heavily on Justice Alito's *dissent* from that ruling. But Justice Alito himself noted that he would "not rule out the possibility that further briefing and argument might convince [him] that [his] current view is unfounded." *Id.* at 1824. The *Migliori* decision was later vacated on mootness grounds because the underlying election was certified.

The *PSC* majority repeatedly acknowledged that the consequence of its counter-textual interpretation is that the Materiality Provision would not apply when it seems it should.  *See, e.g.*, *id.* at 125 ("Because the date requirement is irrelevant to whether a vote is received timely, the blink response is to believe a voter's failure to date a return envelope should not cause his ballot to be disqualified."); *id.* at 131 ("At first glance, one might think the date requirement fits neatly because the date on the declaration bears no relation—it is immaterial—to whether a voter is qualified under Pennsylvania law to vote, i.e., age, citizenship, duration of residence, and so forth."). In other words, the *PSC* majority unabashedly pursued an interpretation that *conflicted* with the plain meaning of the statute.

Indeed, the *PSC* majority read the statute backwards.   The Materiality Provision makes it illegal for anyone "acting under color of law" to:

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election….

52 U.S.C. § 10101(a)(2)(B).  The second clause of the Materiality Provision, starting with "if," is subordinate to the provision's first clause and addresses the mistakes to which the statute applies—those "not material in determining whether such individual is qualified under State law to vote in such election"—while the first clause speaks to the types of paperwork that are covered.  *Id.*  But the *PSC* majority

seized on the phrase "in determining" in the final clause of the statute as "the part we think drives the interpretation of the *rest* of the statute," solely on grounds that those two words "must mean something." But there is no support for the notion that that "something" needed to be limited to registrations; to the contrary, election officials in Georgia determine eligibility to vote at other points in the voting process too, i.e. absentee ballot applications. *See, e.g.*, O.C.G.A. § 21-2-381(b)(2) (registrar or absentee ballot clerk confirms "the applicant is eligible to vote" upon receipt of absentee ballot application). Instead, to reach the "something" they preferred, the majority imported an invented registration-only limitation back into the main clause of the Materiality Provision. In so doing, they rendered meaningless that clause's express language to the contrary—i.e., that it covers "any other act requisite to voting," including "casting a ballot," violating a "cardinal rule" of construction. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). *By its own admission*, the *PSC* majority adopted an interpretation in which "the 'in determining' phrase" in the subordinate clause became "the tail that wags the dog" for the entire provision. *Id.* at 136. Even the *PSC* majority recognized that its contorted reading creates "redundancies." 97 F.4th at 138 (citation omitted).

That is not a natural or permissible way to read text. The words "material in determining" qualifications refer to an "error or omission," which is the "nearest reasonable referent" and is in the same subordinate clause. *See* A. Scalia & B.

Garner, *Reading Law: The Interpretation of Legal Texts* 133 (2012); *see also, e.g.*, *United States v. Safehouse*, 985 F.3d 225, 236 (3d Cir. 2021). That phrase does not refer to (and thus cannot limit) the scope of "record or paper" in the main clause. *Compare Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) (specification in dependent clause of statute could not "swallow" the broader meaning of the main clause). That reading also erases the phrase "any other act requisite to voting," collapsing it into "registration" and truncating the protections of the statute. As the *PSC* dissent detailed in its statutory exegesis, the majority's reading of the Civil Rights Act "would place limits on the text that simply are not there." 97 F.4th at 147 (Shwartz, C.J., dissenting); *see also generally id.* at 145-54.

Appellants follow the same flawed playbook as the *PSC* majority did, and they reach the same untenable result. Instead of dealing with the statutory text of the Materiality Provision, Appellants wrongly focus on the other text *surrounding* it—arguing that, because other provisions in subsection 10101(a)(2) govern voter-qualification determinations, the Materiality Provision must be similarly limited. IOB at 42-43; *see also PSC*, 97 F.4th at 131. This is not how courts interpret statutes; "[i]n a given statute, the same term usually has the same meaning and different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024). Congress intentionally used different language in each of the three subsections of 52 U.S.C. § 10101(a)(2):

- Subsection (a)(2)(A) prohibits applying different rules "in determining whether any individual is qualified" to vote as those that apply to "other individuals" qualified to vote in the same area, 52 U.S.C. § 10101(a)(2)(A). Subsection (a)(2)(A) governs the standards for the substantive rules used "in determining" qualification, and precludes state actors from applying different qualification rules for different voters in the same place.

- Subsection (a)(2)(B), the Materiality Provision, is broader. It does not regulate the standards that officials use to determine eligibility, but instead precludes "deny[ing] the right of any individual to vote" because of a mistake in "*any*" paperwork "relating to *any* … act requisite to voting" "*if*" the mistake is "not material in determining" qualifications (regardless of what the qualifications rules happen to be). 52 U.S.C. § 10101(a)(2)(B) (emphases added). Congress's use of "any"—twice—before the subordinate clause about whether a mistake is relevant "in determining" qualifications shows that Congress intended a broad scope for what paperwork was covered. *See Clover*, 176 F.3d at 1353.

- Subsection (a)(2)(C) bars "employ[ing] any literacy test *as a qualification* for voting in any election" subject to certain exceptions. This provision addresses a specific *form* of voter qualification, not broader standards used "in determining" qualifications. 52 U.S.C. § 10101(a)(2)(C).

Congress's use of different language in each of these provisions means that each *must* have a different scope. *Pulsifer*, 601 U.S. at 149.

Appellants argue that following the letter of the Materiality Provision would somehow "render States powerless to enact even the most basic vote-casting rules." IOB at 28. That is a classic strawman. As their lead example, Appellants argue that applying the Materiality Provision beyond voter registration would require election officials to count a ballot even where a voter "marked the wrong candidate or failed to select any candidate at all." IOB at 40. But there is an obvious difference

between, on the one hand, rejecting outright the ballots of eligible voters for failure to meet a legally immaterial procedural requirement on the outside of a return envelope and, on the other hand, evaluating ballots to determine a voter's substantive preference.  The latter is a rule for interpreting—not excluding—ballots.  Counting a blank field on a ballot (maybe a protest vote) among the tally of no-votes is not the same as refusing to count a ballot based on whether the voter met a procedural exercise.  Having rules for *how* votes are counted is not the same as using immaterial paperwork requirements as obstacles to the franchise.  And if the voter *has* selected a candidate, also as in Appellants' hypothetical, how could an election official determine that the selection was an "error or omission," or that the voter selected the "wrong" candidate, and so reject the ballot?

The *PSC* majority was animated by a similar unconvincing, seemingly pretextual policy concern: "[u]nless we cabin the Materiality Provision's reach to rules governing voter qualification, we tie state legislatures' hands in setting voting rules unrelated to voter eligibility."  *Id.* at 134.  But Congress did not "tie state legislatures' hands" to act fairly and lawfully to monitor voting and the polls.  It outlawed immaterial *documentary* requirements that prevent votes from being "counted and included in the appropriate totals of votes cast."  52 U.S.C. § 10101(e).  And in all events, courts are "not at liberty to rewrite the statute to reflect a meaning [they] deem more desirable": to the contrary, courts "must give effect to the text

42

Congress enacted…." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008); *accord Villarreal v. R.J. Reynolds Tobacco Co*., 839 F.3d 958, 970 (11th Cir. 2016) ("Elevating general notions of purpose over the plain meaning of the text is inconsistent with our judicial duty to interpret the law as written.").

In sum, Appellants' interpretation of the Civil Rights Act limits the scope of the Materiality Provision in violation of numerous core principles of statutory interpretation and against the vast weight of authority.  This Court, like the District Court, should decline to follow it.

### 4.    Constitutional Avoidance Principles Do Not Prevent Application Of The Clear Statutory Text.

Appellants argue that interpreting the Materiality Provision to cover all paperwork requisite to casting a ballot—consistent with the unambiguous text and historical context—would "create serious constitutional problems," because it would "violate the Fifteenth Amendment."  IOB at 49.  That argument lacks merit.  Under the constitutional avoidance canon, "when statutory language is susceptible to multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts."  *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).  But, as discussed above, the Materiality Provision's text is not subject to multiple interpretations.  *See also id.* at 296-297 (finding that the lower court had misapplied the canon because its alternative interpretations were "implausible" and without "statutory foundation").  The "canon of constitutional avoidance has no role to play"

where there is no ambiguity. *Warger v. Shauers*, 574 U.S. 40, 50 (2014). And the *PSC* majority's incorrect, counter-textual interpretation of the statute does not make it ambiguous and cannot thereby bootstrap adoption of the erroneous rule.

In any case, the District Court's correct interpretation of the Civil Rights Act raises no constitutional doubts. The Fifteenth Amendment is not limited matters of voter qualifications. Section 1 broadly prohibits States from denying or abridging the right to vote "on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Section 2 empowers Congress to "enforce" the Fifteenth Amendment "by appropriate legislation." *Id.* § 2. Guarding against minority voter disenfranchisement for *all* immaterial paperwork errors connected to voting does not "violate" or "redefine 'the substance'" of the Fifteenth Amendment. IOB at 48-49. To the contrary, the Civil Rights Act and VRA *enforce* the very rights the Fifteenth Amendment guarantees. U.S. Const. amend. XV, § 1.

Appellants' position is irreconcilable with the Supreme Court's decision in *Brnovich v. Democratic National Committee*, 594 U.S. 647 (2021). There, the Court made clear that VRA Section 2—which prohibits using any "voting qualification or prerequisite to voting or standard, practice, or procedure" to deny or abridge the right "to vote on account of race or color," 52 U.S.C. § 10301(a)—was "adopted to enforce" the Fifteenth Amendment. 594 U.S. at 656. To that end, the VRA applies "to a broad range of voting rules, practices, and procedures," *id.* at 674. If the far-

reaching coverage of the VRA does not cross some constitutional line, neither does interpreting the Materiality Provision to cover acts within its plain statutory scope.

Contrary to Appellants' assertions, the District Court's interpretation of the Materiality Provision does not stray beyond the "'record' compiled by Congress" or provide a remedy that is incongruent or disproportionate to the harm voter suppression inflicts on Black voters. *See* IOB at 48. The record is clear that the injuries were extensive and amounted to "unremitting and ingenious defiance of the Constitution." *Katzenbach*, 383 U.S. at 309. Given these "exceptional conditions"—which Appellants acknowledge (IOB at 49)—there is no question that applying the provision beyond voter registration to address future forms of discrimination is both congruent with Congress's intent and proportionate to the harm it sought to address.

If anything, the Civil Rights Act's legislative history (discussed above, Section II.A.2) shows that Congress expected negative innovation by states and election officials seeking to impose novel and immaterial bars to the franchise, which is why the Materiality Provision uses such broad and flexible language. *See, e.g.*, *Bostock v. Clayton Cnty*, 590 U.S. 644, 680 (2020) (by drafting Title VII language in "starkly broad terms," Congress "virtually guaranteed that unexpected applications would emerge over time"); *accord* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012) (unexpected applications of broad

45

language reflect only Congress's "presumed point [to] produce general coverage—not to leave room for courts to recognize ad hoc exceptions").[12]

The District Court's correct interpretation of the provision's unambiguous text thus creates no constitutional avoidance issues.[13]

---

[12]  Amicus The Honest Elections Project argues that the constitutional avoidance doctrine requires construing the Civil Rights Act to require a showing of racial discrimination.  DE 145 (23-13085) at 33-41.  Because Appellants did not raise this argument, the issue is not properly before this Court. *See, e.g.*, *Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991) ("the arguments raised only by amici may not be considered").  Further, the District Court correctly concluded that Congress required no racial animus to violate the act.  "The Materiality Provision's text says nothing about race or racial discrimination." *E.g.*, *Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095, at *5 (N.D. Fla. Oct. 30, 2023).  The "fact that Congress specified a racial motivation in some portions of the statute, but not in others, indicates that Congress did ***not*** intend to impose a racial motive qualifier uniformly across Section 10101." *League of Women Voters of Ark.*, 2023 WL 6446015, at *16 (declining to add element of racial discrimination to Section 10101(a)(2)(B)) (emphasis in original).  As this Circuit has already held in addressing the Materiality Provision, "Congress in combating specific evils might choose a broader remedy," and "[t]he text of the resulting statute, and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry." *Browning*, 522 F.3d at 1173.  Amicus identifies no court that has adopted its extreme view that the Civil Rights Act would be unconstitutional absent importation of a requirement to prove racially discriminatory animus.

[13]  The Materiality Provision is also a valid exercise of Congressional power under the Elections Clause, U.S. Const. art. I, § 4, cl.1., which delegates "broad authority to Congress to control the substantive and not merely the mechanical aspects of elections." *See, e.g.*, H.R. Rep. No. 88-914 (1963), reprinted 1964 U.S.C.C.A.N. 2391, 2492 (Rep. McCulloch); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (Congress's "comprehensive" power to regulate federal elections pursuant to the Elections Clause "is paramount, and may be exercised at any time, and to any extent which it deems expedient.").

### 5.    Appellants Do Not And Cannot Dispute That The Birthdate Requirement Is Immaterial.

The District Court correctly determined that the "uncontroverted facts show that a voter's ability to correctly provide his or her birthdate on the outer envelope of an absentee ballot is *not* material to determining that voter's qualifications under Georgia law." DE 613 at 22 (emphasis added); *Browning*, 522 F.3d at 1175 (courts consider whether, "accepting the error as *true and correct*, the information contained in the error is material to determining the eligibility of the applicant"). Indeed, Appellants themselves admit that "Georgia's birthdate requirement is not part of the determination of whether a voter is qualified." IOB at 43. *See also* DE 613 at 21-22 (similar); DE 548-05 at 4 [SA396] (State Defendants' Interrogatory Responses) (the Birthdate Requirement "is not used to determine whether the individual is 'qualified' to vote under Georgia law"). "That should end the inquiry." *La Union del Pueblo Entero*, 705 F. Supp. 3d at 764.

Appellants contend that local election officials might use a voter's birthdate to verify voter *identity*. IOB at 31-32, 59. But they cite no evidence in the record to that effect, and, in fact, Appellants and their experts agreed that the birthdate is *not* necessary to confirm a voter's identity. As the District Court found, Appellants "fail[ed] to adequately explain why [the existing] verification methods are not sufficient to identify a voter." DE 613 at 35. Appellants now fail to address this finding on appeal, confirming that the District Court was correct, not "clearly

erroneous," in making it.  *See Transcon. Gas Pipe Line Co.,* 910 F.3d at 1163 ("findings of fact underlying the grant of an injunction are reviewed for clear error") (citing omitted); Fed. R. Civ. P. 52(a)(6).

Voters' ability to correctly write their birthdates on an absentee ballot-return envelope has no bearing on determining their eligibility to vote under Georgia law.

### B.      There Was No Clear Error In Finding That Relief Was Required Before The 2024 Elections To Avoid Irreparable Harm From Denying The Lawful Right To Vote.

The determination of irreparable harm is a question of fact, reversible only for clear error.  *See Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1311 (11th Cir. 2023).  There was no error here, as Plaintiffs easily established that the Birthdate Requirement causes irreparable harm.  One component of that harm is the "continued diversion of resources" away from Plaintiffs' other priorities and activities.  DE 613 at 31.  Another component is disenfranchisement: evidence of county-level vote rejections, and from individual voters, showed that hundreds or thousands of otherwise valid Georgia absentee ballots were being rejected and not counted due to the Birthdate Requirement.  *Id.*  In this Circuit and elsewhere, "missing the opportunity to vote in an election is an irreparable harm for the purposes of a preliminary injunction."  *E.g.*, *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1272 (11th Cir. 2020) (quoting *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020)).

48

Appellants ignore these facts and findings. Instead, they argue that the disenfranchisement of eligible voters in the upcoming 2024 elections would be due to Plaintiffs' "unreasonable delay" in seeking a preliminary injunction. IOB at 55-59. But, as the District Court noted, in the Eleventh Circuit, delay only "'*militates against* a finding of irreparable harm.'"[14] DE 613 at 33 (discussing *Wreal, LLC, v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016)). It does not preclude a finding of harm, and countervailing factors, like the imminent loss of the franchise, overwhelm any impact of delay. *Id.*

Nor did the District Court disregard the principle of reasonable diligence, as Appellants argue. IOB at 58. It recognized that Plaintiffs could not have sought injunctive relief earlier because valid votes had not yet gone uncounted and "prospective harms would not have been 'imminent'." DE 613 at 33. The District Court found that Plaintiffs' motion was timely in light of the delayed discovery schedule and the prudential principles of *Purcell v. Gonzalez*, 549 U.S. 1 (2006),

---

[14] Appellants' reliance on *Wreal* is fundamentally misplaced. There, despite the daily, ongoing use of its trademark, the plaintiff "failed to offer any explanation for its five month delay" in seeking relief, which negated any claim that irreparable harm was imminent. 840 F.3d at 1248 (emphasis added). In contrast, here Plaintiffs moved for injunctive relief as soon as it became apparent that they would not reach trial before the 2024 elections.

which prescribe that courts generally should not change voting rules too close to an election to avoid the risk of causing voter confusion.  DE 613 at 32-33.[15]

In the context of this complex case, the District Court was best situated to assess Plaintiffs' reasonable diligence.  Plaintiffs filed their motion in May 2023, eleven months before the 2024 primaries, when it became clear that no trial would occur before the 2024 election cycle.  *See* Section C, Statement of the Case, *above*. That timing was entirely reasonable and logical.  Until Spring 2023, Plaintiffs had followed *Appellants'* urging that the District Court "just go ahead and have an expedited trial and move to a final decision before the next [2024] election."  DE 234 at 34:20-24 [SA160] (hearing transcript on first preliminary injunction motion regarding line relief claim).  But, after Appellants moved to extend discovery and obtained an order vacating the summary judgment briefing schedule (DE 496 [SA165]), it was evident that only a preliminary injunction could prevent irreparable harm in the 2024 election.  Even assuming Plaintiffs that could have successfully obtained injunctive relief sooner (an argument the District Court rejected), that alone

---

[15] Notably, Intervenors do an about-face with respect to *Purcell*.  After arguing below that *"Purcell* forecloses relief" even when an election is far off (DE 583 at 16-18), now Intervenors fault the District Court for addressing *Purcell* (because Intervenors raised it) to assess whether the timing of Plaintiffs' preliminary injunction motion was reasonable.  IOB at 57-58.  In any event, Intervenors cite no authority suggesting that the District Court's consideration of *Purcell* amounts to clear error justifying reversal.

would not foreclose relief but "must be weighed against the harm a plaintiff suffers." *GRACE, Inc. v. City of Miami*, No. 1:22-CV-24066-KMM, 674 F. Supp. 3d 1141, 1162 (S.D. Fla. 2023) (granting an injunction where election was nine months away and plaintiffs had taken time to develop the evidentiary record).[16]  Here, Appellants were not harmed in any way by the timing of Plaintiffs' injunction motion, but Plaintiffs and Georgia voters would be catastrophically harmed if the injunction were overturned on that basis.

### C.    The District Court Did Not Abuse Its Discretion In Weighing The Equities And Public Interest.

"[T]he public interest is best served by allowing qualified voters to vote and have their votes counted." *Martin*, 347 F. Supp. 3d at 1310.  The District Court was right to be concerned by the unrebutted evidence of hundreds of uncounted votes, such that "one of Plaintiffs' member's absentee ballots might be rejected, and thus not counted, due to a failure to comply with the Birthdate Requirement."  DE 613 at 31.  "No right is more precious in a free country than that of having a voice in the

---

[16] Appellants also criticize the District Court for not addressing *Benisek v. Lamone*, 585 U.S. 155 (2018) (per curiam), which they claim is relevant as "an election-law case."  IOB at 58.  But *Benisek* is distinguishable on several grounds, and in no way governs the result here.  In that case, the preliminary injunction motion challenged a redistricting plan "*six years* after the Maryland General Assembly redrew" the districting map.  585 U.S. at 157 (emphasis added).  The preliminary injunction motion filed in May sought to have the map redrawn by August.  And *Benesik* affirmed *denial* of a motion for preliminary injunction, so in that case, the abuse of discretion calculus cuts the other way.  585 U.S. at 157-58.

election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Once an election is over, and one has lost the opportunity to vote, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). The public interest also favors the Plaintiffs' organizational missions of enabling voter participation without diverting Plaintiffs' resources from other voter education and mobilization activities.

The District Court also committed no error in rejecting Appellants' unsupported appeals to integrity in the electoral process. Defendants do not dispute that they "did not present any evidence that absentee ballots rejected for failure to comply with the Birthdate Requirement were fraudulent ballots" or otherwise invalid. DE 613 at 35. And they cite no such evidence on appeal. The Birthdate Requirement does not serve any legitimate "fraud prevention" role, particularly because the hypothetical ballot fraudster would need not just a birthdate but the voter's driver's license or ID—which themselves contain the birthdate—to submit an illegitimate ballot.

In sum, the District Court properly balanced the equities and the public interest in granting the preliminary injunction, and this Court should affirm that order.

### III. PLAINTIFFS HAVE STANDING AS TO STATE DEFENDANTS, WHICH THE COURT SHOULD ENJOIN TO ENSURE THAT COUNTIES DO NOT ENFORCE THE BIRTHDATE REQUIREMENT.

Absentee voters in *all* Georgia counties are at risk of disenfranchisement through the unlawful rejection of ballots for non-compliance with the Birthdate Requirement. Accordingly, Plaintiffs sued State Defendants to obtain *statewide* redress for their injuries, and Plaintiffs proposed injunctions to effectuate that redress. State Defendants conceded the importance of "uniformity of electoral framework throughout Georgia," and the Secretary of State and SEB's responsibility to provide that uniformity, arguing that, without a statewide injunction, counties would accept and reject absentee ballots according to different standards. *See* State Defendants' Response to Motion to Dismiss, DE 89 (23-13085) at 39, 42.

The District Court found that Plaintiffs' injury was not traceable to State Defendants and, consequently, not redressable by an injunction directed against them. DE 613 at 16. This Court reviews standing decisions *de novo*. *AT&T Mobility v. Nat'l Ass'n for Stock Car Auto Racing*, 494 F.3d at 1360. It should reverse. Given Georgia's assignment of broad, mandatory, directly relevant election-related responsibilities to State Defendants, Plaintiffs' injuries are "fairly traceable" to them. Enjoining State Defendants to ensure statewide compliance with the Civil Rights Act would redress Plaintiffs' injuries. Importantly, neither State Defendants nor Appellants argued in their opening briefs that the District Court erred by finding that

Plaintiffs have suffered a justiciable injury.  Appellants have therefore abandoned injury-related arguments on appeal, and if the Court holds that Plaintiffs do have standing with respect to State Defendants, then it should remand with instructions to enjoin State Defendants as well.

This Court has made clear "that the traceability requirement is *less* stringent than proximate cause." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) (emphasis added, synthesizing cases); *accord Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (identity theft was traceable to healthcare services provider that failed to secure information on laptops stolen by third party).  "Even a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." *Id.*  "[S]tanding is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998).

In the election context, courts have synthesized these principles to find alleged injuries traceable to a Georgia state official over the official's objection that separate government entities are more proximately responsible.  *Rose v. Raffensperger*, 511 F. Supp. 3d 1340, 1355–56 (N.D. Ga. 2021).  In *Rose*, the plaintiffs sued the Georgia Secretary of State for violations of the VRA, alleging minority vote dilution in elections for the Georgia Public Service Commission through statewide at-large

elections. *Id* at 1352-53. The Secretary argued that "Plaintiffs' injuries are not traceable to him because the Commission districts are designed by the Georgia General Assembly." *Id* at 1356. The court disagreed, finding traceability on the ground that, by law, the Secretary "is the person responsible for administering elections."[17] *Id*. The court distinguished *Jacobson v. Florida Sec. State,* 957 F.3d 1236 (11th Cir. 2020)—on which the District Court relied to reject standing as to State Defendants here—on the ground that, unlike in Florida, Georgia law charged the Secretary with sufficient authority over elections to include the Secretary in the chain of traceability. *Id.* at 1357; *see also Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1305-06 (N.D. Ga. 2020), *aff'd sub nom. Black Voters Matter Fund v. Sec'y of State for Georgia*, 11 F.4th 1227 (11th Cir. 2021).

An injury is redressable for Article III purposes where it is "likely" that the plaintiff's injury-in-fact will be "redressed by a favorable decision." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 927 (11th Cir. 2023) (citations omitted).

---

[17] Following a bench trial and final judgment, the district court in *Rose* entered a permanent injunction, enjoining the Secretary of State from administering a statewide election under a new procedure that violated the VRA by diluting votes. The Eleventh Circuit reversed, holding that this was not a "viable remedy" as defined by VRA case law because its effect would be to change the structure of the Public Service Commission. *Rose v. Sec'y, State of Georgia*, 87 F.4th 469, 475 (11th Cir. 2023), *cert. denied sub nom. Rose v. Raffensperger*, No. 23-1060, 2024 WL 3089563 (June 24, 2024), *reh'g denied* No. 23-1060, 2024 WL 3851078 (Aug. 19, 2024). The Eleventh Circuit's holding did not address the issue of standing, nor did it disturb the lower court's holding on Article III standing.

55

"[I]f the plaintiff can show it is 'likely' to obtain redress from a favorable decision, the plaintiff would have standing and the case should proceed to the merits." *KH Outdoor, L.L.C. v. Fulton Cnty., Ga.*, 587 F. App'x 608, 613 (11th Cir. 2014) (citation omitted).  As shown below, many courts have found election-related injuries redressable by orders to Georgia statewide officials, including where local officials are also necessarily involved in the allegedly offending conduct.

State Defendants' statutory authority, including specifically with respect to absentee ballots, puts State Defendants easily in the chain of causation that led to Plaintiffs' injuries.  Indeed, as the Georgia Attorney General has opined, "under both the Constitution and the laws of the State, the Secretary is the state official with the power, duty, and authority to manage the state's electoral system.  No other state official or entity is assigned the range of responsibilities given to the Secretary of State in the area of elections."  Ga. Op. Att'y Gen. No. 05-3, 2005 WL 897337, at *3 (Apr. 15, 2005).  That same statutory authority provides the bases for redress.

### A.    Plaintiffs' Injury Is Traceable To The "Form And Substance" Of The Outer Envelope And Redressable By Order Enjoining The Secretary Of State To Amend It

In S.B. 202, which imposes the Birthdate Requirement, Georgia confirmed that the components of absentee ballot packages, including the "two envelopes"—inner and outer—are to be "in form and substance as provided by the Secretary of State."  S.B. 202 § 27, codified at O.C.G.A. § 21-2-384(b).  The Secretary also

56

inspects, audits, and approves such envelopes for use by county officials. O.C.G.A. § 21-2-390. As of the passage of S.B. 202, the outer envelope contains a field for voters to enter their birthdates, in furtherance of the Birthdate Requirement that the District Court correctly held was likely to violate the Materiality Provision.

But for the presence of the birthdate field on the Secretary-promulgated envelope, no voter in Georgia would be subject to the Birthdate Requirement. Plaintiffs' injuries are therefore traceable to the Secretary. *Black Voters Matter Fund*, 478 F. Supp. 3d at 1305-06. In *Black Voters Matter*, as in *Rose*, the court held that plaintiffs' injuries were traceable to the Georgia Secretary "because Georgia's election code delegates authority to the Secretary of State to oversee the elections and *prepare the form of the absentee ballots and envelopes*." *Id.* at 1306 (denying injunction on other grounds) (emphasis added). An order enjoining the Secretary to delete the birthdate field from the outer envelope—amending its "form and substance"—would redress the injuries.

Citing *Jacobson*, State Defendants argued below that "even if the Secretary were ordered to alter the forms related to absentee ballots, nonparty county election officials would still be obligated" to "follow the statute" and use the old forms. DE 602-1 at 8. *Jacobson*, which concerned a challenge to the order in which candidates appeared on ballots, is inapposite. 957 F.3d at 1242. Under Florida law, candidate order is left to the discretion of local officials, "independently of the

Secretary," *Id.* at 1253, and the Secretary had "highly limited authority" over county officials, *id* at 1256, with no way to assure compliance with ballot form directives except "through coercive judicial process" against them, *id.* at 1253. An injury related to the order of candidates on a ballot was therefore not traceable to the Secretary, and enjoining the Secretary to order changes would not redress the injury because, "as a practical matter," such an order would not "significantly increase the likelihood" that county officials would comply with the order. *Id*. at 1255.

Georgia law is different from Florida law in precisely the ways that render *Jacobson* inapplicable. *E.g., Black Voters Matter*, 478 F. Supp. 3d at 1304-06; *Rose*, 511 F. Supp. 3d at 1357. Georgia law charges the Secretary of State with prescribing the "form and substance" of the outer envelope statewide, O.C.G.A. § 21-2-384(b), unlike the Florida provision at issue in *Jacobson* that left compliance with state law about ballot form to independent local supervisors. Accordingly, Plaintiffs here *did* sue the specific officials, including the Secretary of State, "who will cause any future injuries." *Jacobson*, 957 F.3d at 1255. An order requiring the Secretary to amend the outer envelope, the "form and substance" of which is the Secretary's responsibility, would necessarily require and cause county officials to provide voters with outer envelopes that comply with the Civil Rights Act.

**B.      Plaintiffs' Injuries Are Traceable To State Defendants' Enforcement Of S.B. 202 And Can Be Redressed Through An Order Requiring The Secretary To Direct Counties To Correct And Recertify Tallies Computed In Violation Of Federal Law.**

Georgia law gives the Secretary of State ultimate authority "to tabulate, compute, and canvass the votes cast for all candidates … and upon all questions voted for by the electors of more than one county" and to "certify" the results. O.C.G.A. § 21-2-499(a).  "In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes as described in this Code section, the Secretary of State *shall* notify the county submitting the incorrect returns and *direct the county to correct and recertify such returns*."  *Id.* (emphases added).  Injuries from enforcement of the Birthdate Requirement are therefore traceable to the Secretary, who is charged by law to ensure that certified election results are error-free.  An order enjoining the Secretary to direct counties to correct and recertify returns that failed to count valid ballots in violation of federal law, and not to certify returns tainted by the Birthdate Requirement, is not merely likely but virtually certain to redress this wrong.

And, in fact, courts have granted such relief in response to challenges to a previous incarnation of Georgia's Birthdate Requirement.  In *Democratic Party of Georgia*, the court enjoined the Secretary "from certifying the State Election results until she has confirmed that each county's returns include the counts for absentee ballots where the birth date was omitted or incorrect."  347 F. Supp. 3d at 1347.  The

court explained that "[a]n injunction directed at the Secretary of State addressing election procedures can reduce Plaintiffs' burden of assisting voters," and that "any injunction that clarifies the legal requirements surrounding absentee ballots or clarifying the curative procedures for provisional ballots can reduce the number of rejected ballots, thereby addressing the individual harm suffered by Plaintiffs' members." *Id* at 1338. Similarly, in *Martin*, the court enjoined the defendants, including the Secretary of State, from enforcing the 2018 birthdate requirement, ordering them "to delay certification until such ballots have been counted." 347 F. Supp. 3d at 1311. In *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1300 (N.D. Ga. 2018), the district court enjoined the Secretary of State "from certifying the results of the election" and ordered the Secretary of State to either (1) "direct the county election superintendents to remit certified returns" to certain counties to review the eligibility of voters issued provisional ballots or (2) "engage in an independent review" of the eligibility of voters issued provisional ballots statewide to ensure provisional votes were counted in compliance with the court's order.

The District Court accepted State Defendants' argument that they "are removed from the process of accepting or rejecting absentee ballots" and, citing *Jacobson*, that their "general supervision and administration of the election laws" does not render rejection of those ballots traceable to them. DE 613 at 17; *see id.* at 16. Here again, differences in Florida and Georgia law require a different outcome

in this case, one consistent with the decisions discussed immediately above. *Jacobson* "rests on the reality that the [County] Supervisors are independent officials under Florida law who are not subject to the Secretary's control." *Jacobson,* 957 F.3d at 1253.  In contrast, Georgia law goes well beyond general supervisory authority.  It expressly requires the Secretary to order counties to correct errors, such as the exclusion of ballots rejected on grounds of Birthdate Requirement non-compliance, and to recertify results.  O.C.G.A. § 21-2-499(a)**.**

### C.    Plaintiffs' Injuries Are Traceable To The SEB And Can Be Redressed Through An Order Requiring It To Ensure Compliance.

Plaintiffs' injuries are also traceable to the SEB, an entity created by Georgia law specifically to "obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections."  O.C.G.A. § 21-2-31(1).  Among other powers, the SEB may, without a court order, take remedial action against counties and election officials that do not comply with election requirements. O.C.G.A. § 21-2-33.1(a).  The SEB's broad authority extends to suspending and replacing local county superintendents. *Id.* § 21-2-33.2(c).

In fact, district courts in Georgia have found standing for plaintiffs seeking relief from the SEB specifically for alleged injuries related to provisions of Georgia's absentee ballot regime. *New Georgia Project v. Raffensperger*, 484 F.

Supp. 3d 1265, 1285-86 (N.D. Ga. 2020) (distinguishing *Jacobson* on grounds of broad Georgia statewide officials' broader authority to regulate elections, and finding standing based on SEB's authority to "train local election officials and set election standards"); *Vote.org*, 661 F.Supp.3d at 1338 (alleged violations of the Materiality Provision traceable to and redressable by a favorable decision enjoining SEB and others).

Georgia law created the SEB specifically to exercise control over county officials.[18]   *See* O.C.G.A. § 21-2-31(1) (first enumerated duty of the SEB is to "obtain uniformity in the practices and proceedings of superintendents").   It is therefore likely that an injunction ordering the SEB to instruct counties not to enforce the Birthdate Requirement would redress Plaintiffs' injuries.

## CONCLUSION

Both State Defendants and Intervenors lack standing to appeal the injunction as to County Defendants, but in all events the District Court did not abuse its discretion by enjoining County Defendants from enforcing the Birthdate Requirement and violating the Materiality Provision of the Civil Rights Act.   The portion of its order granting Plaintiffs' request for a preliminary injunction should

---

[18] And, as the undisputed record on summary judgment showed, counties generally do what the SEB tells them to do, without the SEB needing to resort to enforcement proceedings.   DE 808-9 at 195:2-10, 257:15-258:4; DE 807-23 at 257:4-258:24, 270:10-13; DE 807-17 at. 275:20-23; DE 807-20 at 206:8-12.

be affirmed.  Because Plaintiffs had standing to obtain an injunction as to State Defendants as well, that portion of the District Court's order denying injunctive relief as to those Appellants should be reversed with remand from this Court to extend the injunction to apply to the State Defendants as well.

Dated: August 30, 2024

Respectfully Submitted

Laurence F. Pulgram
Armen Nercessian
FENWICK & WEST LLP
555 California Street
San Francisco, CA  94104
(415) 875-2300

Catherine McCord
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
(212) 430-2690

Vilia Hayes
Neil Oxford
Gregory Farrell
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

*Attorneys for Plaintiffs-Appellees
Georgia State Conference of the
NAACP, Georgia Coalition for the
People's Agenda, Inc., League of
Women Voters of Georgia, Inc.,
GALEO Latino Community
Development Fund, Inc., Common
Cause, and the Lower Muskogee Creek
Tribe*

Ezra D. Rosenberg
Julie M. Houk
Jennifer Nwachukwu
Heather Szilagyi
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600

Bryan L. Sells
THE LAW OFFICE OF
BRYAN SELLS, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

Gerald Weber
LAW OFFICES OF
GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 28.1(e)(2)(B) because, excluding the parts of the motion exempted by Federal Rules of Appellate Procedure Rule 32(f) and Eleventh Circuit Rule 32-4, this motion contains 15,222 words.

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

 */s/ Laurence Pulgram*
Laurence Pulgram

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 30, 2024, I served this appellate answering brief and principal cross-appeal brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

*/s/ Laurence Pulgram*
Laurence Pulgram
