No. 23-13085

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————◆———————

IN RE:

GEORGIA SENATE BILL 202.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA IN NO. 1:21-MI-55555-JPB
(HONORABLE JEAN-PAUL BOULEE, U.S. DISTRICT JUDGE)

## BRIEF OF *AMICUS CURIAE* NEW DISABLED SOUTH IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

COREY STOUGHTON
ELIZABETH SNOW
SELENDY GAY PLLC
*Attorneys for Amicus Curiae*
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9399

CP COUNSEL PRESS    (800) 4-APPEAL • (332641)

## <u>CERTIFICATE OF INTERESTED PERSONS</u>
## <u>& CORPORATE DISCLOSURE STATEMENT</u>

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the Plaintiff-Appellee's Certificate of Interested Persons–the following listed persons and entities have an interest in the outcome of this case. These representations are made as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

### *Amicus Curiae*
New Disabled South

### *Attorneys for Amicus Curiae*
Corey Stoughton

Elizabeth Snow

Selendy Gay PLLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1, New Disabled South does not have a parent corporation that owns 10% or more of its stock.


/s/    *Corey Stoughton*
Corey Stoughton

## <u>TABLE OF CONTENTS</u>

<u>**Pages**</u>

INTEREST OF AMICUS CURIAE............................................................ 1

STATEMENT OF THE ISSUE.................................................................. 2

INTRODUCTION AND SUMMARY OF THE ARGUMENT.................... 3

ARGUMENT ............................................................................................ 6

I.    Mail-in Absentee Ballots Are Particularly Important to the
      Ability of Georgians with Disabilities to Vote ................................ 6

II.   S.B. 202's Birthdate Requirement Impedes the Ability to
      Vote Absentee by Mail, Disenfranchising Numerous
      Georgians with Disabilities ........................................................... 13

CONCLUSION ........................................................................................ 21

CERTIFICATE OF COMPLIANCE ........................................................ 23

CERTIFICATE OF SERVICE................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Georgia Senate Bill 202*,
No. 1:21-MI-55555-JPB, 2023 WL 5334582 (N.D. Ga. Aug.
18, 2023) ........................................................................ 8, 11, 19, 20

*La Union del Pueblo Entero v. Abbot*,
705 F. Supp. 3d 725 (W.D. Tex. 2023), *appeal docketed*,
No. 23-50885 (11th Cir. Dec. 5, 2023) ......................................... 15, 16

*La Union del Pueblo v. Abbott*,
No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov.
29, 2023) .................................................................................... 16

*Schwier v. Cox*,
340 F.3d 1284 (11th Cir. 2003) ....................................................... 5

*Spalding Cnty. Bd. of Elections v. McCord*,
700 S.E.2d 558 (Ga. 2010) ............................................................ 12

**Statutes and Rules**

52 U.S.C. 10101(a)(2)(B) ...................................................................... 5, 21

Fed. R. App. P. 29(a)(4)(E) ..................................................................... 1

Fed. R. App. P. 29(a)(4)(G) .................................................................... 22

Fed. R. App. P. 29(a)(5) ........................................................................ 22

Fed. R. App. P. 32 ................................................................................ 22

Ga. Code § 21-2-381(b)(3) ................................................................. 17, 19

Ga. Code § 21-2-385(a) ..................................................................... 13, 15

Ga. Code § 21-2-386(a)(1)(C) ................................................................. 13

Ga. Code § 21-2-391 ................................................................. 13

TEC § 86.002(g) ....................................................................... 15

**Other Authorities**

2005 Georgia Laws Act 53 (H.B. 244) ...................................... 12

Ashley Lopez, *Voting explainer: In many states, there's a process to fix an error with your ballot,* NPR (Sept. 27, 2022), https://www.npr.org/2022/09/27/1125179062/voting-explainer-in-many-states-theres-a-process-to-fix-an-error-with-your-ballo ....................................................................... 18

Ayanna Alexander, *Voters with Disabilities Often Overlooked in Voting Battles,* AP NEWS (April 2, 2023, 8:17 AM EDT), https://tinyurl.com/8ujpkvrc ............................................. 7, 8

Caitlin May et al., *Here's How Georgia's New Voting Law, Harms Voters With Disabilities,* ACLU (May 19, 2023), https://www.aclu.org/news/disability-rights/heres-how-georgias-new-voting-law-harms-voters-with-disabilities .................. 21

*Closing the Gap on Voters with Disabilities*, U.S. VOTE FOUND., https://www.usvotefoundation.org/closing-gap-voters-disabilities (last visited Aug. 18, 2024) .................................. 11

Laura Nwogu, *Barriers to the ballot: Georgia voters with disabilities working to improve access to the polls*, SAVANNAH MORNING NEWS (Nov. 1, 2022) .................................. 10, 16

Leila Fawaz, Kate Mize, & Monica Vu, *SB 202: Revisions to Georgia's Election and Voting Procedures*, 38, Ga. St. U. L. Rev., 105, 132–34 (2022) .................................................... 18

Lisa Schur et al., *Disability and Voter Turnout in the 2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB. RELS. 9, https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact_Sheet_Disability_Voter_Turnout_2022_Elections.pdf (last visited Sept. 5, 2024) ............................................................................. 7, 20

Lisa Schur et al., *Disability and Voting Accessibility in the 2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB. RELS. 5 (July 2023), https://www.eac.gov/sites/default/files/2023-07/EAC_2023_Rutgers_Report_FINAL.pdf (last visited Sept. 5, 2024) ................................................................ *passim*

iv

# INTEREST OF AMICUS CURIAE

Amicus curiae New Disabled South, headquartered in Atlanta, Georgia, is a 501(c)(3) charitable organization that advocates on behalf of people with disabilities in the southern part of the United States. New Disabled South's mission is to improve the lives of people with disabilities and build strong disability justice and rights movements across the South, including Georgia. As detailed in this brief, people with disabilities, including amicus's members, frequently encounter barriers to voting in Georgia. To address these concerns, New Disabled South advocates for the rights of people with disabilities to vote and educates their members on available voting accommodations and voting processes. It is devoted to ensuring its members and all Georgians with disabilities are not disenfranchised by laws such as Georgia Senate Bill 202 ("S.B. 202").

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus affirm that no counsel for a party authored this brief in whole or in part and that no person other than amicus and its counsel made a monetary contribution to its preparation or submission.

1

## STATEMENT OF THE ISSUE

Whether the District Court abused its discretion by enjoining County Defendants from rejecting absentee ballots based on any error or omission relating to the Birthdate Requirement.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

For nearly two decades, Georgians with disabilities have enjoyed the ability to vote absentee by mail without condition—a recognition by the State that the act of in-person voting poses unique challenges to people with disabilities and that their right to vote must be safeguarded. This protection of a most sacred right for people with disabilities was passed by Republican legislators when they took control of the state legislature in 2005—including then-State Senator, now-Governor Brian Kemp. The message was as clear as it was enduring: The votes of Georgians with developmental and physical disabilities count as much as those of their fellow citizens.

In 2021, however, Georgia unnecessarily put the right to vote of people with disabilities at risk by imposing an unjustifiable requirement on absentee voters to write their birthdate on the ballot return envelope (the "Birthdate Requirement"). Among other provisions not directly at issue here, Georgia Senate Bill 202 ("S.B. 202") requires voters to legibly hand-write their birthdate in a place that is not immediately apparent under the flap of the envelope—despite election officials having already verified their eligibility. If voters do not flawlessly implement the

3

Birthdate Requirement, S.B. 202 requires election officials to reject the ballot. Any attempt to correct errors must be completed no fewer than three days following the date of the election—a demand that, especially when considered alongside S.B. 202's shortening of the window for distributing absentee ballots to voters, guarantees some voters will be disenfranchised by not timely learning of their alleged error or not having sufficient time to "cure" by submitting the required affidavit to the county registrar or clerk, along with a valid form of identification.

The Birthdate Requirement assumes that voters will be able to easily find the voter flap and write legibly within that space. But some voters with disabilities have physical or developmental conditions that make it difficult to do either. The law's artificial and unrealistic time limitations for curing pose particular challenges for voters with disabilities, some of whom require additional time to overcome barriers to completing tasks like preparing additional paperwork.

The district court implicitly recognized this peril when it held that Plaintiffs were entitled to a preliminary injunction: It correctly found that Plaintiffs were likely to succeed on the merits on their claim that the

Birthdate Requirement violates Section 101 of the Civil Rights Act of 1964, which prohibits state officials from "deny[ing] the right of any individual to vote" based on "an error or omission on any . . . act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote." *See* 52 U.S.C. 10101(a)(2)(B). The purpose of this provision is to remove irrelevant barriers used to disenfranchise certain voters—exactly the effect that the Birthdate Requirement has on voters with disabilities. *See Schwier v. Cox,* 340 F.3d 1284, 1294 (11th Cir. 2003) (discussing 42 U.S.C. § 1971(a)(2)(B), which was editorially reclassified as 52 U.S. Code § 10101(a)(2)(B), and stating that it "was intended to address the practice of requiring unnecessary information . . . [that] would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters"). As the district court also correctly held, the fact that voters risk disenfranchisement due to the Birthdate Requirement amounts to irreparable injury, and that risk is even more stark for voters with disabilities.

New Disabled South asks this Court to affirm the district court's order for all the reasons offered by Appellees and particularly because

the Birthdate Requirement hampers the ability of Georgians with disabilities to exercise their right to vote.

## **ARGUMENT**

## I.    **Mail-in Absentee Ballots Are Particularly Important to the Ability of Georgians with Disabilities to Vote**

Voting is often a difficult enterprise for Americans with disabilities. A survey issued by the U.S. Election Assistance Commission ("EAC") found that approximately one in seven voters with disabilities reported facing difficulties voting in the 2022 midterms.[1] In another survey, the EAC found that in Georgia, in the 2018 election—before S.B. 202's various impairments of the state's absentee voting scheme—there was no statistically significant disability gap in voting between people with and

---

[1] Lisa Schur et al., *Disability and Voting Accessibility in the 2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB. RELS. 5 (July 2023), https://www.eac.gov/sites/default/files/2023-07/EAC_2023_Rutgers_Report_FINAL.pdf (last visited Sept. 5, 2024).

people without disabilities, but following the enactment of S.B. 202, there was an almost 8% gap.[2]

Voting in person is especially challenging.[3] Voters with disabilities are more than three times more likely than voters without disabilities to report issues with voting in person; in fact, one-fifth of voters with disabilities reported difficulties with voting in person.[4] The Department of Justice found that since 2016 more than three dozen cities and counties have violated the Americans with Disabilities Act by providing poor accessibility at polling locations.[5]

---

[2] *See* Lisa Schur et al., *Disability and Voter Turnout in the 2022 Elections: Supplemental Analysis of Census Voter Turnout Data*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB. RELS. 9, https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact_Sheet_Disability_Voter_Turnout_2022_Elections.pdf (last visited Sept. 5, 2024).

[3] Schur et al., *supra* note 1 at 5.

[4] *Id.* at 27.

[5] *See* Ayanna Alexander, *Voters with Disabilities Often Overlooked in Voting Battles,* AP NEWS (April 2, 2023, 8:17 AM EDT), https://tinyurl.com/8ujpkvrc.

The State Defendant-Appellants' own evidence in this matter confirms the scale of this problem in Georgia. In opposing Plaintiffs-Appellees' motion for preliminary injunction, State Defendants filed an independent analysis of voting accessibility in Fulton County conducted by the Carter Center, which noted obstacles faced by individuals in wheelchairs at each step along the way. *See* Carter Center, 2022 General Election Observations, Fulton County, *In re Georgia Senate Bill 202*, No. 1:21-MI-55555-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) (No. 582-15). Certain urban Fulton County polling places lacked temporary street parking in front of the building and many sites County-wide lacked sufficient signage directing voters to the accessible entrance. *Id.* at 8. The report further found that accessible entrances at Fulton County election sites were not always truly accessible, as 13% of the County's polling places were equipped with non-automatic "doors too heavy to open comfortably from a seated position." *Id.* Challenges persisted once inside. Observers noted that space restrictions made some polling places difficult to navigate by wheelchair and the angle of some accessible voting machines' screens required people in wheelchairs to lift their arms to head height or higher to vote. *Id.* at 7–8, 13.

Physical accessibility is one issue, but not the only issue: challenges to voting in person are acute among people who are visually and cognitively impaired, as well.[6] Over one-half of people with vision impairments "reported difficulty in voting at a polling place, although the rates of difficulty were also high for other disability types, particularly those needing help in daily activities (30%) and with cognitive impairments (28%)."[7] Such voters face difficulties such as: (1) seeing or reading the ballot (approximately 40% of voters with vision impairments); (2) understanding how to vote or use the voting equipment (16% of voters with vision impairments and about 8% of voters with cognitive impairments); (3) writing on the ballot (almost 10% of voters with vision impairments); (4) waiting in line to vote (over 15% of voters with vision impairments and approximately 12% of voters with cognitive impairments); and (5) communicating with election workers or other officials at the polling place (approximately 8% of voters with cognitive impairments).[8]

---

[6] Schur et al., *supra* note 1 at 10.

[7] *Id.*

[8] *Id.* at 29.

New Disabled South members have direct experience of these accessibility issues. A New Disabled South member reported finding her polling place was wheelchair inaccessible; yet another member was refused curbside voting when poll workers did not believe she had a disability even though she uses a wheelchair. When voting inside the polling place, that same member found the voting machine was well above her head because she was in her wheelchair; she needed a poll worker to stand next to her and hold the machine down to use it.

Accessibility issues aside, voters with disabilities may struggle to travel to polling places, both due to the scarcity of accessible polling places, despite legal rules requiring accommodations, and barriers to transportation.[9] Savannah resident Jessica Mathis was reported to be bedridden during the 2020 Senate Elections, and her cerebral palsy made riding public transportation to the polls unbearable.[10] A New Disabled

---

[9] *See id.* at 28.

[10] Laura Nwogu, *Barriers to the ballot: Georgia voters with disabilities working to improve access to the polls*, SAVANNAH MORNING NEWS (Nov. 1, 2022),

South member reported needing to travel forty-five minutes to her near-est accessible polling place when she never received the absentee ballot she requested. This was particularly difficult because she is unable to drive.[11]

The impact of barriers to voting for people with disabilities is mas-sive. Nationwide, if people with disabilities voted at the same rate as peo-ple without disabilities, there would be about 2 million more voters.[12]

---

https://www.savannahnow.com/story/news/politics/elec-tions/2022/11/01/ga-voters-disabilities-fight-against-obstacles-voting-election-2022/10499428002/.

[11] In recognition of similar difficulties surfaced by their constituents, Plaintiff-Appellees Common Cause, Georgia Coalition for the People's Agenda, and Georgia State Conference of the NAACP developed "mobile voter accessibility initiatives" to transport individuals with disabilities and other vulnerable groups to the ballot box. *See* Decl. of Treaunna Dennis ¶ 6, Decl. of Helen Butler ¶ 10, *In re Georgia Senate Bill 202*, No. 1:21-MI-55555-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) (Nos. 548-15–16).

[12] *Closing the Gap on Voters with Disabilities*, U.S. VOTE FOUND., https://www.usvotefoundation.org/closing-gap-voters-disabilities (last visited Aug. 18, 2024).

11

Challenges like these make the option of voting by mail especially important to voters with disabilities. At home, voters with disabilities are free from the obstacles of inaccessible polling locations. They can take their time without impacting other waiting voters, easily access assistive technology or the help of caregivers, avoid travel and potential exposure to disease and the elements, and control their environments in ways that may be necessary because of specific aspects of their disability.

In recognition these realities, Georgia has allowed people with disabilities to vote absentee by mail without excuse since July 2005. *See* 2005 Georgia Laws Act 53 (H.B. 244) (revising Ga. Code Ann. § 21-2-381 as follows: "An elector who requests an absentee ballot by mail … shall not be required to provide a reason … in order to cast an absentee ballot in such primary, election, or run–off primary or election."); *see also Spalding Cnty. Bd. of Elections v. McCord*, 700 S.E.2d 558, 563 (Ga. 2010) (summarizing the history of amendments to OCGA § 21-2-380 and holding that in 2009, "electors were not required to have a reason to vote by absentee ballot").

## II.    S.B. 202's Birthdate Requirement Impedes the Ability to Vote Absentee by Mail, Disenfranchising Numerous Georgians with Disabilities

S.B. 202 veers away from Georgia's tradition of empowering people with disabilities to vote absentee by mail by erecting a complex system for voters seeking to exercise that right. The aspect of that complexity relevant here is the Birthdate Requirement—an entitlement to disqualify absentee ballots if a voter fails to write, or fails to legibly write, their birthdate on a particular location on the outer envelope of the absentee ballot—which has no bearing on eligibility and leaves voters with disabilities likely to be disenfranchised.

The county's registrar or absentee ballot clerk verifies the identity and eligibility of applicants for absentee ballots prior to issuing the ballots, including by collecting the voter's date of birth. Ga. Code §§ 21-2-391(a)(1)(C)(i), (b)(1). Eligible voters are sent two envelopes: an inner and an outer envelope. *Id.* § 21-2-385(a). The voter records their vote, seals it in the inner envelope, and places the inner envelope in the outer envelope. *Id.* The Birthdate Requirement demands that the voter handwrite their birthdate on the outer envelope, under a flap. *Id.* If the birthdate on the outer envelope is not confirmed to exactly match the information on

13

the voter's registration record, officials must reject the voter's ballot. *Id.* § 21-2-386(a)(1)(C).

The Birthdate Requirement assumes that voters will be able to easily find the location hidden in the inside flap of the outer ballot return envelope and write legibly within that space. Those assumptions demonstrate significant ignorance about the experiences of voters with disabilities.

*First*, some voters with disabilities will have difficulty reading or seeing the instructions on the outer envelope and knowing to fill in their birthdate in the correct spot under the flap, heightening the risk of unintentionally failing to fulfill it. This risk is established by data drawn from the country's broader experience with mail-in ballots: 1.4% of voters with disabilities reported difficulty reading a mail ballot; by contrast, no voters without disabilities reported any difficulty.[13] This gap falls hardest on people with vision impairments, who "are the most likely to have difficulty in voting with a mail ballot, with close to *two-fifths* having such

---

[13] Schur et al., *supra* note 1, at 32.

difficulty."[14] In striking down a Texas law that similarly required that certain identifying information be written on the inside flap of the outer ballot return envelope,[15] the District Court for the Western District of Texas relied on evidence that a voter named Teri Saltzman, who is legally blind, missed filling in certain required information because she

---

[14] *Id.* at 33 (emphasis added).

[15] Following trial, Texas's S.B. 1 was struck down under the same materiality provision at issue here. *La Union del Pueblo Entero v. Abbot*, 705 F. Supp. 3d 725 (W.D. Tex. 2023), *appeal docketed*, No. 23-50885 (11th Cir. Dec. 5, 2023). While Texas's S.B. 1 is substantially broader than the challenged provision of S.B. 202 here, the trial court's judgment is relevant as both laws require that, upon receipt of the mail ballot, the voter enter identifying information in a specified place on a flap on the outer return ballot and mandate that election officials will deny the ballot in the event there is not an exact match to what is already on file. TEC § 86.002(g); Ga. Code § 21-2-385(a). This aspect of Texas's S.B. 1 was central to the district court's conclusion that it violated the materiality provision. *Union del Pueblo Entero*, 705 F. Supp. 3d at 751, 754-55 (holding that the ID number on the ballot return envelope is "not material to her eligibility to vote" because the "undisputed evidence confirms that election officials do *not* use the ID numbers on ABBMs and [absentee mail ballots] to confirm voters' identities but to reject their voting materials" and it is duplicative to require "voter who has successfully obtained a mail ballot by matching the ID number on their ABBM to their voter file [to] do so *again* on the carrier envelope to have their vote counted" (emphasis in the original)).

struggled to read the application to vote by mail and her mail ballot during the March 2022 election, resulting in the rejection of her ballot. *La Union del Pueblo Entero v. Abbot*, 705 F. Supp. 3d 725, 749 (W.D. Tex. 2023); *Union del Pueblo*, No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023) (No. 957) (attached hereto as Appendix 1) at 3352:04-05, 3356:1-19, 3357:02-04.

*Second*, some voters with disabilities will have difficulty writing their birthdate legibly, resulting in erroneous rejections of their ballots. For example, Mary Fashik, a Georgian voter with cerebral palsy, described how her handwriting is "getting progressively worse," and she worries that her ballot will be invalidated because of it.[16] In *La Union del Pueblo Entero*, the Western District of Texas heard evidence that voter Laura Halvorson, who has muscular dystrophy and chronic muscular respiratory failure, found filling out the required information on her mail

---

[16] Laura Nwogu, *Barriers to the ballot: Georgia voters with disabilities working to improve access to the polls*, SAVANNAH MORNING NEWS (Nov. 1, 2022), https://www.savannahnow.com/story/news/politics/elections/2022/11/01/ga-voters-disabilities-fight-against-obstacles-voting-election-2022/10499428002/.

16

ballot "very painful and time-consuming." App. 1 at 3320:11-12. She explained that trying to hold a pen with sufficient pressure to make a mark was difficult because she has "very little muscle movement and strength" and she worried that the information on her ballot might not be legible as a result. *Id.* at 3320:7-18.

As these stories demonstrate, the Birthdate Requirement unnecessarily risks disenfranchising many voters with disabilities, who are more likely to be found to have committed some error in fulfilling the requirement. The process to cure does not alleviate that risk.

*First,* Georgians must return the ballot in an unreasonably short amount of time to cure, a constraint that presents particular challenges to voters with disabilities. Georgia requires the absentee ballot clerk to send the voter the notice of rejection, and the voter has only until three days following the election to cure. Ga. Code § 21-2-381(b)(3). Georgian voters with disabilities may not even discover that they need to cure

17

before the cure deadline expires.[17] This, combined with the shortened timeframe that S.B. 202 implements for vote by mail,[18] magnifies the disenfranchising effect of S.B. 202's curing procedures.

*Second*, the cure process replicates many of the challenges of the Birthdate Requirement, including the requirements to follow complex instructions and legibly convey detailed information. To successfully cure, Georgia requires voters to submit "an affidavit to the board of registrars or absentee ballot clerk along with a copy of one of the forms of

---

[17] *See* Ashley Lopez, *Voting explainer: In many states, there's a process to fix an error with your ballot*, NPR (Sept. 27, 2022), https://www.npr.org/2022/09/27/1125179062/voting-explainer-in-many-states-theres-a-process-to-fix-an-error-with-your-ballo (explaining that "[s]ome voters don't have access to landlines, don't check their mail often, or simply don't have consistent access to the internet" and that "some officials simply look for a number, mailing address or email address on file and send notice that way – without checking to see if that contact information is up to date").

[18] Notably, S.B. 202 shortened the period to apply for an absentee ballot from 180 days before the election, and up until the Friday before the election in question, to no more than 78 days and no fewer than 11 days before the election date. *See* Leila Fawaz, Kate Mize, & Monica Vu, *SB 202: Revisions to Georgia's Election and Voting Procedures*, 38, Ga. St. U. L. Rev., 105, 132–34 (2022) (comparing SB 202's new regime to previous mail ballot application procedures).

identification enumerated in subsection (c) of Code Section 21-2-417" before the close of the "period for verifying provisional ballots." Ga. Code § 21-2-381(b)(3). Only then, "[i]f the board of registrars or absentee ballot clerk finds the affidavit and identification to be sufficient," may the voter's ballot be counted. *Id.* A process that fails to cure the causes of false errors in the first place is no cure at all.

The disenfranchising effect of the Birthdate Requirement is not hypothetical. Even the more limited set of evidence at this stage of the proceedings demonstrates that many voters have been disenfranchised by the Birthdate Requirement. The district court below held that it is "highly unlikely" that the not one of Plaintiff-Appellee Georgia NAACP's 10,000 members "will have his or her [ballot] rejected due to a mismatch," based on Plaintiff's presentation of evidence that "numerous ballots have been rejected for the failure to comply with the Birthdate Requirement." *In re Georgia Senate Bill 202*, No. 1:21-MI-55555-JPB, 2023 WL 5334582, at *5 (N.D. Ga. Aug. 18, 2023) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008)). This factual finding was grounded in Plaintiffs' showing that a total of up to 874 absentee ballots were not accepted because of the Birthdate Requirement in just six of

Georgia's 159 counties during the November 2022 election and subsequent December 2022 run-off election. *Id.*

The data strongly suggests that many of the voters whose ballots were rejected are voters with disabilities. In Georgia, from the 2018 election—before S.B. 202—to 2022 election—after its enactment—the voting rate among voters with disabilities decreased by about 4% to below 50%.[19] By contrast, turnout increased for voters without disabilities.[20] This was even as turnout among voters with disabilities nationally—where the overwhelming majority of voters are not subject to onerous requirements like S.B. 202's—actually *increased*.[21]

This voter turnout gap is unsurprising given the particular challenges that S.B. 202's Birthdate Requirement poses to Georgians with disabilities.

---

[19] Schur et al., *supra* note 2, at 9.

[20] *Id.*

[21] Schur et al., *supra* note 2, at 1–2.

## **CONCLUSION**

S.B. 202 makes it unacceptably difficult for Georgians with disabilities to exercise their right to vote and thus denies their right to vote based on an "error or omission" that is immaterial in determining whether they are qualified to vote. *See* 52 U.S.C. 10101(a)(2)(B). S.B. 202 poses challenges when Georgians with disabilities complete their mail ballots and when they attempt to correct rejected applications to vote by mail or ballots. And these difficulties, at least in part, resulted in a meaningful gap in turnout between voters without disabilities and those with disabilities. As Ms. Empish, a voter from DeKalb County who is blind, said, "When voting is accessible, I have equal access to participate in politics alongside my able-bodied peers," and taking that away, "is frustrating to me, because I have thoughts and views just like anyone else."[22]

For the foregoing reasons, this Court should affirm the District Court's order and uphold the injunction.

---

[22] See Caitlin May et al., *Here's How Georgia's New Voting Law Harms Voters With Disabilities,* ACLU (May 19, 2023), https://www.aclu.org/news/disability-rights/heres-how-georgias-new-voting-law-harms-voters-with-disabilities.

September 6, 2024                    Respectfully submitted,

                                     /s/   *Corey Stoughton*
                                     Corey Stoughton
                                     Elizabeth H. Snow
                                     SELENDY GAY PLLC
                                     1290 Avenue of the Americas
                                     New York, NY 10104
                                     Tel: 212-390-9000
                                     cstoughton@selendygay.com
                                     esnow@selendygay.com

                                     *Counsel for Amicus Curiae New Disabled South*

22

## <u>CERTIFICATE OF COMPLIANCE</u>

Under Federal Rule of Appellate Procedure 29(a)(4)(G), I certify that:

This brief complies with Rule 29(a)(5)'s type-volume limitation because it contains 3,771 words, as determined by the Microsoft Word word-processing system used to prepare the brief, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

September 6, 2024                    Respectfully submitted,

                                     /s/    *Corey Stoughton*
                                     Corey Stoughton
                                     Elizabeth H. Snow
                                     SELENDY GAY PLLC
                                     1290 Avenue of the Americas
                                     New York, NY 10104
                                     Tel: 212-390-9000
                                     cstoughton@selendygay.com
                                     esnow@selendygay.com

                                     *Counsel for Amicus Curiae New Disabled South*

23

## CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on September 6, 2024. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

September 6, 2024                    Respectfully submitted,

                                    /s/    *Corey Stoughton*
                                    Corey Stoughton
                                    Elizabeth H. Snow
                                    SELENDY GAY PLLC
                                    1290 Avenue of the Americas
                                    New York, NY 10104
                                    Tel: 212-390-9000
                                    cstoughton@selendygay.com
                                    esnow@selendygay.com

                                    *Counsel for Amici Curiae New Disabled South*

24

# Appendix 1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF TEXAS
 2                           SAN ANTONIO DIVISION

 3
     LA UNION DEL PUEBLO ENTERO,      .
 4   ET AL,                           .
                                      .
 5              PLAINTIFFS,           .
           vs.                        . DOCKET NO. 5:21-CV-844-XR
 6                                    .
     GREGORY W. ABBOTT, ET AL,        .
 7                                    .
                DEFENDANTS.           .
 8

 9

10                    TRANSCRIPT OF BENCH TRIAL
              BEFORE THE HONORABLE XAVIER RODRIGUEZ
11                 UNITED STATES DISTRICT JUDGE
                        OCTOBER 10, 2023
12

13

14

15

16   APPEARANCES:
     FOR THE PLAINTIFFS:      NINA PERALES, ESQUIRE
17                            FATIMA MENENDEZ, ESQUIRE
                              JULIA LONGORIA, ESQUIRE
18                            MALDEF
                              110 BROADWAY
19                            SUITE 300
                              SAN ANTONIO TX 78205
20

21                            JENNIFER A. HOLMES, ESQUIRE
                              NAACP LEGAL DEFENSE & EDUCATIONAL
22                            FUND INC
                              40 RECTOR STREET, FIFTH FLOOR
23                            NEW YORK NY 10006

24

25
```

```
 1

 2                            JAMES D. CROMLEY, ESQUIRE
                              JAMES MICHAEL SHOWALTER, ESQUIRE
 3                            ARENTFOX SCHIFF LLP
                              233 S. WACKER DRIVE, SUITE 7100
 4                            CHICAGO IL 60606

 5

 6                            EITAN BERKOWITZ, ESQUIRE
                              ARENTFOX SCHIFF LLP
 7                            44 MONTGOMERY STREET, 38TH FLOOR
                              SAN FRANCISCO CA 94104
 8

 9                            COURTNEY M. HOSTETLER, ESQUIRE
                              FREE SPEECH FOR PEOPLE
10                            1320 CENTRE STREET #405
                              NEWTON MA 02459
11

12                            BREANNA DELLA WILLIAMS, ESQUIRE
                              NAACP LEGAL DEFENSE & EDUCATIONAL
13                             FUND, INC.,
                              40 RECTOR STREET, 50TH FLOOR
14                            NEW YORK NY 10006

15

16
     FOR THE DEFENDANTS:      RYAN G. KERCHER, ESQUIRE
17                            KATHLEEN HUNKER, ESQUIRE
                              WILLIAM WASSDORF, ESQUIRE
18                            ETHAN QUINN SZUMANSKI, ESQUIRE
                              TEXAS ATTORNEY GENERAL
19                            P.O. BOX 12548
                              MC 009
20                            AUSTIN TX 78711

21

22                            ERIC J.R. NICHOLS, ESQUIRE
                              BUTLER SNOW LLP
23                            1400 LAVACA STREET, SUITE 1000
                              AUSTIN TX 78701
24

25
```

```
 1
 2
 3   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                               OFFICIAL COURT REPORTER
 4                             UNITED STATES DISTRICT COURT
                               SAN ANTONIO, TEXAS
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3320
Laura Halvorson – Direct

 1 | you're able to, to put both numbers on, due to the confusion,
 2 | you know, around SB1.  So I made sure to include both my last
 3 | four of my social and my driver's license number.
 4 | Q.  Can you describe the physical process of filling in the
 5 | mail ballot as well as writing in your ID numbers without the
 6 | benefit of assistance?
 7 | A.  Yes.  It was very difficult.  My very limited mobility and
 8 | pain levels, just trying to -- I have a lot of contractures in
 9 | my hands, just very little muscle movement and strength.  And
10 | so trying to hold a pen and mark my ballot and have enough
11 | pressure to where I could mark my ballot was very painful and
12 | time-consuming.
13 | Q.  Were you worried that your handwriting would not be
14 | legible when you were filling out your ID numbers?
15 | A.  Yes.  I had to -- my handwriting, due to the limited
16 | mobility and weakness, makes my handwriting not very legible.
17 | So I have to kind of move the pen very slowly and carefully to
18 | make sure it's legible enough to read.
19 | Q.  And from start to finish, how long did you it take you to
20 | fill out the ballot and the envelope without assistance?
21 | A.  I would kind of do it in like about, I'd say, 10- or
22 | 15-minute increments throughout the course of two days.  I
23 | would fill out a little bit and then have to take a break.
24 | Especially with my hip fracture, it was very hard to sit up in
25 | my wheelchair and fill out that ballot.

Teri Saltzman – Direct

1  Q.  So before passage of this thing called SB1, what was your

2  preferred way to vote?

3  A.  Mail-in ballot, preferred.

4  Q.  And why did you prefer to vote with a mail-in ballot?

5  A.  It is so much easier.  I have voted every way that there

6  is, and mail-in ballot is easier on me.

7  Q.  So did you vote in the March 2022 primary?

8  A.  Yes.

9  Q.  And you voted in Travis County for the March 2022 primary?

10 A.  Yes, sir.

11 Q.  How was your experience voting in that election?

12 A.  It was the worst experience I ever had in my whole life

13 voting.

14 Q.  Well, let's take it step by step.  What's the first thing

15 you did to vote -- to do to vote in the March 2022 primary?

16 A.  The first thing I did was -- is I took a training class

17 with the League of Women Voters.  Because of SB1, it was

18 suggested that I take this training so that I could learn the

19 new law so that I'd be sure to do it correctly.  So I took the

20 training.

21     And then I ordered -- then I called the County and ordered

22 the application to send in to be approved for the ballot --

23 then in January.  So I did that.  I ordered the ballot.

24     So somewhere like in February I got the application.  So I

25 filled out the application.  I figured that was okay.  So I

Teri Saltzman - Direct

 1  filled out the application.  Then I sent in the application.
 2  And this was the application to be approved to receive a
 3  ballot.

 4      And then I got that back and was denied to be approved to
 5  receive a ballot.  And I'm like, well, okay.  I wasn't sure
 6  why I was denied that.  So I read over it, and says something
 7  about all the numbers.  And I looked at all the numbers, and
 8  they were all correct, every number, my Social Security
 9  number, the UID number, you know, that's on the card, the
10  voter ID number that's on the card and then another number.
11  Okay?  So all the three numbers are correct.  I went over them
12  and went over and over.

13      And so what I did was, is I called Disability Rights Texas
14  because I know that it's -- an important issue of Disability
15  Rights Texas is voting.  So I called Disability Rights Texas
16  and I spoke to Molly.  And I asked Molly if she could help me
17  with this because I didn't know what to do.  So Molly looked
18  at the numbers, and she also agreed that they were correct.

19      So then what she found out is she called Travis County and
20  what they suggested that I do is go to Ballot Tracker and go
21  through Ballot Tracker and cure it, right?  And so I tried to
22  do that.  But Ballot Tracker to me was not accessible.  So
23  when I went through Ballot Tracker, what it said was, is I
24  wasn't registered.  It didn't say anything about the numbers
25  being incorrect.  It said that it wasn't registered.  But I

Teri Saltzman – Direct

 1  A.  Yes.

 2  Q.  It's more like a super magnifying, if I understand it?

 3  A.  Yes.  A super magnifier, yes.

 4  Q.  So what does it physically --

 5  A.  I found -- yeah.  It looks like a giant monitor that

 6  (audio transmission gap) you put a document underneath it, and

 7  it blows it up on this giant monitor so that, you know -- and

 8  then you can turn knobs, and you can even make it larger.

 9  Q.  So you verified that the numbers were correct and --

10  A.  Yes, sir.

11  Q.  -- then what did you do next?

12  A.  Then I just sent it in.  But I was very frustrated that I

13  had to go this far just to get approved to vote by mail.  This

14  is not even voting by mail yet.  I haven't even gotten the

15  ballot yet.

16  Q.  So you've submitted your application.  You verified the

17  numbers?

18  A.  Yes, sir.

19  Q.  And did you -- did this result in you being issued a

20  ballot by mail?

21  A.  Finally, yes, sir.  And it was just before the March 1st

22  election, like a week.

23  Q.  So did you --

24  A.  I got the -- I got the ballot.

25  Q.  So then what happened?

Teri Saltzman – Direct

1   A.  Okay.  So –– okay.  Now I got the ballot, and so I'm

2   happy.  It's almost impossible to read because of the writing.

3   Just every spot on the –– on the envelope and on the ballot is

4   filled.  So I took my time filling everything out, the

5   Scantron, filling in the bubbles, doublecheck everything.  I

6   even had my husband make sure that everything was correct, and

7   I had him just review, make sure everything is correct with

8   the –– with the ballot.  And then I put it in the carrier

9   envelope correctly.  And then I made sure that it was signed

10  on both the line of the envelope correctly.

11      On a sidenote, I even helped people with disabilities make

12  sure to sign it correctly in different states and things like

13  that.  So I knew to do this.  I knew that it had to be

14  perfect.  Okay?

15      But inside –– underneath the flap of the envelope, there

16  was a whole –– there were like three or four things you had to

17  do.  And I think I missed a spot.  And with that, they would

18  not accept my ballot –– my ballot.  There was something

19  underneath the flap.

20  Q.  So did you ––

21  A.  So it was ––

22  Q.  Did your disability prevent you from seeing instructions

23  as to what would go underneath the flap of this envelope?

24  A.  Oh, absolutely.

25  Q.  Why?

Teri Saltzman - Direct

```
 1  A.  Absolutely.
 2      Even with my glasses and all my technology and all the
 3  people in the world to help me, I still couldn't see one area.
 4  Just there was one thing that I couldn't see to do.
 5  Q.  And --
 6  A.  And it just --
 7  Q.  And that area required you to put what in?
 8  A.  I think I have to check a box.
 9  Q.  So what happened next?
10  A.  So I called the elections office again.  And they said,
11  "Oh, well, you can -- you can cure it."
12      I said, "Okay.  How do I do that?"
13      They said, "Well, you can drive by and come into our
14  office and fix it."
15      And I said, "I'm blind, so I can't drive."
16      And they said, "Or you can go to Ballot Tracker."
17      And that means, oh, I have to go through Ballot Tracker
18  again.  Okay?
19      So I said, "Okay.  I'll go through Ballot Tracker again.
20  I'll try."
21      And so I tried to go through Ballot Tracker again.  But,
22  again, it's still not accessible.  But I knew it wasn't
23  accessible because of the first time.  So I went through
24  Ballot Tracker again.  And this time I was more oriented to
25  it, because it wasn't accessible the first time.  So it's not
```

```
1                              –o0o–

2        I certify that the foregoing is a correct transcript from

3   the record of proceedings in the above–entitled matter.  I

4   further certify that the transcript fees and format comply

5   with those prescribed by the Court and the Judicial Conference

6   of the United States.

7

8   Date:  10/10/23            /s/  Gigi Simcox
                               United States Court Reporter
9                              262 West Nueve Street
                               San Antonio TX 78207
10

11

12                             /s/  Chris Poage
                               United States Court Reporter
13                             262 West Nueve Street
                               San Antonio TX 78207
14

15

16

17

18

19

20

21

22

23

24

25
```

*Gigi Simcox, RMR, CRR*