Nos. 23-13085 & 23-13095

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

IN RE: GEORGIA SENATE BILL 202

---

*On Appeal from the United States District Court
for the Northern District of Georgia*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Anna K. Jessurun
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Nos. 23-13085, 23-13095, *In re: Georgia Senate Bill 202*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

I also hereby certify that I am aware of no persons or entities, in addition to those listed in the party and *amicus* briefs filed in this case, that have a financial interest in the outcome of this litigation. Further, I am aware of no persons with any interest in the outcome of this litigation other than the signatory to this brief and its counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: September 6, 2024                    /s/ Brianne J. Gorod

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTEREST OF *AMICUS CURIAE* ..................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ................................................................................... 6

I.    The Fifteenth Amendment Gives Congress Sweeping Power to Enforce the Amendment's Ban on Racial Discrimination. ................. 6

II.    Congress Used Its Fifteenth Amendment Enforcement Power to Enact the Civil Rights Act of 1964 and Prohibit Arbitrary Denials of the Right to Vote. .......................................................... 12

III.    The Materiality Provision's Plain Text Covers Absentee Ballot Envelopes, and Its Application to Absentee Ballot Envelopes Is Constitutional. ... ................................................................ 17

CONCLUSION ................................................................................ 28

CERTIFICATE OF COMPLIANCE ....................................................... 1A

CERTIFICATE OF SERVICE ............................................................. 2A

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008).................................................................. 20

*Allen v. State Bd. of Elections*,
393 U.S. 544 (1969).................................................................. 19

*Allen v. Milligan*,
599 U.S. 1 (2023)............................................................... 12, 19

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021).................................................................. 12

*City of Boerne v. Flores*,
521 U.S. 507 (1997).................................................................. 25

*City of Rome v. United States*,
446 U.S. 156 (1980)........................................................... 10, 25

*Clark v. Martinez*,
543 U.S. 371 (2005).................................................................. 22

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024).................................................................... 18

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ........................................ 4, 23, 24

*Groff v. DeJoy*,
600 U.S. 447 (2023).................................................................. 18

*Jennings v. Rodriguez*,
583 U.S. 281 (2018).................................................................. 22

*Lane v. Wilson*,
307 U.S. 268 (1939).................................................................... 6

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ................................................... 9

# TABLE OF AUTHORITIES — cont'd

**Page(s)**

*McFadden v. United States*,
　576 U.S. 186 (2015)................................................................ 22

*Nev. Dep't of Hum. Res. v. Hibbs*,
　538 U.S. 721 (2003)................................................................ 23

*Oregon v. Mitchell*,
　400 U.S. 112 (1970)................................................................ 26

*Patel v. Garland*,
　596 U.S. 328 (2022)................................................................ 20

*Pa. State Conf. of NAACP Branches v. Sec'y*
　*Commonwealth of Pennsylvania*,
　97 F.4th 120 (3d Cir. 2024) ................................................. 20, 21

*Price v. Time, Inc.*
　416 F.3d 1327 (11th Cir. 2005) ............................................ 22

*Reno v. Bossier Par. Sch. Bd.*,
　528 U.S. 320 (2000)................................................................ 7

*Rice v. Cayetano*,
　528 U.S. 495 (2000)................................................................ 6

*Schwier v. Cox*,
　340 F.3d 1284 (11th Cir. 2003) ............................................ 17

*Shelby County v. Holder*,
　570 U.S. 529 (2013)................................................................ 25

*South Carolina v. Katzenbach*,
　383 U.S. 301 (1966)................................................ 8, 10, 12, 24, 25

*Sturgeon v. Frost*,
　587 U.S. 28 (2019)................................................................ 18

**TABLE OF AUTHORITIES — cont'd**

**Page(s)**

*United States v. Dawson*,
    64 F.4th 1227 (11th Cir. 2023) .............................................. 18

*United States v. Marengo Cnty. Comm'n*,
    731 F.2d 1546 (11th Cir. 1984) ............................................. 25, 26

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ............................................. 2, 23

*Warger v. Shauers*,
    574 U.S. 40 (2014).................................................................. 22

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).................................................................... 7

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886)................................................................ 7

LEGISLATIVE AND CONSTITUTIONAL MATERIALS

Civil Rights '63: 1963 Report of the United States Commission on Civil
    Rights (1963) .......................................................................... 15

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634...................... 13

Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86........................ 14

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241...................... 2, 16

Cong. Globe, 39th Cong., 1st Sess. (1866)............................................... 7

Cong. Globe, 40th Cong., 3d Sess. (1869) ............................................... 6, 7, 8, 9

Cong. Globe, 41st Cong., 2d Sess. (1870)........................................ 3, 4, 10, 11, 12

Cong. Globe, 42d Cong., 2d Sess. (1872).................................................. 8

2 Cong. Rec. (1874) ................................................................................. 11

## TABLE OF AUTHORITIES — cont'd

Page(s)

110 Cong. Rec. (1964) ................................................. 12, 15, 16, 17, 23, 24, 26, 27

H.R. Rep. No. 88-914 (1963) ...................................................... 15, 17

O.C.G.A. § 21-2-386(a)(1)(C) ..................................................... 3

Report of the U.S. Commission on Civil Rights, 1959 (1959) .................. 13, 15

52 U.S.C. § 10101(a)(3)(A) ......................................................... 18

52 U.S.C. § 10101(a)(2)(B) ................................................ 2, 5, 17, 18, 19, 20, 21

52 U.S.C. § 10101(e) ............................................................ 5, 18, 20, 21

52 U.S.C. § 10310(c)(1) ............................................................ 19

U.S. Const. amend. XV .............................................................. 6, 7, 9, 22

Voting: 1961 United States Commission on Civil Rights Report (1961) .. 14

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Vikram David Amar & Alan Brownstein, *The Hybrid Nature of Political Rights*, 50 Stan. L. Rev. 915 (1998) ....................................................... 4

Jack M. Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801 (2010) ................................................................. 9

Douglas Laycock, *Conceptual Gulfs in* City of Boerne v. Flores, 39 Wm. & Mary L. Rev. 743 (1998) ..................................................... 8

Michael W. McConnell, Comment, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 Harv. L. Rev. 153 (1997) .... 8, 9

John T. Noonan, Jr., *Narrowing the Nation's Power: The Supreme Court Sides with the States* (2002) ................................................... 9

Official Journal of the Constitutional Convention of the State of Louisiana, 1898 (1898) .............................................................. 13

## TABLE OF AUTHORITIES — cont'd

**Page(s)**

Michael Stokes Paulsen, *A Government of Adequate Powers*, 31 Harv. J.L. & Pub. Pol'y 991 (2008)........................................................................ 9

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights, freedoms, and structural safeguards that our nation's charter guarantees.  CAC has a strong interest in questions about the scope of the Fifteenth Amendment's protections, Congress's power to enforce those protections, and the Civil Rights Act of 1964 and accordingly has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

In 1964, Congress was faced, yet again, with continued state resistance to the Fifteenth Amendment's promise of a multiracial democracy.  Congress's two previous attempts to enforce federal civil rights laws against the states and safeguard the voting rights of Black people had failed.  Slow-paced litigation targeting deprivations of the right to vote could not keep up with the novel tactics

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission.  The Georgia State Conference of the NAACP Plaintiffs-Appellees, the Sixth District of the African Methodist Episcopal Church Plaintiffs-Appellees, and the Republican National Committee Intervenor-Appellants consent to the filing of this brief.  The New Georgia Project Plaintiffs-Appellees and the State Defendants-Appellants take no position on the filing of this brief.  A motion for leave to file has been filed with this brief.

state and local officials employed to disenfranchise Black voters.  Congress understood that to curb states' persistent efforts to evade the Fifteenth Amendment it would need to address these voter suppression methods head on.

The Civil Rights Act of 1964 did just that by barring states from using arbitrary voting hurdles to deny Black citizens access to the ballot box.  Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 (the "Civil Rights Act" or the "Act").  Critical to achieving the Act's goals was its Materiality Provision, *see Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023), which prohibits states from denying the "right to . . . vote" due to "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified . . . to vote," 52 U.S.C. § 10101(a)(2)(B).  Simply put, if an error or omission in paperwork required to vote is immaterial to a voter's qualifications to vote, that error or omission cannot be grounds for denying that voter's right to vote in an election.

Almost sixty years later, in 2021, Georgia passed an omnibus election law— S.B. 202—that requires voters who vote by mail to include their "date of birth on the outer envelope of an absentee ballot" ("Birthdate Requirement").  DE 613 at 2.[2]

---

[2] Citations to the record refer to the docket entry ("DE") in the district court consolidated docket, No. 1:21-mi-55555.

If a voter fails to include, or makes an error when printing, her birthdate on the outer envelope, S.B. 202 mandates that the "registrar or clerk reject[] the ballot." *Id.* at 5 (citing O.C.G.A. § 21-2-386(a)(1)(C)).

The district court held that the Birthdate Requirement likely violates the Materiality Provision. *Id.* at 22-23. In so ruling, the court correctly determined that the text of the Materiality Provision prohibits denials of the right to vote based on immaterial errors or omissions on papers necessary to vote by mail. *Id.* at 27-29.

Appellants, however, contest this plain reading of the statute, arguing instead that the Materiality Provision only applies to paperwork related to voter registration. Any other interpretation, Appellants assert, exceeds Congress's powers to eliminate racial discrimination in voting under the Fifteenth Amendment. Appellants are wrong. As the text and history of the Civil Rights Act make clear, the Materiality Provision's prohibition of the denial of the right to vote due to immaterial paperwork errors unambiguously includes papers related to voting by mail. And, as the text and history of the Fifteenth Amendment make clear, Congress had the authority to enact this prohibition.

Ratified in 1870, the Fifteenth Amendment gave Congress the "power of conferring upon the colored man the full enjoyment of his right" and "enable[d] Congress to take every step that might be necessary to secure the colored man in

the enjoyment of these rights." Cong. Globe, 41st Cong., 2d Sess. 3670 (1870). Against the backdrop of a political system divided by race, the Fifteenth Amendment's Framers recognized that "black populations in the South would be under siege" and that "political influence and voting power would be their sole means of defense." Vikram David Amar & Alan Brownstein, *The Hybrid Nature of Political Rights*, 50 Stan. L. Rev. 915, 939 (1998). They drafted the Fifteenth Amendment to give Congress broad power—no less sweeping than Congress's Article I powers—to stamp out every conceivable attempt by the states to deny or abridge the right to vote on account of race and to ensure "the colored man the full enjoyment of his right." Cong. Globe, 41st Cong., 2d Sess. 3670 (1870).

Congress used this power to pass the Civil Rights Act. By 1964, Congress had twice endeavored to enforce the Fifteenth Amendment's guarantee of voting equality and ban on racial discrimination. State and local officials, however, continued to use the discriminatory application of arbitrary rules to deny Black citizens the right to vote. *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). The Act sought to stamp out these efforts once and for all by targeting states' use of laws and policies that, although race-neutral on their face, worked to disenfranchise Black voters.

The Materiality Provision addressed these practices by prohibiting states from denying the "right . . . to vote" due to "an error or omission on any record or

4

paper relating to any application, registration, or other act requisite to voting" if the error or omission is "not material" to a state's qualifications to vote. 52 U.S.C. § 10101(a)(2)(B). "Vote," in turn, was defined broadly as "all action necessary to make a vote effective including, but not limited to, registration . . . casting a ballot, and having such ballot counted." *Id.* § 10101(e). The broad language in the Materiality Provision plainly reflects Congress's goal of ending states' myriad mechanisms for discriminating against Black voters. Here, because Georgia voters who seek to vote by mail must submit the absentee ballot in the outer envelope for the ballot to be counted, that envelope is paperwork necessary to casting a ballot.

In sum, the Fifteenth Amendment empowered Congress to eliminate racial discrimination in voting, and Congress used that authority to pass the Materiality Provision and prohibit states from using arbitrary errors in voting paperwork to disenfranchise voters—practices that had long been used to bar Black voters from exercising their right to vote. Appellants' efforts to limit the Materiality Provision are at odds with its text and history and would undermine Congress's ability to help realize the Constitution's promise of voting equality. This Court should reject them.

## ARGUMENT

### I.    The Fifteenth Amendment Gives Congress Sweeping Power to Enforce the Amendment's Ban on Racial Discrimination.

In language "as simple in command as it [is] comprehensive in reach," *Rice v. Cayetano*, 528 U.S. 495, 512 (2000), the Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV, § 1.  "Fundamental in purpose and effect . . . , the Amendment prohibits all provisions denying or abridging the voting franchise of any citizen or class of citizens on the basis of race," *Rice*, 528 U.S. at 512, and "nullifies sophisticated as well as simple-minded modes of discrimination," *Lane v. Wilson*, 307 U.S. 268, 275 (1939).

Recognizing that "[i]t is difficult by any language to provide against every imaginary wrong or evil which may arise in the administration of the law of suffrage in the several States," Cong. Globe, 40th Cong., 3d Sess. 725 (1869), the Framers of the Fifteenth Amendment chose sweeping language requiring "the equality of races at the most basic level of the democratic process, the exercise of the voting franchise," *Rice*, 528 U.S. at 512.  The Fifteenth Amendment equally forbids laws that deny the right to vote outright on account of race and those that abridge the right by diluting the voting strength of citizens of color and nullifying

6

the effectiveness of their votes.  *See Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 333-34 (2000).

A constitutional prohibition on state denial and abridgement of the right to vote on account of race was necessary because "[t]he ballot is as much the bulwark of liberty to the black man as it is to the white," Cong. Globe, 40th Cong., 3d Sess. 983 (1869), and because "[n]o man is safe in his person or his property in a community where he has no voice in the protection of either," *id.* at 693.  The right to vote, the Framers of the Fifteenth Amendment understood, was "preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined.").  In this respect, the Framers viewed the right to vote as "kindred to that which belongs under natural law to the right of self-defense." Cong. Globe, 39th Cong., 1st Sess. 174 (1866).  The Fifteenth Amendment thus gave Black citizens a critical weapon to protect themselves from white-dominated legislatures seeking to roll back their rights.

To make the Fifteenth Amendment's guarantee a reality, the Framers explicitly vested Congress with a central role in protecting the right to vote against all forms of racial discrimination.  They did so by providing that "Congress shall have power to enforce this article by appropriate legislation."  U.S. Const. amend. XV, § 2.  This Enforcement Clause gives Congress a broad "affirmative power" to

7

secure the right to vote, Cong. Globe, 40th Cong., 3d Sess. 727 (1869); *see id.* at 1625 ("Congress . . . under the second clause of this amendment" has the power to "impart by direct congressional legislation to the colored man his right to vote.  No one can dispute this."), and makes clear that "Congress was to be chiefly responsible for implementing the rights created" by the Amendment and that Congress would have "full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966).  As the Framers of the Fifteenth Amendment recognized, "the remedy for the violation" of the Fifteenth Amendment, like the remedies for the violation of the other Reconstruction Amendments, "was expressly not left to the courts.  The remedy was legislative, because . . . the amendment itself provided that it shall be enforced by legislation on the part of Congress."  Cong. Globe, 42d Cong., 2d Sess. 525 (1872).

The enforcement power "was born of the conviction that Congress—no less than the courts—has the duty and the authority to interpret the Constitution." Michael W. McConnell, Comment, *Institutions and Interpretation: A Critique of City of Boerne v. Flores*, 111 Harv. L. Rev. 153, 183 (1997).  And Congress refused to leave the right to vote "to the unchecked discretion of the Supreme Court that decided *Dred Scott v. Sandford*," Douglas Laycock, *Conceptual Gulfs in City of Boerne v. Flores*, 39 Wm. & Mary L. Rev. 743, 765 (1998), fearing that

8

without a broad enforcement power the constitutional guarantee of equal voting rights would not be fully realized.  "Who is to stand as the champion of the individual and enforce the guarantees of the Constitution in his behalf as against the so-called sovereignty of the States?  Clearly no power but that of the central Government is or can be competent for their adjustment . . . ."  Cong. Globe, 40th Cong., 3d Sess. 984 (1869).

The Fifteenth Amendment's express grant of power to enact "appropriate legislation" gives Congress wide discretion to enact whatever measures it deems "appropriate" for achieving the Amendment's objective of ensuring that "[t]he right of citizens of the United States to vote shall not be denied or abridged . . . by any State on account of race."  U.S. Const. amend. XV.  By authorizing Congress to enact "appropriate legislation," the Framers granted Congress the sweeping authority of Article I's "necessary and proper" powers as interpreted by the Supreme Court in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), a seminal case well known to the Reconstruction Framers.  *See, e.g.*, John T. Noonan, Jr., *Narrowing the Nation's Power: The Supreme Court Sides with the States* 29-31 (2002); Jack M. Balkin, *The Reconstruction Power*, 85 N.Y.U. L. Rev. 1801, 1810-15 (2010); Michael Stokes Paulsen, *A Government of Adequate Powers*, 31 Harv. J.L. & Pub. Pol'y 991, 1002-03 (2008); McConnell, *supra*, at 188.  As history shows, "Congress' authority under § 2 of the Fifteenth

9

Amendment . . . [is] no less broad than its authority under the Necessary and Proper Clause." *City of Rome v. United States*, 446 U.S. 156, 175 (1980); *see Katzenbach*, 383 U.S. at 326 (explaining that *McCulloch*'s "classic formulation" provides "[t]he basic test to be applied in a case involving [Section] 2 of the Fifteenth Amendment").

In 1870, the same year the Fifteenth Amendment was ratified, Congress employed the Amendment's Enforcement Clause to enact federal voting rights legislation. As the debates over the Enforcement Act of 1870 reflect, the Fifteenth Amendment "clothes Congress with all power to secure the end which it declares shall be accomplished." Cong. Globe, 41st Cong., 2d Sess. 3563 (1870). The Amendment's Enforcement Clause, Senator Oliver Morton explained, was "intended to give to Congress the power of conferring upon the colored man the full enjoyment of his right. We so understood it when we passed it." *Id.* at 3670. "[T]he second section was put there," he went on to explain, "for the purpose of enabling Congress to take every step that might be necessary to secure the colored man in the enjoyment of these rights." *Id.* Thus, "the colored man, so far as voting is concerned, shall be placed on the same level and footing with the white man and . . . Congress shall have the power to secure him that right." *Id.*; *see id.* at 3655 (explaining that the "intention and purpose" of the Fifteenth Amendment's Enforcement Clause was to "secure to the colored man by proper legislation the

right to go to the polls and quietly and peacefully deposit his ballot there"); *id.* at 3663 ("Congress has a right by appropriate legislation to prevent any State from discriminating against a voter on account of his race . . . ."); *see also* 2 Cong. Rec. 4085 (1874) (observing that the Fifteenth Amendment's Enforcement Clause was added to allow Congress "to act affirmatively" and ensure that "the right to vote, should be enjoyed").  The Framers of the Fifteenth Amendment specifically recognized that a broad legislative power to protect the right to vote against all forms of racial discrimination was critical to ensuring "the colored man the full enjoyment of his right."  Cong. Globe, 41st Cong., 2d Sess. 3670 (1870).

The grim reality that "[t]he States can invent just as many requirements [for voting] as you have fingers and toes" made it essential to provide "proper machinery . . . for enforcing the fifteenth amendment."  *Id.* at 3658.  Members of Congress insisted that "it is our imperative duty . . . to pass suitable laws to enforce the fifteenth amendment" because, without them, "the fifteenth amendment will be practically disregarded in every community where there is a strong prejudice against negro voting."  *Id.* at 3568.  The only means to safeguard equal political opportunities and ensure the multiracial democracy the Fifteenth Amendment promised, they insisted, "are to be found in national legislation.  This security cannot be obtained through State legislation," where "the laws are made by an oppressing race."  *Id.* at app. 392.  Stringent national safeguards were needed to

"neutralize the deep-rooted prejudice of the white race there against the negro" and "secure his dearest privileges" at the ballot box. *Id.*

The Fifteenth Amendment thus gave Congress a significant new power. As the next Section shows, Congress used this power to pass the Civil Rights Act of 1964 and thereby prohibit practices that states used to disenfranchise Black voters.

## II.    Congress Used Its Fifteenth Amendment Enforcement Power to Enact the Civil Rights Act of 1964 and Prohibit Arbitrary Denials of the Right to Vote.

Tragically, "[i]n the century that followed" its ratification, the Fifteenth Amendment "proved little more than a parchment promise." *Allen v. Milligan*, 599 U.S. 1, 10 (2023). State and local officials employed "devious and wrongful methods" to flout the Fifteenth Amendment's guarantee of voting equality and deny Black citizens the right to vote. 110 Cong. Rec. 1631 (1964). Congress enacted the Civil Rights Act of 1964 "to eliminate consistent, determined abuses of law" and fulfill the Fifteenth Amendment's aspirations of a multiracial democracy free from discrimination. *Id.* at 5996.

Despite the Fifteenth Amendment's broad prohibition of racial discrimination in voting, states devised novel procedures "specifically designed to prevent [Black citizens] from voting," *Katzenbach*, 383 U.S. at 310, such as poll taxes, grandfather clauses, literacy tests, and white primaries, *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 655 (2021). Proponents of these tactics

were explicit about their desire to "evad[e] the clear intent of the Fifteenth Amendment." Report of the U.S. Commission on Civil Rights, 1959, at 33 (1959) ("1959 Report"). As the President of the Louisiana Constitutional Convention explained in 1898 in support of enshrining these methods into the state's constitution, "Doesn't it let the white man vote, and doesn't it stop the Negro from voting, and isn't that what we came here for?" *Id.* (quoting Official Journal of the Constitutional Convention of the State of Louisiana, 1898, at 380 (1898)).

States' persistent efforts to disenfranchise Black voters led Congress to enact the Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. 634 ("1957 Act"), which created the Commission on Civil Rights ("Commission"), *id.* § 101(a), 71 Stat. at 634, and authorized the Attorney General to seek injunctive relief against local officials who deprived citizens of their right to vote, *id.* § 131, 71 Stat. at 637. But, as the Commission noted two years later, the 1957 Act was not enough to protect Black voters from rampant discrimination. State and local officials used various tactics to evade federal enforcement of the 1957 Act. Officials, for example, prevented the Department of Justice and the Commission from accessing local registration records. 1959 Report, *supra*, at 133. Registrars would avoid liability in civil suits by resigning from their positions, resulting in the cases' dismissal because there were no defendants. *Id.* at 132.

13

Congress addressed these evasive tactics in the Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. 86 ("1960 Act").  *See* § 301, 74 Stat. at 88 (requiring states to preserve voting records); *id.* § 601(b), 74 Stat. at 92 (authorizing the Attorney General to sue states in addition to registrars).  The 1960 Act also gave the Attorney General additional tools to enforce the right to vote, such as the authority to seek the appointment of voting referees, *see id.* § 601(a), 74 Stat. at 90, and in so doing, defined "vote" broadly as "all action necessary to make a vote effective," *id.* § 601(a), 74 Stat. at 91.

But state and local officials still eluded federal civil rights enforcement.  In 1961, the Commission observed that "[t]he most prevalent form of discrimination . . . occurs in arbitrary registration procedures."  1 Voting: 1961 United States Commission on Civil Rights Report 133 (1961).  Local officials would reject registration applicants or remove "voters from the rolls[] on grounds of minor technical errors in the completion of required forms."  *Id.* at 137.  While the Department of Justice could challenge these tactics under the Fifteenth Amendment, "the very nature of the practices" made it difficult to prove that they involved racial discrimination.  *Id.* at 138.  The Commission recommended that Congress enact legislation to "prohibit any arbitrary action or . . . inaction, which deprives or threatens to deprive any person of the right to register, vote, and have that vote counted."  *Id.* at 141.

14

By 1963, little had changed.  *See* Civil Rights '63: 1963 Report of the United States Commission on Civil Rights 24 (1963) ("[S]o long as prejudiced registrars have access to a variety of discretionary registration criteria . . . they can practice discrimination in a variety of forms.").  Indeed, the Commission had foreshadowed this result in its 1959 report:

> [W]here there is will and opportunity to discriminate against potential voters, ways to discriminate will be found. . . .  If any State were to pass a law forthrightly declaring colored citizens ineligible to vote, the Supreme Court would strike it down forthwith as in flagrant violation of the Fifteenth Amendment.  The trouble, however, comes not from discriminatory laws, but from the discriminatory application and administration of apparently non-discriminatory laws.

1959 Report, *supra*, at 133.

Spurred by the Commission's reports on ongoing voting discrimination and abysmal registration numbers for Black voters, and recognizing that "no right is more essential to citizenship than the right to vote," H.R. Rep. No. 88-914, pt. 2, at 2 (1963), Congress once again sought to strengthen federal civil rights protections with the Civil Rights Act of 1964.  *See* 110 Cong. Rec. 1600 ("To deny the right to vote to any American citizen on the basis of race, color, creed, or nationality is an act which is not only unconstitutional, but also inimical to the political well-being of our society."); *id.* at 1529 ("In voting, the foundations of our Republic are enhanced by a free elective franchise.").

15

Congress was particularly concerned with the "specific practices by means of which voting officials have denied Negroes the right to register and vote." *Id.* at 1642. As Senator Humphrey explained, the Act "is the result of an explicit investigation which revealed the incontrovertible fact that an effort is made to deny citizens of the United States the right to vote, through denying them the opportunity to register." *Id.* at 5996. The Act's proponents detailed the many ways that state and local officials disenfranchised Black voters and the inability of existing federal remedies to address those tactics. *See, e.g.*, *id.* at 6714-15 (describing several incidents of tests and rules working to deny Black voters the right to vote); *id.* at 6529 ("[P]resent procedures do not provide adequate remedies for the loss of voting rights on account of race or color."). Congress repeatedly called the tactics it sought to outlaw "arbitrary," *id.* at 6555; "irrelevantly strict," *id.* at 6530; "determined abuses of the law," *id.* at 5996; "devious and wrongful," *id.* at 1631; and a "façade to mask acts of racial discrimination," *id.* at 1600.

The Civil Rights Act addressed these rampant discriminatory practices head on. Among other things, the Act mandated that state and local officials apply the same standards to everyone when determining qualifications to vote and limited the use of literacy tests. *See* § 101(a), 78 Stat. at 241.

On top of that, the Act also targeted "the practice of requiring unnecessary information for voter registration with the intent that such requirements would

16

increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *see also* 110 Cong. Rec. 1694 ("We provide in [the Act] that immaterial errors in an application shall not be deemed fatal."). As one Congressman succinctly put it, "the failure to insert a period or a comma may not be used to keep a Negro off the voting rolls." *Id.* at 1628.

As the text and history of the Civil Rights Act make clear, the Act was one in a series of congressional attempts to target the ways in which state and local discrimination against Black voters persisted despite federal civil rights protections. The Materiality Provision and its accompanying protections were passed to "close many loopholes in existing laws," H.R. Rep. No. 88-914, pt. 2, at 5, and fulfill the promise of the Fifteenth Amendment almost a hundred years after its ratification.

## III. The Materiality Provision's Plain Text Covers Absentee Ballot Envelopes, and Its Application to Absentee Ballot Envelopes Is Constitutional.

The Materiality Provision prohibits state and local officials from denying any citizen the "right . . . to vote" due to any "error or omission" on "any record or paper" required to "cast[] a ballot" "if such error or omission is not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B), (e). The absentee ballot envelopes at issue here are plainly

17

"record[s] or paper[s]" required to make a voter's absentee ballot vote "effective," *id.* § 10101(e), and Appellants' argument that this Court should ignore the text's plain meaning on constitutional avoidance grounds is completely without merit.

**A.** "The starting point for statutory interpretation is the language of the statute," *United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir. 2023), and courts must "heed[] what a statute actually says," *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). When, as here, "Congress takes the trouble to define the terms it uses, a court must respect its definitions as 'virtually conclusive.'" *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 59 (2024) (quoting *Sturgeon v. Frost*, 587 U.S. 28, 56 (2019)).

The Materiality Provision provides:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election . . . .

52 U.S.C. § 10101(a)(2)(B). The word "vote" is defined broadly as

> all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election.

*Id.* § 10101(e); *see also id.* § 10101(a)(3)(A) (incorporating this definition into the Materiality Provision). Putting the two together, the Materiality Provision protects

18

a person's "right . . . to" take "all action necessary to make a vote effective," which includes "casting a ballot, and having such ballot counted." It does so by prohibiting the denial of this right due to an "error or omission" in "any record or paper relating to any application, registration, or other act requisite to" "mak[ing] a vote effective" "if such error or omission is not material in determining whether such individual is qualified . . . to vote." *See id.* § 10101(a)(2)(B), (e).

While focused on one particular means by which Black voters had been denied the right to vote—the denial of the right to vote due to immaterial errors in voting-related paperwork—the text of the Materiality Provision is sweeping in its scope. And as the statutory definition makes clear, the Provision encompasses any paperwork necessary for a voter to make her "vote effective." The "broad language" in this definition includes all stages of voting, including registration, casting a ballot, and having that ballot counted. *Milligan*, 599 U.S. at 40; *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 564 (1969) (describing the Voting Rights Act's definition of vote as "broad").[3]

---

[3] In interpreting the substantially similar definition of "vote" in the Voting Rights Act, the Supreme Court has twice pointed to language that also appears in the Civil Rights Act's definition—"all action necessary" and "including but not limited to"—as indicia of the definition's sweeping scope. *See Milligan*, 599 U.S. at 40; *see also Allen*, 393 U.S. at 565-66; 52 U.S.C. § 10310(c)(1) (definition of "vote" in the Voting Rights Act).

The sweeping definition of the word "vote" is paired with the Materiality Provision's specification of "*any* record or paper relating to *any* application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). "[R]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citation and quotation marks omitted); *see also Patel v. Garland*, 596 U.S. 328, 338 (2022). "[A]ny . . . other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), then, "is most naturally read to mean" an act requisite to voting "of whatever kind," *Ali*, 552 U.S. at 220.

Thus, the plain text of the Provision encompasses the absentee ballot envelopes at issue in this case. In Georgia, a voter seeking to "cas[t] a ballot" by mail and "hav[e] such ballot counted," 52 U.S.C. § 10101(e), must insert the absentee ballot into the outer envelope, fill out the requested information on the envelope, and return the ballot to her county's registrar or clerk, DE 613 at 3-4. In other words, the absentee ballot outer envelope is plainly a "record or paper" relating to an "act requisite to" "casting a ballot." 52 U.S.C. § 10101(a)(2)(B), (e). This paperwork easily falls within the Materiality Provision's reach.

Appellants urge this Court to follow the Third Circuit's recent decision in *Pennsylvania State Conference of NAACP Branches v. Secretary Commonwealth of Pennsylvania* ("*Pa. NAACP*"), 97 F.4th 120 (3d Cir. 2024), *reh'g denied* (Apr.

20

30, 2024), in which a divided panel held that the Materiality Provision only applies to voter registration materials, *id.* at 125.  *See* RNC Br. 2.  But to reach that result, the court's majority ignored the Materiality Provision's expansive language that covers "*any* application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), side-stepped the Act's sweeping definition of "vote," and misapplied the Act's history to narrow the broad sweep of the Provision's plain text.  *See Pa. NAACP*, 97 F.4th at 146-50 (Shwartz, J., dissenting).  This Court should not follow *Pa. NAACP* and its flawed reasoning.  Instead, it should adhere to the plain text of the Provision, which encompasses all paperwork—including paperwork related to voting absentee—that is required to "make a vote effective."  52 U.S.C. § 10101(e).

**B.**  In the face of the Provision's broad language, Appellants rely on the canon of constitutional avoidance and ask this Court to ignore the Materiality Provision's plain meaning.  *See* RNC Br. 23.  Appellants' arguments, however, are irreconcilable with the text and history of the Fifteenth Amendment and Congress's sweeping power to enforce the Amendment's promise of a democracy free from discrimination.  This Court should reject them.

As a preliminary matter, Appellants' invocation of constitutional avoidance is misplaced.  "Courts employ the canon of constitutional avoidance as 'a tool for choosing between competing plausible interpretations of a statutory text,'" but

21

"[c]ourts do not use this tool when the text of the statute is unambiguous." *Price v. Time, Inc.*, 416 F.3d 1327, 1342 (11th Cir. 2005) (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)). Thus, "[i]t 'has no application' in the interpretation of an unambiguous statute such as" the Materiality Provision. *McFadden v. United States*, 576 U.S. 186, 197 (2015) (quoting *Warger v. Shauers*, 574 U.S. 40, 50 (2014)); *see also Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018) ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases."). Because the Materiality Provision's plain text unambiguously includes absentee ballots, "the canon of constitutional avoidance has no role to play here." *Warger*, 574 U.S. at 50.

In any event, Appellants' constitutional challenges to the Materiality Provision are meritless. Appellants argue that the Materiality Provision's inclusion of absentee ballot materials, as opposed to just registration-related materials, exceeds Congress's Fifteenth Amendment enforcement power. *See* RNC Br. 23. Appellants are wrong for at least two reasons.

*First*, Appellants' position is irreconcilable with the text and history of the Fifteenth Amendment. As previously described, the Fifteenth Amendment gave Congress sweeping authority to ensure that Black voters were fully able to realize their constitutional right to vote. See *supra* Section I. The Fifteenth Amendment's Framers repeatedly emphasized the need for national legislation to guard against

22

states' efforts to disenfranchise communities of color and made clear that it was up to Congress to determine how best to promote the Amendment's promise of a multiracial democracy free from discrimination.

In 1964, after "years of bitter experience" of federal civil rights enforcement, Congress lamented the fact that "voter discrimination enjoy[ed] widespread existence in many parts of the country" due to states' persistent efforts to disenfranchise Black voters. 110 Cong. Rec. 1593. Relying in part on its Fifteenth Amendment authority, Congress took action to end states' widespread and persistent resistance to Black citizens exercising their right to vote by passing "prophylactic legislation that proscribe[d] facially constitutional conduct in order to prevent and deter unconstitutional conduct." *Vote.org*, 89 F.4th at 486 (quoting *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 721-22 (2003)); *see also Browning*, 522 F.3d at 1173 ("Congress in combating specific evils might choose a broader remedy").

The Materiality Provision's expansive protection against arbitrary, paper-based denials of the right to cast a ballot and have that ballot counted plainly falls within Congress's broad Fifteenth Amendment enforcement authority. Rectifying the ongoing discrimination required federal action to target "specific practices by means of which voting officials have denied Negroes the right to register and vote," 110 Cong. Rec. 1642, including the common tactic of requiring "trivial

information [that] served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants," *Browning*, 522 F.3d at 1173. *See also* 110 Cong. Rec. 1644 ("It must be the responsibility of the Federal Government to act where discrimination exists when State and local governments have not acted and have refused to act."). Moreover, the expansive definition of the term "vote" in the statute—originally enacted in the 1960 Act and applied to the Materiality Provision in 1964—comports with Congress's goal to "eliminate consistent, determined abuses of law," *id.* at 5996, close the loopholes that states had been exploiting to deny Black people the right to vote, and finally realize the Fifteenth Amendment's promise.

In brief, the Materiality Provision ensures that no voter will be prevented from exercising their right to vote due to arbitrary errors in any paperwork required to vote, and this prohibition is a proper exercise of Congress's "full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting" under the Fifteenth Amendment. *Katzenbach*, 383 U.S. at 326.

*Second*, Appellants argue that because congressional debates about the Materiality Provision were focused on racial discrimination during voter registration, the Provision cannot be construed to apply to other voting-related paperwork without running afoul of the Fifteenth Amendment. RNC Br. 22. This argument suffers from several flaws.

24

To start, Appellants support their position by erroneously relying on the congruence and proportionality standard articulated by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507 (1997).  *See* RNC Br. 22.  But the Supreme Court has never applied that standard in a Fifteenth Amendment case.  *Katzenbach*, 383 U.S. at 326-27; *City of Rome*, 446 U.S. at 174-78; *cf. Shelby County v. Holder*, 570 U.S. 529, 555 (2013) (striking down coverage provision under *McCulloch*).  Under the correct "rational means" standard, *Katzenbach*, 383 U.S. at 324, the Materiality Provision is plainly constitutional.

Significantly, the Fifteenth Amendment does not require Congress's chosen remedy to mirror exactly the scope and types of discriminatory practices that motivated the statute's enactment, as this Court made clear in *United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir. 1984).  The *Marengo* Court upheld the constitutionality of the Voting Rights Act's nationwide prohibition on electoral practices with discriminatory results even though there was "no nationwide record of pervasive voting discrimination akin to the record of discrimination in the jurisdictions covered by preclearance."  *Id.* at 1559; *see also id.* ("[In *Oregon v. Mitchell*,] the [Supreme] Court sustained a *nationwide* ban on literacy tests without demanding evidence of nationwide purposeful discrimination." (emphasis in original)).  Under the Fifteenth Amendment, this Court explained, "Congress may paint with a much broader brush than" courts.  *Id.*

at 1560 (quoting *Oregon v. Mitchell*, 400 U.S. 112, 284 (1970) (opinion of Stewart, J.)).  By enacting the Materiality Provision, Congress "could justifiably conclude" that an expansive prohibition against denials of the right to vote due to immaterial errors in voting-related paperwork "was necessary to remedy" states' rampant disenfranchisement of Black voters.  *Id.*  There is thus nothing constitutionally suspect about the Provision's broad scope.

Furthermore, Appellants' myopic focus on voter registration mischaracterizes the harm that Congress sought to address.  Congress knew that states were using "every trick in the book . . . to deny citizens the right to vote." 110 Cong. Rec. 5997.  To end these "devious and wrongful methods" once and for all, *id.* at 1631, Congress enacted the Materiality Provision's sweeping ban on the denial of the right to vote based on immaterial errors or omissions in voting-related paperwork.  The Provision's broad scope makes sense: because Congress was seeking to close existing loopholes in civil rights laws, it ensured that states could not evade the Materiality Provision's command.  The inclusion of papers beyond those necessary for voter registration is entirely consistent with this goal.

In sum, the Fifteenth Amendment gives Congress sweeping powers to enforce the right to vote free from racial discrimination.  *See Marengo*, 731 F.2d at 1556.  In considering how best to protect that right, Congress was faced with an extensive record of states' efforts to "systematically prevent[] [Black citizens]

from registering and voting." 110 Cong. Rec. 6529. Congress's chosen remedy—a broad prohibition against denial of the right to vote due to immaterial errors or omissions in voting-related paperwork—is an eminently rational means of tackling that problem.

\* \* \*

As the Materiality Provision's text and history make clear, the Provision plainly prohibits states from denying the right to vote based on immaterial "error[s] or omission[s]" in paperwork related to voting by mail. Appellants' argument that this Court should ignore the Provision's plain meaning on avoidance grounds is wrong as a matter of statutory interpretation and irreconcilable with the Fifteenth Amendment's text and history. This Court should reject it.

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction enjoining the enforcement of the Birthdate Requirement should be affirmed.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
David H. Gans
Anna K. Jessurun
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: September 6, 2024

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 6,486 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief *amicus curiae* complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Executed this 6th day of September, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on September 6, 2024

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 6th day of September, 2024.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*