No. 23-13095; No. 23-13085

In the

# United States Court of Appeals
## for the Eleventh Circuit

In re: Georgia Senate Bill 202

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-mi-55555 — J.P. Boulee, *Judge*

## RESPONSE AND REPLY BRIEF OF DEFENDANT-APPELLANTS GOVERNOR OF GEORGIA, GEORGIA SECRETARY OF STATE, GREGORY W. EDWARDS, GEORGIA STATE ELECTION BOARD & ELECTION BOARD MEMBERS

Gene C. Schaerr
*Special Ass't Attorney General*
Donald M. Falk
*Special Ass't Attorney General*
Brian J. Field
*Special Ass't Attorney General*

Christopher M. Carr
*Attorney General of Georgia*
Stephen J. Petrany
*Solicitor General*
Ross W. Bergethon
*Principal Dep. Solicitor General*
Elijah J. O'Kelley
*Assistant Solicitor General*

SCHAERR |JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Defendant-Appellants*

*In re: Georgia Senate Bill 202*, No. 23-13095; No. 23-13085

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities, in addition to those listed in the State Defendant-Appellants' opening brief, may have an interest in the outcome of this case:

Center for Election Confidence, Inc., *Amicus Curiae*

Constitutional Accountability Center, *Amicus Curiae*

Fuller, Stephen, *Counsel for Amicus Curiae Center for Election Confidence, Inc.*

Fuller Sloan, LLC, *Counsel for Amicus Curiae Center for Election Confidence, Inc.*

Gans, David H., *Counsel for Amicus Curiae Constitutional Accountability Center*

Gorod, Brianne J., *Counsel for Amicus Curiae Constitutional Accountability Center*

Henson, Zachary D., *Counsel for Amicus Curiae Honest Elections Project*

Holtzman Vogel PLLC, *Counsel for Amicus Curiae Honest Elections Project*

Honest Elections Project, *Amicus Curiae*

Jessurun, Anna K., *Counsel for Amicus Curiae Constitutional Accountability Center*

May, Caitlin Felt, *Counsel for Plaintiff-Appellees*

New Disabled South, *Amicus Curiae*

*In re: Georgia Senate Bill 202*, No. 23-13095; No. 23-13085

O'Kelley, Elijah J., *Counsel for State Defendant-Appellants*

Selendy Gay PLLC, *Counsel for Amicus Curiae New Disabled South*

Snow, Elizabeth, *Counsel for Amicus Curiae New Disabled South*

Stoughton, Corey, *Counsel for Amicus Curiae New Disabled South*

Torchinsky, Jason Brett, *Counsel for Amicus Curiae Honest Elections Project*

Wenger, Edward M., *Counsel for Amicus Curiae Honest Elections Project*

Wydra, Elizabeth B., *Counsel for Amicus Curiae Constitutional Accountability Center*

/s/ *Stephen J. Petrany*
Stephen J. Petrany

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................... v

Statement Regarding Adoption of Briefs of Other Parties ............ xi

Introduction ..................................................................... 1

Argument ........................................................................ 4

    I.  Plaintiffs have not shown they are likely to succeed on the merits of their First Amendment claim. ............................. 4

        A.  Plaintiffs cannot show that handouts are ever inherently expressive conduct, much less that they can succeed on a facial challenge. .......................................... 4

            1.  Plaintiffs' conduct is just that: conduct. .................... 5

            2.  Plaintiffs cannot succeed on a facial challenge. ....... 20

        B.  Even if the law regulates expressive conduct, it is still constitutional. ............................................................ 23

            1.  The voting line is a nonpublic forum and the handout law is reasonable. ..................................................... 23

            2.  Even if the handout law is subject to First Amendment scrutiny, it is narrowly tailored to advance compelling state interests. ........................ 27

    II.  The equities weigh against a preliminary injunction. ....... 35

    III. As to the Birthdate Requirement, the State Defendants have standing to appeal the district court's injunction, but the NAACP and AME Plaintiffs lack standing to pursue a challenge against the State Defendants............................. 38

# TABLE OF CONTENTS
## (continued)

Page

    A. The State Defendants have standing to appeal the district court's indefinite injunction of a Georgia statute. ...................................................................... 39

    B. Plaintiffs lack standing to pursue their birthdate requirement claims against the State Defendants....... 42

        1. Plaintiffs cannot show traceability or redressability because county officials, not the State Defendants, process absentee ballots.......................................... 42

        2. Plaintiffs' belated and indistinct request for relief regarding the form of the absentee ballot return envelopes does not solve the deficiencies in traceability and redressability................................ 50

        3. The Board's suspension power does not show adequate traceability and redressability................ 55

Conclusion..................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Access Now, Inc. v. Sw. Airlines Co.*,
    385 F.3d 1324 (11th Cir. 2004) ................................................. 52

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel.,*
    *Barez*,
    458 U.S. 592 (1982) ................................................. 39

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch.*
    *Bd.*,
    557 F.3d 1177 (11th Cir. 2009) ................................................. 38

*Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*,
    76 F.4th 569 (7th Cir. 2023)...................................................... 10

*Black Voters Matter Fund v. Raffensberger*,
    478 F. Supp. 3d 1278 (N.D. Ga. 2020) ...................................... 47

*Bloedorn v. Grube*,
    631 F.3d 1218 (11th Cir. 2011) ..........................................23, 26

*Burns v. Town of Palm Beach*,
    999 F.3d 1317 (11th Cir. 2021) ...........................2, 5, 7, 8, 13–15

*Burson v. Freeman*,
    504 U.S. 191 (1992) .......................................3, 18, 24–26, 30–32

*Chavez v. Sec'y, Fla. Dep't of Corr.*,
    647 F.3d 1057 (11th Cir. 2011) ................................................. 22

*Citizens for Police Accountability Pol. Comm. v.*
    *Browning*,
    572 F.3d 1213 (11th Cir. 2009) ................................................. 25

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989) ...................................................................... 9

*Cowen v. Sec'y, State of Ga.*,
  22 F.4th 1227 (11th Cir. 2022) .................................................. 35

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008) ................................................................. 35

*Davis v. FEC*,
  554 U.S. 724 (2008) ................................................................. 43

*Democratic Party of Ga., Inc. v. Crittenden*,
  347 F. Supp. 3d 1324 (N.D. Ga. 2018) ...................................... 47

*Dirks v. SEC*,
  463 U.S. 646 (1983) ................................................................. 19

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  11 F.4th 1266 (11th Cir. 2021)......................................12, 28, 32

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018) ............... 1, 2, 5–8, 10–14, 16, 21

*Ga. Republican Party, Inc. v. Ga. Sec'y of State*,
  2020 WL 7488181 (11th Cir. Dec. 21, 2020) .................45, 46, 48

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ................................................................. 46

*Hollingsworth v. Perry*,
  570 U.S. 693 (2013) ...........................................................40, 41

*Holloman ex rel. Holloman v. Harland*,
  370 F.3d 1252 (11th Cir. 2004) ...............................1, 5, 9, 10, 14

*In re Home Depot Inc.*,
  931 F.3d 1065 (11th Cir. 2019) ................................................ 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of
    Bos.*,
    515 U.S. 557 (1995) ........................................................8, 10, 15

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ....................42, 44–49, 52, 54, 55

*Johnson v. Terry*,
    112 F.4th 995 (11th Cir. 2024).................................................. 25

*Keister v. Bell*,
    29 F.4th 1239 (11th Cir. 2022)..............................................23, 26

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of
    State*,
    66 F.4th 905 (11th Cir. 2023)................................................40, 41

*Leake v. Drinkard*,
    14 F.4th 1242 (11th Cir. 2021) .................................................. 8

*Lewis v. Gov. of Ala.*,
    944 F.3d 1287 (11th Cir. 2019) (en banc) ......................46, 48, 55

*Lichtenstein v. Hargett*,
    83 F.4th 575 (6th Cir. 2023)...................................................... 27

*Maine v. Taylor*,
    477 U.S. 131 (1986) .................................................................. 40

*Marks v. United States*,
    430 U.S. 188 (1977) .................................................................. 25

*Martin v. Crittenden*,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ...................................... 47

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) ....................................................23, 24, 26, 30

*Mock v. Bell Helicopter Textron, Inc.*,
    373 F. App'x. 989 (11th Cir. 2010) ........................................... 52

*Moody v. NetChoice, LLC*,
   144 S. Ct. 2383 (2024) ..........................................................20, 21

*Munro v. Socialist Workers Party*,
   479 U.S. 189 (1986) ................................................................. 34

*New Georgia Project v. Raffensberger*,
   484 F. Supp. 3d 1265 (N.D. Ga. 2020) ...................................... 48

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447 (1978) ................................................................. 19

*Pittman v. Sec'y, Fla. Dep't of Corr.*,
   871 F.3d 1231 (11th Cir. 2017) ................................................ 14

*Porter v. Martinez*,
   68 F.4th 429 (9th Cir. 2023).................................................... 28

*Purcell v. Gonzalez*,
   591 U.S. 1 (2006) .................................................................... 37

*Richardson v. Hughs*,
   978 F.3d 220 (5th Cir. 2020) ..............................................34, 35

*Rose v. Raffensperger*,
   511 F. Supp. 3d 1340 (N.D. Ga. 2021) ...................................... 49

*Rose v. Sec'y, State of Ga.*,
   87 F.4th 469 (11th Cir. 2023).................................................... 49

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006) ..........................................................2, 5, 12

*Spence v. Washington*,
   418 U.S. 405 (1974) ................................................................. 7

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................. 43

*Texas v. Johnson*,
   491 U.S. 397 (1989) ........................................................... 7

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
   581 U.S. 433 (2017) ............................................................42, 43

*Trump v. Kemp*,
   511 F. Supp. 3d 1325 (N.D. Ga. 2021) ...................................... 43

*United States v. Kokinda*,
   497 U.S. 720 (1990) ............................................................23, 26

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ........................................................... 19

*United States v. Penn*,
   63 F.4th 1305 (11th Cir. 2023) ................................................ 25

*United States v. Playboy Ent. Grp.*,
   529 U.S. 803 (2000) ........................................................... 32

*United States v. Roy*,
   869 F.2d 1427 (11th Cir. 1989) ................................................ 14

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ........................................................... 21

*Vote.org v. Ga. State Election Bd.*,
   661 F. Supp. 3d 1329 (N.D. Ga. 2023) ...................................... 48

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ................................................ 35

**Statutes**

O.C.G.A. § 21-2-31 ........................................................... 41

O.C.G.A. § 21-2-32 ........................................................... 44

O.C.G.A. § 21-2-33.1 ........................................................ 44

O.C.G.A. § 21-2-33.2 ................................................................44, 55

O.C.G.A. § 21-2-40 ................................................................ 44

O.C.G.A. § 21-2-70 ................................................................ 44

O.C.G.A. § 21-2-71 ................................................................ 44

O.C.G.A. § 21-2-384 ................................................................52, 53, 54

O.C.G.A. § 21-2-385 ................................................................ 38

O.C.G.A. § 21-2-386 ................................................................ 43

O.C.G.A. § 21-2-390 ................................................................ 54

O.C.G.A. § 21-2-414 ................................................................ 13

O.C.G.A. § 21-2-499 ................................................................ 47

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

The State Defendants adopt the reply brief of the Intervenor-Appellants (Georgia Republican Party, Inc., National Republican Congressional Committee, National Republican Senatorial Committee, and Republican National Committee), which addresses Plaintiffs' arguments regarding the district court's order preliminarily enjoining the provision of Georgia law (O.C.G.A. § 21-2-385(a)) that requires voters to print their date of birth on the outer envelope of an absentee ballot.  *See* Doc. 613.

## INTRODUCTION

Handing out gifts is not inherently expressive.  Conduct is expressive only when the plaintiff intends to convey a particularized message and a reasonable observer would perceive some generalized version of that message.  Critically, when explanatory speech is needed to explain the message, there is no message, as a constitutional matter.  *See, e.g.*, *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1244 (11th Cir. 2018) (*Food Not Bombs I*).

Try as they might, Plaintiffs cannot get around that basic point.  They wrongly argue that precedent does not require intent to convey a particularized message, even though it undisputably does.  *See, e.g.*, *id.*  And they try to whittle the reasonable observer test down to nothing.  According to Plaintiffs, the reasonable observer test means an observer need only think that a person is trying to convey *a* message.  *See* Br. of New Georgia Project, et al. at 25 ("NGP Br."); Br. of African Methodist Episcopal Church, et al. at 33 ("AME Br.").  Not so.  Binding precedent makes clear a reasonable observer must perceive at least some generalized version of the plaintiff's intended message.  *See, e.g.*, *Food Not Bombs I*, 901 F.3d at 1244; *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

Plaintiffs also try to escape the objectivity of the reasonable observer test altogether by presenting it as a fact issue reviewed for clear error. *See* NGP Br. at 10, 26; AME Br. at 26–27, 31. That position has no basis in precedent or reason. The issue is an objective legal one that is reviewed *de novo*, as this Court's decisions make abundantly clear. *See, e.g.*, *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1330–31 (11th Cir. 2021); *Food Not Bombs I*, 901 F.3d at 1239–40.

But even if the reasonable observer test depended on trial testimony, Plaintiffs can point only to testimony from *themselves* or recipients of gifts, not neutral third-party observers who don't already know about the explanatory speech. Plaintiffs' testimony instead confirms that this conduct requires explanatory speech to convey a message, which means it is not inherently expressive. *See Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006).

But even if Plaintiffs' conduct is (sometimes) expressive, their claim still fails. The handout law serves the State's concededly compelling interests and is narrowly tailored under any First Amendment analysis because it is limited to only a short 25-foot distance from the area in need of protection: the polling line. It will never extend beyond that area, which is tethered specifically and only to the place that needs protection. That is the definition

of narrowly tailored. *See Burson v. Freeman*, 504 U.S. 191, 211 (1992) (lead op.).

On top of everything else, Plaintiffs fail to establish the equities are in their favor. They face no irreparable harm—indeed, it is unlikely any of them will ever be subject to the supplemental buffer zone, which applies only if there are long lines, something that has become rare in Georgia. They also delayed seeking an injunction and have no good excuse. And of course Georgia faces great harm from being unable to enforce election laws that protect election integrity.

As to the birthdate requirement, the State Defendants have appellate standing over a judgment holding a state statute unconstitutional as preempted by federal law. But the district court was correct that Plaintiffs lack standing to seek relief against the State Defendants because the harm Plaintiffs allege is the responsibility of county officials. That harm is neither traceable to the State Defendants nor redressable by an order against them.

This Court should reverse the district court's grant of a preliminary injunction.

## ARGUMENT

Plaintiffs' response and cross-appeal briefs address both the handout law preliminary injunction and the absentee ballot birthdate requirement. The State Defendants first explain why the handout law is perfectly valid and Plaintiffs are not entitled to a preliminary injunction. The State Defendants then address the standing issues related to the birthdate requirement. As to the merits of the birthdate requirement, the State Defendants again adopt the Intervenor-Appellants' reply brief on that issue. *Supra* at xi.

### I. Plaintiffs have not shown they are likely to succeed on the merits of their First Amendment claim.

#### A. Plaintiffs cannot show that handouts are ever inherently expressive conduct, much less that they can succeed on a facial challenge.

Plaintiffs have no likelihood of success. Their conduct—handing items to voters in line—is not inherently expressive. Their claim fails for that reason alone. Making matters worse, they assert a facial challenge. Even if in *some* cases a handout could be expressive, it is certainly not always or even usually expressive. That forecloses facial relief.

### 1.    Plaintiffs' conduct is just that: conduct.

As State Defendants have explained, the First Amendment protects conduct only when it is "inherently expressive." *See, e.g.*, State Defendants' Br. at 23–25 ("State Br."); *Rumsfeld*, 547 U.S. at 66.  Conduct is "inherently expressive" when there is "an intent to convey a particularized message" and a "reasonable observer" would perceive a generalized version of that message. *Food Not Bombs I*, 901 F.3d at 1242 (alteration adopted and quotation omitted); *Holloman*, 370 F.3d at 1270; State Br. at 26.  There is a simple harmony between the intent and reasonable observer tests: a plaintiff must intend to convey a *particularized* message and the reasonable observer must perceive some *generalized* version of that message.  *See, e.g.*, *Burns*, 999 F.3d at 1336; *Food Not Bombs I*, 901 F.3d at 1244–45; *Holloman*, 370 F.3d at 1270.  Critically, conduct is not inherently expressive when "explanatory speech is necessary for the reasonable observer to perceive a message." *Food Not Bombs I*, 901 F.3d at 1244 (emphasis removed); *accord Rumsfeld*, 547 U.S. at 66.

Plaintiffs cannot show either a particularized message or satisfy the reasonable observer test.  *See* State Br. at 25–31.  They cobble together a variety of vague intended messages but fail to identify any particularized one.  *See id.* at 25–26.  That's not

5

surprising because handing items to voters standing in line is run-of-the-mill conduct, symbolizing nothing and carrying no inherent message. *Id.* at 27–31. True, the conduct may have a certain effect, like making it easier (or harder) for a voter to stay in line. But that is true of all conduct and does not mean it inherently carries a message. *Id.* at 27. Instead, the handout conveys a message only when paired with explanatory speech, which means the conduct is not itself expressive. *See, e.g.*, *id.* at 28.

Some of Plaintiffs' efforts are aimed at expanding the concept of inherently expressive conduct in conflict with Supreme Court precedent. Some efforts focus on presenting legally irrelevant and factually unhelpful testimony about how certain voters perceived Plaintiffs' conduct. And some efforts are aimed at misrepresenting the State Defendants' arguments. All their efforts fail.

**a.** Plaintiffs first try to expand the concept of inherently expressive conduct well beyond precedent. They get both the "intent to convey a particularized message" and the reasonable observer requirements wrong.

As the State Defendants have explained, *see* State Br. at 25–26, Plaintiffs fail to show an "intent to convey a *particularized* message," *Food Not Bombs I*, 901 F.3d at 1240 (emphasis added

6

and quotation omitted).  Their supposed messages are all over the place, ranging from protest, to gratitude, to showing community support, and so on.  *See* State Br. at 25–26.  Those are just variegated thoughts that Plaintiffs think might be consistent with their conduct—but they are not an intended and "particularized message."  *Food Not Bombs I*, 901 F.3d at 1240.

Plaintiffs do little to address this problem.  The New Georgia Project Plaintiffs seem not to address it at all.  *See* NGP Br. at 23–28.  The AME Plaintiffs address it only by misrepresenting case law.  *See* AME Br. at 32.  They assert that "both the Supreme Court and this Court have rejected" that Plaintiffs must prove "an intent to convey a particularized message" as "a requirement for finding expressive conduct."  *Id.* (quotation omitted).  But that is *exactly* what the Supreme Court's and this Court's binding precedent requires.  *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *Spence v. Washington*, 418 U.S. 405, 410–11 (1974); *Burns*, 999 F.3d at 1336–37; *Food Not Bombs I*, 901 F.3d at 1240.  This Court has applied the requirement to conclude that a plaintiff "intended to convey a *certain* message," describing the intended message in specific terms.  *Food Not Bombs I*, 901 F.3d at 1240 (emphasis added).

7

Plaintiffs also try to get around the intent requirement by citing inapplicable case law about social media platforms and government speech. AME Br. at 32–33 (citing *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1219 (11th Cir. 2022), *vacated and remanded sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2409 (2024); *Leake v. Drinkard*, 14 F.4th 1242, 1252–53 (11th Cir. 2021)). But neither case involved expressive conduct. And *Leake* is particularly unhelpful for Plaintiffs. That case reasoned that a government-sponsored Veterans' Day parade *did* have a particularized message: celebrating veterans. *Leake*, 14 F.4th at 1245, 1248–50.

Plaintiffs would make the intent requirement meaningless by insisting that a "narrow, succinctly articulable message" is not required. AME Br. at 32 (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995)). But that is true only with respect to the *reasonable observer test*, not the intent test. *See, e.g.*, *Burns*, 999 F.3d at 1336; *Food Not Bombs I*, 901 F.3d at 1244–45; *supra* at 5. That is, the requirement of an intent of a specific message is different than the generalized version of the message that a reasonable observer must understand. *See, e.g.*, *Food Not Bombs I*, 901 F.3d at 1240–

41, 1244–45. Plaintiffs offer no reason to depart from that understanding.

That said, Plaintiffs cannot satisfy the reasonable observer test, either, so they try to water it down, too. They emphasize this Court's statements that a reasonable observer need only perceive "*some* sort of message," not any specific one. NGP Br. at 25 (quoting *Holloman*, 370 F.2d at 1270); AME Br. at 33 (same). Plaintiffs say that means a reasonable observer need only "recognize the conduct as an attempt at expression." AME Br. at 33. That position sweeps virtually all conduct into the "inherently expressive" category because there is "some kernel of expression in almost every activity a person undertakes." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). That would render the concept of expressive conduct meaningless.

Cases instead confirm that the reasonable observer must be able to discern at least the "generalized" message related to the topic of the conduct. *See, e.g.*, *Holloman*, 370 F.3d at 1270; *see also* State Br. at 27–31. In *Holloman*, for example, the "generalized message" of a student's raised fist was one "of disagreement or protest directed toward [his teacher], the school, or the country in general," and a reasonable observer would perceive that much even if he did not know the student's "specific

message." 370 F.3d at 1270. In *Food Not Bombs I*, the reasonable observer would "infer some sort of message, e.g., one of community and care for all citizens," even if the observer did not know the "*specific* message that public money should be spent on providing food for the poor rather than funding the military." 901 F.3d at 1244. And in *Hurley*, although the combination of actors in a single parade did not "produce a particularized message," the parade still conveyed the generalized message that the parade consisted of what, in the organizer's "eyes … merits celebration on that day." 515 U.S. at 574. Nothing similar comes out of handing someone an item while they wait in line.

Plaintiffs also stress the claimed historical significance of line warming in the civil rights context and among black activists. *See* NGP Br. at 6–7; AME Br. at 29–30. But these arguments *undermine* Plaintiffs' position. "[C]ourts do not assume that an observer has foreknowledge of an actor's intentions" or is "aware of [the actor] and knows its missions." *Bail Project, Inc. v. Comm'r, Ind. Dep't of Ins.*, 76 F.4th 569, 577 (7th Cir. 2023). If a reasonable observer knows someone is an activist with a particular agenda, that practically guarantees a reasonable observer will perceive his conduct as having a message. But that

10

amounts to little more than smuggling explanatory speech into the equation.

Plaintiffs also incorrectly compare this case to *Food Not Bombs I*, where this Court held a reasonable observer could perceive a communal meal as conveying a message. 901 F.3d at 1243. That meal was identified with tables and banners and handing out literature; was open to everyone; was in a public park known for homelessness and near government buildings; was about an issue of community concern following increased local media coverage about homelessness; and involved sharing meals, which was activity that millennia of history suggested was symbolic. *Id.* at 1242–43. Handing food to voters standing in line is just not on par.

Plaintiffs assert otherwise only by misrepresenting *Food Not Bombs I*'s reasoning and wrongly comparing facts. Most egregiously, they suggest their conduct is expressive because it is "frequently accompanied by traditional expressive activity." NGP Br. at 27. That is precisely the opposite of the law, and it is not what *Food Not Bombs I* or any other case says. *Food Not Bombs I* discussed tables, banners, and the handing out of literature only because it "distinguishe[d] [the plaintiff's] sharing of food … from relatives or friends simply eating together in the park." *Food Not*

*Bombs I*, 901 F.3d at 1242.  In other words, the two forms of conduct (a private picnic versus a public event) *look* different. This Court cannot have meant that the presence of "traditional expressive activity," NGP Br. at 27, makes conduct expressive because it often means the opposite is true: where explanatory speech is necessary, conduct is *not* expressive, *see, e.g.*, *Rumsfeld*, 547 U.S. at 66; *Food Not Bombs I*, 901 F.3d at 1244.

Plaintiffs also overstate the comparison between their handouts to voters standing in line and the communal meal in *Food Not Bombs I*, suggesting both must be expressive because both involve "sharing food."  *See* NGP Br. at 27.  The biggest problem with that position is the Eleventh Circuit itself has held that *Food Not Bombs I* is an outlier and that "*most* social-service food sharing events will *not* be expressive." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1292 (11th Cir. 2021) (*Food Not Bombs II*) (emphasis added).  Plaintiffs' "food therefore expression" formula is foreclosed.

But even ignoring binding precedent and assuming food sharing has special expressive powers, it would do Plaintiffs little good.  For one thing, Plaintiffs do not always hand out food, *see, e.g.*, Doc. 185-5 at 3 (ponchos, fans, books, and phone chargers); Doc. 171-3 at 3–4 (coloring books, chairs, and lactation pods), and

the handout law does not cover only food, O.C.G.A. § 21-2-414(a). For another, Plaintiffs' food sharing is not comparable to the food sharing in *Food Not Bombs I*. The food sharing there was a communal meal that this Court compared to Jesus sharing meals with tax collectors. *Food Not Bombs I*, 901 F.3d at 1243. Simply handing food to someone is nothing like sharing a communal meal—Jesus's meals were not drop-off Biblical Doordashes. Plaintiffs cannot rely on the comparison.

**b.** Plaintiffs also try to confuse the standard of review. The reasonable observer test for expressive conduct is a legal issue reviewed *de novo*. *See, e.g.*, *Burns*, 999 F.3d at 1330–31; *Food Not Bombs I*, 901 F.3d at 1239–40. This Court has never suggested otherwise. Yet Plaintiffs frame the reasonable observer test as a "factual finding" reviewable only for clear error. *See* NGP Br. at 10, 26; AME Br. at 26–27, 31. And they rely heavily on subjective testimony from voters who claim they perceived various messages when receiving line warming gifts. *See* NGP Br. at 24–26; AME Br. at 28–29. Plaintiffs' approach is all wrong. The testimony they cite is not relevant, and even if it were, it does not help their case.

Plaintiffs provide no authority for their attempt to transform a constitutional reasonable observer test into an issue of fact.

13

That is not surprising, as this Court has not suggested that the analysis turns *at all* on testimony from people who observed the conduct at issue. *See, e.g.*, *Burns*, 999 F.3d at 1343–47 (never mentioning testimony from observers); *Food Not Bombs I*, 901 F.3d at 1242–43 (same); *Holloman*, 370 F.3d at 1270 (same). And expressive conduct cases decided at summary judgment never conclude a reasonable juror could find conduct expressive, which is what the Court would say if it were a fact issue. *See, e.g.*, *Burns*, 999 F.3d at 1343–47; *Food Not Bombs I*, 901 F.3d at 1242–45; *Holloman*, 370 F.3d at 1269–70 (discussing reasonable juror as to whether student was disciplined but *not* as to whether his conduct was expressive).

That makes sense because the test is about the *reasonable* observer, not a smattering of subjective ones. Objective legal tests typically do not consider subjective testimony from witnesses. *See, e.g.*, *Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1250 (11th Cir. 2017) (review of sufficiency of counsel is "objective" so what actually motivated counsel's actions is irrelevant); *United States v. Roy*, 869 F.2d 1427, 1433 (11th Cir. 1989) ("existence of probable cause is determined by objective standards" so "Courts determine the existence of" it and it does not matter that "none of the government's witnesses … testified that they believed

probable cause existed"). Plaintiffs' position is inconsistent with the concepts of *inherently* expressive conduct and the *reasonable* observer test. They would apparently subject the issue to dueling testimony from subjective observers and credibility determinations. That's the antithesis of objective, *inherent* expressiveness.

And if Plaintiff's position were correct, what then? Every plaintiff could take every expressive conduct case to trial—it would be as easy as finding a single witness to say he saw some message in the plaintiff's conduct. And what of the trial? Is a jury to be authorized to determine as a matter of fact what conduct is protected by the First Amendment? That cannot be right, and it is not. *See, e.g.*, *Hurley*, 515 U.S. at 567 ("[O]ur review of petitioners' claim that their activity is indeed in the nature of protected speech carries with it a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court."); *Burns*, 999 F.3d at 1330.

Even if that's wrong and subjective viewer testimony could be relevant, the testimony Plaintiffs present is not from the relevant "reasonable observer." The test "focuse[s] on the perspective of those *who view* the expressive conduct." *Burns*, 999 F.3d at 1337 (cleaned up and emphasis added). In *Food Not Bombs I*, for

example, this Court considered the perspective of a reasonable observer viewing a communal meal, not someone who sat down and shared it. 901 F.3d at 1242–44. Applied here, the relevant "reasonable observer" is someone who was standing away and watching the gift being handed to the voter without being able to observe any explanatory speech. But the testimony Plaintiffs rely on is not from that kind of observer. They instead point to witnesses who, being on the receiving end of gifts, necessarily observed any explanatory speech. For just one example, one witness explicitly noted that the activist was wearing a t-shirt that said "Voting is Your Right." Doc. 171-17 at 3–4. Any view she may have had of whether the conduct was expressive cannot be disentangled from that explanatory speech. Indeed, that problem only further shows why the reasonable observer test does not turn on subjective testimony in the first place.

Setting those problems aside, Plaintiffs also stretch the testimony too far. The "voters" they point to are almost entirely themselves—they're Plaintiffs' members or other line warming activists. *See* Doc. 171-6 at 3 (Delta Sigma Theta member); Doc. 171-13 at 3 (same); Doc. 171-17 at 3 (same); Doc. 171-18 at 3 (same); Doc. 171-19 at 3 (AME and Delta Sigma Theta member); Doc. 171-20 at 3 (Delta Sigma Theta member); Doc. 185-3 at 1

(director of Rise); Doc. 185-4 at 2 (line warming activist); Doc. 185-5 at 1 (director of New Georgia Project); Doc. 185-7 at 1 (director of line warming organization).  A plaintiff cannot establish a constitutional right to engage in certain conduct just by *saying* that he finds a message in his own conduct.

There's an even bigger problem for Plaintiffs.  The testimony *undermines* their own case by showing that explanatory speech is necessary for any "message."  *See* State Br. at 28.  The explanatory speech is often explicit.  Some recipients testified that they were told things such as "not to let the delay diminish [their] voting rights."  Doc. 185-4 at 2; *see also* Doc. 171-9 at 5–6 (similar); Doc. 171-13 at 4 (similar).  Line warming activists testified that they "identify themselves as being part of a local Delta Sigma Theta chapter" and "often tell voters that they are entitled to vote if they are in line before the polls close."  Doc. 171-4 at 10; *see also* Doc. 171-10 at 6 (similar).  Others said that "[p]articipating in line relief efforts gives [activists] an opportunity to talk to voters and offer translation services" as well as answer "voting-related questions."  Doc. 171-11 at 3.

Plaintiffs fail to address their explanatory speech problem.  They argue that any explanatory speech is only "incidental and driven by the expressive act."  AME Br. at 35.  But Plaintiffs' own

17

testimony repeatedly shows the opposite—the *handouts* are incidental and driven by the desire to engage in speech. Explanatory speech is clearly necessary for a reasonable observer to perceive a message. Without explanatory speech, an observer could think a person handing an item to a voter is a friend, an activist, a poll worker, a stranger. The observer could think the reason for the handout is encouragement, protest, job responsibility, routine kindness divorced from any "message," or a spouse dropping off car keys she had forgotten earlier. There is nothing inherently expressive about it.

**c.** Plaintiffs last try to distract from the applicable legal test by arguing that the State Defendants have conceded Plaintiffs' conduct is expressive. NGP Br. at 24, 32. According to Plaintiffs, because the State regulates handouts to protect voters against coercion, intimidation, and bribery, the State has agreed that the handouts by themselves have some general message of coercion. NGP Br. at 19–20, 24, 35–36. Plaintiffs' argument is strange because if they're right, they're apparently conceding that their conduct is inherently coercive. In that case, the handout law is obviously constitutional, *see, e.g.*, *Burson*, 504 U.S. at 206–08, and Plaintiffs' gotcha attempt backfires.

Regardless, Plaintiffs misrepresent the State Defendants'
argument and manufacture tension where there is none. The
State regulates the conduct of handouts to prophylactically
enforce protections against the unlawful conduct that often
*accompanies* the handouts. The very point of the handout law is
to enable easier and more effective enforcement of laws
prohibiting illegal electioneering, bribery, or other coercion. *See*
Doc. 197-4 at 8 (election official testimony that a clear
supplemental zone is easier to enforce); Doc. 578-4 at 8 (election
official testimony that it is "impossible" to "ascertain[] the purpose
of each" line warming activist without a clear zone). By
comparison, consider prophylactic securities regulations that
"prohibit acts not themselves fraudulent" but are nonetheless
reasonably designed to prevent fraud (or breaches of fiduciary
duty). *See United States v. O'Hagan*, 521 U.S. 642, 672–73 (1997).
Those regulations may target certain conduct, such as insider
trading, even though that conduct will often require or be paired
with unlawful speech, such as tipping. *See Dirks v. SEC*, 463 U.S.
646, 659 (1983). Or consider prohibitions on attorneys engaging in
in-person solicitation. *See Ohralik v. Ohio State Bar Ass'n*, 436
U.S. 447, 456–59 (1978). Even though those laws actually *do*
involve protected speech, they are lawful as prophylactic measures

19

against unlawful coercion. *Id.* at 462–64. The handout law is similar—except it does not even regulate speech in the first place.

The handout law allows officials to observe easily identifiable conduct without needing to place an ear into every conversation or an eye on every handout. *See* State Br. at 10–11. That does not regulate any speech, including any of the varied speech Plaintiffs claim an interest in. *See, e.g.*, NGP Br. at 25. They remain entirely free to tell voters all legal messages—they just can't pair it with certain conduct. *See* State Br. at 28–29. Indeed, precisely because the law prohibits handouts, it *lessens* burdens on speech, because state officials need not *guess* what is going on and potentially disrupt perfectly legal expression.

### 2. Plaintiffs cannot succeed on a facial challenge.

Because handing items of value to voters is not inherently expressive, the Court need go no further, but even if voter handouts may in *some* cases be inherently expressive conduct, facial relief is unjustified. *See id.* at 31–35.

The Supreme Court has "made facial challenges hard to win" because they "threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 144 S. Ct. at 2397 (quotation omitted). Facial challenges are almost uniformly inappropriate in

expressive conduct cases, as this Court has instructed. *See, e.g.*, *Food Not Bombs I*, 901 F.3d at 1241; *see also* State Br. at 34–35.

Plaintiffs contend that facial relief is appropriate under the standard for First Amendment facial challenges. *See* NGP Br. at 34 n.9 (citing *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003)); AME Br. at 50–52 (citing *Moody*, 144 S. Ct. at 2397). That standard requires several arduous steps. Plaintiffs must first assess the handout law's full scope, determining every possible application of the law. *Moody*, 144 S. Ct. at 2398. Then Plaintiffs must assess—as to every possible application—whether that application is constitutional or unconstitutional. *Id.* Plaintiffs must then further show that the unconstitutional applications "substantially outweigh" the constitutional applications. *Id.* at 2397. Only then could facial relief be appropriate. *Id.* The upshot is Plaintiffs must show both that nearly every possible actor *other than Plaintiffs* is engaged in expressive conduct *and* that the regulation of those other actors' conduct is also unconstitutional.

Plaintiffs don't even try to clear that high hurdle. The New Georgia Project Plaintiffs assert that the "record below confirms" that unconstitutional applications outweigh constitutional ones. NGP Br. at 34 n.9. But they cite the *entirety* of their preliminary injunction motions, not any specific part of the record. *Id.* That is

21

plainly insufficient because "appellate judges are not like pigs, hunting for truffles buried in briefs." *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (quotation omitted).

Plaintiffs' other arguments belie any claim to facial relief because they present a heavily idiosyncratic case. *See, e.g.*, NGP Br. at 6–7; AME Br. at 29–30. They focus exclusively on food sharing—not all the other gifts they or other people might hand out. *See* NGP Br. at 27; AME Br. at 27–28. They also rely on subjective testimony about their own experiences, which says nothing about other actors. *See supra* at 13–17. And they stress that line warming has special meaning for black activists and churches like themselves, insisting that they "provide line relief *within a highly specific historical, cultural, and political context* that explains its symbolic meaning, *particularly in predominantly Black communities*." AME Br. at 29 (emphasis added). A "highly specific context" is antithetical to facial relief.

Everything Plaintiffs rely on will *not* be true for other actors with other backgrounds engaged in other line warming conduct. Facial relief is inappropriate.

22

**B.    Even if the law regulates expressive conduct, it is still constitutional.**

**1.    The voting line is a nonpublic forum and the handout law is reasonable.**

As the State Defendants have explained, the sidewalks where voters stand in line are not public forums on election day.  *See* State Br. at 36–41.  A forum analysis is fact and context specific, turning on things like "the government's intent and policy concerning the usage" of the property, *Bloedorn v. Grube*, 631 F.3d 1218, 1232–33 (11th Cir. 2011), and the property's "purpose," *Keister v. Bell*, 29 F.4th 1239, 1255 (11th Cir. 2022).  Sidewalks, although *often* public forums, are not automatically; each requires an independent forum analysis.  *See, e.g.*, *United States v. Kokinda*, 497 U.S. 720, 730 (1990) (lead op.).  And a forum analysis of the sidewalks where voters wait in line shows them to be nonpublic on election day.  Supreme Court precedent dictates as much.  It has held that the inside of a polling place is not a public forum because "[i]t is, at least on Election Day, government-controlled property set aside for the sole purpose of voting." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018).  That is exactly true of the sidewalks and other areas where voters wait in line.

Plaintiffs' responses fail. Preliminarily, Plaintiffs' forfeiture and concession arguments are wrong. NGP Br. at 28–30; *see also* AME Br. at 41–42. State Defendants did not forfeit anything and they certainly did not concede that sidewalks are always a public forum. State Defendants argued below that, under *Manksy*, they could properly "creat[e] a zone that protects the [voter] line" by "creating 'an island of calm in which voters can peacefully contemplate their choices.'" Doc. 578 at 28 (quoting *Manksy*, 585 U.S. at 15). And they argued that *Manksy*'s "reasoning confirms that the distinct features of the inside of a polling place equally apply to the areas immediately surrounding the polling place." Doc. 197 at 32. Regardless, at the very most, the State Defendants' forum argument is not a new "issue" that can be forfeited, but a new argument on a previously raised issue. *See, e.g.*, *In re Home Depot Inc.*, 931 F.3d 1065, 1086 (11th Cir. 2019). Either way, the State Defendants certainly did not concede the point. They argued that, *even if* the *Burson* plurality means the area around a polling place is a public forum, that still supports the State Defendants, because *Burson* allowed the restriction of "pure political speech," which necessarily means the State can restrict "lesser forms of expression" like Plaintiffs' conduct. Doc. 578 at 27–28.

24

On the merits, Plaintiffs insist that the Supreme Court's plurality opinion in *Burson* supports them and argue this Court held that *Burson* made a "binding" holding that the "area outside [a] polling place is a traditional public forum." NGP Br. at 29–30 (citing *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1217 n.9 (11th Cir. 2009)); *see also* AME Br. at 41– 42 (same). Plaintiffs wildly overstate *Browning* and *Burson*. Although this Court in *Browning* applied a *Marks*[1] analysis to *Burson*, it never clearly addressed or applied a forum analysis. *See Browning*, 572 F.3d at 1217 n.9. It seems the parties did not even raise the forum issue. The "Supreme Court has long and consistently told [courts] that issues not raised by the parties and not discussed in opinions are not holdings." *Johnson v. Terry*, 112 F.4th 995, 1010 (11th Cir. 2024) (collecting cases); *accord United States v. Penn*, 63 F.4th 1305, 1310 (11th Cir. 2023) ("[A]ssumptions are not holdings.").

*Burson* should not be overread either. As State Defendants explained (and Plaintiffs do not rebut), *Burson*'s holding turned on

---

[1] *Marks v. United States*, 430 U.S. 188, 193 (1977) (instructing courts that, when five Justices do not join a single rationale, to treat as the Supreme Court's holding the position taken by Justices "who concurred in the judgments on the narrowest grounds").

the State's unique interests around polling places on election day and on those places *not* being open and devoted to assembly and public debate, *i.e.*, not being public forums. *See* State Br. at 40. In any event, although sidewalks may be "quintessential public forums," *Burson*, 504 U.S. at 196, that does not mean they *always* are. *See, e.g.*, *Kokinda*, 497 U.S. at 728; *Bloedorn*, 631 F.3d at 1233–34; *Keister*, 29 F.4th at 1253. The sidewalks where Georgia voters wait in line are a location the State has clearly *not* "by government fiat … devoted to assembly and debate." *Burson*, 504 U.S. at 196. Instead, precisely like in *Mansky*, the State is specifically "set[ting] aside [the sidewalks] for the sole purpose of voting" and waiting to vote. 585 U.S. at 12.

Because the voting line is a nonpublic forum, the State's restrictions on it need only be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quotation omitted); *see also* State Br. at 35–36, 40–41. Plaintiffs do not appear to contest that, if the voting line is a nonpublic forum, the handout law is reasonable. And for good reason. As the State Defendants have explained, the handout law is reasonable. *Id.* at 40–41.

26

### 2. Even if the handout law is subject to First Amendment scrutiny, it is narrowly tailored to advance compelling state interests.

The handout law passes muster even if heightened scrutiny applies. *See id.* at 41–51. The law is content-neutral because it does not "treat[] different messages differently" but merely "treats different conduct differently." *Lichtenstein v. Hargett*, 83 F.4th 575, 588 (6th Cir. 2023). But even if the law were content-based, the analysis would still turn on tailoring because nobody disputes that the State has compelling interests in protecting voters from undue influence and in running efficient elections. *See* State Br. at 45–46. And the handout law is narrowly tailored because it does not prohibit anyone from expressing messages or target Plaintiffs' purported messages—it just prohibits handouts. *See id.* at 46. It is necessarily narrowly tailored because it is tied specifically to a 25-foot zone around the area in need of protection, the voting line. *Id.* at 46–50. It goes no further, ever, than that area.

**a.** Plaintiffs contend that the handout law is content-based. NGP Br. at 31–34. They largely repeat their argument that the law must be content-based because the State says it helps enforce bans on voter intimidation. *Id.* at 32; *see also* AME Br. at 37–39. As already explained, the handout law does not target any

27

message.  It does not apply to only handouts that may intimidate
or handouts that may do something else—it applies to all
handouts equally.  The law is a prophylactic measure that
*alleviates* the need to monitor or distinguish among different types
of speech.  *See supra* at 19–20.

Plaintiffs try to distinguish an analogous case involving a ban
on car horn honking, but they fail.  *See* AME Br. at 39–40 (citing
*Porter v. Martinez*, 68 F.4th 429 (9th Cir. 2023)).  That ban did not
single out honking for differential treatment based on any
intended messages but "applie[d] evenhandedly to all."  *Porter*, 68
F.4th at 441 (quotation omitted).  The handout law is no
different—it does not matter what message might be intended by
a handout (intimidation or otherwise) or what "emotive impact"
the handout may have, NGP Br. at 32 (quotation omitted), the law
applies exactly the same to everyone.  For the same reason,
Plaintiffs fail to meaningfully distinguish *Food Not Bombs II*,
which involved a content-neutral law because its application did
"not depend on the content of the message associated with any
food sharing that happens to be expressive."  *Food Not Bombs II*,
11 F.4th at 1292.

**b.** Plaintiffs also contend that the handout law is not
narrowly tailored because it is a blanket ban on handouts, it seeks

to ban conduct that is already banned by other laws, the 25-foot zone is too large, and it's too difficult to enforce.  NGP Br. at 34–41; AME Br. at 44–49.  Those arguments fail.

The handout law is not a blanket ban on handouts, theoretically or practically.  Plaintiffs are free to provide handouts if they are 25 feet away from the voter line.  *See* State Br. at 46–47.  Plaintiffs say that is impractical because voters cannot leave the line to grab a snack from 25 feet away.  NGP Br. at 40; AME Br. at 44.  But that argument does not go to *tailoring* because it is no different from saying the State should not ban line warming in the first place.  Plaintiffs' argument would not change whether the zone was 25 feet or 250 feet.  Regardless, the district court concluded the opposite of Plaintiffs' assertion: as to the 150-foot zone, there were "alternative avenues for expression," because Plaintiffs could provide gifts "directly to voters and set up tables that voters can approach of their own accord."  Doc. 241 at 53–54.  That is equally true of the 25-foot zone (and the district court never suggested otherwise).  That conclusion is supported by the record evidence that line warming activists can and *have* operated outside buffer zones, either by functioning outside of them or handing things to voters before they're in line.  *See* Doc. 578-6 at 4; Doc. 578-7 at 4; Doc. 578-8 at 4.  And Plaintiffs' position

29

generally disregards the value of allowing *voters* the choice to voluntarily engage with activists, rather than allowing them to be involuntarily approached.

Even more importantly, the handout law is not a blanket ban—or *any* ban—on the actual *speech* that Plaintiffs claim an interest in.  It does not prohibit them from sharing the variety of messages they want to share; it just prohibits them from giving out gifts.  Even though Plaintiffs say that prohibiting that combination makes their speech less "powerful," NGP Br. at 38, they have no inherent constitutional right to *act* in ways that magnify the impact of their speech, *see* State Br. at 28–29.

Plaintiffs are also wrong that the handout law is limitless in geographic scope, which they argue violates *Burson*'s instruction that "[a]t some measurable distance from the polls … governmental regulation of vote solicitation could effectively become an impermissible burden."  *Burson*, 504 U.S. at 210; *see also* NGP Br. at 36–38; AME Br. at 45.  The handout law is by definition limited to the voting line, which is the location that matters because that is where the people in need of protection are located.  And a short 25-foot distance tied directly and only to the area in need of protection is obviously narrowly tailored to the area in need of protection.  *See, e.g.*, *Burson*, 504

30

U.S. at 211 (upholding 100-foot zone from area needing protection); *see also* State Br. at 47–48.

Plaintiffs suggest that the voting line could theoretically go on forever, making the handout ban "geographically unbounded." NGP Br. at 37 (emphasis removed); *see* AME Br at 45. That's an exaggeration, *see* State Br. at 50, but even if true it would hardly matter. If the area that needs protection expands, protective laws can expand with it. *Burson* does not contradict that point but proves it. The Supreme Court's statement about a ban becoming unconstitutional at "some measurable distance from the polls" was made in the context of the polls being the place in need of protection. *See Burson*, 504 U.S. at 210. The further away from the area of protection, the less tailored a law is. Here, the area needing protection is the line itself. If anything, the further the line is from the polling place, the *more* voters need protection because that is where they are furthest from the close sight and hearing of poll workers. The handout law is necessarily, *always* narrowly tailored to the area that matters.

Plaintiffs also miss the mark by arguing that other laws already prohibit the kind of undue influence the State seeks to protect against. *See* NGP Br. at 35–36; AME Br. at 47. They say the State cannot do that because it must "target [the] precise

31

expression" of intimidation "and nothing more."  NGP Br. at 36 (citing *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000)).  That is just a rewording of the least restrictive means test, which does not apply to content-neutral conduct regulations. *See, e.g.*, *Food Not Bombs II*, 11 F.4th at 1294.  It does not even apply to *content-based* regulations under *Burson*, which requires only that the law is "reasonable and does not *significantly impinge* on constitutionally protected rights."  *Burson*, 504 U.S. at 209 (quotation omitted).  And the law does not significantly impinge any rights because, as explained, it narrowly limits only particular conduct.  *See supra* at 27–30.

Plaintiffs suggest that the handout law is somehow not narrowly tailored because monitoring a 25-foot distance is too difficult, but that makes little sense.  *See* NGP Br. at 39–40; AME Br. at 44.  Enforcing the handout law is as simple as looking at the voting line and looking at the location of the person handing things out.  Practically, it will be obvious where the voting line is and whether someone is standing close enough to a voter to hand him something.  It will certainly be obvious if someone is *actually* handing something over, which requires being within 25 feet. More importantly, as the State Defendants have already explained, enforcing a 25-foot distance is *easier* for officials than

32

having to independently assess each and every conversation and handout to determine whether it amounts to or conceals bribery or undue influence. *See supra* at 19. Plaintiffs' ease-of-enforcement argument only helps the State Defendants.

**c.** Plaintiffs pick fights over the record, saying there is no evidence of voter intimidation or confusion connected to handouts. *See* NGP Br. at 14; AME Br. at 48. Plaintiffs are wrong.

The record shows that multiple election officials had serious concerns about line warming activists. Generally, they believed line warming activists were "worrisome," Doc 197-2 at 18, and "troubling," Doc. 197-4 at 6, because they could be used to disguise unlawful electioneering. And it is no surprise why: Based on their experience with polling places, they understood that voters often perceive line warming as intimidation or as "unwanted pressure and even harassment." Doc. 578-4 at 8; *see also* Doc. 197-2 at 12. They also understood that line warming could confuse voters by making them think they are receiving rewards for voting. Doc. 197-2 at 24. Or that at the very least line warming could create the appearance of impropriety because inevitably some voters may receive gifts while others do not. *See* Doc. 578-4 at 9. Plaintiffs would disregard these poll workers' decades of experience and observations, but the Georgia legislature need not.

33

There are also numerous voters across multiple counties who have complained about encounters with line warming activists, including that the activists were just disguised partisan campaigners.  Doc. 197-2 at 10–11; *see also, e.g.*, Doc. 197-2 at 33, 39; Doc. 578-4 at 9.  Cobb County, for example, has received "a lot of complaints from voters" about line warming activists "because [voters] always suspect the motives are partisan."  Doc. 197-2 at 39.  One Dougherty County voter expressly complained that older voters felt intimidated by line warming activists.  *Id.* at 50.  Plaintiffs say that this voter should not have thought what she thought.  *See* NGP Br. at 13–14; AME Br. at 48.  But disagreement with the voter's thinking does not mean the voter did not think it.

In any event, the General Assembly can take *proactive* measures—States may "respond to potential deficiencies in the electoral process with foresight rather than reactively."  *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986).  And a State need not "make a particularized showing of the existence of voter confusion" or other ills, *id.* at 194–95, or "shoulder 'the burden of demonstrating empirically the objective effects' of election laws," *Richardson v. Hughes*, 978 F.3d 220, 240 (5th Cir. 2020) (quoting *Munro*, 479 U.S. at 195).  A state can, for example, enact

measures combatting voter fraud even when there is no evidence of that kind of fraud having ever happened. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194–96 (2008) (lead op.); *see also Richardson*, 978 F.3d at 240 ("States have thus never been required to justify their prophylactic measures to decrease occasions for vote fraud.") (quotation omitted and alteration adopted). Simply, "[n]o proof … is required." *Cowen v. Sec'y, State of Ga.*, 22 F.4th 1227, 1234 (11th Cir. 2022).

## II.  The equities weigh against a preliminary injunction.

Setting aside the merits, injunctive relief is improper because the equities favor the State. As State Defendants have explained, Plaintiffs face no irreparable harm while the State faces obvious harm. State Br. at 51–52. Because Georgia's reforms in SB 202 have dramatically reduced wait times already and will likely continue to do so, the occasions where voter lines extend beyond the 150-foot zone (which Plaintiffs do not challenge) will be rare. *See id.* So the 25-foot zone will rarely ever come into play. The lack of irreparable harm is also evident because, after the district court denied Plaintiffs' first request for a preliminary injunction, they delayed eight months before seeking one again. *Id.* at 52; *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). While Plaintiffs face minimal if any harm, Georgia

35

clearly faces grave harm from being unable to enforce its election laws. *See* State Br. at 52–54.

Plaintiffs respond that they suffer irreparable harm because their First Amendment rights are chilled. NGP Br. at 42; AME Br. at 52. That argument necessarily fails because, as explained, Plaintiffs' First Amendment rights are not at issue. *See supra* at 5–20.

Plaintiffs also claim irreparable injury because they assert long voting lines will continue to extend beyond the 150-foot zone. *See* NGP Br. at 12 n.5, 43; AME Br. at 52–53. But that's wrong. The average election day wait times in Georgia's recent elections have been at or under a few minutes: In 2020 it was three minutes, in November 2022 it was just over 2 minutes, and in the December 2022 runoff it was under 2 minutes. Doc. 578-3 at 5; *see also* Doc. 578-4 at 5; Doc. 578-9 at 5, 31–38 (expert report). One study showed that in 2022 only 10% of Georgia voters reported waiting in line longer than 30 minutes. Doc. 578-3 at 5, 34. Observational evidence confirms those reports: A seasoned election official who has observed numerous polling stations for decades testified that it is "now rare" and an "anomaly" for lines to extend beyond 150 feet from the polling location. Doc. 578-4 at 3, 6.

Plaintiffs argue that the district court rightly rejected evidence that voting lines in Georgia will rarely extend beyond 150 feet.  NGP Br. at 12 n.5.  The district court reasoned that Plaintiffs and the State Defendants presented evidence about different elections and voting periods.  *See* Doc. 614 at 31.  The district court's conclusion was apparently based on Plaintiffs presenting evidence about a *single* early voting day in December 2022, while the State Defendants presented evidence about several elections on election day.  *See id.* at 30.

The district court ignored a wealth of statewide evidence in favor of one day to conclude that long lines are "sufficiently likely to continue in the 2024 elections such that Plaintiffs will suffer irreparable injury absent an injunction."  *Id.* at 31.  That's clearly erroneous as a factfinding.  And it's clearly wrong about irreparable injury, anyway: If *some* polling places may *occasionally* have long wait times, while across the board there will generally be virtually no wait times, that only proves the State Defendants' point that any harm to Plaintiffs is minimal.

As to their delay in seeking a preliminary injunction, Plaintiffs seek to excuse it by arguing that they had to wait until the election was close but not too close so they could show imminent harm without violating *Purcell v. Gonzalez*, 591 U.S. 1

37

(2006).  NGP Br. at 43–44; AME Br. at 54.  That Goldilocks approach stretches the word "imminent" too far.  An election many months off is still imminent because it is certain to actually happen.  *Cf. Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1193–94 (11th Cir. 2009) (an imminent injury "requires only that the anticipated injury occur within some fixed period of time in the future," such as an election) (alteration adopted).  Plaintiffs cannot use the need for an "imminent" injury as an excuse for their delay.

## III. As to the Birthdate Requirement, the State Defendants have standing to appeal the district court's injunction, but the NAACP and AME Plaintiffs lack standing to pursue a challenge against the State Defendants.

Apart from the handout law, the NAACP and AME Plaintiffs cross-appeal the district court's ruling that they lack standing to seek an injunction against the State Defendants regarding O.C.G.A. § 21-2-385(a).  *See* Br. of Georgia State Conference of the NAACP, et al. at 53–61 ("NAACP Br."); AME Br. at 1 (adopting NAACP Brief).  That statute requires voters to print their date of birth on the outer envelope of an absentee ballot.  The district court incorrectly enjoined that law as to certain County Defendants, Doc. 613 at 38, but it also concluded that Plaintiffs lacked standing as to the State Defendants, *id.* at 17.

38

As to the *merits* of the district court's analysis, the State Defendants continue to adopt and rely on the brief of the Intervenor-Defendants, *supra* at xi, but with respect to *standing*, there are two issues to address.  First, whether the State Defendants have appellate standing to challenge the district court's merits ruling with respect to the counties, and second, whether the district court correctly held that Plaintiffs lack standing to sue the State Defendants regarding the birthdate requirement.  Plaintiffs are wrong on both.

## A.   The State Defendants have standing to appeal the district court's indefinite injunction of a Georgia statute.

The State Defendants have already briefed why they have appellate standing.  *See* ECF 89.  They rely on those arguments here, except to point out the most glaring deficiencies in Plaintiffs' latest brief.

To start, Plaintiffs err in suggesting that the State Defendants are "not aggrieved" because the district court's injunction "binds County Defendants only."  NAACP Br. at 24. The district court's injunction intrudes on the State's "sovereign interest[]" in "the power to create and enforce a legal code."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592,

601 (1982).  Apart from Plaintiffs, "[n]o one doubts that a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional." *Hollingsworth v. Perry*, 570 U.S. 693, 709–10 (2013) (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)).  The district court's decision halts the continued enforceability of the birthdate requirement in much of the State on the ground that the law is likely unconstitutional. *See* Doc. 613 at 21–22, 38.  That is more than enough to establish the State Defendants' standing.

Plaintiffs similarly ignore this Court's recent decision holding that the Florida Secretary of State had standing to appeal a judgment enjoining a county supervisor of elections from enforcing a provision of Florida election law.  *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 945–46 (11th Cir. 2023).  The Secretary had standing even though he was not enjoined and apparently had no direct role in enforcing the provision at issue—and the county official had not appealed.  *See id.* at 945.  This Court explained that the Secretary "need not be bound by an injunction nor even bear the primary responsibility for enforcing the [challenged] provision to enjoy the requisite interest." *Id.*  That's because the "Secretary is not merely a 'concerned bystander' without a 'personal stake in defending [the

law's] enforcement,'" and he instead "has a statutory obligation to uniformly administer elections according to the election code adopted by the Legislature." *Id.* (quoting *Hollingsworth*, 570 U.S. at 707); *see also* O.C.G.A. § 21-2-31(1) (State Election Board duties include promulgating rules and regulations "to obtain uniformity" statewide in election administration).

The State's concrete interest in the enforcement of its election laws also encompasses the other State Defendants, including the State Election Board and its members. Each of these State Defendants has a concrete interest in ensuring the uniformity of the electoral framework throughout Georgia. The result of the preliminary injunction leaves eleven counties enjoined from enforcing the birthdate requirement, while 148 other counties remain compelled to enforce it by state law. This nonuniformity separately aggrieves State Defendants, who now must administer different rules for different counties.

That Plaintiffs' only avenue of relief is an order against county officials does not deprive the State of its interest in the enforceability—and enforcement—of its statutes. The State Defendants have standing to appeal the injunction.

41

**B. Plaintiffs lack standing to pursue their birthdate requirement claims against the State Defendants.**

The district court concluded that Plaintiffs lack standing to sue the State Defendants regarding the birthdate requirement. *See* Doc. 613 at 17. It reasoned that because "county officials are responsible for accepting or rejecting absentee ballots," then "Plaintiffs' injury—the rejection of absentee ballots with missing or incorrect birthdates—is not redressable by an order directed to the State Defendants, who are removed from the process of accepting or rejecting absentee ballots." *Id.* at 16. In short, the "Secretary of State's ability to ensure compliance with judicial orders and to inspect and audit absentee ballot envelopes does not render the rejection of absentee ballots traceable to that office or to other State Defendants." *Id.* (citing *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020)). That was correct and compelled by this Court's decision in *Jacobson*.

**1. Plaintiffs cannot show traceability or redressability because county officials, not the State Defendants, process absentee ballots.**

To establish standing, Plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Town of Chester, N.Y. v. Laroe*

42

*Ests., Inc.*, 581 U.S. 433, 438 (2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  And a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Id.* at 439 (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

Plaintiffs lack standing because their claimed injury is not traceable to the State Defendants and could not be redressed by an injunction against them.  As the district court recognized, "Georgia law commits the processing and verification of absentee ballots solely to county officials."  Doc. 613 at 15; *accord Trump v. Kemp*, 511 F. Supp. 3d 1325, 1333–34 (N.D. Ga. 2021); *see generally* O.C.G.A. §§ 21-2-384, 21-2-386.  The county registrar or absentee ballot clerk collects and safely stores absentee ballots.  Doc. 613 at 16 (citing O.C.G.A. § 21-2-386(a)(1)(A)).  And it is the registrar or clerk who "compares the information on the outer envelope with the information in the voter registration records."  *Id.* (citing O.C.G.A. § 21-2-386(a)(1)(B)).  Those county officials, not any State Defendant, must "reject the ballot if any of the required information is missing or does not match voter registration records."  *Id.* (citing O.C.G.A. § 21-2-386(a)(1)(C)).  County officials—and only county officials—review the outer

43

envelopes containing completed absentee ballots and decide whether to count or reject the ballots. *See id.*

None of this is open to dispute. Nor is there any dispute that the Secretary and State Election Board members do not appoint county officials, or that they can only enforce the election code through civil penalties and judicial proceedings following allegations of violations. *See* O.C.G.A. § 21-2-33.1; *see also* O.C.G.A. §§ 21-2-32, 21-2-33.2, 21-2-40, 21-2-70, 21-2-71. The Board can impose limited civil penalties only after notice and a hearing. O.C.G.A. § 21-2-33.1(a)(2), (b). The new provisions from SB 202 regarding oversight of county officials allow only suspension, not removal, and only after multiple years of county problems. O.C.G.A. § 21-2-33.2(c) (requiring clear and convincing evidence the county or municipal superintendent has, for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections).

*Jacobson* is dispositive. In that case, this Court confronted an effort, similar to Plaintiffs' effort, to enjoin the Florida Secretary of State with respect to tasks that state law committed to county officials—the printing of ballots with candidates' names in the order prescribed by state law. *Jacobson*, 974 F.3d at 1253.

44

Because "Florida law tasks [county] Supervisors [of Elections], independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute," this Court concluded that "any injury from ballot order is not traceable to the Secretary." *Id.* And "[b]ecause the Secretary will not cause any injury the voters and organizations might suffer, relief against her will not redress that injury." *Id.* at 1254. The same is true here.

Plaintiffs try to distinguish *Jacobson* and argue that Georgia law is different than Florida law, NAACP Br. at 58, but they overlook this Court's contrary conclusion in *Georgia Republican Party, Inc. v. Georgia Secretary of State*, 2020 WL 7488181 (11th Cir. Dec. 21, 2020). This Court upheld the dismissal of a case against a similar group of Georgia State Defendants regarding signature verification during the processing of absentee ballots in the 2021 runoff. *Id.* at *1. As with other aspects of the verification and counting of absentee ballots, Georgia "law gives the authority to conduct the signature-verification process to local supervisors, not the Secretary." *Id.* at *2. Like Plaintiffs here, the plaintiffs in *Georgia Republican Party* sought relief against the Secretary based on his position as "the state's chief election officer" with "the authority and responsibility to manage Georgia's

45

electoral system" and to obtain uniformity in election practices. *Id.* That was not enough for standing. "[J]ust as in *Jacobson*, the absentee ballot statute puts the duty to 'compare the signature' and accept or reject a ballot on the 'registrar or clerk'—not the Secretary of State." *Id.*

*Jacobson* also makes clear that Plaintiffs cannot manufacture redressability by pivoting to a request for an order that the State Defendants provide "guidance" on the absentee voter verification provisions. 974 F.3d at 1254. As this Court explained, a "'notice' theory of redressability contravenes the 'settled principle[]' that 'it must be the *effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury.'" *Id.* (quoting *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (citations omitted and emphasis in *Lewis*). Any mere "persuasive effect a judicial order might have upon" county registrars—"nonparties who are not under the Secretary's control"— "cannot suffice to establish redressability." *Id.*; *see also Lewis*, 944 F.3d at 1303–04 (unlikely that city or employers would change behavior based on judgment against attorney general finding state statute unconstitutional); *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023).

Plaintiffs also try escaping *Jacobson* by relying on district court decisions that preceded this Court's controlling opinion, but that tactic fails. NAACP Br. at 57 (citing *Black Voters Matter Fund v. Raffensberger*, 478 F. Supp. 3d 1278 (N.D. Ga. 2020)). For example, Plaintiffs argue that the State Defendants have a role in certifying election results, which they assert makes their injury redressable through an order directing the State Defendants to not "certify returns tainted by the Birthdate Requirement." *Id.* at 59–60 (citing *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) and *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018)). That argument relies on decisions that precede *Jacobson* and that apply attenuated theories of traceability and redressability that are inconsistent with it.

In any event, the certification argument makes no sense. The State Defendants receive and certify overall returns—ballot counts. *See*, *e.g.*, O.C.G.A. § 21-2-499(a). Plaintiffs cannot and do not contend that any county sends each absentee ballot in its original envelope to the State Defendants. Plaintiffs cannot explain how any State Defendant would determine whether ballot counts included or omitted ballots in envelopes that did not comply with the birthdate requirement.

47

The best Plaintiffs can do is to stretch a handful of recent outlier district court decisions beyond the breaking point while ignoring their departure from the reasoning of *Jacobson*, *Lewis*, and *Georgia Republican Party*.  Although Plaintiffs contend that the district court in *New Georgia Project v. Raffensberger*, 484 F. Supp. 3d 1265, 1285–86 (N.D. Ga. 2020), "distinguish[ed] *Jacobson*," NAACP Br. at 61–62, in fact the district court did so only in assessing the plaintiffs' individual *injuries*, *see New Georgia Project*, 484 F. Supp. 3d at 1285–86.  In addressing traceability and redressability against the State Defendants, the court did not acknowledge *Jacobson* but relied on general authority for "uniform election practice" and training, *id.* at 1286—the types of generalities squarely rejected by this Court in *Jacobson* and *Georgia Republican Party*,  *see Jacobson*, 974 F.3d at 1256–57; *Ga. Republican Party*, 2020 WL 4788181, at *2.  No better is *Vote.org v. Georgia State Election Board*, 661 F. Supp. 3d 1329, 1338 (N.D. Ga. 2023), which offered no reasoning at all to support its conclusory pronouncement finding traceability and redressability applicable to the Board.  Regardless the plaintiff in that case was not suing to get ballots counted (a county function), but for voters to be able to use the plaintiff's electronic signature tool statewide to apply for an absentee ballot.  *Id.*

Plaintiffs also rely on *Rose v. Raffensperger*, 511 F. Supp. 3d 1340 (N.D. Ga. 2021), *see* NAACP Br. at 54–55, but *Rose* did not involve processing ballots or any other duties assigned to county registrars. The issue there was a Voting Rights Act § 2 challenge to the statewide structure for electing members to the Georgia Public Service Commission. *Rose*, 511 F. Supp. 3d at 1344. And the district court (whose final judgment this Court reversed on the merits, *see Rose v. Sec'y, State of Ga.*, 87 F.4th 469, 472 (11th Cir. 2023)), merely held that the Secretary was responsible for administering the elections, rejecting the contention that only the General Assembly could redress the claimed injury. *See Rose*, 511 F. Supp 3d at 1536. That the Secretary and the Board have some duties that have nothing to do with the counties does not make them responsible for duties explicitly assigned to the counties.

The upshot is that if the Secretary issued guidance on absentee ballot envelopes that contradicted Georgia law, the 148 county registrars who are *not* parties to this case would be duty-bound to follow the plain statutory dictates rather than the Secretary's guidance. *Jacobson* makes clear that Plaintiffs cannot establish traceability or redressability that way.

**2.    Plaintiffs' belated and indistinct request for relief regarding the form of the absentee ballot return envelopes does not solve the deficiencies in traceability and redressability.**

Plaintiffs nevertheless try to change the result by arguing that the Secretary of State has control over the form and substance of the envelopes sent to absentee voters, which means the Secretary has caused and could change the birthdate requirement.  *See* NAACP Br. at 56.  As Plaintiffs' argument goes, that means their injury must be traceable to the Secretary and redressable by an injunction directed at him.  *Id.* at 56–58.  This argument is premised partially on sleight of hand: it depends on a form of relief Plaintiffs never actually requested, a change to the absentee ballot envelopes.  But even if they had requested that relief, they still would lack standing.

Plaintiffs principally rely in this Court on requested relief—a change to absentee ballot envelopes, *see id.*—that their complaints did not plead (*see, e.g.*, Doc. 33), their motion referenced only in a footnote (Doc. 548 at 21 n.4), their proposed order did not request (Doc. 548-20 at 2), and their reply in the district court only hinted at (Doc. 595 at 7).  The district court appropriately ignored that belatedly requested relief.

Plaintiffs' original motion sought to enjoin "Defendants from rejecting absentee ballots based on any error or omission relating to SB 202's requirement of birthdates on ballot return envelopes and ORDER the Secretary of State to count such ballots and refuse certification of election results until all such ballots have been counted." Doc. 548-1 at 2, *see also* Doc. 548-20 at 2 (Proposed Order). Plaintiffs did not ask that the State Defendants be required to alter the absentee-ballot envelope as part of any injunctive relief—only that the processing of absentee ballots be altered. *Id.* Indeed, although Plaintiffs mentioned in a footnote that they would like to have the absentee ballot forms altered, Doc. 548-1 at 21 n.4, they provided neither argument nor analysis supporting that relief and said only that "counting absentee ballots regardless of birthdate information on the return envelope is an adequate alternative," *id.* Only on reply did Plaintiffs change their tune and suggest—without coming out and saying so—that they were seeking an injunction requiring the alteration of those forms. Doc. 595 at 6.

By omitting a request for relief against the State Defendants in their proposed order and mentioning the possibility (without support or elaboration) only in a footnote of their opening brief below, Plaintiffs forfeited any argument for an order compelling a

51

change in the Secretary's guidance for absentee ballot envelopes. *See*, *e.g.*, *Mock v. Bell Helicopter Textron, Inc.*, 373 F. App'x. 989, 992 (11th Cir. 2010). Indeed, even Plaintiffs' reply below barely hinted at relief regarding the envelopes, without elaboration. *See id.*; *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[E]valuating an issue on the merits that has not been raised in the initial brief would undermine the very adversarial nature of our appellate system."). Plaintiffs, having sandbagged the district court, cannot properly press the claim here.

But Plaintiffs' belated, apparent embrace of a new remedy still does not solve the deficiencies in traceability and redressability. As this Court explained in *Jacobson*, there is no "writ of erasure"—injunctions may only enjoin the actions of officials who are parties to the action. 974 F.3d at 1254–55. Thus, even if the district court ordered the Secretary to alter the forms related to absentee ballots, nonparty county election officials would still be obligated to follow the statute as it is and use conforming envelopes notwithstanding contrary guidance from the Secretary. And the statute itself explicitly and directly requires county superintendents to include "a space for the elector to print his or her date of birth" on absentee ballot return envelopes. O.C.G.A. § 21-2-384(b).

Plaintiffs try pinning the blame for the birthdate requirement on the Secretary via § 21-2-384(b)'s use of the phrase "in form and substance as provided by the Secretary of State."  *See* NAACP Br. at 56.  They argue that phrase means counties must use absentee ballot return envelopes that conform with whatever the Secretary says.  *Id.* at 58.

Plaintiffs blatantly misread that provision.  The statute provides what shall be contained in the "mailing envelope addressed to the elector."  O.C.G.A. § 21-2-384(b).  It "shall contain … two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing and returning the ballot, *in form and substance as provided by the Secretary of State*, provisional absentee ballot information, if necessary, and a notice in the form provided by the Secretary of State of all withdrawn, deceased, and disqualified and any substitute candidates pursuant to Code Sections 21-2-134 and 21-2-155 and nothing else."  O.C.G.A. § 21-2-384(b).  The phrase "in form and substance as provided by the Secretary of State" modifies only the immediately preceding term, "the uniform instructions for the manner of preparing and returning the ballot."  It does not modify the phrase "two envelopes."  The Secretary does not prescribe the "form and substance" of the "official absentee ballot," which

53

(unlike "uniform instructions") must necessarily vary from county to county given the different candidates for different offices in different geographic areas. And the next sentences of O.C.G.A. § 21-2-384(b) thoroughly instruct the Secretary as to the required contents of those "uniform instructions."

So the premise of Plaintiffs' argument is false: although the Secretary does provide a proposed form, nothing requires the counties to use it. The statute instead instructs county officials directly about what the return envelopes must contain. And if the Secretary provided a model envelope that contradicted the clear dictates of the very same statutory subsection, county officials would remain bound by the direct requirements the statute imposes on them rather than any contradictory guidance from the Secretary.[2]

Like the plaintiffs in *Jacobson*, Plaintiffs here "have not proved that declaratory relief against the Secretary will

_____

[2] Plaintiffs also invoke, *see* NAACP Br. 56–57, the Secretary's authority to "inspect and audit the information contained in the absentee ballot applications or envelopes," O.C.G.A. § 21-2-390(b). They omit when that authority exists: "during the 24 month retention period," *id.*, which begins "upon the *conclusion* of the primary or election, *id.* § 21-2-390(a) (emphasis added). The audit authority comes after the election, not before absentee ballots are sent out.

'significantly increase the likelihood' that the [county registrars] will ignore state law and follow a federal decree that does not bind them." *Jacobson*, 974 F.3d at 1255 (quoting *Lewis*, 944 F.3d at 1301). Any injunction against the Secretary would be hollow. That precludes traceability and redressability.

### 3. The Board's suspension power does not show adequate traceability and redressability.

Plaintiffs also seek to establish traceability and redressability against the Board based on its purported ability to suspend and supplant a county registrar's office in particular circumstances. *See* NAACP Br. at 61–62. But the Board has no direct power to suspend a country registrar. On the contrary, the Board can step in only *after* a series of problems occur over multiple elections and with specific factual findings, after notice and a hearing. *Compare* O.C.G.A. § 21-2-33.2(c), *with Jacobson*, 974 F.3d at 1253. There are no allegations (let alone evidence) that any county is anywhere near suspension under that process. Rather, the counties are and remain "independent officials," and Plaintiffs cannot establish traceability and redressability through speculation about possible future exercise of the suspension provisions. *Jacobson*, 974 F.3d at 1253.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court.

Respectfully submitted.

/s/ *Stephen J. Petrany*

| | |
|---|---|
| Gene C. Schaerr | Christopher M. Carr |
| *Special Ass't Attorney General* | *Attorney General of Georgia* |
| Donald M. Falk | Stephen J. Petrany |
| *Special Ass't Attorney General* | *Solicitor General* |
| Brian J. Field | Ross W. Bergethon |
| *Special Ass't Attorney General* | *Principal Dep. Solicitor General* |
| | Elijah J. O'Kelley |
| | *Assistant Solicitor General* |

SCHAERR │JAFFE LLP                Office of the Georgia
1717 K Street NW, Suite 900       Attorney General
Washington, DC 20006              40 Capitol Square, SW
(202) 787-1060                    Atlanta, Georgia 30334
                                  (404) 458-3408
                                  spetrany@law.ga.gov
                                  *Counsel for Appellants*

56

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,776 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Stephen J. Petrany*
Stephen J. Petrany