**No. 23-13085**

# United States Court of Appeals
# for the Eleventh Circuit

In re: GEORGIA SENATE BILL 202

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division
No. 1:21-mi-55555-JPB; Hon. J.P. Boulee

**SUPPLEMENTAL BRIEF OF DEFENDANTS-APPELLANTS
GOVERNOR OF GEORGIA, GEORGIA SECRETARY OF STATE,
GREGORY W. EDWARDS, GEORGIA STATE ELECTION BOARD
& ELECTION BOARD MEMBERS**

Gene C. Schaerr
*Special Assistant Attorney General*
Donald M. Falk
Brian J. Field
Miranda Cherkas Sherrill
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

Bryan P. Tyson
Bryan F. Jacoutot
Diane Festin LaRoss
CLARK HILL PLC
3630 Peachtree Rd. NE, Ste. 700
Atlanta, Georgia 30326
(678) 370-4377
btyson@clarkhill.com

Christopher M. Carr
*Attorney General of Georgia*
John Henry Thompson
*Solicitor General*
Elijah J. O'Kelley
*Deputy Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
(404) 458-3408
jhthompson@law.ga.gov

*Counsel for State Defendants-Appellants*

No. 23-13085

*In Re: Georgia Senate Bill 202*

## CERTIFICATE OF INTERESTED PERSONS

State Defendants hereby certify that, in addition to those listed in the State Defendants-Appellants' Certificate of Interested Persons (ECF 72), Opening Brief (ECF 124), and Response and Reply Brief (ECF 168), the following persons and entities may have an interest in the outcome of this case:

1. Futch, Jayme Briana Hayes, *Counsel for AME Plaintiffs-Cross-Appellants*;

2. Prince, Joshua James, *Counsel for State Defendants-Appellants*;

3. Sherrill, Miranda Cherkas, *Counsel for State Defendants-Appellants*; and

4. Thompson, John Henry, *Counsel for State Defendants-Appellants*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, State Defendants-Appellants state that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................... C1

TABLE OF AUTHORITIES .................................................................ii

ARGUMENT ....................................................................................1

    I.    *LWVF* and *Schultz* Confirm State Defendants' Appellate Standing. ...............................................................................2

        A.    *LWVF* establishes state officials' standing on materially identical facts. .................................................2

        B.    *Schultz* confirms State Defendants' standing. ...................6

    II.    *FDA v. Alliance for Hippocratic Medicine* Confirms that Plaintiffs Lack Standing to Sue. ..............................................10

CONCLUSION .................................................................................19

CERTIFICATE OF COMPLIANCE.......................................................21

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Berger v. N.C. State Conf. of NAACP,*
  597 U.S. 179 (2022) .................................................................4

*Coleman v. Miller,*
  307 U.S. 433 (1939) .................................................................4

*Diamond v. Charles,*
  476 U.S. 54 (1986) ...................................................................5

*Edwards v. U.S. Att'y Gen.,*
  97 F.4th 725 (11th Cir. 2024).................................................10

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024) .................................1, 11, 12, 13, 14, 15, 16, 17, 18

*Fla. State Conf. of NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) ..............................................15

*Georgia Ass'n of Latino Elected Offs., Inc. v.*
  *Gwinnett Cnty. Bd. of Registration & Elections,*
  36 F.4th 1100 (11th Cir. 2022)...............................................14

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ................................................................15

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ..................................................................6

*Johnson v. Terry,*
  119 F.4th 840 (11th Cir. 2024).................................................8

*Kimberly Regenesis, LLC v. Lee County,*
  64 F.4th 1253 (11th Cir. 2023).................................................6

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State,*
  66 F.4th 905 (11th Cir. 2023)........................... 1, 2, 3, 4, 6, 9

*Maine v. Taylor,*
  477 U.S. 131 (1986) .............................................................3, 6

*Republican Nat'l Comm. v. Eternal Vigilance Action, Inc.,*
917 S.E.2d 125 (Ga. 2025) ........................................................... 8

*Schultz v. Alabama,*
42 F.4th 1298 (11th Cir. 2022) ...................................... 1, 7, 8

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) .................................................................. 18

*United States v. Kaley,*
579 F.3d 1246 (11th Cir. 2009) ............................................. 14

*Valley Forge Christian Coll. v. Ams. United for Separation of
Church & State, Inc.,* 454 U.S. 464 (1982) ............................ 12

## Statutes

O.C.G.A. § 9-4-7 ....................................................................... 8

O.C.G.A. § 21-2-31 ................................................................... 9

O.C.G.A. § 21-2-32 ................................................................... 8

O.C.G.A. § 21-2-50 ................................................................... 8

## Other Authority

Elections Div., Ga. Sec'y of State,
*Data Hub November 8, 2022 General Election* .................... 18

## ARGUMENT

This Court has made clear that State officials have standing to appeal election-law injunctions, even if the injunction directly binds only county officials, especially where those state officials are responsible for upholding and defending the constitutionality of state election law. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 945–46 (11th Cir. 2023) (*LWVF*). That rule plainly applies to State Defendants here. And that conclusion is unaffected by this Court's holding in *Schultz v. Alabama*, 42 F.4th 1298, 1316–18 (11th Cir. 2022), that local judges—who are not charged with the responsibility of enforcing and defending state election laws—lack standing to appeal injunctions that in no way bind them. *LWVF*, a case decided on materially indistinguishable facts, controls, and *Schultz*, a case different in every meaningful way, does not.

Plaintiffs, by contrast, lack Article III standing. The Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), confirmed as much by holding (1) that individual plaintiffs must have suffered a concrete injury beyond general disagreement with state law, and (2) that organizational plaintiffs may

not demonstrate standing by pointing to a diversion of resources based on issue advocacy.

## I. *LWVF* and *Schultz* Confirm State Defendants' Appellate Standing.

This Court has directed the parties to address whether *Schultz* or *LWVF* "governs the appellate standing of the state defendants here, and why?" ECF 221.[1] *LWVF* governs, as it is materially indistinguishable on its facts and reasoning. By contrast, *Schultz* neither addressed nor involved similar facts, and it creates no tension with *LWVF* or with the conclusion that State Defendants here have appellate standing.

### A. *LWVF* establishes state officials' standing on materially identical facts.

*LWVF*, correctly applying Supreme Court precedent, confirms that a State through its responsible officials has an interest in enforcing its duly enacted laws, and that this interest supports appellate standing to challenge an injunction even when directed at another party.

In *LWVF*, the district court enjoined only a single county supervisor of elections as the party who directly enforced the challenged state law provisions in that county. 66 F.4th at 945. Although the enjoined county

---

[1] Eleventh Circuit case documents are cited using "ECF"; district court documents use "Doc."

official "did not appeal," and the injunction did not bind the Florida Secretary of State, this Court nonetheless held that the Florida Secretary of State had standing to appeal. *Id.*

This Court explained that the Secretary of State "need not be bound by an injunction nor even bear the primary responsibility for enforcing the [enjoined] provision to enjoy the requisite interest" for appellate standing. *Id.* Even if he "'ha[d] no role in enforcing'" the challenged provision at the county level, he was "not merely a 'concerned bystander' without a 'personal stake in defending [the law's] enforcement.'" *Id.* (citations omitted). Rather, the Secretary had "a statutory obligation to uniformly administer elections according to the election code adopted by the Legislature." *Id.*

Relatedly, the State, through its officials, has a general interest in defending the State's laws. "Federal courts must respect states' strong interests in defending the constitutionality of their laws." *Id.* In *LWVF*, this Court expressed concern that, "if the [decision on appeal] 'is left undisturbed, [the State] will be bound by the conclusive adjudication that [the challenged statute] is unconstitutional.'" *Id.* (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)). But a State's participation on appeal

ensures "a full and fair adversarial testing of [its] interests and arguments." *Id.* at 946 (quoting *Berger v. N.C. State Conf. of NAACP*, 597 U.S. 179, 191–92 (2022)). That "adversarial testing" could be completely circumvented if a plaintiff could sue only county officials who are sympathetic to the plaintiff's position or who lack resources to appeal. Collusive litigation would be a real concern.

*LWVF* is consistent with Supreme Court precedent, which has "cautioned that 'federal courts should rarely question that a State's interests will be practically impaired or impeded if its duly authorized representatives are excluded from participating in federal litigation challenging state law.'" 66 F.4th at 945–46 (quoting *Berger*, 597 U.S. at 191). And that line of authority runs long and deep. Decades ago, the Supreme Court recognized "the legitimate interest [of] public officials and administrative commissions, federal and state, to resist the endeavor to prevent the enforcement of statutes in relation to which they have official duties." *Coleman v. Miller*, 307 U.S. 433, 441–42 (1939). And "[b]ecause the State alone is entitled to create a legal code, only the State has the kind of direct stake" needed for standing to "defend[] the

standards embodied in that code." *Diamond v. Charles*, 476 U.S. 54, 65 (1986) (cleaned up).[2]

This case is materially indistinguishable from *LWVF*. The district court recognized that only the county officials could be enjoined, and it enjoined 11 counties from enforcing the birthdate requirement, while 148 other counties remain compelled to enforce it by state law. *See* Doc. 613 at 15–17 (J.A. Vol. 1, ECF 128-1). As in *LWVF*, even if the State Defendants are not responsible for the county-level enforcement of the birthdate requirement, they have a cognizable stake in defending that state-law requirement. They also have a concrete interest in ensuring a uniform electoral framework throughout Georgia. The confusion and fragmentation created by an indefinite, patchwork invalidation of Georgia election law plainly aggrieves State Defendants. And indeed, Plaintiffs argued below that, if the district court "determined that SB 202's absentee restrictions are improper, the State is duty bound to take corrective action." Doc. 826 at 80; *see generally id.* at 71–87.

---

[2] The State of Georgia is itself no longer a party. *See* State Defs.' Opening Br. 13 n.3. But it acts through State Defendants, so the same considerations apply.

On top of everything else, this Court's unambiguous instruction that federal courts must respect states' interests in defending their laws plainly applies to State Defendants here. As the Supreme Court put it, "[n]o one doubts that a State has a cognizable interest 'in the continued enforceability' of its laws that is harmed by a judicial decision declaring a state law unconstitutional." *Hollingsworth v. Perry*, 570 U.S. 693, 709–10 (2013) (quoting *Taylor*, 477 U.S. at 137). And here, the lack of "continued enforceability" of the birthdate requirement across portions of the State on a county-by-county basis, *LWVF*, 66 F.4th at 945 (quoting *Taylor*, 477 U.S. at 137), is an "injury caused by the judgment," *Kimberly Regenesis, LLC v. Lee County*, 64 F.4th 1253, 1259 (11th Cir. 2023) (per curiam) (citation omitted).

### B.    *Schultz* confirms State Defendants' standing.

Nothing in *Schultz* conflicts with *LWVF*. The cases' results differ only because the facts differ: The appellants who lacked standing in *Schultz* were not statewide officials facing non-uniform enforcement of election laws stemming from an injunction, nor were they responsible for administering or defending the challenged state law. And *Schultz*'s logic confirms that State Defendants have standing here.

6

*Schultz* involved a suit by arrestees against the local sheriff, the circuit court, local magistrate judges, and state district court judges claiming the county's local bail policy was unconstitutional. 42 F.4th at 1306, 1310–11. The district court enjoined only the sheriff because he alone had a legal role in administering and defending the challenged policy. Although not covered by the injunction, the judges also appealed and sought to argue that judicial immunity prevented its application to them. *Id.*

This Court held that the judges lacked appellate standing because they lacked a sufficient legal interest in the bail policy or the injunction. *Id.* at 1316–17. Tellingly, the judges did not argue they had any state-mandated responsibility to enforce or defend the bail policy in the manner of a statewide official who is authorized to defend state laws that have been challenged in civil litigation. Rather, they argued only that that "the injunction ha[d] the practical effect of binding their actions" and that the bail policy was "enforceable against them through contempt." *Id.* at 1311, 1316–18.[3] This Court rejected those contentions because neither

---

[3] The judges also urged the Court to exercise "pendent party appellate jurisdiction," which this Circuit does not recognize. *Schultz,* 42 F.4th at 1318.

was correct. *Id.* at 1317–18. "No part of the injunction require[d] [the judges] to modify their actions in any way." *Id.* at 1317.

*Schultz* could not be further from this case, in both its facts and reasoning. It did not even address whether state officials who are not bound by the injunction may have appellate standing based on their role in defending the state's laws. *See, e.g.*, *Johnson v. Terry*, 119 F.4th 840, 855 (11th Cir. 2024) ("[I]ssues not raised by the parties and not discussed in opinions are not holdings." (collecting cases)), *cert. denied,* 146 S. Ct. 101 (2025). And that's no surprise because the judges could not—and so did not—make that argument. But State Defendants here *are* responsible for defending the constitutionality of state election laws in court. *See, e.g.*, *Republican Nat'l Comm. v. Eternal Vigilance Action, Inc.*, 917 S.E.2d 125, 137 (Ga. 2025) ("[T]he [State Election Board] … regulate[s] federal, state, and county elections."); O.C.G.A. § 9-4-7(c) (the Attorney General "shall be entitled to be heard in defense of" the constitutionality of state statutes); *id.* § 21-2-32(a) (the "State Election Board shall have the right to institute or to intervene" in any action related to state election law); *id.* § 21-2-50(b) (the Secretary of State is "the state's chief election official"). Whereas the judges in *Schultz* did not implicate the concern

8

that "[f]ederal courts must respect states' strong interests in defending the constitutionality of their laws," *LWVF*, 66 F.4th at 945, the State Defendants here plainly do.

In addition, unlike the judges in *Schultz*, State Defendants here have a concrete interest in the uniform enforcement of state election law across all of Georgia's 159 counties. That is the same "statutory obligation to uniformly administer elections according to the election code adopted by the Legislature" that was controlling in *LWVF*. 66 F.4th at 945; *see also* O.C.G.A. § 21-2-31(1) (State Election Board duties include promulgating rules and regulations "to obtain uniformity" statewide in election administration).

At bottom, *LWVF* and *Schultz* have little overlap. The question decided in *LWVF* was whether state officials had appellate standing to defend the constitutionality of a state statute over which the officials had responsibility for administering and defending in court. That was not true of the judges in *Schultz*—and at the very least, it was simply not an

9

argument raised, considered, or decided.[4] *LWVF* controls this case, and it establishes that State Defendants have appellate standing.

II.    ***FDA v. Alliance for Hippocratic Medicine* Confirms that Plaintiffs Lack Standing to Sue.**

In the underlying action, only organizational plaintiffs challenged the birthdate requirement. *See* Doc. 613 at 2 n.1. And the district court analyzed standing only for the Georgia NAACP and the Georgia Muslim Voter Project. Those organizations, the court reasoned, had standing because (they claimed) they diverted resources away from "veteran affairs programs" and "leadership development programs" toward "outreach" and "voter education efforts" on "how to cast an absentee ballot." *Id.* at 7–10. Alternatively, the court ruled that the Georgia NAACP had associational standing because it found the organization's purpose—the elimination of racial discrimination—germane to the interests at stake and because the court believed it was unlikely that none of the organization's members would be harmed by the birthdate

---

[4] Recognizing as much does not require this Court to resolve any conflict in prior panel precedent. Indeed, there's no tension between the two decisions. But even if there conceivably were, "[r]econciling [the] two previous decisions is not difficult," *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 736 (11th Cir. 2024), given the major factual differences in the nature of the laws, officials, and lawsuits.

requirement. *Id.* at 10–14. The court, however, did not identify any evidence that any Georgia NAACP member had been, or would be, harmed by the requirement. The district court also explained that it was "not convinced" that "any of the other plaintiffs … has shown associational standing." *Id.* at 14 n.12.

The Supreme Court's recent decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), makes clear that Plaintiffs do *not* have Article III standing to challenge the birthdate requirement. Their purported organizational injury is based on an invalid diversion-of-resources theory and their purported associational standing is far too speculative.

1. In *Alliance,* the Supreme Court underscored that plaintiffs must have concrete injuries-in-fact that result from a predictable chain of events tying the government action to the alleged harm—and not from an organization's own spending choices to pursue education or advocacy in response to a change in the law. There, several medical associations and individual doctors sued seeking to require the FDA to rescind its approval of mifepristone or to rescind regulatory actions it took in 2016 and 2021. 602 U.S. at 376–77. A unanimous Supreme Court explained

11

that federal courts do not "operate as an open forum for citizens to press general complaints about the way in which government goes about its business." *Id.* at 379 (cleaned up). Thus, "courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982)). In other words, the Constitution "does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* at 382.

To the contrary, a cognizable "injury must affect the plaintiff in a personal and individual way and not be a generalized grievance." *Id.* at 381 (cleaned up). Moreover, "to establish causation, the plaintiff must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff." *Id.* at 385 (collecting cases). As the Court explained, "Article III standing screens out plaintiffs," even service-providing organizations, "who might have

12

only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

Turning squarely to organizational standing, the Court held that an organizational plaintiff may not "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. The Court flatly rejected the notion that "standing exists when an organization diverts its resources in response to a defendant's actions," including for issue-advocacy purposes. *Id.* at 395. Nor can standing arise from an organization spending "considerable resources" on "public education" about the defendant's action "to the detriment of other spending priorities." *Id.* at 394.

2. *Alliance* does not affect State Defendants' appellate standing. But it does establish that the district court was wrong to rule that the Georgia NAACP and the Georgia Muslim Voter Project have organizational standing. The district court's principal basis for finding standing for both organizations was their alleged diversion of resources to publicize the new birthdate requirement and educate the public on the need to comply with it. That is exactly what *Alliance* says is *not* an injury. *See* 602 U.S. at 394–95. *Alliance* holds that standing does not exist

13

merely because "an organization diverts its resources in response to a defendant's actions," including specifically the diversion of resources "to gather information and advocate against" the challenged action. *Id.*

This Court has previously adopted a diversion-of-resources theory of standing, and the district court relied on that precedent. *See* Doc. 613 at 8 (citing *Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022)). But *Alliance* abrogates that circuit precedent across the board—but at a minimum in the precise context of this case. *See, e.g.*, *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009). So this Court is no longer bound (or allowed) to rely on it.

To be sure, Plaintiffs have tried to recast their diversion-of-resources argument by claiming that the birthdate requirement affected their "core business activities"—which *Alliance* suggests might still support standing. 602 U.S. at 395. *See* Doc. 891 at 3–8. But Plaintiffs cannot rely on that approach because applying it here would render *Alliance*'s core holding meaningless.

*Alliance* explained the distinction between a diversion of resources based on issue advocacy and standing based on a law's interference with

14

"core business activity." 602 U.S. at 395. In so doing, it pointed to *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and explained why that decision does not support a diversion-of-resources theory of standing. *See Alliance,* 602 U.S. at 395. *Havens*, the Court explained, involved an organization that "not *only* was an issue-advocacy organization, *but also* operated a housing counseling service." *Id.* (emphases added) (citing *Havens,* 455 U.S. at 368). That meant the defendant's racial steering policy "directly affected and interfered with [the plaintiff's] core business activities," which is what justified standing. *Id.* The situation was "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* The Court went on to warn that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396. The Court's point was clear: Do not read *Havens*, which we've cabined to its facts, to support the diversion-of-resources theory of standing we just rejected.[5]

---

[5] This explicit confinement of *Havens* further shows why *Alliance* abrogates this Court's precedent, which seems to have first sourced its adoption of a diversion-of-resources theory to the understanding of *Havens* that the Supreme Court has now rejected. *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008).

Plaintiffs here are nothing like retailers suing manufacturers for defective goods, and they're nothing like the plaintiff in *Havens*. Plaintiffs cannot identify any activity apart from issue advocacy. They are the *very* type of plaintiff the Supreme Court held *cannot* rely on a diversion-of-resources theory. And the activities Plaintiffs point to are the very "public advocacy and public education" activities *Alliance* deemed insufficient. *See* 602 U.S. at 394. *Alliance* would be a dead letter if plaintiffs could simply relabel issue advocacy as business activity because they are issue-advocacy organizations. And we know the Court did not leave that door open because it rejected the notion "that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. But that absurd notion would be true if public advocacy counts as the kind of "core business activity" *Alliance* distinguished.

3. Nor can the decision below be sustained on the district court's alternative holding that the Georgia NAACP had standing based on the individual standing of its members. Doc. 613 at 10–14. The district court did not identify, and thus did not rely on, any affirmative showing of actual or imminent harm to a single Georgia NAACP member. Instead,

16

the court speculated that at least one member would be harmed by the birthdate requirement because there were 10,000 NAACP members in Georgia. *See id.* at 12–13. The court relied on this speculation despite the tiny number of ballots rejected for failure to comply with the birthdate requirement—at most a few hundred among hundreds of thousands of ballots in the six counties identified. *See id.* at 12 & n.11.

But *Alliance* makes clear that an individual cannot rely on maybes. And an organization relying on a member's standing bears the same burden: It "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." 602 U.S. at 393–94. And that is why *Alliance* rejected one of the doctors' claims of injury—the doctors had neither "identified any instances in the past" where the alleged harm had occurred nor "offered any persuasive evidence or reason to believe that the future will be different." *Id.* at 391.

Here too the Georgia NAACP did not identify a single "instance[] in the past" where a member had been harmed, nor did it offer evidence or reason to believe a member would be unable to supply a birthdate in the future—and could not cure the error in time to have the ballot counted. Associational standing cannot rest on mere speculation that an injury

17

might have occurred or might occur later. Less than one percent of Georgia voters were NAACP members, *see* Doc. 613 at 12 (approximately 10,000 members), compared to nearly 4 million Georgia voters.[6] And far less than one-tenth of one percent of ballots were rejected for failure to comply with the birthdate requirement in 2022. *See* Doc. 613 at 12 & n.11. The notion that there has been, or will be, any overlap between those two small groups is pure conjecture. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (finding "a statistical probability that some of those members are threatened with concrete injury" insufficient).

In short, like the plaintiff doctors in *Alliance*, Plaintiffs here have not established any concrete injury that is personal to them and causally connected to the birthdate requirement. This Court should not allow a legal pathway through which "virtually every citizen ha[s] standing to challenge virtually every government action that they do not like—an approach to standing that [the Supreme] Court has consistently rejected as flatly inconsistent with Article III." *Alliance*, 602 U.S. at 392.

---

[6] Elections Div., Ga. Sec'y of State, *Data Hub November 8, 2022 General Election,* https://sos.ga.gov/data-hub-november-8-2022-general-election (last visited Apr. 18, 2026).

## CONCLUSION

This Court's decisions in *LWVF* and *Schultz* confirm that State Defendants have appellate standing based on their strong interests in defending state election laws and ensuring their uniform application. As for Plaintiffs, *Alliance* demonstrates that they lack standing because they rely on an invalid theory of diversion of resources and on a speculative theory of associational standing. This Court should vacate the injunction and remand with instructions to dismiss the case for lack of standing.

Dated: April 20, 2026

Respectfully submitted,

Christopher M. Carr
  *Attorney General of Georgia*
John Henry Thompson
  *Solicitor General*
Elijah J. O'Kelley
  *Deputy Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3488
jhthompson@law.ga.gov

*/s/ Gene C. Schaerr*
Gene C. Schaerr
  *Special Assistant Attorney General*
Donald M. Falk
Brian J. Field
Miranda Cherkas Sherrill
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

Bryan P. Tyson
Bryan F. Jacoutot
Diane Festin LaRoss
CLARK HILL PLC
3630 Peachtree Rd. NE, Suite 700
Atlanta, Georgia 30326
(678) 370-4377
btyson@clarkhill.com

*Counsel for State
Defendants-Appellants*

20

## CERTIFICATE OF COMPLIANCE

The foregoing Supplemental Brief complies with the type-volume limitation set forth in the Court's Order of March 23, 2026 (ECF 221) because it contains 3,700 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Gene C. Schaerr*
Gene C. Schaerr