No. 23-13085

## In the United States Court of Appeals for the Eleventh Circuit

IN RE: GEORGIA SENATE BILL 202

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA**

Master Case No. 1:21-mi-55555-JPB

## PLAINTIFFS-APPELLEES-CROSS-APPELLANTS' RESPONSE TO ORDER FOR SUPPLEMENTAL BRIEFING

FENWICK & WEST LLP
One Front Street
San Francisco, CA 94111
(415) 875-2300

LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Ste 900
Washington, D.C. 20005
(202) 662-8600

THE LAW OFFICE OF BRYAN SELLS,
LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

LAW OFFICES OF GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

*Attorneys for Plaintiffs-Appellees-Cross-Appellants Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek Tribe*

*Additional Counsel Information on Front Pages*

*Attorneys for Plaintiffs-Appellees-Cross-Appellants Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek Tribe:*

Laurence F. Pulgram
FENWICK & WEST LLP
One Front Street
San Francisco, CA  94111
(415) 875-2300

Catherine McCord
FENWICK & WEST LLP
902 Broadway, Suite 14
New York, NY 10010
(212) 430-2690

Julie M. Houk
Jennifer Nwachukwu
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600

Vilia Hayes
Gregory Farrell
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

Bryan L. Sells
THE LAW OFFICE OF BRYAN SELLS, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

Gerald Weber
LAW OFFICES OF GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

*Attorneys for Plaintiffs-Appellees-Cross-Appellants Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, Georgia Muslim Voter Project, Latino Community Fund of Georgia, The Arc of the United States, and Women Watch Afrika:*

Sophia Lin Lakin
Davin M. Rosborough
Jonathan Topaz
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7836

Leah C. Aden
Alaizah Koorji
John S. Cusick
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Anuja Thatte
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street, NW
Washington, DC 20005
(202) 682-1300

Bradley E. Heard
Pichaya Poy Winichakul
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30031
(404) 521-6700

Cory Isaacson
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
(770) 415-5490

Debo P. Adegbile
WILMER CUTLER PICKERING HALE AND DORR LLP
250 Greenwich Street
New York, NY 10007
(212) 230-8800

Tania Faranasso
Laura E. Powell
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

George P. Varghese
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

**Table of Contents**

1.    *Schultz v. Alabama* Governs State Defendants' Lack of Appellate Standing. 1

2.    *FDA v. Alliance for Hippocratic Medicine* Is Consistent with Plaintiffs' Standing Arguments...................................................................................7

    A.    Plaintiffs' Standing Is Undisturbed by *Alliance for Hippocratic Medicine*. .................................................................................8

        i.    Plaintiffs established associational standing. ..............................9

        ii.    Plaintiffs have organizational standing under *Alliance for Hippocratic Medicine*.................................................................12

    B.    *Alliance for Hippocratic Medicine* Reconfirms Intervenors' Lack of Standing on Appeal ...............................................................19

# Table of Authorities

**CASES**

*A. Philip Randoph Institute v. Raffensberger*,
No. 1:24-cv-03412-SDG, 2026 WL 892852
(N.D. Ga. Mar. 31, 2026)................................................................11, 17, 18

*Arcia v. Fla. Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014) ................................................................10, 15

*Az. All. for Retired Americans v. Mayes*,
117 F.4th 1165 (9th Cir. 2024), *vacated en banc* 130 F.4th 1177
(9th Cir. 2025)................................................................................18, 19

*City of South Miami v. Governor*,
65 F.4th 631 (11th Cir. 2023)................................................................16, 17

*Common Cause/Georgia v. Billups*,
554 F.3d 1340 (11th Cir. 2009) ...........................................................15, 16, 17

*Durning v. Citibank, N.A.*,
950 F.3d 1419 (9th Cir. 1991) ................................................................19, 20

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024).......................................................................*passim*

*Finn v. Cobb County Board of Elections & Registration*,
111 F. 4th 1312 (11th Cir. 2024) ................................................................6

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...........................................................*passim*

*Florida Immigrant Coalition v. Attorney General*,
No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) ................................4

*Ga. Republican Party v. Secs. & Exchange Comm'n*,
888 F.3d 1198 (11th Cir. 2018) ................................................................10

*Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*,
344 F.3d 1288 (11th Cir. 2003) ................................................................15

*Georgia Assoc. of Latino Elected Officials v. Gwinnett County Board of
Registration and Elections*,
36 F. 4th 1100 (11th Cir. 2022)................................................................15

*Get Loud Ark. v. Thurston*,
748 F. Supp. 3d 630 (W.D. Ark. 2024) ................................................................18

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982).......................................................................*passim*

*Henderson v. Ford Motor Co.*,
   72 F.4th 1237 (11th Cir. 2023) ...............................................................1

*Jacobson v. Florida Secretary of State*,
   974 F.3d 1236 (11th Cir. 2020) ............................................................20

*La Union Del Pueblo Entero v. Abbott*,
   753 F. Supp. 3d 515 (W.D. Tex. 2024) .................................................19

*League of Women Voters of Fla., Inc. v. Lee*,
   No. 4:21-cv-00186, Dkt. 274 of 41, Dkt. 359 (N.D. Fla 2021).  .........3

*League of Women Voters v. Florida Secretary of State*,
   66 F.4th 905 (11th Cir. 2023) .........................................................2, 3, 4

*Lopez-Aguilar v. Marion Cnty. Sherriff's Dept.*,
   924 F.3d 375 (7th Cir. 2019) ..................................................................6

*Maine v. Taylor*,
   477 U.S. 131 (1986)..................................................................................6

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) ................................................................10

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) ...............................................................18

*Sandusky Cnty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) ................................................................10

*Schultz v. Alabama*,
   42 F.4th 1298 (11th Cir. 2022), *cert. denied sub nom. Hester v. Gentry*,
   143 S. Ct. 2610 (2023)..........................................................................1, 2

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................................10

*United States v. Seabrooks*,
   839 F.3d 1326 (11th Cir. 2016) ..............................................................2

*United States v. Vega-Castillo*,
   540 F.3d 1235 (11th Cir. 2008) ............................................................16

*Walker v. Mortham*,
   158 F.3d 1177 (11th Cir. 1998) ..............................................................2

Plaintiffs-Appellees-Cross-Appellants in Case Number 23-13085 (hereinafter "Plaintiffs"), respectfully submit this response to the Court's March 23, 2026 order.

1. ***Schultz v. Alabama* Governs State Defendants' Lack of Appellate Standing.**

Because *Schultz* governs, State Defendants-Appellants lack standing.

*Schultz* stands for the black-letter proposition that there is no standing to appeal an "injunction [which], by its very terms, does not require the [State] Defendants to do anything, and that . . . could not be enforceable against the [State] Defendants through contempt." *Schultz v. Alabama*, 42 F.4th 1298, 1317 (11th Cir. 2022), *cert. denied sub nom. Hester v. Gentry*, 143 S. Ct. 2610 (2023). There, this Court held that state judges had no appellate standing to challenge an injunction that bound only the county sheriff. *Id.* Although the enjoined bail practices stemmed from an order issued and implemented by the defendant judges, based on their claim of judicial immunity the judges had not been enjoined from doing anything. *Id.* at 1316. This Court rejected their argument that the injunction had "the 'practical effect' of enjoining them," because "[n]othing in the injunction prevent[ed] the Judicial Defendants from taking any action they wish[ed]." *Id.* at 1317.

Under *Schultz*, State Defendants lack appellate standing because they prevailed on and were not aggrieved by the district court's order preliminarily enjoining the County Defendants from applying the immaterial Birthdate Requirements of Senate Bill 202 ("SB 202"). *See Henderson v. Ford Motor Co.*, 72

1

F.4th 1237, 1245 (11th Cir. 2023) ("[T]he prevailing party does not have standing to appeal because it is assumed that the judgment has caused that party no injury.") (cleaned up).  State Defendants convinced the district court that it had no Article III jurisdiction over them because they are purportedly powerless to require uniform enforcement of ballot counting consistent with a federal court order.  In their words, "the processing of absentee ballots has nothing to do with State Defendants."  State Defs. Opp. to Mot. for Preliminary Injunction, ECF No. 582[1] (DE 70-6) at 16 of 30.  As in *Schultz*, the injunction, by its terms and at their urging, does not require State Defendants to do anything.

    *Schultz* was decided before *League of Women Voters v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023) ("*LWV*"), and thus governs under this Court's "earliest case" rule.  *See Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998) (when circuit authority is in conflict, a reviewing panel "should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel"); *accord United States v. Seabrooks*, 839 F.3d 1326, 1345 (11th Cir. 2016).  In any case, *LWV* does not require a different result.  In *LWV*, the district court enjoined an elections supervisor from enforcing a state law's polling-place

---

[1] "ECF" citations refer to the district court docket entries in Case No. 1:21-mi-55555. "DE" citations refer to docket entries on appeal in Case No. 23-13085.  Page numbers reflect the page number generated by the relevant court's electronic filing system, and where appropriate, are followed by the page number where the document is located in Plaintiffs' supplemental appendix ("SA") in [brackets].

2

non-solicitation provision and enjoined other defendants, including Florida's Secretary of State and Attorney General, from enforcing three other provisions. *Id.* at 920-921, 945. The supervisor did not appeal the judgment, but the Secretary and Attorney General did. *Id.* at 945. This Circuit found standing based on the specific statutory duties of the two state officials, including an "obligation to uniformly administer elections." *Id.* (citing Fla. Stat. § 97.012(1) and Fla. Stat. § 16.01(4)– (5)).

LWV should not apply here for two reasons.

*First*, State Defendants are not similarly situated to the Florida officials in *LWV* because they disclaimed below any role in ensuring the uniform execution of absentee-ballot counting rules. In *LWV*, after Florida officials successfully sought dismissal from the non-solicitation provision claim because they lacked control over the challenged provision, they then moved to intervene in the same claim to present the State's interest. *See League of Women Voters of Fla., Inc. v. Lee*, No. 4:21-cv-00186, Dkt. 274 at 24-25 of 41, Dkt. 359 (N.D. Fla 2021). In contrast, State Defendants here have only denied the district court's jurisdiction over them, arguing there was no Article III case or controversy because they have "nothing to do" with ballot counting and allegedly do not control the counties. ECF No. 582 (DE 70-6) at 16 of 30. They sought their own dismissal to *prevent* statewide relief, and then never intervened to subject themselves to the binding authority of the federal courts.

*Id.* The Eleventh Circuit in *LWV* therefore never confronted or addressed the point Plaintiffs present here:  that having insisted below that they have no role in the subject of the injunction at issue, and instead denying jurisdiction, State Defendants may not flip the deck to assert standing to challenge that order on appeal.  Nothing in *LWV* endorses State Defendants' "heads I win, tails you lose" approach to the federal courts' Article III jurisdiction.

On appeal, State Defendants have invoked an interest in uniformity as warranting jurisdiction.  DE 89 at 38-40 of 49.  But any lack of uniformity at this point is entirely of State Defendants' making.  *They* elected to prevent a statewide ruling on the Birthdate Requirement, convincing the district court that it could enjoin only the County Defendants.  *See* ECF No. 582 (DE 70-6) at 16-18 of 30; Order on Preliminary Injunction, ECF 613 (DE 70-5) at 16-17 of 38.  Having eschewed uniformity below to escape the federal court's power, nothing in *LWV* or elsewhere empowers State Defendants to reverse field and now claim a role and interest in an attempt to invoke Article III jurisdiction.

*Florida Immigrant Coalition v. Attorney General*, No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025), is instructive.  There, the Florida Attorney General challenged a district court order enjoining, *inter alia*, non-party state officials from enforcing newly created immigration crimes it held unconstitutional.  *Id.* at 5.  The Attorney General asserted that the officials should not have been enjoined as they

were "totally separate entities over which he has no meaningful control; they have different sources of authority in state law; and they serve separate functions under Florida's constitution." *Id.* This Court denied the stay:

> If [this assertion of lack of control] is true, then we doubt that the Attorney General has Article III standing to appeal the portion of the district court's order enjoining other state law-enforcement officials. ... The problem for the Attorney General is that, on his own theory, he is *not* aggrieved by the portion of the district court's order enjoining non-party law-enforcement officials. Instead, it is those (separate) law-enforcement officials who are aggrieved—and the Attorney General, having effectively disavowed any relationship to them, is (apparently) seeking to vindicate *their* rights and mitigate *their* injuries.

*Id.* The same applies here. Having convinced the trial court that they have no control over or ability to ensure uniformity among Georgia's counties,[2] State Defendants lack standing to appeal an injunction the Counties did not appeal.

*Second*, no authority vests in State Defendants some general standing to appear when and if they wish to defend against any challenge to state law. *See* Plaintiffs' Reply in Support of Motion to Dismiss Appeal (DE 97) at 35-40 of 46. Certain statutes and doctrines permit state actors to *intervene* in a challenge to state law, thereby submitting to jurisdiction and agreeing to be bound. But State Defendants have not moved to intervene.[3] Rather, having successfully excluded

---

[2] For the reasons advanced in Plaintiffs' cross-appeal, they disagree with the State Defendants' stingy view of their powers. But for the purpose of jurisdiction, State Defendants' assertion won the day in the district court.

[3] The right to intervene, not a right to reverse field after escaping Article III jurisdiction, was at stake in cases relied upon by State Defendants in prior briefing.

5

themselves from the adjudication below, they now assert a *de jure* right to participate on appeal. *See Finn v. Cobb County Board of Elections & Registration*, 111 F. 4th 1312, 1319 (11th Cir. 2024) (school district that intervened and won dismissal below lacked standing to appeal injunction against elections board absent intervention on appeal; Court declined to allow "a self-determined nonparty the same right to appeal it would have had if it had not bailed out of the case").

For these reasons, this Court is best guided by *Schultz*'s requirement that only parties actually subject to an injunction may appeal. State Defendants' appeal should be dismissed, as should Republican-Intervenors' effort to piggy-back on it. *See also* part 2.B*., infra.* If, however, this Court were to accept the State Defendants' position on standing, then it should grant Plaintiffs' Cross-Appeal to provide statewide injunctive relief. State Defendants cannot have it both ways: assuming they were entitled to appeal in the interest of uniformity then the Court should order them to provide uniformity—i.e., to refuse to certify county vote counts that wrongly exclude absentee ballots lacking birthdates, or simply to change their uniform, statewide form that requires birthdates in the first place. *See* DE 147 at 92-93 of 100; DE 173 at 42-46 of 60.

---

*E.g.*, *Lopez-Aguilar v. Marion Cnty. Sherriff's Dept.*, 924 F.3d 375 (7th Cir. 2019); *Maine v. Taylor*, 477 U.S. 131 (1986).

## 2. *FDA v. Alliance for Hippocratic Medicine* Is Consistent with Plaintiffs' Standing Arguments.

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*"), does not alter either of Plaintiffs' two bases for standing as found by the district court. Plaintiffs continue to have both associational standing and organizational standing. *AHM* further confirms that Republican-Intervenors lack standing to appeal.

In *AHM*, the plaintiff associations and individual doctors sued the FDA to rescind the drug mifepristone's approval and modifications to its conditions of use. *AHM*, 602 U.S. at 376-377. The plaintiffs had never prescribed or used mifepristone or confronted any complications from its use; they were parties with ideological objections who sought to challenge FDA's approvals. *Id.* at 372-374, 386. Ultimately, the Supreme Court rejected all their theories of standing as unsupported and speculative. As most relevant here, the Court rejected the plaintiff associations' assertion of organizational standing based on theories that FDA's approvals of mifepristone injured the associations themselves. *Id.* at 393-396 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

The *AHM* plaintiffs argued that organizational standing exists whenever an organization spends its resources in response to a defendant's actions. *Id.* While the Court did *not* hold that such responsive spending could never support standing, it explained that mere diversion of resources to oppose a disfavored public policy does

not give rise to organizational standing, lest "all the organizations in America . . . have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395.  It noted that the plaintiff organization in *Havens* faced actions that "directly affected and interfered with [the plaintiff's] core business activities." *Id.* (explaining that the *Havens* plaintiff "not only was an issue-advocacy organization, but also operated a housing counseling service" that was "perceptibly impaired" by illegal racial steering).  The *AHM* associations did not allege a similar type of concrete injury, and no evidence suggested that the FDA's actions concerning mifepristone "imposed any similar impediment to the medical associations' advocacy businesses." *Id.*  The associations simply disagreed with the FDA's decisions as "concerned bystanders" without a concrete stake in the dispute. *Id*. at 382.

### A. Plaintiffs' Standing Is Undisturbed by *Alliance for Hippocratic Medicine*.

The district court, after extensive analysis of the factual record, found that Plaintiffs had demonstrated both associational and organizational standing to bring their Birthdate Requirement claims. ECF 613 (DE 70-5) at 7-14 of 38.  Both findings are consistent with *AHM*.  First, *AHM* did not address associational standing and leaves undisturbed that finding. *See AHM*, 602 U.S. at 393-396.  Accordingly, this Court need not reach application of organizational standing here.

Second, if this Court does proceed to organizational standing, *AHM* would not change the outcome.  The resources Plaintiffs spent here were not, as in *AHM*, spent advocating against a policy position.  Rather, because the Birthdate Requirement was and is excluding ballots of unwary voters, it impairs Plaintiffs' core missions of enabling maximum eligible-voter participation.  This caused Plaintiffs to divert funds, time, and other resources from other activities—like veterans, housing, and leadership programs—to provide concrete voter training programs causally linked to redressing ongoing, not speculative, exclusion of otherwise valid ballots.  ECF 548-12 at ¶¶ 9, 10 [SA 458].  This Court's longstanding rule from *Browning* and similar cases still controls and establishes organizational standing, as well as associational standing, here.  *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165-1166 (11th Cir. 2008).

### i.    Plaintiffs established associational standing.

An organization has associational standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 1160 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).  "When the alleged harm is prospective," this Court has "not required that the organizational plaintiffs name names because every member faces a probability

9

of harm in the near and definite future." *Browning*, 522 F.3d at 1160. "To satisfy the requirements of associational standing, all that plaintiffs need to establish is that at least one member faces a realistic danger of having his or her application rejected." *Id.* at 1163; *accord Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014).[4]

The evidence established that the Birthdate Requirement had excluded at least hundreds, more likely thousands, of ballots in each election.[5] Gwinnett County, for

---

[4] Courts have required, in some circumstances, identification of a particular association member. *See, e.g.*, *Ga. Republican Party v. Secs. & Exchange Comm'n*, 888 F.3d 1198 (11th Cir. 2018). Here, at least one of Plaintiff GAO's constituents, Terri Thrower, had her ballot initially rejected for lack of a birthdate match. ECF 595-15 at ¶¶ 6-7 [SA 901]; 595-16 at ¶ 13 [SA 906].

Moreover, those cases that have required identification of members involved alleged injuries dependent on an affirmative, intentional act of the member, such as desired use of a particular national forest (*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)), or gift or receipt of campaign contributions (*Ga. Republican Party*, 888 F.3d 1198). In those cases, it is reasonable to require identification of members actually intending to act before embarking on adjudication. That principle does not apply here, where the injury stems from an unintended error in completing an absentee ballot application and the identity of a victim cannot be anticipated. *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (organizational plaintiffs need not identify specific members injured because "by their nature, mistakes" related to human errors with respect to voting "cannot be specifically identified in advance"; "it is inevitable, however, that there will be such mistakes" and those issues "are not speculative or remote; they are real and imminent"); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 396 and n.2 (6th Cir. 2020) (Moore, C.J., dissenting) (confirming *Sandusky* remains good law; "this court does not hold [associations] to an impossible standard); *see also Arcia*, 772 F.3d at 1342 (applying "realistic danger" standard to purge of voter rolls).

[5] *See* DE 147, at 47-50 of 100 and material cited; ECF 613, DE 70-5, at 10-14 of 38.

10

example, had 218 ballots rejected for lack of birthdate matches in the 2022 run-off election, alone.  ECF 595-1 at ¶¶ 12-15 [SA 560].  Based on the evidence, the district court rightly concluded that "[g]iven that the Georgia NAACP has around 10,000 members state-wide, it is highly unlikely 'that not a single member will have his or her [ballot] rejected due to a mismatch.'"  ECF 613 (DE 70-5) at 12-13 of 38 (quoting *Browning*, 522 F.3d at 1163).

This finding of likely injury stands in vivid contrast to the individual doctors who lacked standing in *AHM*.  There, the Court recognized that "doctors *would* have standing to challenge a government action that *likely* would cause them to provide medical treatment against their consciences."  *AHM* at 387 (emphases added).  The facts in *AHM*, however, foreclosed any such likelihood: "federal conscience laws definitively protect doctors from being required to perform abortions or to provide other treatment that violates their consciences."  *Id.* at 387, 389.  By contrast, at least hundreds, likely thousands, of voters (including likely NAACP members) had their ballots improperly excluded.  DE 147, at 47-50 of 100.[6]

---

[6] The court in *A. Philip Randoph Institute v. Raffensberger*, No. 1:24-cv-03412-SDG, 2026 WL 892852, at *10-12 (N.D. Ga. Mar. 31, 2026)("*APRI*") invoked *Browning*'s "realistic danger" standard, noting there was no allegation "that anyone has been *unlawfully* removed from Georgia's voter registration list since SB 189 came into effect, prevented from voting in a particular election, or forced to use an election board address to receive election-related mail."  *Id.* at *11.  Not so here.

11

The district court also determined that the other requirements for associational standing were met: the injury and the voting interests at stake are germane to Plaintiff Georgia NAACP's longstanding mission—to eliminate racial discrimination through democratic process, including through "work to promote voter registration, voter education, [and] election protection." ECF 613 at 8 of 38; ECF 548-12 at ¶ 3 [SA 456] (same). Finally, it found that "because Plaintiffs seek declaratory and injunctive relief, a decision favorable to Plaintiffs will accrue to the benefit of their members, and therefore, no need exists for individual joinder of any one member." ECF 613 at 13 of 38 (citing *Browning*, 522 F.3d at 1160). Accordingly, Plaintiffs have established associational standing. *Id.* at 15-16 of 38. That finding is sufficient to end the inquiry as to Plaintiffs' standing.

### ii. Plaintiffs have organizational standing under *Alliance for Hippocratic Medicine*.

If this Court chooses to address Plaintiffs' organizational standing in light of *AHM*,[7] organizational standing also exists. *AHM* limits organizational standing that purports to rest on mere expenditures in advocacy against a challenged policy. *AHM*, 602 U.S. at 394. "[U]nder Article III of the Constitution, [sincere legal, moral, ideological and policy objections] alone do not establish a justiciable case or

---

[7] The district court has not considered the import of *AHM* or a record compiled after *AHM* was decided. This Court may choose to afford that opportunity to the district court before taking up an unnecessary issue.

controversy in federal court." *Id.* at 396.  The *AHM* plaintiffs could not "spend [themselves] into standing simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394.  The *AHM* associations' allegations were insufficient because they relied on funds spent "oppos[ing] [the] FDA's actions," including petitioning the FDA, engaging in public advocacy and education, and conducting studies to support that advocacy. *Id.*

*AHM* reaffirmed *Havens*, while clarifying its scope.  In *Havens*, "[c]ritically, [plaintiff] HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *AHM*, 602 U.S. at 395.  HOME had standing to bring Fair Housing Act claims against apartment owner Havens because Havens' delivery of false information about apartment availability "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." *Id.* at 379.

So too here: State Defendants' implementation of SB 202 perceptibly impaired Plaintiffs in a core mission of providing voter counseling and support. Following SB 202's implementation, Plaintiff Georgia NAACP (as one example) launched an unprecedented, 22-city voter education campaign and added staff, attorneys, and a State Director to educate and prepare voters.  ECF 548-12 at ¶¶ 9, 10 [SA 458].  Addressing SB 202 in these ways triggered diversion of resources from the NAACP's other activities, including veterans and housing projects. *Id.*  All

13

of this disrupted the NAACP's core missions: eliminating racial discrimination and protecting the right to vote. *Id.* ¶¶ 2,6-10 [SA 455-459]. Addressing SB 202 required other Plaintiffs to make similar diversions. *See* ECF 613, DE 70-5, at 9-10 of 38 (Preliminary Injunction Order, recognizing Plaintiff GAMVP's diversion of resources from leadership development); ECF 548-11 – 548-15 [SA 441 – 479]. In the words of *Havens*, Plaintiffs here have shown "a concrete and demonstrable injury to the organization[s'] activities," not just a "setback to the organization's abstract social interest." *Havens*, 455 U.S. at 379.

In the framing of *AHM*, Plaintiffs here are "not only . . . issue-advocacy organization[s]." They are not relying on the boundless theory of "standing to challenge almost every . . . policy that they dislike" so long as they "spend a single dollar opposing those policies." *AHM*, 602 U.S. at 395. Instead, the Georgia NAACP and other Plaintiffs have standing because the challenged policies "directly affect[] and interfere[] with [] core business activities," (*id.*), *i.e.*, providing counseling and training to voters so they can effectively exercise the franchise.

Moreover, Plaintiffs' costs are not hypothetical; they are concrete steps *already* taken to ensure voters would learn and comply with the new restrictions. Nor is the imperative of new training hypothetical: the Birthdate Requirement has *already* wrongly excluded many votes. And these steps are not merely advocating against a policy Plaintiffs dislike; Plaintiffs have provided counseling services to

14

Georgia voters for generations, unlike the *AHM* plaintiffs formed to oppose abortion policies. In no respect are Plaintiffs here "spending their way" into standing.

The district court's finding of organizational standing is correct under this Circuit's longstanding jurisprudence. In *Browning*, this Court held the plaintiffs (including Florida NAACP) demonstrated an injury-in-fact because they diverted personnel and time away from traditional activities to educate volunteers and voters on compliance with the challenged regulation. *Browning*, 522 F.3d at 1165–66; *accord Georgia Assoc. of Latino Elected Officials v. Gwinnett County Board of Registration and Elections*, 36 F. 4th 1100 (11th Cir. 2022) (organizational standing found for challenge to English-only publication of voter information, based on diversion of resources to educate Spanish speakers); *Arcia*, 772 F.3d at 1141 (finding standing for plaintiffs who "will have to divert personnel and time to educating potential voters on compliance with the laws"); *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) (standing to challenge voter ID law based on diversion of resources to educate voters).

*AHM* did not overrule this controlling line of cases, either expressly or by implication. "[A]n intervening decision of the Supreme Court can overrule the decision of a prior panel of [the Eleventh Circuit]" only if "the Supreme Court decision [is] clearly on point." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1291-1292 (11th Cir. 2003) (because Supreme Court decision "did

15

not reject" prior Eleventh Circuit interpretation, that interpretation remained controlling circuit law); *see also United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008) ("For the Supreme Court to overrule a case, its decision must have 'actually overruled or conflicted with [this court's prior precedent].'") (citations omitted). *AHM* is not clearly on point here; by its terms, it addresses issue advocacy, not voter training that is the subject of this Court's many prior decisions.

This Court's precedent in *City of South Miami v. Governor*, 65 F.4th 631 (11th Cir. 2023), further shows the compatibility of the *Browning* line of cases with *AHM*. Those plaintiffs challenged SB 168, which required local law enforcement to cooperate with immigration authorities in ways alleged to require racially discriminatory profiling. *Id.* at 640. Consistent with the Supreme Court's later explanation in *AHM*, this Court stated that "an organization can no more spend its way into standing based on speculative fears of future harm than an individual can." *Id.* at 639 (citations omitted). This Court found no organizational standing because plaintiffs "failed to produce concrete evidence that S.B. 168 [was] an imminent threat to their members or the immigrant community"; indeed, "the record fail[ed] to establish that local officers profiled anyone based on S.B. 168." *Id.* at 640. But this Court also distinguished *Browning*, *Billups*, and similar cases, finding each to have shown more than mere diversion of funds, because in each, the organizations faced "concrete harm to an identifiable community, not speculative fears of future

16

harm." *Id.*; *see also id.* at 639 (citing and harmonizing *Browning,* where "new voting rules [were] 'forcing' the organizations to divert resources to educate these voters before the election"). The same rationale applies here, consistent with *AHM*. This is not a case of uncertain impact on Plaintiffs' programs and mission. The Birthdate Requirement has already disenfranchised many eligible voters, making the causation for diversion of resources concrete and imminent, as *City of South Miami* requires.

Plaintiffs respectfully submit that the recent district court decision in *APRI* incorrectly opines that this Court's precedents, *Browning*, *Billups*, and *GALEO*, cannot be reconciled with *AHM*. 2026 WL 892852, at *7-8. First, *APRI* hinged its analysis on a misconstruction of *AHM*'s use of the word "educate." *Id.* at *7, *8. It wrongly conflated education in public policy advocacy with education to train voters. *Id.* But *AHM*'s dismissal of "educational" spending as insufficient referred to "engag[ing] in public advocacy and public education," lest any advocate could spend its way into standing on any issue. *AHM*, 602 U.S. at 394. By contrast, the "education" at stake here is direct service work: training voters how to comply with new rules. Second, the *APRI* court's conflation led it to conclude that resources diverted to "educate" voters to *prevent* an error was insufficient to warrant standing, while resources directed to *cure* errors after the fact (when, in this case, it could be too late to count a vote) are sufficient. *Id.* at *7, n.25. Nothing in *AHM* supports that illogical result. Third, the *APRI* court's supposition that anticipatory training is

17

somehow "voluntary" ignores the reality that some organizations, as here, are required to implement training to address entirely new risks of disenfranchisement, as illustrated by the many voters actually disenfranchised by the new Birthdate Requirements here. DE 147 at 48-50 of 100. Training to attempt to mitigate such disenfranchisement was a mission-driven organizational necessity.

It also stretches *AHM* far beyond its terms to assume that no diversion of resources "in response to" governmental action can ever support standing. *APRI*, 2026 WL 892852, at *6-8. *AHM* does reject the position that standing arises *whenever* an organization diverts resources in response to a defendant's action— specifically, when that response is mere advocacy against the government action because of a policy disagreement. *AHM*, 602 U.S. at 394. But *AHM* does not hold that *all* injuries caused by responding to perceptible impairment of a plaintiff's delivery of services must be disregarded. The two things—perceptible impairment, and funds diverted to provide services in response to it—can exist together. When, as here, they do, *AHM* and *Havens* authorize standing.

Following *AHM*, other courts continue to apply *Havens* to find organizational standing, especially in the context of voter assistance. *E.g.*, *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394, 397 (4th Cir. 2024) (political parties had organizational standing to challenge a state's alleged noncompliance with the Help America Vote Act); *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630,

18

651-655 (W.D. Ark. 2024) (voter registration organization had organizational standing to challenge handwritten signature requirement); *La Union Del Pueblo Entero v. Abbott*, 753 F. Supp. 3d 515, 562 (W.D. Tex. 2024) ("As in *Havens*, the organizational injury here is a perceptible impairment of one of Plaintiffs' core services—voter assistance—resulting from violations of a federal law . . ..").  This Court should apply *Havens* in this case, too.  While one Ninth Circuit panel came out differently, *Az. All. for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), *vacated en banc* 130 F.4th 1177 (9th Cir. 2025), "a decision that has been vacated has no precedential authority whatsoever."  *Durning v. Citibank, N.A.*, 950 F.3d 1419, 1424 (9th Cir. 1991).

The Supreme Court's organizational standing analysis in *AHM* does not disturb Plaintiffs' standing in this case.  This Court's precedents applying organizational standing to voter training services remain good law, fully harmonizable with *AHM* and *Havens.*

### B. *Alliance for Hippocratic Medicine* Reconfirms Intervenors' Lack of Standing on Appeal

Republican-Intervenors' primary basis to assert standing to appeal is to rely on State Defendants' incorrect standing theory.  DE 90-1 at 29 of 32.  That basis falls with State Defendants' standing, for the reasons explained in Part 1, *supra*.  Intervenors' alternative theory for standing—that they may have to divert their own

resources to respond to invalidation of the Birthdate Requirement—fails due to lack of any concrete evidentiary support.

Intervenors argue that they "must adjust their campaign strategy and divert personnel and time to educating voters about . . . the district court's order." DE 90-1 at 30 of 32 (cleaned up, citations omitted). They broadly refer to "fundraising, budgetary allocations, election strategy, the content and targeting of election advertising, and voter education and turnout efforts" that may be affected. *Id.*

But Intervenors provide no facts establishing a causal relationship of any of this to the injunction at issue. The injunction requires election officials to count absentee ballots regardless of the presence or absence of a matching date-of-birth. This does not require educating the RNC's voters to do anything. Intervenors' declaration at most vaguely speculates about what it "would need" to do if the injunction is upheld. DE 90-2 ¶¶ 9–14. *AHM* discounts pure speculation about future conduct. And Intervenors also fail to identify any concrete services that resources have been diverted *from*. *See Jacobson v. Florida Secretary of State¸* 974 F.3d 1236, 1249 (11th Cir. 2020).

Accordingly, Intervenors cannot, by an unsupported diversion of resources theory, backfill State Defendants' lack of standing to appeal in the first instance.

Dated: April 20, 2026

Respectfully Submitted,

*/s/ Laurence F. Pulgram*

Laurence F. Pulgram
FENWICK & WEST LLP
One Front Street
San Francisco, CA  94111
(415) 875-2300

Catherine McCord
FENWICK & WEST LLP
902 Broadway, Floor 18
New York, NY 10010
(212) 430-2690

Vilia Hayes
Gregory Farrell
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
(212) 837-6000

Julie M. Houk
Jennifer Nwachukwu
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
(202) 662-8600

Bryan L. Sells
THE LAW OFFICE OF
BRYAN SELLS, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

Gerald Weber
LAW OFFICES OF
GERRY WEBER, LLC
PO Box 5391
Atlanta, GA 31107
(404) 522-0507

*Attorneys for Plaintiffs-Appellees-Cross-Appellants Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda, Inc., League of Women Voters of Georgia, Inc., GALEO Latino Community Development Fund, Inc., Common Cause, and the Lower Muskogee Creek Tribe*

21

Sophia Lin Lakin
Davin M. Rosborough
Jonathan Topaz
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7836

Leah C. Aden
Alaizah Koorji
John S. Cusick
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Anuja Thatte
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street, NW
Washington, DC 20005
(202) 682-1300

Cory Isaacson
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 570738
Atlanta, GA 30357
(770) 415-5490

Bradley E. Heard
Pichaya Poy Winichakul
SOUTHERN POVERTY LAW
CENTER
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30031
(404) 521-6700

Debo P. Adegbile
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, NY 10007
(212) 230-8800

Tania Faranasso
Laura E. Powell
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
(202) 663-6000

George P. Varghese
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Plaintiffs-Appellees-Cross-Appellants Sixth District of the African Methodist Episcopal Church, Delta Sigma Theta Sorority, Georgia ADAPT, Georgia Advocacy Office, Georgia Muslim Voter Project, Latino Community Fund of Georgia, The Arc of the United States, and Women Watch Afrika*

22

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the Court's March 23, 2026 Order, DE 221, because, excluding the parts of the brief exempted by Federal Rules of Appellate Procedure Rule 32(f) and Eleventh Circuit Rule 32-4, this brief contains 4,959 words.

2.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5) and 32(a)(6) and 11th Circuit Rule 27-1(a)(10) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

 */s/ Laurence F. Pulgram*
Laurence F. Pulgram

23

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ Laurence F. Pulgram
Laurence F. Pulgram